Marcia Robinson Lowry (*pro hac vice pending*)
mlowry@abetterchildhood.org
Julia K. Tebor (*pro hac vice pending*)
jtebor@abetterchildhood.org
Jonathan G. Borle (*pro hac vice pending*)
jborle@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456
Facsimile: (212) 692-0415

Danielle M. Ryman, AK Bar No. 9911071
dryman@perkinscoie.com
Elena M. Romerdahl, AK Bar No. 1509072
eromerdahl@perkinscoie.com
Michael O'Brien, AK Bar No. 0311084
mobrien@perkinscoie.com
**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Telephone: (907) 279-8561
Facsimile: (907) 276-3108

James J. Davis, Jr., AK Bar No. 9412140
jdavis@njp-law.com
Nicholas Feronti, AK Bar No. 2106069
nferonti@njp-law.com
Savannah V. Fletcher, AK Bar No. 1811127
sfletcher@njp-law.com
**NORTHERN JUSTICE PROJECT, LLC**
406 G Street, Suite 207
Anchorage, AK 99501
Telephone: (907) 308-3395
facsimile: (866) 813-8645

Mark Regan, AK Bar No. 8409081
mregan@dlcak.org
Patrick D. Stocks, AK Bar No. 1505032
pstocks@dlcak.org
**DISABILITY LAW CENTER OF ALASKA**
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Telephone: (907) 565-1002
Facsimile: (907) 565-1000

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Jeremiah M., Hannah M. and Hunter M. by their next friend Lisa Nicolai; Mary B. and Connor B. by their next friend Charles Ketcham; David V., George V., Lawrence V., Karen V., and Damien V. by their next friend Michelle Caldwell; and Rachel T., Eleanor T. and Gayle T. by their next friend Rebecca Fahnestock, individually and on behalf of all other similarly situated<br><br>                Plaintiffs,<br><br>    v.<br><br>ADAM CRUM, Director, Alaska Department of Health and Social Services, in his official capacity; KIM GUAY, Director, Office of Children's Services, in her official capacity; ALASKA DEPARTMENT OF HEALTH AND SOCIAL SERVICES; and ALASKA OFFICE OF CHILDREN'S SERVICES,<br><br>                Defendants. | Case No. 3:22-cv-_____<br><br>CLASS ACTION COMPLAINT<br><br>(42 U.S.C. § 1983; 42 U.S.C. § 670 *et seq.*; 25 U.S.C. § 1901 *et seq.;* 42 U.S.C. § 12131 *et seq.*, 29 U.S.C. § 701) |

## JURISDICTION AND VENUE

1.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court has jurisdiction over the federal claims under 28

Class Action Complaint       Page 2 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-

Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 2 of 90

U.S.C. §§ 1331 and 1343(a), as well as the under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. § 670 *et seq.*, the Indian Child Welfare Act of 1978 ("ICWA"), 25 U.S.C. §§ 1901 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act ("Rehabilitation Act") 29 U.S.C. § 701 *et seq.*

2.     This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

3.     Venue in this district is proper under 28 U.S.C. § 1391(b) and divisional venue is appropriate in the Anchorage Division under Local Civil Rule 3.2 because the claims arise in this district. Although the Department of Health and Social Services ("DHSS") and Office of Children's Services ("OCS") are responsible for children all over the state, they operate their administrative and managerial functions out of their headquarters located within the Anchorage Division.

## PRELIMINARY STATEMENT

4.     Alaska's child welfare system has long failed the children in foster care. This failure includes:

- caseworker caseloads "exceed[ing] what is safely manageable";

- high caseworker turnover causing "mission critical tasks [to] go unmet";

- child placement instability threatening to increase behavioral issues for children who have already faced a traumatic removal from their parents;

- not enough adequate foster care placements, leading to children being placed in overly restrictive facilities or homeless shelters, and in extreme cases, forcing them to sleep in OCS's offices;

- a failure to provide services or support to foster children or to their foster or biological parents; and

- a failure to provide timely case plans and adequate permanency planning.

5. Caseworkers are the key to ensuring child safety in state foster care custody. But caseworkers at OCS have caseloads that are much higher than professional standards and "more than 3x the national average." Meanwhile, OCS recently admitted that caseworker turnover is at an all-time high of 59.4%—up 11.8% from the previous year. In a vicious cycle, this turnover is both a cause and effect of high caseloads. This unstable and insufficient workforce creates a "long-lasting and pervasive negative impact" that "cannot be overstated." With such excessive caseloads piled atop an unstable workforce, OCS cannot protect children in foster care or meet the needs of the children and families that it serves.

6. Placement instability also plagues foster care. While research shows that stability is crucial for foster children—for their education, wellbeing, and health—OCS consistently shuffles children across placements. OCS acknowledges that it has historically fallen "well below the national standard" in placement stability. Foster care placements often disrupt because OCS does not provide enough support to the child or foster parents. When placements disrupt, OCS forces children into whatever placements remain available,

regardless of what they need. Some children are shipped out-of-state, thousands of miles from their homes and cultures. Others are placed in overly restrictive settings or in facilities that do not meet their basic needs—often because they have nowhere else to go.

7.     OCS also fails to perform long-term case planning to ensure reunification when possible or to ensure that children are positioned for adoptive placements where reunification is not an option. As a result, Alaska children languish in foster care for years, oftentimes until they age out of care. OCS does not prepare the foster children that age out for Independent Living and, instead, allows many to age out into homelessness or into criminal conduct.

8.     OCS has also failed to provide support—financial or otherwise—to unlicensed kinship foster homes. These unlicensed kinship homes, which provide a stable, family-like setting to hundreds of children in foster care—who are disproportionately Alaska Native—are struggling to remain afloat without additional help. Even so, OCS has completely disregarded its statutory duty to assist them in becoming licensed.

9.     Alaska Native children are significantly overrepresented in the Alaska foster care system. They are over seven times more likely to be in foster care than non-Native children. Of about 3,000 children presently in out-of-home care, roughly 2,000 are Alaska Native. Despite this, OCS has failed to place these Native youth in culturally appropriate foster homes and provide them with necessary services—violating language and intent of ICWA—often inflicting deep wounds of cultural loss in the process.

10.    These issues are not new. OCS has known about these issues for years but has not made any meaningful improvements to the foster care system. By failing to act, OCS has violated its statutory and constitutional obligations. And despite the dysfunction of the state's child welfare system, state officials continue to operate it without regard to reasonable professional standards and have exhibited deliberate indifference to the ongoing harm to the children who depend on the state for protection and care.

11.    Plaintiffs therefore seek declaratory and injunctive relief against Defendants to end the ongoing harm, and risk of harm, to which thousands of children in the state are subjected. This lawsuit seeks to have Alaska's child welfare system brought into compliance with applicable federal law and constitutional standards.

## PARTIES

### I.    NAMED PLAINTIFFS

#### A.    Jeremiah M., Hannah M., and Hunter M.[1]

12.    Jeremiah M. (age 10), and twins Hannah M. and Hunter M. (ages 6), have been in OCS custody since around May 2021, live in a licensed non-kinship foster home in Wasilla, Alaska. They are Alaska Natives and are all members of the General Class, Alaska Native Subclass, Kinship Subclass, and ADA Subclass.

13.    Jeremiah M., Hunter M., and Hannah M. appear through their next friend, Lisa Nicolai. Ms. Nicolai is an ICWA representative. In that role, she acts as an intermediary between tribal families and state and federal governments, including with

---

[1] The names of the children have been changed to pseudonyms to allow the children to remain anonymous.

Class Action Complaint                    Page 6 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-

respect to child welfare cases. Ms. Nicolai has known the three children since they were born, is familiar with both the family's background and the children's current needs, and is truly dedicated to their best interests.

**B.    Mary B. and Connor B.**

14.    Connor (age 1) has been in OCS custody since September 2020, and Mary (age 3) has been in OCS custody since March 2019. Mary lives in an unlicensed kinship home. Connor lives with a licensed non-kinship foster parent in Anchorage. Mary and Connor are Alaska Natives and are members of the General Class and Alaska Native Subclass. Connor is a member of the ADA Subclass and Mary is a member of the Kinship Subclass.

15.    Mary and Connor appear through their next friend, Charles Ketcham. Mr. Ketcham is a tribal administrator and has known Mary since she was born. He is also familiar with Connor and his history and is familiar with the family's background and the children's needs. He is dedicated to the children's best interests.

**C.    David V., George V., Karen V., Lawrence V., and Damien V.**

16.    David V. (age 16), George V. (age 15), Karen V. (age 13), Lawrence V. (age 12), and Damien V. (age 11) are adopted siblings. The children have been in OCS custody since April 2021 and are currently living separately in non-kinship foster homes.

17.    The children are all Alaska Natives and are members of the General Class, the ADA Subclass, and the Alaska Native Subclass.

18.     These children appear through their next friend, Michelle Caldwell, who is the principal at their former school. All five of the children attended the school for almost two years, starting in 2019. Given that the school is small, Ms. Caldwell knew all five children well. She has continued to receive updates on the children since they left her school and is dedicated to their best interests.

**D.     Rachel T., Eleanor T., and Gayle T.**

19.     Rachel T. (age 15) and Eleanor T. (age 14) have been in OCS custody since August 2020 and live in a licensed kinship foster home. They are members of the General Class and ADA Subclass. Gayle T. (age 16) has been in OCS custody since August 2020 and lives in a non-kinship foster home. She is a member of the General Class and ADA Subclass.

20.     Rachel T., Eleanor T., and Gayle T. appear through their next friend, Rebecca Fahnestock, who works at Covenant House Alaska as a youth engagement specialist. Ms. Fahnestock is familiar with the children and continues to receive periodic updates on them. She is dedicated to their best interests.

## II.     DEFENDANTS

21.     Defendant DHSS is a state agency created and authorized under Alaska law.

22.     Defendant OCS is a subdivision of DHSS, which is responsible for the safety and welfare of children in foster care in Alaska.

23.     Defendant Adam Crum is the director of DHSS. Plaintiffs sue him solely in his official capacity. DHSS is the principal human services agency of the government of

Class Action Complaint                    Page 8 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 8 of 90

the state of Alaska and is responsible for OCS. Defendant Crum is responsible for DHSS's policies, practices, and operations, and for ensuring that DHSS complies with all applicable federal and state laws.

24.     Defendant Kim Guay is the director of OCS. Plaintiffs sue her solely in her official capacity. She oversees and is responsible for implementing programs for children including those providing for their safety, wellbeing, and permanency, and is responsible for OCS's policies, practices, and operations, and for ensuring that OCS's foster care program complies with all applicable federal and state laws.

## CLASS ACTION ALLEGATIONS

25.     This action is proper as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

26.     This action consists of one major class and three subclasses:

    a)    All children for whom OCS has or will have legal responsibility and who are or will be in the legal and physical custody of OCS (the "General Class");

    b)    Alaska Native children who are or will be entitled to federal ICWA protection (the "Alaska Native Subclass");

    c)    Children who currently reside or will reside in a kinship foster home—the home of a family member—who meet the criteria to receive foster care maintenance payments under 42 U.S.C. § 672 (the "Kinship Subclass"); and

       d)      Children who are or will be in foster care and experience physical, cognitive, and psychiatric disabilities (the "ADA Subclass").

27.    Each class is numerous enough to make joinder impracticable:

       a)      The General Class consists of at least 3,000 children who currently are in or will enter OCS's custody;

       b)      The Alaska Native Subclass consists of at least 2,000 children and youth who are currently in or will enter OCS's custody;

       c)      The Kinship Subclass consists of foster children placed in relative homes or who will enter relative homes who meet the criteria to receive foster care maintenance payments but for whom payment is not being made on their behalf;

       d)      The ADA Subclass consists of thousands of children with disabilities who are already in or will enter OCS's custody.

28.    The questions of fact and law that Plaintiffs raise are common to and typical of those of each putative member of the General Class and subclasses whom they seek to represent.

29.    The named Plaintiffs rely on Defendants for foster care services in Alaska and wholly depend on them for the provision of those services.

30.    Defendants' long-standing and well-documented actions and inactions substantially depart from accepted professional judgment and constitute deliberate

Class Action Complaint        Page 10 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-

Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 10 of 90

indifference to the harm, risk of harm, and violations of Plaintiffs' legal rights as well as those of the General Class and subclasses they represent.

31.   Common questions of fact to the General Class and subclasses include:

a)   whether Defendants fail to protect the General Class from physical and psychological harm, and risk of harm;

b)   whether Defendants operate a system that promptly and adequately assesses the individual needs of members of the General Class and subclasses;

c)   whether Defendants operate a system that adequately plans placements, treatment, and supports appropriate to the individual needs of the members of the General Class and subclasses;

d)   whether Defendants operate a system that provides an adequate number and diversity of placements to permit the members of the General Class and subclasses to reside in the least restrictive, and most family-like environment;

e)   whether Defendants provide adequate caseworker resources to ensure that members of the General Class and subclasses routinely meet with caseworkers face-to-face, receive individualized case plans, and receive all necessary services to enable the General Class and subclasses to avoid harm and the risk of harm;

f)     whether Defendants take necessary steps to initiate termination of parental rights proceedings for all children who have been in foster care for 15 out of the last 22 months, unless there is a compelling reason why that would not be in the children's best interests as documented in the record or the child is eligible for a statutory exception;

g)     whether Defendants place Alaska Native Subclass members "in the least restrictive setting which most approximates a family" and "within reasonable proximity to his or her home";

h)     whether Defendants place Alaska Native Subclass members, by order of preference, in: (i) a member of the child's extended family; (ii) a foster home licensed, approved, or specified by the child's tribe; (iii) a foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs;

i)     whether Defendants fail to provide members of the Kinship Subclass with appropriate and adequately supported placements by not paying their relatives foster care maintenance payments and/or by failing to assist their caregivers in becoming licensed where appropriate;

Class Action Complaint                    Page 12 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 12 of 90

j)      whether Defendants deprive members of the ADA Subclass necessary and appropriate services to ensure that they have access to home- and community-based placements; and

k)      whether Defendants deprive members of the ADA Subclass home- and community-based placements in the least restrictive integrated setting appropriate to their needs.

32.     Common questions of law to the General Class and subclasses include:

a)      whether Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including exposing children to further neglect, abuse, and trauma by exposing them to unnecessary and frequent moves, harmful and inadequate placements, lack of necessary services and lack of permanency planning;

b)      whether Defendants' systemic failures violate Plaintiffs' rights under AACWA, as amended by the Adoption and Safe Families Act of 1997, including their right to placement in the least restrictive, most family-like setting, closest to their home community that conforms to nationally recommended professional standards, placement with relatives whenever possible, access to necessary services to protect their safety and health, and comprehensive written case plans along with a case review system ensuring those case plans are in place and

are updated and their right to permanency by seeking the termination of parental rights after they have been in custody for 15 out of the last 22 months, subject to certain exceptions;

c)     whether Defendants' systemic failures violate the Alaska Native Subclass's rights under ICWA, including, specifically, the right to ICWA-compliant foster homes, and access to extended family;

d)     whether Defendants' failure to pay unlicensed kinship foster parents of children eligible for foster care maintenance payments or assist in licensing those kinship families violates the Kinship Subclass's rights pursuant to 42 U.S.C. § 672; and

e)     whether Defendants policies and procedures violate the ADA Subclass's rights under: (1) Title II of the ADA, 42 U.S.C. § 12131 *et seq.*; (2) the Rehabilitation Act, 29 U.S.C. § 794; and (3) all regulations issued to implement the above laws.

33.     The violations of law and resulting harms that Plaintiffs allege are typical of the legal violations and harms or risk of harm that all children in the General Class and subclasses experience.

34.     The named Plaintiffs will fairly protect the interests of the General Class and subclasses that they seek to represent.

Class Action Complaint                    Page 14 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS    Document 1    Filed 05/20/22    Page 14 of 90

35.     Defendants have acted or failed to act on grounds generally applicable to all members of the General Class or, where appropriate, subclasses, requiring class-wide declaratory and injunctive relief.

36.     Counsel for Plaintiffs know of no conflict among the class members.

37.     These attorneys, who are competent and experienced in class action litigation, child welfare litigation, and complex civil litigation, represent the named Plaintiffs:

a)      Attorneys from A Better Childhood, Inc., a nonprofit legal advocacy organization, including the Executive Director, Marcia Robinson Lowry, who has extensive experience and expertise in federal child welfare class actions throughout the United States, and staff attorneys Julia Tebor and Jonathan Borle, who are experienced with federal court litigation and class action litigation.

b)      Attorneys James Davis, Nick Feronti, and Savannah Fletcher from Northern Justice Project, a preeminent private civil-rights law firm that has successfully litigated landmark civil rights and consumer protection cases, including many class action cases, on behalf of aggrieved Alaskans.

c)      Attorneys from Perkins Coie, a full-service international law firm, including Danielle Ryman, Michael O'Brien, and Elena Romerdahl.

d)      Attorneys Mark Regan and Patrick Stocks from Disability Law Center of Alaska, which is Alaska's state-designated Protection and Advocacy agency that has litigated in Alaska state and federal courts since the late 1970s.

## FACTS

## III.   THE PLAINTIFF CHILDREN

38.    The following named Plaintiffs' cases illustrate how OCS violates its legal obligations and exposes children in foster care to a substantial risk of harm while in its custody.

### A.   Jeremiah M., Hannah M., and Hunter M.

39.    Jeremiah M. and twins Hannah M. and Hunter M. are Native Alaska children who come from a small village about a four-hour drive from Wasilla. All three children have disabilities and special needs, of which OCS is aware.

40.    Jeremiah M. has autism, is nonverbal, and requires special education, including speech therapy, physical therapy, and occupational therapy. He struggles in classroom settings and can be aggressive toward teachers and school staff. Overall, his disabilities are severe enough for him to require a devoted professional with him while he is in school.

41.    Hannah M. and Hunter M. both have Early Childhood Developmental Delay and require special education classes and services, including physical therapy, occupational therapy, and speech therapy. They also have delayed language and motor skills.

Class Action Complaint         Page 16 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-

Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 16 of 90

42.     Jeremiah M., Hunter M., and Hannah M. first came to OCS's attention around May 2021. While no longer living with the children, their father visited the family one night while intoxicated. The police came to the home and called OCS and the children's mother's, Ms. N.'s, landlord later evicted her because of the incident. Afterward, OCS did not help Ms. N. find housing or obtain services to enable her to retain custody of the children.

43.     In May 2021, OCS took the children into foster care and initially placed the children with their maternal grandmother, Ms. S., who was already taking care of two other grandchildren, ages 16 and 18 (cousins). She also lives in a small village, which is around a four-hour drive from Wasilla.

44.     As the primary caregiver for five total children, including three children formally in foster care, Ms. S. understandably required special services and foster care payments.

45.     She repeatedly reached out to OCS for healthcare services, educational services, and daycare services. And even though the children satisfied all applicable eligibility requirements to receive foster care maintenance payments, OCS did not license her as a foster parent who could receive foster care maintenance payments on the children's behalf. Indeed, OCS never provided Ms. S. with any support—financial or otherwise—to help take care of the children. Instead, OCS told Ms. S. that she would receive backpay after she was licensed. In the meantime, they told her to apply for food stamps.

46.     On one occasion, her caseworker explicitly told her to call OCS if she ever needed help. She later called her caseworker several times and left multiple messages, but no one from OCS ever called her back.

47.     Others also reached out to OCS on Ms. S.'s behalf, including an ICWA coordinator and a representative from the Copper River Native Association, a tribal health organization. These requests to OCS also went unanswered as did requests for financial assistance.

48.     The lack of assistance creates a tremendous risk of harm for the children who have significant needs. Jeremiah M. requires a nonverbal diagnosis/assessment and specific treatment for autism. OCS told Ms. S. that for Jeremiah M. to receive the services that he requires, she would need to drive four hours to Anchorage multiple times a week.

49.     Ms. S. also repeatedly sought to become a licensed foster parent so that she could have additional financial support to address the children's food and clothing needs. OCS never helped in any way—even though OCS is required to assist and encourage kinship foster families. OCS never even sent someone to visit her home, which is necessary to move her licensing application forward. As a result, Ms. S. was forced to support the children largely on her own, which became increasingly difficult.

50.     In December 2021, OCS notified Ms. S. that the agency was removing the children from her care and sending them to a licensed foster home in Wasilla, a three-to-four-hour drive away from her. Ostensibly, the removal was related to an allegation of

"physical abuse of one of the children in the home," though OCS never provided any other details in their removal notice.

51. For a while, Ms. S. continued seeking to become a licensed foster parent in hopes the children would return to her. But OCS informed her that she was no longer eligible for licensing and that she needed to voluntarily withdraw her application.

52. The children's removal from their grandmother and placement with strangers adds to the trauma of being removed from their mother. The distance from the family's home to Wasilla makes continued visitation with family and other tribal members nearly impossible. Furthermore, this placement is with a non-Native foster family.

53. Perhaps most concerning, OCS placed the children in a home where the foster family's child has a record of sexual abuse. While OCS has asked that the sex offender leave the foster home, he still comes to visit. Indeed, the children's tribe has asked that the children be immediately moved to another foster home in a village near Ms. S. At the time of the filing of this complaint, OCS has failed to move the children or ensure their safety.

54. The case plan goal for the children remains reunification. But OCS has failed to make reasonable efforts toward reunification. Indeed, the placement with foster parents in Wasilla not only threatens to sever the children's ties from their tribal roots but is also far from the villages of the children's families, making it difficult for any visitation and maintenance of a relationship.

55.     OCS has also repeatedly failed to include the mother and her family in case planning. Indeed, neither Ms. S. nor her daughter, Ms. N., have seen copies of the children's case plans. The children's permanency plan remains unclear to them and does not appear to be moving toward implementation.

**B.     Mary B. and Connor B.**

56.     Connor B. has been in OCS custody since September 2020 and Mary has been in OCS custody since March 2019. Mary B. (who is three years old) is living with her maternal uncle in a small village that is about four and a half hours from Anchorage. Connor B. is living with a non-kinship non-ICWA foster parent in Anchorage. The children also have three siblings ages nine, fourteen, and eighteen. The fourteen-year-old is also currently living with the maternal uncle.

**i.     Mary B.**

57.     Mary B. and her three older half siblings came to OCS's attention in February 2019 after OCS received reports of poor conditions, a lack of food, and drug use. During this time, Mary B. was living with her mother, Ms. B., and several other siblings, but they did not have stable housing.

58.     OCS took Mary B. into custody in March 2019 and initially placed Mary B., along with one of her sisters, in a foster home in Glennallen with a non-Native family. OCS made insufficient efforts to place Mary B. with an Alaska Native family and to keep all siblings together. Her other siblings were placed elsewhere. Unsurprisingly, Mary B. struggled to adjust and was frequently upset. When that would happen, the foster parents would leave her alone.

59.     Mary B.'s grandmother, Ms. Y., formally asked OCS for custody in and around January of 2020. Although Ms. Y had a stable home and a good income, OCS refused to place Mary B. with her because Ms. Y. had a driving while intoxicated conviction from a decade earlier. Ms. Y. sued OCS, and the agency settled. OCS finally placed Mary B. and her 14-year-old half-sibling with her grandmother in September 2021.

60.     From the start, OCS provided Ms. Y. with no support to care for the children, despite her repeatedly asking for help—for Mary B., OCS did not even offer to send Emergency Relief Support payments, which provide time-limited financial support to relatives caring for children in custody. This forced her to pay all the children's expenses out-of-pocket.

61.     Ms. Y. did not receive payments even though Mary B. met all the federal eligibility requirements to receive foster care maintenance payments.

62.     To obtain more support, Ms. Y. repeatedly sought a foster care license, filling out three separate licensing applications. OCS never helped her with any of those applications. And when she asked OCS to help her obtain a needed variance, the agency provided her with incorrect information and directed her to incorrect websites.

63.     The total lack of financial support along with other supports put an immense stress on Ms. Y., eventually forcing her to give up Mary B. In March 2022, Ms. Y. moved in with her own mother in Anchorage and Ms. B.'s brother moved into Ms. Y.'s home to live with Mary B. and her half-sibling.

64.     OCS has not provided the uncle with any form of financial support, which is crucial to facilitate a stable placement.

65.     Mary B.'s long-term future is uncertain. While her case plan goal remains reunification, and the case plan required Ms. B. to complete residential substance abuse treatment, OCS has never helped Ms. B. obtain any of these services or related outpatient treatment. When Ms. B. asked OCS for help in obtaining these services, they responded by sending her a referral letter and bus fare. Other than that, she has had to find treatment completely on her own.

66.     Ms. B., who has struggled with periodic homelessness, also needs to obtain permanent housing to be able to reunify with her children. And while she has repeatedly asked OCS for help, the agency has completely ignored her.

    ii.    **Connor B.**

67.     Connor B. was born prematurely in June 2020 and was immediately placed in a Neonatal Intensive Care Unit ("NICU"), where he stayed for three full months. At the time that Connor finally left the NICU, Ms. B. was incarcerated for violating her parole.

68.     Even so, Ms. B. provided OCS with contact information for several relatives and OCS preliminarily vetted the biological father as a potential placement. However, OCS waited several months to even visit the father's home. Instead, OCS placed Connor B. with a non-Native family in Anchorage, hundreds of miles from his nearest relatives.

69.     Ms. Y. sought Connor's custody since shortly after his birth. OCS had told her for several months that they would place Connor B. with her no later than October

2021, but kept delaying the transfer. As of this filing, Connor B. is still living in the licensed non-Native foster home. OCS has also not indicated whether they will place Connor B. with his uncle, who is willing to take him. Because Connor B.'s foster home is far from the village where his family lives, it has been difficult to maintain familial relationships. Making matters worse, OCS has done nothing to facilitate family visitations and Ms. B. has not seen Connor B. for months.

70.     Furthermore, though the case plan goal for Mary B. and Connor B. is reunification and guardianship with Ms. B.'s family, respectively, OCS has repeatedly excluded Ms. B and Ms. Y. from Team Decision Making meetings. In one instance, a representative from the village attending one such meeting of which Ms. B. and Ms. Y had not received notice texted Ms. Y. mere minutes before its start to say that she should join. Ms. B. happened to be on the phone with Ms. Y. and also joined the call.

71.     Permanency is nowhere in sight for either Mary B. or Connor B. OCS has made no progress on permanent placement plans for either child. Both of them remain subject to shifting custodial situations and are at risk of being moved again.

**C.     David V., George V., Lawrence V., Karen V., and Damien V.**

72.     OCS initially placed David V., George V., Lawrence V., Karen V., and Damien V. in foster care with Ms. V. after they were removed from their biological parents. Damien V. and David V. share the same biological mother and Lawrence V. and Karen V. share the same biological mother and father. All five children had been exposed to

substances and/or alcohol prenatally. After fostering the children, the foster mother adopted each of them.

73. In April 2021, OCS removed David V., George V., Lawrence V., Karen V., and Damien V. from their mother's home following reports of medical abuse by Ms. V. After OCS removed the children from their mother, OCS arranged for the mother to be interviewed by Dr. Barbara Knox, a pediatrician who resigned in January 2022 following press reports that she had wrongly diagnosed child abuse several times. OCS did not interview the children before removing them from the home.

74. While the children are all Alaska Natives, OCS never placed any of the children in an ICWA-compliant foster home. OCS has changed the children's placements a total of 40 times, but has held only three Team Decision Making conferences and has refused to hold a Team Decision Making meeting for each move. When the mother asked an OCS caseworker about having more Team Decision Making meetings, his response was that while TDM meetings were required:

> [T]his case has seen 38 placement changes in the approximate 45 weeks this case has been open, the majority of which have been emergency placement changes. I am unsure what you expect to achieve by holding a TDM each time one of the children has changed a placement, particularly with how frequent placement changes occur in this case. To date, the Department has held three TDM meetings to discuss placements. The Department is aware of your preference for the children to be placed in a home together. … The Department has endeavored to place the children together and in the least restrictive settings; however, this has not been possible. … [Another meeting] is a waste of time and resources.

75. OCS only permitted the children to see their mother all together on Zoom for one hour a week (or 10–15 minutes per child) and until recently the adoptive mother and

the children had weekly visits in-person for 1.5 hours. This was the only time that the children regularly saw their siblings. But in April 2022, OCS cancelled any further in-person visits, stating that they would only proceed with therapeutic visitation, which requires supervision of the mother. As OCS is and was aware, there are long waiting lists for therapeutic visitation providers, and it may be many months until such therapeutic visitation begins. Until then, the children will not be able to visit their mother or siblings in-person even though the case plan goal remains reunification.

76.     OCS's failed permanency planning and lack of appropriate homes for the children has led to the children each being moved many times in the short span that they have been in OCS custody, for a total of 40 moves in a time span of slightly over a year. This has led to a deterioration of the children's behavior and mental state.

      **i.     David V.**

77.     David V. (16) has been diagnosed with Fetal Alcohol Syndrome ("FASD"), autism, ADHD, depression, bi-polar disorder, and anxiety. Before entering OCS custody, David V. took various medications, including anti-depression medication, anti-psychotic medication, anti-anxiety medication and ADHD medication. During that time, he also received speech therapy, occupational therapy, counseling, and Applied Behavioral Analysis therapy.

78.     Since entering OCS custody in April 2021, OCS has moved David V. seven times and, even though he is an Alaska Native, has not placed him in a single ICWA-compliant home.

79.     OCS has not appropriately supported, supervised, or educated these foster homes and, thus, these foster homes have been unable to support David V.'s emotional and behavioral needs. For example, in one foster group home in Anchorage, David V. and the other children in the foster group home were often left unsupervised and another child in the home physically assaulted David V. In the same home, the foster parent yelled and swore at David V., calling him a "little shit," and shoving him. While OCS found out about this abuse and investigated it, they did not transfer David V. out of the home.

80.     In each of David V.'s placements, OCS told the foster parents nothing about David V.'s medical history or his diagnoses. Thus, these foster parents and David. V. were both set up for failure with the parents not receiving any information as to how to support David V.'s needs. These placements soon disrupted with David V. needing to be transferred to another placement and the foster parents asking for the change.

81.     David V. has not been receiving any services during the time that he has been in OCS custody and has been removed from all medications.

    ii.     **George V.**

82.     George V. (15) has been previously diagnosed with FASD, autism, ADHD, Pica (an eating disorder that involves eating non-food items), static encephalopathy (often used to describe brain disorders in children, such as cerebral palsy and intellectual disability), and Disruptive Behavior Disorder. George V.'s toxicology screens as a newborn were positive for cocaine and marijuana. George V. previously received physical therapy, speech therapy, occupational therapy, and Applied Behavioral Analysis therapy.

George V. had also been on the Medicaid waiver program since he was two years old and received in-home support, respite, and day habilitation.

83.     Despite George V.'s extensive needs, OCS has failed to do any substantive permanency planning or to support George V. or his foster parents. As a result, since entering OCS custody around April 2021, OCS has moved George V. 11 times, including to two institutions and nine non-kinship non-ICWA foster homes.

84.     Along with the substantial number of placement changes, OCS has placed George V. in several inappropriate placements because of a lack of appropriate foster homes. For example, at one point, OCS removed George V. from an emergency foster placement and placed him at Covenant House, which provides services and shelter to homeless and runaway youth. This was, according to OCS notes, "due to not finding placement for him and him possibly having to spend the night at OCS building." An email from OCS noted that it was not optimal that George V. be placed with the general population, stating that "if [Covenant House] takes him just as an overnight, they will be able to have more room to keep him separate from the general population but if they do an intake this will not happen."

85.     OCS also failed to properly notify the foster parents at various placements of George V.'s medical and behavioral history, leading placements to frequently disrupt and to George V. running away from at least three foster homes. One time, George V. walked over twenty miles from the foster home and was found on a highway by his Applied Behavioral Analysis ("ABA") therapist who happened to be driving by. The ABA therapist

took George V. to her home in Wasilla and tried to call OCS to alert them that George V. had run away. This incident happened on a Friday and OCS did not return the ABA therapist's call until Monday—after the weekend. At no point did OCS contact the Anchorage Police Department or George V.'s adoptive mother to alert them that George V. had run away.

86.     The ABA therapist agreed to take all the children, but OCS delayed its licensing investigation for over a year after losing the ABA therapist's paperwork and fingerprints. OCS has since rejected the ABA therapist as a foster parent for the children due to her relationship with Ms. V.

87.     George V. continued to run away due to a lack of OCS support and supervision. On another occasion, George V. ran away three times in one weekend from a separate foster home, which resulted in him spending time in inadequate and inappropriate facilities. After this incident, OCS brought George V. to Alaska Native Medical Center and then to North Star Behavioral Health System, a behavioral health facility in Anchorage that provides psychiatric care. George V. stayed at North Star for over 30 days based on a lack of another placement. This inappropriate placement harmed or created a risk of harm to George V.'s emotional state.

88.     At the time of the filing of this complaint, George V. was living in a non-kinship non-ICWA licensed foster home in Palmer.

89.     George V. has not been placed on any medication since he has been in OCS custody and has not been receiving adequate and necessary services.

### iii.    Karen V.

90.     Karen V. (13) shows signs of Fetal Alcohol Syndrome, such as certain facial features typical of FASD. Karen V. also has a spinal malformation and back pain and often has stomachaches and headaches. Before entering OCS custody, Karen V. received physical therapy and occupational therapy as well as individual counseling.

91.     Since entering OCS custody in April 2021, OCS has moved Karen V. six times, including into one kinship foster home and four different non-kinship placements. While OCS placed Karen V. with a close family friend who Karen V. called "Grandma" in Eagle River, OCS later moved Karen from this placement, stating that they did not want to place the children with anyone who knew the adoptive mother. Since then, OCS has changed her placement multiple times to non-kinship and non-ICWA homes further increasing the trauma experienced following her removal from the home. Karen V. remains in a non-kinship, non-ICWA foster home.

### iv.    Lawrence V.

92.     Lawrence V. (12) was previously diagnosed with FASD, autism, ADHD, and Trichotillomania (an anxiety disorder involving the urge to pull out one's hair), Disruptive Behavior Disorder, Functional Abdominal Pain Syndrome, and Nocturnal Enuresis with daytime accidents. Lawrence V. has received physical therapy, speech therapy, occupational therapy, ABA therapy and behavioral health therapy.

93.     Since entering OCS custody in April 2021, OCS has moved Lawrence V. nine times, including to eight different non-kinship foster homes.

94.     Lawrence V.'s placements have continuously disrupted because OCS has failed to provide the foster parents with appropriate information and training on Lawrence V.'s medical and behavioral history.

95.     Lawrence V. is now living in a non-kinship foster home in Anchorage. He has been placed back on certain ADHD medications, but not other medications and has not been receiving the services he requires.

### v.     Damien V.

96.     Damien V. (11) has been diagnosed with FASD and ADHD and has received individual counseling. Since entering OCS custody in April 2021, Damien V. has been moved seven times, including to six different non-kinship placements.

97.     In at least one of these homes, a therapeutic foster home in Wasilla, Damien V. was abused and called names by the foster parents including the "N" word (Damien V. is part Black) who also hit him on the leg with a shoe. OCS was alerted to these allegations but has failed to remove Damien V. from this placement where he remains as of the filing of this complaint.

98.     In little more than one year—between the five of them—these children have had a total of 40 moves and/or placements. Many of these placements have been inappropriate and, in many cases, the foster parents were provided with no information about the children's behavioral and physical issues and no support in handling the resulting behavior, such as aggression and running away. This led to placements frequently disrupting, leading to greater placement instability.

**D.**      **Rachel T., Eleanor T., and Gayle T.**

     **i.**      **Rachel T. and Eleanor T.**

99.      Eleanor T. (14) and Rachel T. (15) and have been in OCS custody since August 2020. They are members of the General Class and ADA Subclass.

100.      Rachel T. and Eleanor T.—along with their older sister Gayle T.—came to OCS's attention in 2019 and OCS took the children into custody in August 2020.

101.      After entering foster care, the children were first placed in an emergency placement and later placed in a home with their half-sister, who is a licensed foster parent. OCS subsequently moved Gayle T. to a psychiatric facility.

102.      OCS provided no information about any of the children's medical needs and failed to provide the children's medical consent forms to the foster parents. The foster parents needed these forms to obtain any routine or emergency care for the children. OCS did not provide medical consent forms until September or October 2020, which greatly endangered the girls' health even though OCS policy requires those forms to be given to foster parents when children enter their home.

103.      Moreover, despite the extensive medical and behavioral needs of the children, OCS has lagged in paying for services, forcing the children's foster parents to cover many expenses, including treatment for a staph infection for Rachel T. and surgery for Gayle T., and wait for reimbursement.

104.      Rachel T. has many disabilities requiring care. She has Fetal Alcohol Syndrome (FASD), extreme anxiety, PTSD, is nonverbal, and has explosive mood regulation. Due to her disabilities, Rachel T. cannot attend public school and is currently

Class Action Complaint              Page 31 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-

Case 3:22-cv-00129-JWS    Document 1    Filed 05/20/22    Page 31 of 90

homeschooled. Rachel T. has an Individualized Education Program in place and is undergoing speech therapy at a nearby school. She is also in behavioral therapy, physical therapy, and is on the waiting list for occupational therapy.

105.    Apart from services, five different medical professionals have said the Rachel T. needs medication for ADHD, mood regulation, and anxiety. Given that this is a non-routine behavioral medication, OCS needed to obtain permission from Rachel T.'s parents. After a doctor recommended certain medications for Rachel T. in June 2021, OCS failed to timely obtain parental consent. This consent was only provided as of May 2022 after Rachel T.'s doctor made several calls to the biological parents and OCS. Thus, OCS's lag forced Rachel T. to go without important medication for over a year.

106.    Eleanor T. also has many disabilities requiring care, including a diagnosis of autism, ADHD, PTSD, anxiety, and major depressive disorder. She receives behavioral therapy and is beginning speech therapy. She is on the waiting list to consult a psychiatrist about the possibility of starting medication and is on her fourth therapist through Alaska Behavioral Health because of employee turnover.

107.    Since August 2020, OCS caseworkers have only met with the children about four to five times and have provided little to no support to the children in obtaining required services.

108.    This is in part likely due to significant caseworker turnover. Rachel T. and Eleanor T. have had multiple caseworkers since being placed in their current placement. These caseworkers have generally not been communicative or supportive. At least one

caseworker was reassigned, another quit, and yet another was promoted and reassigned. OCS did not provide notice of that caseworker's reassignment until several months after the fact. Additionally, in one instance, a caseworker took a medical leave for two months without notice to the families and without anyone covering his cases. The lack of communication and support from OCS is also likely due to an overwhelming caseload. Multiple caseworkers for Rachel T. and Eleanor T. had almost 100 children under their supervision.

109.    Moreover, despite these children's special needs, OCS has fallen behind in its case planning and has not provided an updated communication plan—a plan signed by the biological family and foster family regarding visitation and calls—in over a year.

    ii.  **Gayle T.**

110.    Gayle T. is a 16-year-old female living in a foster home in Palmer. As discussed above, OCS took Gayle T. into custody in August 2020 at the same time as her sisters Rachel T. and Eleanor T., placing her first into an emergency placement and then into a licensed kinship foster home. She is a member of the General Class and ADA Subclass.

111.    In November 2020, OCS sent Gayle T. to the Discovery Unit, an adolescent inpatient mental health unit at Providence Hospital in Anchorage. While OCS stated that this placement was only for two weeks, Gayle T. stayed at the Discovery Unit for two months. During that time, OCS would not let Gayle T.'s family visit her regularly and provided no structured education. Most of the time that Gayle T. was at the Discovery Unit,

Class Action Complaint    Page 33 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-

Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 33 of 90

she was isolated except for short breaks in the day for group sessions. While alone in her room she could only draw, do puzzles, or sleep.

112.  While already isolated in a facility, OCS also failed to assist Gayle T. in communication and visits with her family. For example, on Christmas 2020, Gayle T.'s parents came to visit her, but OCS was not there to supervise—even after agreeing to be present—so the hospital staff would not let the parents in. Gayle T. became upset, and a staff member told her to stop crying and attempted to physically restrain her. She was then injected with a sedative against her will, which led to Gayle T. becoming sedated for some time. During that time, she became dehydrated and needed to receive fluid intravenously. Thus, not only did the OCS placement not support her familial relationship, but she was overmedicated and subdued after becoming upset that she could not see her family on Christmas.

113.  Additionally, during the time that Gayle T. was at the Discovery Unit, she was given a strong sleeping medication, Seroquel, at higher than the recommended dosage, that made it difficult for her to wake up.

114.  After leaving the Discovery Unit in January 2021, OCS sent Gayle T. to live at the Hanson House facility associated with the Youth Advocates of Sitka, a nonprofit mental health agency in Sitka, which is almost 800 miles from Fairbanks. It is about a three-hour flight from Anchorage and driving there is extremely difficult. This distance made it near impossible for Gayle T. to maintain familial and community relationships while she was there.

Class Action Complaint                    Page 34 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 34 of 90

115. OCS first stated that Gayle T. was only to remain in Sitka for thirty days, but ultimately, she remained in Sitka for eight-and-a-half months. This facility was unnecessarily restrictive, and while there, Gayle T. was strip-searched upon arrival and required to undergo drug testing once a week.

116. Along with placing her far from home, OCS did not respond to requests from Gayle T.'s family to visit her while she was in Sitka and Gayle T.'s family was also not placed on the contact list for communications during the first six months that she was in Sitka, so she could not speak with them.

117. OCS continued to fail to supervise the facilities in which they placed Gayle T. And indeed, at a certain point, a male in the facility sexually assaulted Gayle T. This same male assaulted several other females and a male in the facility. When Gayle T. reported the sexual abuse to the management of the facility, they told her that it was not sexual assault because neither she nor the other individuals had told the male, "no." OCS did not conduct any investigation and the male was not moved out of the facility.

118. OCS moved Gayle T. to Palmer to live with another sister in August 2021. This placement disrupted in October 2021. In October 2021, OCS moved Gayle T. to live with licensed foster parents in Palmer.

119. OCS remains inattentive to her case. For example, Gayle T. injured her back at work and needed an appointment for treatment. She asked her former caseworker for OCS's assistance to get treatment, but no one at OCS ever helped.

120.    OCS also stated that they would appoint Gayle T. an Independent Living Specialist who would help her find a place to live once she leaves foster care, but that Independent Living Specialist has not communicated with her. She reached out to OCS regarding connecting with the ILP but has not heard back.

121.    OCS placed Gayle T. in several inappropriate and isolating placements, thus further traumatizing her and making it less likely that she could find a permanent home before aging out of the foster system. Moreover, Gayle T.'s prior caseworker threatened her several times that if she misbehaves in her current foster home or runs away, she will be placed back in a treatment center. Thus, Gayle T. also remains at risk of further placement instability and/or being again inappropriately institutionalized.

* * *

122.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate these children's' substantive due process and federal statutory rights. Defendants have failed to protect them from harm and risk of harm while in their care by failing to properly provide for their service and medical needs, placing the children in unsuitable facilities, and subjecting them to placement instability. Due to turnover and high caseloads, OCS has also failed to adequately supervise the children and to adequately support the children or their foster parents. They continue to be at risk of irreparable harm because of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

## IV.    LEGAL FRAMEWORK

123.    Defendants are violating constitutional principles and legal obligations that create an overall scheme to regulate the provision of child welfare services to children entitled to those services.

124.    The applicable constitutional standards and federal statutes set out general and specific duties with which Defendants are failing to comply in administering the State's child welfare system.

### A.    The United States Constitution Imposes Affirmative Requirements on Alaska's Child Welfare System

125.    The Fourteenth Amendment of the United States Constitution guarantees to each child in state custody many substantive due process rights and requires state and local child welfare officials to:

   a)    ensure that each child placed in foster care is free from the foreseeable risk of physical, mental, and emotional harms;

   b)    ensure that each child placed in foster care receives the services necessary to ensure their physical, mental, intellectual, and emotional wellbeing in the least restrictive environment;

   c)    provide each child placed in foster care with conditions, treatment, and care consistent with the purpose and assumption of custody;

   d)    ensure that each child placed in foster care is not maintained in custody longer than is necessary to accomplish the purpose of custody; and

e)     provide each child placed in foster care with reasonable efforts to obtain an appropriate permanent home and family within a reasonable period.

**B.     AACWA, ICWA, the ADA, and the Rehabilitation Act also Impose Affirmative Duties on Alaska's Child Welfare System**

126.    AACWA requires that state and local child welfare officials:

a)     Place each child in foster care in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

b)     Provide for each child placed in foster care a written case plan that includes a plan to provide safe, appropriate, and stable foster care placements and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

c)     Provide for each child placed in foster care, the necessary services to enable the child to be returned to the biological parents' home, including services to the parents, or where reunification is impossible or inappropriate, a written case plan that ensures the location of an appropriate adoptive or other permanent home for the child and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

d)     Provide for each child placed in foster care a written case plan that ensures the educational stability of the child while in foster care and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

Class Action Complaint                    Page 38 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 38 of 90

e)   Maintain a case review system in which each child in foster care has a case plan designed to achieve safe, appropriate, and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

f)   Maintain a case review system in which the status of each child in foster care is reviewed every six months by a court, or person responsible for case management, to determine the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan, and the projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C);

g)   Maintain a case review system that ensures that for each child in foster care for 15 of the most recent 22 months, OCS petitions to terminate the parental rights of the child's parents, subject to statutory exceptions, and concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(E); and

h)   Provide to each child in foster care necessary services to protect his or her safety and health, 42 U.S.C. § 671(a)(22).

127.   AACWA also requires that state and local child welfare officials:

a) Provide foster care maintenance payments to both licensed and approved caregivers on behalf of eligible foster children under the statute. 42 U.S.C. § 672(a)(1).

128. ICWA requires that state and local child welfare officials:

a) Provide that any Alaska Native child that is placed in foster care be placed "in the least restrictive setting which most approximates a family" and "within reasonable proximity to his or her home." 25 U.S.C. § 1915(b); and

b) In any foster care, preadoptive, or adoptive placement, provide preference to the Alaska Native Subclass being placed with: (i) a member of the Alaska Native Subclass member's extended family; (ii) a foster home licensed or approved by the Native child's own Tribe; (iii) a Native licensed foster home; or (iv) an institution for children approved by a Tribe or operated by a Tribal organization which has a program suitable to meet the Native child's needs. 25 U.S.C. § 1915 (a), (b).

129. The ADA and the Rehabilitation Act require that:

a) state and local officials make available a full range of home and community-based placements, and necessary and appropriate community-based services, to ensure access to the least restrictive and integrated setting appropriate to their needs. 42 U.S.C. § 12131 *et*

Class Action Complaint                    Page 40 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 40 of 90

*seq.*; 29 U.S.C. § 701 *et seq.*; 28 C.F.R. § 35.101, *et seq.*; 45 C.F.R. § 84.1, *et seq.*

## V. ALASKA'S CHILD WELFARE SYSTEM VIOLATES CHILDREN'S RIGHTS

### A. OCS's Historical Failures

130.    In March 2017, the federal Children's Bureau of the Department of Health and Human Services issued a Child and Family Services Review ("CFSR") based on its review of the Alaska child welfare system. The CFSRs are conducted on the child welfare systems of all states periodically and measure compliance with federal standards. The CFSR looked at whether Alaska was in substantial conformity with seven family outcomes and with seven systemic factors. The federal Children's Bureau found that none of the family outcomes were in substantial conformity and only one of the seven systemic factors was in substantial conformity with federal standards.

131.    Some of the CFSR's findings included:

- "Poor engagement and infrequent and insufficient quality caseworker visitation with children and families was a critical factor in the lack of comprehensive and accurate risk, safety, and needs assessments, resulting in children, in almost half of the applicable cases, remaining in their homes despite unmitigated safety concerns."

- "[A]s prevalent concerns across the state, delayed permanency goal establishment, inadequate assessments of an appropriate service provisions to parents and foster parents, and lack of engagement in case planning. The statewide assessment also identified a lack of mechanisms to monitor termination of parental rights (TPR) filings[.]"

- "[C]ase reviews revealed court-related barriers and delays that affect the establishment of appropriate permanency goals and the achievement of permanency" as well as "ineffective implementation of concurrent planning."

- "OCS, stakeholder interviews, and case-participant interviews with field staff called attention to the significant workforce concerns experienced throughout the state, most notably high turnover rates, sharply increased workloads, inadequate staff training, and limited access to families and services in remote areas of the state. In the cases reviewed, multiple caseworkers and high workloads resulted in disjointed and often delayed case planning, as well as a triage approach to case management. A lack of service availability, accessibility, and facilitation of participation also were barriers noted in the cases reviewed, the statewide assessment, and stakeholder interviews."

132.    As a result of the CFSR, Alaska had to establish a two-year Program Improvement Plan, which it submitted to the Children's Bureau in February 2018.

133.    Since then, Alaska has continued to fail its children. Problems within OCS include high caseloads and turnover leading to inadequate supervision and planning, delays in permanency planning, inadequate case planning, a dearth of appropriate services, and a lack of appropriate foster homes.

## B.    OCS Caseworkers Are Plagued with High Caseloads, and Caseworker Turnover Is at an All-Time High

### i.    Caseloads "Exceed What Is Safely Manageable"

134.    OCS has a legal duty to adequately supervise children in its custody. This duty includes recruiting and retaining enough caseworkers to maintain a caseload in line with national standards to ensure that all cases receive appropriate oversight, supervision, and services.

135.    The Child Welfare League of America ("CWLA"), a national coalition of agencies that develops child welfare policies, recommends that caseloads be limited to between 12 and 15 children per worker for children in foster care. Similarly, the Council on Accreditation ("COA") (a national professional licensing organization) recommends

that caseloads be limited to 12–15 children per worker and only eight children where the child is in treatment foster care.

136.   To decrease caseworker caseloads and improve caseworker retention, the Alaska Legislature passed House Bill (HB) 151 ("Children Deserve a Loving Home Act" or "HB 151") in June 2018 with strong bipartisan support. The legislation set an average caseload limit of 13 families per caseworker. This number still falls below national standards because it limits caseloads to 13 families per caseworker, rather than 13 children per caseworker. Indeed a family will often include multiple siblings, so 13 families can greatly exceed national professional standards.

137.   Regardless, caseloads remain higher than both professional standards and the too-high Alaska statutory standards. In May 2019, Alaska averaged 25 cases per caseworker—almost double national professional standards. The 2021 Annual Report to the Legislature on Employee Caseload Staffing, Recruitment and Retention and Impact on Child Welfare Outcomes issued by OCS's Director Kim Guay (hereinafter the "2021 Annual Report") later noted that "[c]aseloads exceed what is safely manageable, and caseworkers feel they cannot meet the mandated requirements of their position."

138.   The state does not report on or make available the actual number of children's cases per worker, or the number of caseworkers whose caseloads exceed the CWLA or COA caseload standard for children who are in foster care.

139.   In 2021, OCS reported that caseworker caseloads stood at 14.2 cases per caseworker, but that figure is deceiving. OCS limits caseworkers to six cases during their

first three months of employment and to 12 cases during months four through six. Moreover, "61.4% of caseload-carrying employees [have been] on the job less than a year." These newer caseworkers are necessarily weighing down the total average.

140.    In other words, OCS's reported average of 14.2 cases per caseworker is higher than what state statute allows, and much higher than what professional standards permit. And since that figure is weighed down by new caseworkers, many caseworkers (perhaps half or more) have caseloads that greatly exceed even the reported average.

141.    In Alaska, high caseworker caseloads is partly a result of high staff turnover, which forces remaining workers to cover the caseloads of those who depart. Indeed, OCS's inability to retain staff is "[a] primary barrier to not meeting the [legislature's] caseload standards." High staff turnover is also directly linked to unmanageable caseloads. OCS staff surveys and exit interviews have found that caseworkers "repeatedly cite heavy caseload burdens as a major reason for why they are unable to achieve meaningful field work activities." For this reason, OCS has stated that unmanageable caseloads, among other things "continue to be a barrier for recruitment and retention."

### ii.    Caseworker Turnover Remains at an All-Time High

142.    OCS has not reduced caseworker turnover since enacting HB 151. From October 1, 2020, to September 30, 2021, annual turnover increased 11.8% to an all-time high of 59.4%. During that time, 61.4% of caseload-carrying employees had been employed for less than one year.

143.   OCS's turnover has kept rising even though it has lowered its hiring requirements. Current job listings have no minimum educational requirements—not even a 2-year Associate degree.

144.   Presenting on a child welfare bill, Representative Tiffany Zulkosky noted on April 22, 2021 that OCS "typically operates at a 50% vacancy rate and require[s] frontline workers to carry caseloads more than [three times] the national average" and that despite "[t]the goal of HB 151 (2018) [being] to lower turnover and vacancy rates," they "have not decreased."

145.   The consequences of high turnover are devastating. OCS recognized in its 2021 Annual Report that "[m]ission-critical tasks go unmet when there are an insufficient number of adequately trained staff to perform child welfare work" and that "[a] high turnover rate among protective services specialists directly impacts the outcomes for Alaskan children and their families."

### iii.   High Caseloads and Turnover "Materially Impact Outcomes in the Foster Care System"

146.   High caseworker turnover and unmanageable caseworker caseloads have disastrous consequences for child welfare. The 2021 Annual Report notes that "staff caseload sizes materially impact outcomes in the foster care system." And OCS admitted in the 2020 Annual Report to the Legislature on Employee Caseload Staffing, Recruitment and Retention and Impact on Child Welfare Outcomes (hereinafter the "2020 Annual Report") that "[h]igh staff turnover and high caseload[s] … overburden the child welfare system's ability to … achieve safe and timely exits of children from foster care."

147.   As OCS admits, "[t]he long-lasting and pervasive negative impact on children and families involved in the child welfare system due to the lack of a stable and sufficient workforce cannot be overstated," including effects like:

o  Delayed initiation of investigations on reports of maltreatment, resulting in repeat maltreatment and greater harm to children.

o  Lack of caseworker visits with parents and children, which results in poor ongoing assessment of safety, needs and case planning. This results in children languishing and staying longer in foster care.

o  Decrease in support to foster parents, which results in foster parents choosing to give up on being foster parents, increasing the shortage of foster parents. Not enough foster homes cause overcrowding and unsafe conditions for foster children.

148.   Indeed, high caseworker caseloads and high caseworker turnover prevent OCS from determining which children should even be in foster care. OCS screens reports of abuse and neglect according to three levels. Priority 3 protective service reports, which are more likely to be higher in volume than Priority 1 and 2 reports, are those where the child may be in a neglectful or marginally safe situation and a response is due "within seven days of the time the report is received." OCS has instructed at least some offices to not respond at all to Priority 3 reports, because it does not have capacity to respond to every report.

149.   The high turnover and unmanageable caseloads also prevent caseworkers from adequately supervising children in the foster care system. According to 2019 data, Alaska had the second lowest percentage of caseworkers making federally mandated visits of all the states. And, according to the 2021 Annual Report, monthly caseworker visits are

Class Action Complaint          Page 46 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 46 of 90

only at 67%—meaning that monthly visits are made only 67% of the time—while timely investigations are only at 60%.

150.  High caseloads and high turnover prevent caseworkers from assessing a child's safety or wellbeing, developing case plans, facilitating provision of reunification services, placing children in appropriate placements, or deciding when to petition to terminate parental rights. In short, high caseloads and high turnover prevent OCS from adequately supervising and providing services to the children in its protective custody. This all contributes to child maltreatment in care, of which Alaska has the seventh highest rate in the nation.

### C. Placement Instability and Lack of Adequate Placements Harm Children
#### i. Placement Instability Harms Children

151.  Research and child welfare experience show that, for children in foster care, placement stability is essential, and instability can hamper a child's development, wellbeing, and opportunities for placement with permanent families. The National Center for Child Welfare Excellence noted that "as the number of placement changes increases, there is a decreased likelihood of children and youth achieving reunification or adoption." Moreover, "[a]s children experience placement disruptions, they can develop a sense of profound distress, loss and absence of belonging which can then lead to feelings of distrust and fear about forming healthy relationships with others."

152.  When children move between placements, they lose continuity of schooling, are often separated from their siblings, and often experience disruption or unavailability of the necessary mental, medical, and behavioral health services. Over time, these children

develop weaker interpersonal relationships and support networks. In one study, children with unstable placements had between a 36% and 63% greater risk of developing behavioral challenges than children who enter stable placements early in their time in foster care. Placement instability is especially harmful to members of the ADA Subclass, as children who are diagnosed with physical, mental, intellectual, or cognitive disabilities often find that their health conditions worsen while in foster care.

153.    Multiple placement changes also lead to data entry delays in OCS's Online Resource for the Children of Alaska ("ORCA") system, which by OCS's admission, "creates a significant safety risk to children in care."

154.    Despite all the negative effects of placement instability, OCS continues to shuffle children through multiple placements. As early as 2015, OCS admitted it fell "well below the national standard" in placement stability. Data from 2016 shows OCS moved children far more often (6.84 times per 1,000 days in care) than the national average (4.12 times per 1,000 days in care).

155.    In 2019, 58.4% of children who had been in care at least 24 months had three or more placements, 34.6% of children in foster care between 12 months and 24 months had three or more placements, and 21.8% of children in care under 12 months had three or more placement. Alaska does not publicly report data on how many children have more than three placements, so it is impossible to determine the number of children who have had, perhaps, many more placements. The available data shows unequivocally, though, that

OCS exposes children in foster care to a risk of substantial physical or psychological harm as a result of placement instability.

### ii. Alaska Does Not Have Enough Adequate Foster Care Placements

156.    Federal law and widely accepted professional standards require OCS to place each child in the most appropriate and least restrictive placement that best suits the child's needs. *See* 42 U.S.C. § 622(b)(8)(A)(iii); 42 U.S.C. § 675(5)(A). OCS's internal policies also state that "placement decisions will include meeting the child's needs when choosing a placement preference" and that "all placements will be in the least restrictive setting in reasonable proximity to the child's home, extended family or siblings meeting the needs of the child." There is extensive child welfare literature emphasizing the need to carefully choose each child's placement in light of all available information, and doing the utmost to minimize institutional or group care.

157.    Even so, OCS consistently fails to recruit, reimburse, and maintain enough available foster homes and other community-based placements, particularly among Alaska Native families. An article published in 2021 noted that OCS maintained only 1,026 non-specific foster homes—a 24% decrease from 2017 (1,351)—despite having around 3,000 foster youth in custody. The same article quoted Barbara Cosolito, the social service program officer for the Resource Family Unit Social Service Programs, as saying that the state is struggling to find housing placements for children and that "[s]ome foster youth at times might have to spend a short time in an office overnight [where OCS is able to] set up for a child to sleep during the night if need be." Another article published on April 26,

2022, quoted a foster child who OCS sent to a locked psychiatric hospital in Anchorage because it could not find another placement for him and that he was supposed to stay for two weeks but stayed for two months.

158.   Once OCS recruits foster homes, it fails to adequately prepare them, making it more likely that the placements in those homes will disrupt. OCS is required to prepare prospective foster parents to provide for the needs of the child according to the "prudent parent" standard. As part of this training, OCS must teach prospective foster parents how to maintain the health, safety, and best interests of the child while encouraging the child's emotional and developmental growth. A 2020 audit, however, found that OCS's training was "not consistently provided to foster parents" and that "OCS staff did not formally identify, and document foster parent training needs." Nor did OCS adequately provide this training to Residential Child Care Facilities as required.

159.   In addition to lacking sufficient foster homes for children in foster care, generally, OCS often places children with disabilities in overly restrictive placements. This is because OCS lacks facilities and homes that can provide appropriate services for children with developmental delays or autism, children who display violent behavior, and children who have been sexually abused or severely traumatized. These facilities make inappropriate use of restraints and medication, fail to adequately supervise children leading to violence between them, and also fail to provide adequate programming or education.

160.   Because of Alaska's shortage of specialized placements, OCS often sends children with higher needs to out-of-state facilities, far from their communities, that are

themselves inadequate and harmful to children. These facilities often are understaffed and fail to provide meaningful educational and other programs to the children in their care.

161.    OCS also fails to adequately supervise foster group homes to ensure they meet state standards or reasonable professional standards. State law provides that no more than six children may reside in a foster home, but homes licensed as "foster group homes" may care for up to eight children. For any type of foster home, only two children under 30 months of age are allowed. If more than six children are in care, one foster parent must be generally available in the home.

162.    But many foster group homes exceed these restrictions. OCS rarely ensures compliance with the statutory limit on young children and does not specifically inspect the number of total children in the home. If a group home exceeds the numerical limit, OCS would not know unless all children were present in the home at the time of the licensing inspection, which occurs only every other year.

163.    OCS also does not adequately supervise children in those foster group homes. This leaves children vulnerable to physical and emotional abuse.

**D.    OCS Does Not Provide Adequate and Timely Case Plans and Assessments, Permanency Planning, and Other Services**

**i.    Case Plans and Assessments**

164.    Federal law requires OCS to provide children in foster care with a detailed case plan. These plans are necessary to effectively engage family members and tailor services to properly address the family's and the child's needs. OCS must also periodically

review these case plans—at least once every six months—until a child's case is resolved, and the child has been discharged from custody.

165. OCS has admitted, at least since 2015, that it needs to improve its case planning. Yet it still consistently fails to complete and review case plans.

166. As of October 31, 2021, only 60% of case plans were current, which is lower than the figures reported in 2020 (66%). Similarly, according to the 2019 OCS Annual Progress and Services Report "ORCA reported 68% of children [as of April 30, 2019] who have been out of the home for 60+ days have a current case plan."

167. Federal law requires OCS to complete a child's case plan within 60 days of a child's entering custody. To address this issue, OCS began distributing carbon-copy case plans to caseworkers to complete in the field with the parent or child. Still, this does not appear to have significantly increased the number of timely, completed case plans. And OCS has stated that due to "high caseloads and record high staff turnover, it is has [sic] been difficult to evaluate if the use of hand written, carbon-copy case plans, has impacted the desired outcome of increased engagement with parents."

168. Another problem is that OCS does not engage enough with families. OCS recently noted that "[a]n area of great concern in practice is caseworker visits with children, parents and case planning." In its 2019 Annual Progress and Services Report, OCS noted that it actively involved the child and family in case planning in only 39% of cases, which is well below the national performance standard of 95% and in 2020, this number had only gone up to 52%.

Class Action Complaint                    Page 52 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 52 of 90

169. Without input from family members, caseworkers lack critical information necessary to create an effective case plan that includes all necessary information on the need for services and how they will be obtained. This can lead to caseworkers creating "cookie-cutter" case plans. For example, reunification is the default permanency goal in every case, even in cases when the biological parents sexually abused their own children.

170. High staff turnover also affects case planning. Caseworkers do not have the experience, knowledge, or confidence to properly develop case plans and OCS outsources parental assessments before the case plans are even developed. As a result, caseworkers create "cookie-cutter" case plans that repeatedly prescribe the same handful of services to most of the families with whom OCS works, even when those services are unavailable in the area or require long waiting periods. Children and their biological parents, including those who have experienced various forms of grief or trauma, are rarely prescribed specialized services.

171. Staff turnover also affects OCS's ability to meaningfully review existing case plans. Indeed, OCS's Continuous Quality Improvement ("CQI") Unit (often called the Quality Assurance ("QA") team) conducted no case reviews in 2018 specifically because of turnover.

172. Additionally, OCS caseworkers often do not explain to foster parents how to obtain the services detailed in these case plans. This is especially damaging for those children and families in rural areas, who are more likely not to have access to such services or know how to obtain them.

Class Action Complaint     Page 53 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-

Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 53 of 90

173.    For specialized services, such as those that cannot be easily obtained through Medicaid, children are often forced to wait on long waiting lists. Again, even if OCS provides for specialized services in a case plan, OCS caseworkers do not appear to provide any help on either getting off these waitlists or finding alternative service providers.

174.    The lack of timely, appropriate assessments and case planning, along with inadequate case reviews, ensures that OCS fails to use Alaska's limited resources and, ultimately, harms children. This is aggravated by related issues, such as high staff turnover and caseworker caseloads, which altogether delay permanency for children and prevent children from obtaining the services and support that they require.

### ii.    Permanency Delays Persist in OCS

175.    Prompt permanency planning is essential to ensure that children leave foster care as quickly as possible and are placed in stable, permanent homes.

176.    Research has shown that the longer a child remains in care the less likely they are to be reunified or adopted. Similarly, children placed in congregate care or institutions often fail to achieve permanency.

177.    Moreover, federal law mandates that foster children expeditiously be placed in a permanent home. Specifically, when children have been in foster care for 15 out of the last 22 months, OCS must petition to terminate parental rights, so that the child can be adopted, unless the case plan documents that termination would not be in the child's best interests, or the child's case qualifies for a statutory exemption.

178.    OCS's own policy states that each child will have an identified permanency goal, and that permanency goals will be established and distributed in a case plan within the first 60 days of assuming custody or opening a case for services without custody.

179.    But in Alaska, it is common for children to languish in foster care.

180.    The 2017 CFSR of Alaska noted that Alaska's success at achieving reunification, adoption, or other permanency goal is an "[a]rea [n]eeding [i]mprovement." Indeed, Alaska is far worse than other states in achieving reunification for children. For example, in 2019, Alaska ranked as the fifth worst state in the country for its rate of reunifications in under 12 months.

181.    Many children who age out of foster care have essentially grown up in the system. In 2019, 18.8% of the children who aged out had been in foster care since under the age of 12 or younger. When these children age out of foster care, they lack the necessary training to function independently, and frequently end up unemployed, homeless, pregnant, and either as the victim or perpetrator of various crimes.

182.    And this trend or permanency delay continues. As OCS's 2020 Annual Progress and Services Report notes, identifying permanency goals and achieving permanency continues to be "an area of struggle." In many cases, OCS still maintains a goal of reunification after 12 months of foster care even when the biological parents have made no progress toward behavioral change or case plan goals.

183.    OCS even lacks a standardized process to track petitions for termination of parental rights, or to ensure that such petitions are timely filed. As an example, OCS

recently admitted that it "continues to experience a disparity among regional and judicial districts on the process and timeliness associated with filing a [termination] petition and when the hearing is conducted."

184.   This delay in obtaining permanent placements worsens conditions for foster children and leads to higher and higher caseloads (as cases fail to close) as well as increased caseworker turnover. Indeed, OCS informed the Alaska Legislature that a "lack of permanent placement options for hard to place youth increases [caseworkers'] workplace stress" and is a contributing factor to workplace turnover.

### iii.   OCS Does Not Provide Necessary Services to Children

185.   Children in foster care, along with their families, need adequate services so that these children can be successfully reunified with their families or placed in another permanent family.

186.   Foster children who do not receive necessary services experience behavioral problems, which leads to those children being placed in a greater number of placements, thereby causing permanent damage to the child.

187.   Even so, OCS has acknowledged that "[t]he array of services is not fully functioning, and there are many services that are not available in all communities of Alaska."

188.   Services pertaining to mental health and substance abuse services are particularly lacking. Indeed, OCS has acknowledged that "[t]he dearth of substance abuse treatment options and resources coupled with a burgeoning mental health crisis in Alaska

means that a lack of services to parents and children where substance addiction and/or mental health concerns is contributing to the inability for children to safely remain at home." OCS also acknowledged that "[t]he lack of timely and available resources in communities where families reside, makes the success of timely reunification with parents and children much less likely."

189.    The Alaska Mental Health Trust Authority, which is responsible for providing mental health care in Alaska, has said that, for youth and adults alike, "Alaska's capacity to provide timely, appropriate levels of support to avoid institutional placement is limited."

190.    Moreover, "[t]he services that are available do not have automated or standardized referral processes, and families and workers may not always be aware of what services and resources are available to them."

191.    OCS recently stated that "[d]ue to its vast geographical area, Alaska is challenged in ensuring that the array of needed services is accessible in all jurisdictions covered by [Alaska's Child and Family Service's Plan 2020–2024 ("CFSP")]."

192.    That CFSP revealed that OCS is aware of alarming service-deficiencies, such as:

> a)    "Alaska does not have an established routine system for collecting needs assessment data from communities regarding service array, resource development and service gaps";

b) "[S]ervice array is not routinely included as an aspect of the OCS CQI processes";

c) "[T]here are significant gaps in the service array throughout the state, most notably in in-home services and specialized medical, mental health, and substance abuse treatment, both outpatient and residential, especially in rural areas";

d) "[T]here is a statewide shortfall in Independent Living (IL) programs that assess and address the needs of eligible youth … result[ing] in long waitlists for some services";

e) "The state [also struggles due to] limited funding and the lack of availability of community-based services";

f) "The flexible funding and the developmentally and culturally appropriate services that exist are not sufficient and do not meet the unique needs of all the children and families in the state, particularly in rural areas";

g) "The lack of culturally competent agency workers, turnover in the agency's and Rural Child Welfare grantee staff, lack of universal acceptance of culturally sensitive interventions, and travel restrictions also contribute to the state's inability to individualize services."

193. This problem is especially aggravated for children with disabilities who have greater therapeutic needs. Rather than providing services to disabled children in their

homes, OCS often places these children—and specifically those with developmental disabilities or mental illnesses—in facilities. In some instances when facilities have reached full capacity, OCS has placed children in hospitals for several days, with no medical reason for doing so, or left them in homeless shelters which cannot service the children's medical and behavioral needs.

194.　OCS continuously fails to provide community-based support services that would enable children to either remain in their own homes or be placed in community-based, family-like settings, such as family therapy, respite care, wraparound services, and other supports appropriate to the emotional and behavioral needs of Alaska foster children.

195.　This failure to provide community-based support services is especially true in rural areas. OCS often forces parents to go to urban areas far from their home to obtain services, and has at times even removed children from an otherwise good home, because it refuses to make services available to these (often disabled) children in their local communities.

196.　OCS also fails to ensure that children access services on time, contrary to legal requirements. Foster children often remain on waiting lists for services or are never referred at all. Foster parents are forced to spend extensive time and their own money scheduling and obtaining services for the children in the hopes that they may at some point receive reimbursement from OCS.

197.     Moreover,    accurate    and    necessary    information    about    children's circumstances, including medical and social histories as well as special needs, are withheld from foster parents or residential providers.

    **E.**    **OCS Fails to Properly Support Alaska Foster Children that are Placed in Kinship Care**

        **i.**    **Background on Kinship Care**

198.     Kinship care is "the full-time care, nurturing, and protection of a child by relatives, members of their Tribe or clan, godparents, stepparents, or other adults who have a family relationship to a child." Kinship care can have many benefits, "such as increased stability and safety as well as the ability to maintain family connections and cultural traditions."

199.     These benefits are supported by academic research. For instance, research shows that kinship caregivers can feel more committed to caring for a child than non-kinship caregivers and are often more likely to continue caring for a child that has behavioral issues or other problems. Moreover, according to a Casey Family study entitled "Moving Youth to Family Level of Need and the Impact on Legal and Relational Permanency," "[y]outh whose last placement was with family exited to legal permanency at a higher rate and significantly faster than those whose placement at case closure was not with family."

200.     Research also shows that, compared with non-kinship foster placements, kinship placements are often more stable, and result in fewer behavioral and mental health problems for youth.

Class Action Complaint                    Page 60 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-

201.    Federal law and Alaska law mandate that kinship placements be favored for children in foster care. 42 U.S.C. § 671(a)(19) (requiring states to develop a plan providing "that the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards"); ALASKA STAT. § 47.14.100(e) (2021) (showing preference for family members as placements for children).

202.    OCS policy states that "[r]elatives will be given priority consideration as a placement preference over non-relatives unless a determination occurs that placement of the child with the relative is not in the child's best interest."

203.    Further, OCS policy states that "[w]hen relatives cannot be a placement option for the child, OCS will make efforts to actively recruit and support resource families within the child's home community and in close proximity as possible to the child's parents, to assure that the child may continue to maintain important and lasting cultural, familial, educational and community-based connections."

204.    According to OCS's 2021 Annual Report, the rate of kinship placements for the end of the November 1, 2018 to October 31, 2019 reporting session was 55%, for the November 1, 2019 to October 31, 2019 period it was 57%, and for the November 1, 2020 to October 21, 2021 time period it was 58%.

205.    In short, kinship caregivers play a vital role in Alaska's foster care system. Despite this, OCS insufficiently supports kinship foster homes.

## ii. OCS Does Not Provide Approved, Unlicensed Kinship Care Providers with Foster Care Maintenance Payments

206. Federal law requires that Alaska pay monetary benefits in the form of foster care maintenance payments to foster parents "on behalf of each child who has been removed from the home of a relative" where certain factors have been met including that the state agency places the child with a "foster family home" that is either licensed or approved by the state agency. 42 U.S.C. § 672. Even where foster children are eligible to have such payments made on their behalf, OCS does not make these payments to the unlicensed kinship foster families caring for these children. This is so even though OCS has extensively investigated and then approved the foster parents.

207. This is especially important given the substantial difference in support that licensed foster care parents receive. Foster care maintenance payments for a licensed foster home in Alaska range from $780.90 to $1,415.70 per month depending on the location of the foster home and the age of the child. Rates are higher for emergency placements and augmented rates may be provided when a child's level of care exceeds a basic level. These augmented rates are set on a case-by-case basis and can be up to 500% of the base.

208. Unlicensed relative or kinship caregivers by contrast, do not receive foster care maintenance payments. Even for unlicensed kinship placement, however, the foster parent must still undergo a quasi-licensing process before a child can be placed with them. Every unlicensed kinship caregiver must receive OCS's approval, ensuring that the caregiver can safely care for the kinship child. Each such caregiver must complete an

unlicensed relative foster home safety evaluation, undergo a background check, and submit to fingerprinting.

209. However, unlicensed kinship caregivers are eligible for only Emergency Relief Support ("ERS") payments or assistance under Alaska's Temporary Assistance Program (ATAP/TANF). Both funding sources generally offer considerably less money than regular maintenance payments.

210. ERS, for instance, provides payments to kinship caregivers for only a two-month period while OCS determines whether the foster family should be licensed. The ERS program provides $500 per month per child for up to two months.

211. OCS states that "[t]he [ERS] payments are designed to support families in a crisis situation until they can complete the foster care licensing process or find another option to support the children in care." Although the ERS program is intended to be a two-month stopgap measure, the licensing process often takes much longer (often with no end in sight).

212. For example, of the 509 foster children in Alaska that were in unlicensed kinship care and whose placements were paid by the ERS program from January 1, 2019 to August 12, 2019, these children were placed in the care of 325 kinship relatives. But at the end of that period, only 65 of the 2019 kinship providers had become licensed. Of the 1,689 foster children in Alaska that were in unlicensed kinship care and whose placements were paid by the ERS program from March 1, 2016, to November 12, 2019, these children were placed in the care of 1,135 kinship relatives. But at the end of that period, only 384

of those kinship relatives became licensed. Alaska does not maintain or make public data on how many kinship foster homes have remained unlicensed beyond the period after ERS funding ends.

213.   The lack of foster care maintenance payments for unlicensed kinship caregivers goes against the state and federal expressed preference for kinship placements and imposes a significant burden on many children and their proposed kinship foster parents. In many cases, the lack of foster care maintenance payments deprives children of otherwise suitable foster parents who simply cannot afford to provide necessary care and support for them.

214.   OCS's failure to pay foster care maintenance payments to unlicensed kinship caregivers also threatens substantial harm to Alaska's foster children. Foster children in kinship placements require the same necessities as foster children in non-kinship placements, such as nutritional food, warm clothing, and educational supplies. By failing to pay unlicensed kinship caregivers the same as licensed caregivers, OCS ensures that some foster families will be unable to provide these necessities to their foster children. And not only will a child go without necessities, but academic literature shows that stress about the provision of necessities can hurt a child's health, cognitive development, social and emotional development, and academic outcomes.

215.   Moreover, by failing to pay unlicensed kinship providers maintenance payments available to licensed unrelated foster parents, OCS makes it more likely that the relative foster family will be unable to financially support the child and thus more likely

that the placement will disrupt. This disrupted placement exposes the child to further trauma.

216.    In short, it is not reasonable and it is unlawful to withhold foster care maintenance payments from unlicensed kinship caregivers because they must still submit to many quasi-licensing requirements before they can take in and provide care to their relatives. More importantly, the lack of foster care maintenance payments exposes children to an unreasonable risk of harm because of financial strain.

### iii.    OCS Fails to Assist Kinship Foster Parents in Becoming Licensed

217.    State law requires OCS to assist appropriate and willing kinship providers in seeking and obtaining licensure under state law, whenever possible, and to help them to obtain variances so long as these variances do not implicate the safety of foster children. *See* ALASKA STAT. § 47.14.115 (2021). This statute states that "[i]f the department determines that it is in the best interests of a child in the custody of the department to place the child with an adult family member who does not have a foster care home license under AS 47.32, the department shall assist the adult family member in obtaining a license, including assisting the adult family member with obtaining any variances necessary to obtain the license, so that the family member is eligible for [statutory] payments[.]"

218.    OCS has systematically violated this statute and failed to assist adult family members in obtaining licensure and necessary variances required for licensure. This failure is particularly significant for the Alaska Native community given that Native children make up the largest percentage of the foster child population. OCS does not make publicly

available the data on the number of unlicensed kinship providers in Alaska, and the number of such providers who are Native.

219.    Defendants are aware of their failure and violation of law, but have not taken necessary steps to assist kinship caregivers in becoming licensed.

220.    Often, OCS will provide unlicensed caregivers with a large packet of complicated papers, with no further explanation on how to navigate the licensing process.

221.    When unlicensed kinship caregivers ask OCS for help, they are almost always ignored. Other times, OCS will claim the placements are "temporary" and forego any discussion of licensing.

222.    Many of the unlicensed kinship placements fail because OCS failed to obtain the necessary licensing of the foster homes and to provide adequate financial resources to support the family.

223.    In short, OCS's practices prevent unlicensed kinship caregivers who intend to obtain licensure and are fully qualified to do so from obtaining licenses and receiving corresponding foster care maintenance payments necessary to care for these children. OCS not only fails to assist kinship caregivers from obtaining variances—even though this assistance falls under OCS's obligations—but also actively creates barriers that prevent kinship caregivers who wish to obtain a license from doing so.

**F.     OCS Harms Alaska Native Children and Creates a Risk of Harm for All Native Children**

**i.     Background on ICWA**

224.    ICWA, 25 U.S.C. §§ 1901 *et seq.*, resulted from concern over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.

225.    These removals were very damaging, not only for many Indian families but also for their tribes, which were losing their future generations. The wholesale separation of Indian children from their families was described as "perhaps the most tragic and destructive aspect of American Indian life today," resulting in a crisis "of massive proportions." H.R. REP. NO. 95-1386, at 9 (1978).

226.    In passing ICWA, Congress found that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children." 25 U.S.C. § 1901(3).

227.    Congress also found that "an alarmingly high percentage of Indian families were broken up by the removal, often unwarranted, of their children from them by non-tribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(4).

228.    Consistent with such findings, in passing ICWA in 1978, Congress declared that the policy of the United States is "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of

minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes" where those standards would "reflect the unique values of Indian culture." 25 U.S.C. § 1902.

229.    Alaska's Child in Need of Aid Rules incorporate ICWA's mandates in cases involving Indian Children. CINA Rule 1(f).

230.    AACWA specifies that state-developed plans for child welfare services must "contain a description, developed after consultation with tribal organizations … of the specific measures taken by the State to comply with the Indian Child Welfare Act." 42 U.S.C. § 622(b)(9).

231.    ICWA itself requires that any Indian child that is placed in foster care be placed "in the least restrictive setting which most approximates a family" and "within reasonable proximity to his or her home" while also "taking into account any special needs of the child." 25 U.S.C. § 1915(b).

232.    As for placements, ICWA requires that OCS give preference to (by order) "(i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs." *Id*.

233.    OCS must also maintain "[a] record of each such placement … [that shows evidence of] efforts to comply with the order of preference." 25 U.S.C. § 1915(e).

### ii.      Background on Alaska Native Children in Foster Care

234.     Alaska Native children are at particular risk given their disproportionate representation in the Alaska foster care system. While Native children made up about 27.9% of the child population of Alaska as of 2020, according to statistics maintained by OCS, the percentage of Alaska Native children in foster care has risen from 60% in 2017 to 65.2% in 2021. OCS's policies, practices, and customs at issue undermine Alaska Native children by impacting their familial relationships and permanently severing them from their culture and identity.

235.     Alaska has noted that "[b]ecause of the high number of Alaska Native/American Indian children involved in the OCS system, and because young Alaska Native children are the population at greatest risk in Alaska, there is a critical need for OCS to provide culturally relevant services that are available to meet the needs of families in remote areas. In many of these areas, OCS must serve clients remotely or does not have a stable workforce to provide the close monitoring and support necessary to adequately meet the legal mandates needed to serve Alaska Native families."

236.     OCS has acknowledged these failures, noting that ICWA foster homes constitute a needed target area for recruitment.

### iii.      OCS Fails to Place Alaska Native Children with ICWA-Compliant Kinship Caregivers

237.     Contrary to the requirements of ICWA, OCS often fails to place Alaska Native children with "member[s] of the Indian child's extended family."

238.    Indeed, the number of licensed foster homes in Alaska, whether kinship or otherwise, has been dropping. For example, in March 2021, there were 883 licensed non-child specific foster and group homes but by March 2022, that number was down to only 786. The numbers of OCS licensed ICWA homes are far lower. In March 2021, there were only 163 licensed ICWA homes (with a capacity for 359 children) and by March 2022, there were only 126 licensed ICWA homes (with a capacity for 280 children).

239.    OCS's practice of not providing foster care maintenance payments to unlicensed relative caregivers further aggravates this issue. Many potential Alaska Native relative caregivers, who otherwise would help raise their kin, cannot afford the financial cost.

240.    OCS further violates ICWA's placement preference by placing too many Alaska Native children in institutional or group home placements. In March 2022, there were 1,970 Alaska Native children in out-of-home care. At that same time, OCS had only 126 licensed non-child-specific ICWA foster and group homes, with a capacity of 280.

241.    OCS has overlooked or disregarded potential placements with members of Alaska Native children's extended family and own communities. OCS, instead, often places Alaska Native children with non-Native but licensed families who may be insensitive to their cultural needs, or in foster group homes or institutions in urban Alaska, hundreds of miles from home or in faraway institutional settings, and sometimes out-of-state.

Class Action Complaint                Page 70 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 70 of 90

### G.    OCS Fails Children with Disabilities

242.    OCS has failed to make available a wide array of home and community-based therapeutic placements, including therapeutic foster homes, resulting in the placement of children with disabilities in inappropriately restrictive settings, often far from their communities and biological families.

243.    OCS's similar failure to adequately recruit, train, and support foster families results in "failed placements" of children with disabilities and, in turn, unnecessary and traumatizing placement changes, institutionalization, placement in inappropriately restrictive, non-institutional placements, and other maltreatment.

244.    By failing to safely plan with the parents and Alaska Native custodians of children with disabilities, or make reasonable modifications to their safety planning programs, OCS unnecessarily removes children with disabilities from their homes and communities.

245.    With awareness of the children's unmet needs, OCS often fails to provide adequate medical and behavioral health services and supports to children with disabilities and their foster families, leading to unnecessary placement changes, often in institutional settings. This failing is particularly alarming considering the general recognition by public health authorities, such as the Centers for Disease Control and Prevention, that the provision of timely interventions to children with disabilities "can change a child's developmental path and improve outcomes for children, families and communities."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983–Fourteenth Amendment to the U.S. Constitution Substantive Due Process (On Behalf of the General Class Against All Defendants)

246.   Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

247.   A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to provide reasonable care to and to protect from harm a child with whom it has formed a special relationship, such as a child in foster care.

248.   The foregoing actions and omissions of Defendants constitute a policy, pattern, practice, or custom inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all the members of the General Class.

249.   Defendants are aware of the policies and practices that prevent these class members from receiving adequate protection from harm after the State has formed a special relationship with them and are deliberately indifferent to them.

250.   As a result, the named Plaintiffs and all the members of the General Class of children to whom the state owes a special duty, children in foster care, have been, and are, at risk of being deprived of substantive due process rights the United States Constitution confers.

251.   These substantive due process rights include, but are not limited to:

a) the right to freedom from the foreseeable risk of maltreatment while under the protective supervision of the State;

b) the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child;

c) the right to services necessary to prevent unreasonable risk of harm in the least restrictive environment;

d) the right to conditions and duration of foster care reasonably related to the purpose and assumption of government custody;

e) the right to treatment and care consistent with the purpose and assumptions of government custody;

f) the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody; and

g) the right to receive or be reunited with an appropriate permanent home and family within a reasonable period.

## SECOND CAUSE OF ACTION
## 42 U.S.C. § 1983–First, Ninth, and Fourteenth Amendment Right to Family Association (On Behalf of the General Class Against All Defendants)

252. Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

253. A state assumes affirmative duties to provide reasonable efforts to obtain a permanent home and family derived from the First Amendment's right of association and right to a permanent family and the Ninth Amendment's reservation of rights to the people.

254. Plaintiffs and the class members they represent are in Defendants' custody or guardianship and greatly dependent on Defendants to provide for their basic physical, psychological, and emotional needs, and to protect them from physical, psychological, and emotional harm.

255. Children frequently and foreseeably suffer physical, psychological, and emotional harm in OCS custody. They suffer harm in part because, unlike the ideal of a stable and permanent home and family, they are continually shuttled between temporary and often non-familial custodial arrangements. Professional judgment and standards of conduct require the Defendants to make reasonable efforts toward placing children in their care in stable, permanent families.

256. The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, or custom inconsistent with the exercise of professional judgment and amount to deliberate indifference to the constitutional rights of Plaintiffs and the members of the General Class.

257. By failing to take all reasonable efforts toward fostering familial association and securing a permanent home and family for the named Plaintiffs and the class members they represent, Defendants have failed to protect them from physically, psychologically, and emotionally harmful circumstances.

258.   As a result, the named Plaintiffs and all the members of the General Class have been, are at risk of being, deprived of the right to familial association and reasonable protection from physical, psychological, and emotional harm while in Defendants' custody, in violation of the First Amendment's right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983–The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.* (On Behalf of the General Class Against All Defendants)

259.   Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

260.   Federal law requires that the Plaintiffs have specific rights under the federal Adoption Assistance and Children Welfare Act of 1980.

261.   The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, or custom of depriving the named Plaintiffs and the classes they represent of the rights in the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, to:

a)   placement in the least restrictive and most family-like setting, closest to their home community that conforms to nationally recommended professional standards, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

b)   access to quality services to protect his or her safety and health, 42 U.S.C. § 671(a)(22);

c)   a written case plan that includes a plan to provide safe, appropriate and stable placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

d)   a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

e)   a written case plan that ensures provision of services to parents, children, and foster parents to facilitate reunification, or where that is impossible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

f)   a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, close to their home community. 42 U.S.C. §§ 671(a)(16), 675(5)(A); and

g)   the right to have a petition to terminate parental rights filed if the child has been in foster care for 15 out of the last 22 months, unless doing so goes against the best interest of the child as documented in the case record, or subject to a statutory exemption. 42 U.S.C. § 675(5)(E).

262.   These provisions are intended to benefit Plaintiffs and the classes they represent; the rights conferred are neither vague nor amorphous such as to strain judicial competence, and the statute imposes a binding obligation on the states. 42 U.S.C. § 1983; *see also Henry A. v. Willden*, 678 F.3d 991, 1008–09 (9th Cir. 2012).

## FOURTH CAUSE OF ACTION
### 42 U.S.C. §§ 1983–The Indian Child Welfare Act § 1915(a) & (b) (On Behalf of the Alaska Native Subclass Against All Defendants)

263.    Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

264.    ICWA requires that "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a).

265.    ICWA requires that an Indian child be placed in a least restrictive setting "within reasonable proximity to his or her home, taking into account any special needs of the child." 25 U.S.C. § 1915(b).

266.    ICWA specifically enumerates that, when in foster care, Indian children must be placed, by order of preference, in the following: (i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs. *Id.*

267.    An "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian

tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4); *see also* the definitions in 25 C.F.R. § 23.2 (2022).

268.    An "extended family member" is defined "by the law or custom of the Indian child's tribe or, in the absence of such law or custom, [is] a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." 25 U.S.C. § 1903(2); *see also* 25 C.F.R. § 23.2 (2022).

269.    ICWA's placement preferences must be read in light of ICWA's requirement, in 25 U.S.C. § 1912(d), that "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." *See also* 25 C.F.R. § 23.2 (2022).

270.    Defendants have deprived the Alaska Native Subclass members of their ICWA rights to placement in the least restrictive and most family-like setting, within reasonable proximity to their home communities. 25 U.S.C. § 1915(b). This is because Defendants have not made legally sufficient efforts to place Indian children with members of their extended family, *see* 25 U.S.C. § 1915(b)(i); Defendants have not recruited or retained enough "foster home[s] licensed, approved, or specified by" Indian tribes; *see* 25 U.S.C. § 1915(b)(ii); nor have Defendants recruited or retained enough "Indian foster

Class Action Complaint                    Page 78 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 78 of 90

home[s] licensed or approved by an authorized non-Indian licensing authority," *see* 25 U.S.C. § 1915(b)(iii).

271. Defendants have deprived the Alaska Native Subclass members of their rights to be placed with members of their extended families, *see* 25 U.S.C. §§ 1915(a)(1) and 1915(b)(i), because Defendants have failed to place children in kinship foster homes, and, for children in kinship homes, have failed to assist kinship caregivers to become licensed foster parents so that necessary support and services can be provided to their foster children. *See infra* ¶¶ 271–76.

272. Defendants' violations of 25 U.S.C. §§ 1915(a) and (b) include their failure, after an Indian child is placed in a non-preferred placement, to consistently review how to move that child to a legally preferred placement.

273. As a direct and proximate result of these violations, the Alaska Native Subclass members have been or are at risk of being injured and will continue to suffer injury because of Defendants' violations of the letter and the intent of ICWA.

### FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983–The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 672(a) (On Behalf of the Kinship Subclass Against All Defendants)

274. Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

275. Under federal law, in order to receive federal funding, Defendants must provide foster care maintenance payments "on behalf of" "each child who has been removed from the home of a relative" where certain factors have been met including that

the state agency places the child with a "foster family home" that is either licensed or approved by the state agency. 42 U.S.C. § 672. Even so, OCS does not pay kinship foster families that have gone through extensive review and have been approved to care for their relative children.

276.    The named plaintiffs in the Kinship Subclass meet all of the federal eligibility requirements to receive foster care maintenance payments for their benefit, including the Aid to Families with Dependent Children income eligibility requirements, but their kinship foster families have not been provided with said payments. *See* 42 U.S.C. § 672.

277.    Defendants have an ongoing policy, pattern, or practice of not providing foster care maintenance payments to kinship caregivers of members of the Kinship Subclass who qualify as approved caregivers under 42 U.S.C. § 672(a)(1) unless they become licensed foster parents. Defendants fail to assist kinship foster parents in doing so.

278.    In the alternative, Defendants have an ongoing policy, pattern, or practice of failing to take necessary steps to ensure that relatives or community members who could appropriately provide homes for Plaintiff Kinship Subclass members under 42 U.S.C. § 672(a)(1) are licensed as kinship foster parents, and adequately reimbursed for their care, thus violating the federal statute.

279.    As a direct and proximate result of these violations, Kinship Subclass members have been or are at risk of being injured and will continue to suffer injury because of Defendants' violations of the letter and the intent of 42 U.S.C. § 672.

Class Action Complaint                Page 80 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 80 of 90

## SIXTH CAUSE OF ACTION
## 42 U.S.C. § 12131 *et seq.* –The Americans with Disabilities Act
## (On Behalf of the ADA Subclass Against All Defendants)

280.    Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

281.    Title II of the ADA, 42 U.S.C. 12131, *et seq.*, and its enabling regulations, 28 C.F.R. 35.101 *et seq.* (2022), prohibit public entities from excluding individuals with disabilities from participating in, or receiving the benefits of, services, programs or activities provided by the entity, or otherwise discriminating against individuals with disabilities because of their disability.

282.    Members of the ADA Subclass experience physical, cognitive, and psychiatric disabilities that qualify them as individuals with disabilities under the ADA. 42 U.S.C. § 12131(2).

283.    Defendants are public officials of a public entity subject to the ADA. 42 U.S.C. § 12131(1)(A)–(B).

284.    Under the regulations implementing the ADA, public entities may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii) (2022).

285. The public entity is also required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination based on disability[.]" 28 C.F.R. § 35.130(b)(7)(i) (2022).

286. Moreover, the ADA and its implementing regulations require the State to place individuals with disabilities in the most integrated community settings appropriate to their needs, rather than institutions. 28 C.F.R. § 35.130(d) (2022); *see also* 42 U.S.C. § 12131; *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 119 S. Ct. 2176 (1999).

287. By placing foster children with disabilities in institutions instead of foster homes in the community, Defendants have violated the ADA Subclass members' rights under *Olmstead* and the integration mandate of the ADA to placement in the least restrictive setting appropriate to their needs. 42 U.S.C. § 12131; 28 C.F.R. § 35.130(d) (2022); *Olmstead*, *supra*.

288. Defendants have further deprived ADA Subclass members of their rights to placement in the least restrictive setting under *Olmstead* and the integration mandate by failing to "make reasonable modifications" in the policies, practices, and procedures of Alaska's foster care system to ensure that children with disabilities are not left behind, but are instead given an equal opportunity to obtain the same result as other foster youths. 28 C.F.R. § 35.130(b)(1)(iii) (2022); 28 C.F.R. § 35.130(b)(7)(i) (2022). The Defendants have failed to modify their programs to ensure that foster youth with disabilities have an equal opportunity to obtain the benefits of:

a.   OCS "Safety Plans" that would allow them to remain in their family home under OCS supervision;

b.   Appropriate healthcare and timely health screenings provided in the most integrated setting appropriate to their needs;

c.   Timely delivery of behavioral healthcare and other disability-related community-based services needed to avoid unnecessary placement changes, or placement at psychiatric hospitals, residential care facilities, and other institutional settings; and

d.   Services delivered to foster care providers to enable them to meet the need of foster youth with disabilities, including respite care services.

289.   By engaging in the foregoing actions and inactions, the Defendants have discriminated against the members of the ADA Subclass based on their disabilities in violation of 42 U.S.C. § 12132.

290.   As a result of the Defendants' violations of the ADA, the ADA Subclass members have suffered injuries, are at risk of suffering injury and will continue to be at risk of suffering further injuries unless Defendants are required to comply with applicable law.

## SEVENTH CAUSE OF ACTION
### 29 U.S.C. § 701 *et seq.*–The Rehabilitation Act
### (On Behalf of the ADA Subclass Against All Defendants)

291.   Plaintiffs repeat and incorporate by reference all the allegations in each of the preceding paragraphs.

292.     Like the ADA, the Rehabilitation Act and its implementing regulations prohibit entities receiving federal funding from excluding individuals with disabilities from participating in, receiving the benefits of, or otherwise discriminating against individuals on account of their disabilities. 29 U.S.C. § 794(a).

293.     The Rehabilitation Act and its implementing regulations likewise require covered entities to provide individuals with disabilities services in the most integrated setting appropriate to their needs and an equal opportunity to participate in or benefit from available services. 45 C.F.R. § 84.4(b)(2) (2022).

294.     Members of the ADA Subclass have physical, cognitive, and psychiatric disabilities that make them qualified individuals with disabilities under the Rehabilitation Act. 29 U.S.C. § 705(20).

295.     The Defendants receive substantial federal funding to operate the statewide foster care system, and DHSS's and OCS's operations constitute a "program or activity" under the Rehabilitation Act. 29 U.S.C. § 794(a), (b)(1)(A).

296.     For all the reasons set forth above, Defendants have violated the Rehabilitation Act by failing to provide foster children with disabilities an equal opportunity to participate in foster care services detailed above, including placement in the most home-like, least restrictive setting appropriate to their individual needs.

297.     As a result of Defendants' past and ongoing violations of the Rehabilitation Act, the ADA Subclass members have suffered injuries, are at risk of suffering injury, and

will continue to be at risk of suffering further injuries unless Defendants are required to comply with applicable law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs request that this Honorable Court:

I.      Assert jurisdiction over this action;

II.     Order that Plaintiffs may maintain this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure;

III.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

      a.      Defendants' violation of Plaintiffs' right to be free from harm under the Fourteenth Amendment to the U.S. Constitution;

      b.      Defendants' violation of Plaintiffs' rights under the First, Ninth and Fourteenth Amendments to the U.S. Constitution;

      c.      Defendants' violation of Plaintiffs' rights under AACWA, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 *et seq.*;

      d.      Defendants' violation of Plaintiffs' rights under ICWA, 25 U.S.C. §§ 1901 *et seq.*;

      e.      Defendants' violation of Plaintiffs' rights under Title II of the ADA, as amended, 42 U.S.C. § 12132 *et. seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*;

IV.   Permanently enjoin Defendants from subjecting Plaintiffs to practices that violate their rights, including:

a.    Require Defendants to maintain caseloads for each case worker providing direct supervision and planning for children at accepted professional standards, as developed by either the COA and/or the CWLA;

b.    Require Defendants to recruit and/or retain enough qualified and appropriately trained workers providing direct supervision and planning for children, as set by the COA and/or CWLA;

c.    Require Defendants to place children in placements that are safe, appropriate, and in the least restrictive environment that best suits their individual needs;

d.    Enjoin Defendants from placing any child in a congregate care setting based on the unavailability of foster home resources;

e.    Require that Defendants ensure that all children who enter foster care placement receive within 30 days of entering care a comprehensive evaluation of the child's needs, performed by a qualified individual, including whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with disabilities under the ADA and that the child be reevaluated as the child's needs and the information available to Defendants change;

f.    Require that Defendants ensure that all children who enter foster care placement receive within 60 days of entering care an adequate and

individualized written case plan for treatment, services, and supports to address the child's identified needs; describe a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting; describing any interim placements appropriate for the child while the child moves toward a permanent home-like setting; and describing the steps needed to keep the child safe during the child's time in Defendants' custody;

g.      Require that Defendants ensure that all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatment;

h.      Require Defendants to file and proceed with a timely petition to free a child for adoption when the child's permanency plan is adoption, unless the child's case plan documents show that doing so is not in the child's best interest or that the child has a statutory exemption from this requirement;

i.      Require Defendants to take all necessary steps to seek and secure an appropriate adoptive placement for a child when the child's plan is adoption;

j.      Require that Defendants, when a child turns 14 years old while in its custody and is unlikely to be reunified with family, adopted, or otherwise placed in a permanent family-like setting, engage in transition planning to meet the healthcare, educational, employment, housing, and other social needs of the children in transitioning to adulthood;

Class Action Complaint                    Page 87 of 90
*Jeremiah M., et al. v. Adam Crum, et al.*
Case No. 3:22-cv-
Case 3:22-cv-00129-JWS   Document 1   Filed 05/20/22   Page 87 of 90

k.      Require Defendants to provide all necessary services to each child who enters foster care, including necessary services to the child's parents to ensure a speedy reunification for as long as the child's permanency plan remains reunification;

l.       Enjoin Defendants from withholding foster care maintenance payments from eligible unlicensed kinship caregivers of members of the Kinship Subclass;

m.      Require Defendants to assist kinship caregivers in obtaining foster care licenses to take care of members of the Kinship Subclass;

n.       Require Defendants to place members of the Alaska Native Subclass with ICWA-compliant caregivers;

o.       Require that Defendants ensure that all children with physical, mental, intellectual, or cognitive disabilities shall receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable professional standards, family foster homes with supportive services;

p.       Require that Defendants ensure that an adequate array of community-based therapeutic services are available to children with disabilities;

q.       Require that Defendants ensure that they develop an adequate array of community-based therapeutic foster homes and therapeutic placements to meet the needs of children with disabilities; and

r.      Require that Defendants conduct annual case record reviews of a statistically significant sample of children in Defendants' custody to measure how likely children in Defendants' custody are to receive timely permanence, as required by state and federal law, how often they are maltreated in care; and how well placement stability is maintained for these children;

V.      Award Plaintiffs the reasonable costs and expenses incurred to litigate this action, including reasonable attorneys' fees, under 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h);

VI.     Grant such other equitable relief as the Court deems just, necessary and proper to protect Plaintiffs from further harm while in OCS's custody in foster care.


Dated: May 19, 2022                          /s/ *Marcia Robinson Lowry*
                                             Marcia Robinson Lowry (*pro hac vice pending*)
                                             mlowry@abetterchildhood.org
                                             Julia K. Tebor (*pro hac vice pending*)
                                             jtebor@abetterchildhood.org
                                             Jonathan G. Borle (*pro hac vice pending*)
                                             jborle@abetterchildhood.org
                                             **A BETTER CHILDHOOD**
                                             355 Lexington Avenue, Floor 16
                                             New York, NY 10017
                                             Telephone: (646) 795-4456
                                             Facsimile: (212) 692-0415

                                             Danielle M. Ryman, AK Bar No. 9911071
                                             dryman@perkinscoie.com
                                             Elena M. Romerdahl, AK Bar No. 1509072
                                             eromerdahl@perkinscoie.com
                                             Michael O'Brien, AK Bar No. 0311084
                                             mobrien@perkinscoie.com
                                             **PERKINS COIE LLP**

1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Telephone: (907) 279-8561
Facsimile: (907) 276-3108

James J. Davis, Jr., AK Bar No. 9412140
jdavis@njp-law.com
Nicholas Feronti, AK Bar No. 2106069
nferonti@njp-law.com
Savannah V. Fletcher, AK Bar No. 1811127
sfletcher@njp-law.com
**NORTHERN JUSTICE PROJECT, LLC**
406 G Street, Suite 207
Anchorage, AK 99501
Telephone: (907) 308-3395
facsimile: (866) 813-8645

Mark Regan, AK Bar No. 8409081
mregan@dlcak.org
Patrick D. Stocks, AK Bar No. 1505032
pstocks@dlcak.org
**DISABILITY LAW CENTER OF ALASKA**
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Telephone: (907) 565-1002
Facsimile: (907) 565-1000

*Attorneys for Plaintiffs*