1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
2

3  JEREMIAH M.,                    )
                                   )
4          Plaintiff,              )
                                   )
5      vs.                         )  CASE NO. 3:22-cv-00129-JMK
                                   )
6  ADAM CRUM, ET AL.,              )
                                   )
7          Defendant.              )
   _____ )
8

9              TRANSCRIPT OF ORAL ARGUMENT
      **BEFORE THE HONORABLE JOSHUA M. KINDRED, DISTRICT JUDGE**
10              Tuesday - December 20, 2022
                10:04 a.m. - 11:02 a.m.
11                 Anchorage, Alaska

12  **FOR THE PLAINTIFF:**
        A Better Childhood
13      BY:  MARCIA ROBINSON LOWRY
        BY:  JULIA K. TEBOR
14      BY:  JONATHAN G. BORLE
        355 Lexington Avenue, Floor 16
15      New York, New York 10017
        646-795-4456
16

17  **FOR THE DEFENDANT:**
        State of Alaska, Attorney General's Office
18      BY:  CHRISTOPHER A. ROBISON
        BY:  KATE DEMAREST
19      1031 West Fourth Avenue, Ste. 200
        Anchorage, Alaska 99501
20      907-269-5275

21  Clerk in attendance: Jessica Solnick

22  _____
                    **STACY M. BALDWIN**
23              **Realtime Certified Reporter**
                **Federal Official Court Reporter**
24              222 West 7th Avenue, #4
                Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record

```
1              (Call to Order of the Court at 10:04 a.m.)

2              DEPUTY CLERK:  All rise.  His Honor, the Court, the

3    United States District Court for the District of Alaska is now

4    in session, the Honorable Joshua M. Kindred presiding.

5              Your Honor, we're on record on Case No.

6    3:22-cv-00129-JMK, Jeremiah M., et al. versus Adam Crum, et al.

7    Will counsel please state your names for the record.

8              MR. ROBISON:  Good morning, Your Honor.  Chris Robison

9    from the Department of Law, here for the defendant.  Also I

10   have with me Kate Demarest.

11             THE COURT:  Good morning.

12             MS. LOWRY:  Good morning, Your Honor.  Marcia Lowry

13   from A Better Childhood.  With me is Julia Tebor and Jon --

14   Borle, sorry, just froze, is Jonathan Borle.

15             THE COURT:  Good morning and thank you, Madam Clerk.

16             So we are here today for oral arguments.  I don't know

17   that any of you have appeared in front of me before, and I

18   handle oral arguments maybe a little bit differently than my

19   colleagues.  What I would like to do, absent objections from

20   the parties, is I have a litany of questions.  This is a

21   complex motion.  And what I would like to do is actually start

22   off by having the parties remain seated, going through the list

23   of questions that I have, having those discussions, having it

24   be more conversational.  And at the end I will invite both

25   parties an opportunity to present any additional arguments they
```

1    would like to make, sort of a closing argument, if you will,

2    and proceed that way.  I find it to be efficient and quite

3    frankly more product from my perspective, although I recognize

4    that everyone's prepared to give arguments and I don't want to

5    frustrate that endeavor.

6         So, again, absent objections that's how I would like

7    to proceed this morning.  Does that work for both parties?

8         MR. ROBISON:  Yes.

9         THE COURT:  And, again, feel free to remain seated.

10   And I do think, sort of prudence dictates that we take these

11   sort of in the broader categories of issues.

12        And we'll start here with *Younger* -- and I should also

13   note, if there's a topic or an issue that I don't ask you

14   questions about, chances are it's because I've either already

15   made up my mind or I don't see any benefit from any discussion.

16   There are a lot of questions that I have and I do want to use

17   the time efficiently.  So we'll just get right into it.

18        So -- and I'll start with the state here.  You cite

19   frequently in your motion to *Moore*.  Is the fact that in *Moore*

20   it was the parents that brought the complaint et al., does that

21   distinguish the present matter from the applicability of *Moore*

22   in this case?

23        MR. ROBISON:  So to answer that question, Your Honor.

24   Actually in *Moore* the parents were parties, the Court's correct

25   on that, but the children were also parties in *Moore.*  I think

1  that was something that was, you know, in our view, lost on the

2  Fourth Circuit when it issued the *Jonathan R.* opinion late this

3  summer.  So in our view it doesn't make *Moore* any less

4  applicable.  And I think the courts, the circuit courts at

5  least, that have come down on our side of this issue -- 31

6  *Foster Children, Joseph A., Ashley W.* -- have all cited to

7  *Moore* in support of the notion that *Younger* applies to these

8  types of cases.

9          THE COURT:  But isn't *Moore* also distinguishable, even

10  if you're correct that it wasn't just the parents but it was

11  also the children, that they were challenging the initial

12  action of the court to remove the children from their parents?

13  Doesn't that make this distinguishable -- that distinguishable

14  from this case where that isn't an aspect of the original

15  complaint?

16          MR. ROBISON:  Yeah.  I think -- they were challenging

17  an entire statutory scheme, I think.  It may have been the

18  statutory scheme pertaining to removal.  You know, I'm hesitant

19  to disagree too much with the fact that -- does that make *Moore*

20  different?  Does it make it distinguishable and thus not

21  applicable?  I would disagree with the Court there.

22          I have something to add.

23          THE COURT:  Please do.

24          MR. ROBISON:  So on this notion that *Younger* applies

25  only to the initial removal hearing in the case, but not to

1  subsequent hearings in the same case, a couple of points I want

2  to make there.  The circuits that have come down on our side of

3  this question -- *Oglala, Joseph A., 31 Foster Children, Ashley*

4  *W.* -- they haven't drawn that distinction, would be point one.

5          Point two, I think this sort of piecemeal application

6  of *Younger* that you get into if you come down on the side that

7  it applies to the initial removal hearing and not subsequent

8  hearings in the very same case doesn't really serve the

9  federalism principles that underlie *Younger*.

10         And then the third point I would make is that you

11 have -- the sort of penal nature of the removal hearing, that's

12 an issue throughout the case.  So if you look at the orders

13 that we ask the Court to take judicial notice of, many orders

14 that superior courts enter that occur after the initial removal

15 of the child contain an explicit finding that removal continues

16 to be appropriate and then ultimately proceedings may terminate

17 or may culminate in termination of parental rights.  And so

18 you're back into this situation where I think those cases, if

19 you come down on their side of the ledger, that it only applies

20 to the initial removal hearing, I think it would also have to

21 apply to any termination of parental rights hearing as well.

22 So you've got this kind of odd, nonsensical situation where

23 *Younger* applies at bookends of the case, but to nothing that

24 happens in the middle.  Even though the removal of the child,

25 at least in Alaska, continues to be at issue throughout the

1   proceeding.

2          THE COURT:  But isn't there a distinction, I mean

3   again, it's not apples -- or it's not completely analogous

4   here, but if you look at the context of a criminal case from

5   soup to nuts, the intent and the endeavor of the proceedings

6   from arraignment to say a probation violation, are very

7   different.  And so wouldn't it be fair to say that when you're

8   looking at what's in between the bookends, the endeavor of OCS

9   and the Court, I guess to the extent that they are involved in

10  it, is the best interest of the child, which is separate from

11  the more penal nature that you're describing?

12         So isn't there a pragmatic reason to make that

13  distinction between the bookends and the interior?

14         MR. ROBISON:  I think the pragmatic problems with

15  drawing that distinction would be that the best interest of the

16  child includes whether or not removal continues to be

17  appropriate.  So whether or not the -- I mean, if you look at

18  it very narrowly through the lens of the child, you know, I

19  think you can get to where Your Honor is going there.  The best

20  interest of the child includes whether or not continued removal

21  from the parent is appropriate.

22         Another point I wanted to make is, in terms of Supreme

23  Court *Younger* cases, as far as I can tell no Supreme Court

24  opinion at least has ever drawn this distinction about hearings

25  or issues in the state court case.  They all refer to

1   proceedings.  So if you look at *Middlesex*, *NOPSI*, *Sprint,*
2   *Moore*, *Younger*, there's really nothing in those opinions that
3   suggests that this type of piecemeal application of *Younger* is
4   what the Court had in mind when that doctrine was created
5   decades ago.
6           THE COURT:  Thank you.
7           And for plaintiffs, we'll go from *Moore* to *Tinsley.*
8   How is this -- this concept that it is one continuance
9   proceeding, how does that impact this Court's analysis under
10  the *Tinsley* decision, does it impact it at all?
11          MS. LOWRY:  Your Honor, the Supreme Court has
12  characterized *Moore* as a state-initiated proceeding to gain
13  custody of the children because of potential abuse.  And so,
14  they're different interests in these proceedings.  And this is
15  a group of people -- the children being people.  This is a
16  group of children who do not otherwise have any right to
17  challenge basically the conditions under which they are in OCS
18  custody in any meaningful way.
19          And so when we try to apply *Younger* we have to
20  remember that it is about comity, of course, and about the
21  interference with state court proceedings.  And in this
22  instance it's quasi criminal proceedings.  So at the beginning
23  of the proceeding it is about the removal of the children from
24  the home.  At perhaps the end of the proceeding, there's a
25  termination.  That's a separate proceeding.  It's about

1  parental rights, but what these proceedings are aimed at is
2  what's happening to the child.

3          And the children get placed by OCS without regard to
4  OCS having to go back to court.  The children get placed in the
5  custody of the child welfare agency.  The child welfare agency
6  decides whether or not there are enough foster homes, whether
7  or not the licensing of the foster home is adequate.  It
8  decides everything regarding what's happening to the child in
9  foster care.  And so we think that that distinction really
10 holds up.

11         And, in fact, Your Honor, the *Moore* case originated in
12 the Fifth Circuit.  In the Fifth Circuit there was no
13 difficulty distinguishing between the quasi criminal
14 proceedings in *Moore* and the subsequent lawsuit that was
15 brought, *M.D. Stukenberg,* that was brought to deal with what
16 happens to children in the foster care system, in that case
17 declined to abstain and went on to onto actually court judgment
18 and went up to Fifth Circuit of Appeals.  Where it was largely
19 upheld and had no difficulty separating the different functions
20 of these state proceedings, said no abstention here.

21         So that really I think illustrates the difference in
22 what's going on in these proceedings.  And, in fact, in *Moore*,
23 of course, the parents were challenging the removal statute,
24 challenging the constitutionality of the removal statute.

25         In this case plaintiffs are not seeking any relief

1  with regard to juvenile court proceedings, with regard to state

2  law, with regard to state processes in the judicial

3  proceedings.  Their relief is directed solely to OCS and what

4  it provides in its foster care system, and a lot of that is

5  outside of court.  The Court reviews.  And, in fact, *NOPSI* says

6  that when it is simply a review of executive action, which is

7  the executive agency, then it is also something that does

8  not -- that bars abstention.  That there is no abstention.

9          THE COURT:  Thank you.

10          And, Mr. Robison, on that point, I recognize that it's

11  difficult, to the degree that the superior court is wed to OCS

12  in these matters, but plaintiffs here are challenging OCS and

13  OCS specifically.  And doesn't that fact, that what this Court

14  would be doing is reviewing claims against OCS and not sort of

15  serving as an appellate court for the state superior court,

16  doesn't that distinction alone suggest that *Younger* abstention

17  is not appropriate here?

18          MR. ROBISON:  I think they say they're only

19  challenging OCS, but if you look at how CINA proceedings are

20  conducted in this state, what they are challenging is so

21  intertwined with what goes on in superior courts in CINA cases,

22  I think they are effectively interfering with CINA proceedings.

23  And again, I would encourage the Court to take a close look at

24  the orders that we provided and that we ask the Court to take

25  judicial notice of, I think you'll find some things that sound

1  very familiar.

2        On the first point that we discussed, Your Honor, I

3  wanted to quote the specific language in Exhibit B of our

4  appendix, page 2, that kind of goes to this notion that *Younger*

5  applies to the initial removal hearing, but not subsequent

6  hearings in the same case.  This is an order from a permanency

7  hearing, which occurs very much down the road from the initial

8  removal hearing.  In finding B, the Court found with respect to

9  three of the named plaintiffs:  "That at the time continued

10  placement in the home is contrary to the welfare of each child

11  based on the information provided in the department's report."

12        So that's an expressed finding by a superior court

13  that goes to this issue of removal.  And I wanted to make sure

14  I pointed that out to the Court, because I think it

15  demonstrates how that issue permeates the entire proceeding and

16  it is consistently something that superior courts are

17  evaluating.

18        THE COURT:  Well, in that vein, so if the argument is

19  that the superior court is more than just a perfunctory vehicle

20  when it comes to the ongoing placement of a child, is there

21  avenue -- if this is not the proper vehicle, this Court, for

22  the type of systemic change that this complaint would suggest

23  is necessary, is the superior court a vehicle that plaintiffs

24  can avail themselves of to, not get specific relief for

25  individuals, but to push for the systemic changes that are

1  evident and articulated in their various injunction

2  requirements?

3           MR. ROBISON:  Yeah.  And I'll note that we haven't

4  really taken a position on that point.  So I'm not going to sit

5  here and tell the Court that class actions are or are not

6  available in a CINA proceeding.  I suspect they're not.  But I

7  don't think that's -- I think the overarching point would be

8  that's not a barrier to the Court applying *Younger.*  I think

9  it's up to them to demonstrate that the state court forum is

10  inadequate.  And in a situation like here, where they haven't

11  pressed their claims in state court, I think what the Supreme

12  Court told us in *Pennzoil* is that they're operating against the

13  presumption that the state court forum is adequate.

14           And on this notion of Rule 23, and somehow that being

15  an end run on *Younger*, I would point the Court to the cases

16  that say that Rule 23 doesn't enlarge or modify substantive

17  rights for one, and you don't have a substantive right to bring

18  a claim in federal court when it's subject to *Younger.*  So

19  that's point one.

20           Point two, I would point the Court to the cases in our

21  motion that talk about, at the 12(b)(6) stage, class action

22  allegations being irrelevant.

23           And then the third point I would make is with more of

24  a policy argument, but if -- if class-wide relief was an end

25  run around *Younger*, why couldn't a criminal defendant in a case

1    that is indisputably subject to *Younger* simply file a complaint

2    in federal court and invoke Rule 23 and go, hey, no *Younger*,

3    I've pled a class action, doesn't apply, I can't do a class

4    action down in my state criminal case, so *Younger* doesn't

5    apply.

6            THE COURT:  And I can appreciate that, Mr. Robison.  I

7    think that's part of the question.  But the broader, maybe more

8    philosophical question is here, where it does seem, again

9    assuming that the allegations in the complaint are accurate, is

10   the superior court a forum where that plaintiffs could go to

11   and actually seek this level of systemic change?

12           MR. ROBISON:  A superior court cannot order OCS to

13   hire more case workers or reduce case loads, but a superior

14   court can deal with a situation like the ones described in

15   their complaint where OCS isn't returning phone calls.  OCS

16   case workers haven't given the foster family the child's

17   medical records.  The specific complaints that these named

18   plaintiffs have raised about OCS in our view could absolutely

19   be addressed in superior court.

20           THE COURT:  So talking about the relief requested, I

21   mean, if the CINA proceedings -- obviously, there are folks --

22   an individual child's situation -- I guess can you provide

23   specific examples of how the relief requested here would impact

24   or affect a superior court's decision in a specific CINA case?

25           MR. ROBISON:  Sure.  We cited the Court to a case

1    called *Zander B.,* in our pleading.  It was a case where OCS

2    placed a child with his natural grandmother.  In that case his

3    foster parent, who he had lived with before, actually

4    intervened and challenged that placement on the basis that it

5    wasn't in the best interest of the child.  Their theory was

6    that the grandmother simply was not capable of caring for that

7    child.  So it's complaint about placement.

8          So that issue gets litigated in both the superior

9    court and before the Alaska Supreme Court.  Both agree with the

10   foster parents that placement with the grandmother was an abuse

11   of discretion and thus the child went back to his foster

12   parent.  Here they want an injunction across the board that

13   theoretically if the class is certified would apply to all

14   children in foster care that may be in foster care sometime

15   later, that all placements be safe, appropriate, and in the

16   least restrictive environment.  I think is the language that

17   they use.

18         What that does is it makes you, makes this Court the

19   ultimate arbiter or decider of issues like the one in *Zander B.*

20   If the grandmother wasn't happy with the superior court's

21   decision or with the Alaska Supreme Court's decision, she could

22   come to this Court and say no, no, this placement with me is in

23   the best interest of the child.  And then you've got to look at

24   that issue and that would be a state-wide, system-wide problem.

25   You know, in essence, there would be no finality for any

1   superior court or Alaska Supreme Court decision regarding

2   placement, because it would always be subject to second

3   guessing by the federal court under the injunction.

4           THE COURT:  Ms. Lowry, what about that?  So it is a

5   concern.  I barely have the confidence to do my job.  I don't

6   want to be in a position where I'm effectively the appellate

7   court for all CINA proceedings.  And the injunctions here do

8   seem to suggestion that it would be a frequent occurrence that

9   individuals who felt aggrieved by their CINA proceedings would

10  come to this Court for enforcement of the injunction or for

11  some other remedy born from these proceedings.  How do we avoid

12  that, or is it avoidable at all?

13          MS. LOWRY:  I'm sorry, Your Honor.  I just didn't hear

14  the end of what you said.

15          THE COURT:  I said:  Is that a concern?  Is it

16  avoidable?  I mean, is that inevitable?

17          MS. LOWRY:  No, Your Honor.  And I think when you look

18  at the circumstances of the individual plaintiffs, the named

19  plaintiffs, who do have standing, Your Honor.  When we look at

20  their circumstances we see that they cannot be solved solely by

21  the superior court.  So some of these children have been in

22  five or six or seven or eight different placements.  And that's

23  because the caseloads are too high and they can't be addressed

24  by the superior court.  How's the superior court going to deal

25  with that?  Superior court could conceivably order that the

1  particular child that's put forward can only have five cases
2  but then what happens to all the other children?  Also there's
3  no way to know what the superior court does necessarily,
4  because the proceedings are confidential and they only get
5  reported if they go up to the higher court.

6        But also the judge that is, you know, sitting on the
7  superior court, no matter how diligent, how thorough, that
8  judge is going to have a limited option in terms of where
9  they're going to place the child.  Most of these children --
10  not most of them, but many of these children who are the named
11  plaintiffs needed a therapeutic foster home.  There are limited
12  numbers of therapeutic foster homes.  The child welfare system
13  in Alaska is not adequate.  It's not constitutionally
14  sufficient.

15        And so the judge in the superior court is limited by
16  what OCS has presented to it.  And if there are no therapeutic
17  foster homes for the next three months that are available,
18  what's the judge to do?  The judge chooses the best possible
19  option, but there are not enough options.  They're not the
20  right kinds of options.

21        THE COURT:  But, Ms. Lowry, doesn't that suggest that
22  this Court would be in the day-to-day vocation of interfering
23  with these CINA proceedings in order to enforce these
24  injunctions moving forward?

25        MS. LOWRY:  No, Your Honor.  I don't think so.  First

1  of all, there is no problem with -- with a court issuing an

2  injunction requiring the development of more placements, more

3  facilities, more workers, because if that is constitutionally

4  required the Court has jurisdiction to order it.  That's an

5  ancillary expense, and it maybe isn't in fact even a necessary

6  expense.  I think sitting here today we don't know whether it's

7  a necessary expense, because we don't know whether, for

8  example, the caseloads in OCS have a 60 percent turnover rate.

9  That costs the state a lot of money.  Every time a new worker

10  is hired and has to be trained and then leaves, which is what's

11  happening now, 60 percent of the workers are turning over, it's

12  costs the state money to train the worker, to have the worker

13  to have a lower caseload to start, the worker to know what to

14  do.  So if, in fact, you could lower the turnover rate it would

15  not necessarily --

16           THE COURT:  Ms. Lowry, I appreciate the rationale that

17  I guess gives rise or is the catalyst for the request for the

18  specific injunctions.  I think this Court's concern is if I

19  were to issue those injunctions, is it unavoidable that I am

20  going to eventually be in the position where I'm interfering

21  with CINA proceedings, based on those injunctions.

22           MS. LOWRY:  I don't think so, Your Honor.  I really

23  don't think so.  And I think at this preliminary stage that is

24  not something that we can really deal with.  I think that we

25  have -- we have offered remedies that we think do not violate

1    the rules.  And I think it is really too earlier to decide how

2    the remedies are going to play out.  Obviously we have no

3    discovery in this case.  We have to find out whether it's gone

4    into -- what the issues are.  But certainly the turnover rate

5    alone is a tremendous expense for the state.  And the state can

6    deal with that by having a better work force and people who

7    stay longer.

8            THE COURT:  Thank you, Ms. Lowry.

9            I'd like to move to *O'Shea* if we may.  I think I'll

10   start again with the state.  I think, it appears that the

11   majority of cases that pertain to *O'Shea* are aimed directly at

12   statutory and constitutional violations in the administration

13   of state courts.  Here, again, the complaint is aimed

14   exclusively at OCS.  Given the nature of the complaint, doesn't

15   that sort of take *O'Shea* abstention off the table?

16           MR. ROBISON:  I would agree with the Court about the

17   *O'Shea* cases that are out there.  But I think terms of -- the

18   goal behind *O'Shea* is to keep you from having to monitor on an

19   ongoing basis what's going on in state proceedings.  And I

20   don't really have much to add here, other than just to go back

21   to the example we used earlier about placements and services.

22   If those issues are addressed by the injunction, then they're

23   always open for second-guessing and challenge before Your

24   Honor.  So you would be in a position where you would have to

25   be on an ongoing basis monitoring what's going on in state

1    court proceedings.

2          THE COURT:  So in that vein, I mean, obviously the

3    worrying of the injunctions that are requested -- I'm not wed

4    to those.  So couldn't I modify injunctions in such a fashion

5    that I could avoid the *O'Shea* implications?  In other words, is

6    it premature, given that we haven't -- is dismissal at this

7    stage premature given we don't really know what injunctions we

8    may land at?

9          MR. ROBISON:  I don't think so, Judge.  If you look at

10   the cases; *Younger*, *O'Shea*, *Rooker-Feldman*, jumping ahead a

11   little bit to standing in subject matter jurisdiction, those

12   issues are dealt with.  I mean, those are threshold issues.

13   They're dealt with early in the case.  And I think we cited the

14   court to a Ninth Circuit case in our reply.  It was a putative

15   class action that was challenging some sort of executive

16   action.  It was not a child welfare case.  But the Ninth

17   Circuit went through at the appellate level and looked at each

18   request for relief.  And I believe that was after a motion to

19   dismiss.

20         So this notion that, you know, we just get to kind of

21   plow ahead and we'll figure out the relief later, I would

22   disagree with that.  I think it's just -- I think these are

23   threshold issues that need to be dealt with at the motion to

24   dismiss stage.

25         THE COURT:  So I know I've sort of gone back and forth

1   between *Younger* and *O'Shea*.  But Ms. Lowry's last answer about
2   the involvement this Court would have in monitoring day-to-day
3   CINA proceedings, given the nature of the relief requested.
4   Would you disagree with her contention that it's either
5   premature or it's not necessary that this Court would be in the
6   business of running the superior court as it relates CINA
7   matters?

8          MR. ROBISON:  I think the Court would be in the
9   business of running or at a minimum overseeing what's going on
10  in superior court CINA cases.  So I would disagree with that.

11         A couple other points I want to make.  To get in the
12  courthouse they have to have standing.  You have to have
13  subject matter jurisdiction.  The last component of subject
14  matter jurisdiction is redressability.  They have to plead for
15  sort of concrete relief that is likely to remedy the harms
16  complained about in the pleading.

17         We don't get to sit here and guess.  We don't get to
18  sit here and go, well, if we had more case workers maybe that
19  would help plaintiff George B., if we had a case worker cap
20  maybe that would help plaintiff Gail T. We don't get to guess
21  and speculate --

22         THE COURT:  But there's a difference between guesswork
23  and speculation and recognizing that if you had an OCS worker
24  that went from having 100 cases to having a dozen, that would
25  invariably result in better work product, better results.  I

1    mean, that's not speculation, right, that's just intuition?

2          MR. ROBISON:  It might.  I would note that on -- the

3    two remedies that Ms. Lowry talked about, more therapeutic

4    foster homes and case worker caps or hiring more caseloads, I

5    don't know that we have a huge sample size on either of those.

6    I'm not sure they've ever gotten relief anywhere that has

7    required a state child welfare agency to go out and create or

8    find more therapeutic foster homes.  With all due respect, I'm

9    not sure that's something you can order the state to do.

10          As far as case worker caps and caseloads, I think we

11   got a sample size of one there and they did obtain that relief

12   in the case down in Texas.  And it was struck down by the Fifth

13   Circuit, I think as too blunt a relief for a complex problem.

14   That's pretty close to a direct quote from the Fifth Circuit.

15          So I think the case law on both of those remedies is

16   not great for the plaintiffs.

17          THE COURT:  Let me approach this from a different

18   angle.  I'm going to ask you an unfair and pointed question.

19   Is the state's contention here that OCS is doing their job

20   well?  That they're meeting the goals and endeavors of what OCS

21   has intended to do?  Are they meeting expectations?

22          MR. ROBISON:  So we're outside the pleading so I'm

23   going to qualify my answer.

24          THE COURT:  That's fine.

25          MR. ROBISON:  I think OCS has --

```
 1          THE COURT:  Actually, you know what, I'm not going to
 2   make you answer it.  Let's assume that they are not.  Let's
 3   just hypothetically say OCS is failing categorically,
 4   unequivocally.  How could these -- the relief requested not
 5   serve to better that organization and in turn provide actual
 6   relief for the named plaintiffs?  If we all accept that OCS is
 7   failing, providing them with more resources and providing them
 8   with, I guess, better tools across the board, how could that
 9   not result in redressing the injuries that these 14 named
10   plaintiffs have and will suffer?
11          MR. ROBISON:  Let me see if I can break that down a
12   little bit.
13          So in terms of more resources, I think most courts
14   that have written on this topic agree that the more resources
15   in theory would help child welfare agencies.  But I also think
16   courts have been very skeptical about whether or not that's
17   something a federal district court can do.  And I would refer
18   the Court --
19          THE COURT:  Sure.  Whether or not I can do it is
20   different than whether or not that would theoretically provide
21   some relief to the party.
22          MR. ROBISON:  And I would -- I mean, I do want to take
23   issue with that theory a little bit.  And I would point the
24   Court to Judge Posner's opinion in the *K.H. v. Morgan* case.
25   It's a case that they cited.
```

1          And in that case he -- admittedly it's dicta, because
2      it was a suit for damages, but he's addressing the plaintiffs'
3      complaint about a state agency shuffling kids from placement to
4      placement to placement.  Very similar to what Ms. Lowry
5      mentioned earlier.  And what Judge Posner says is, "the
6      underlying problem is not a lack of professional competence,
7      but a lack of resources, a problem of political will unlikely
8      to be soluble by judicial means."
9          So in his mind I think if these problems do exist, he
10     was very skeptical about whether or not there're problems that
11     can be solved by a court.  And I think that kind of highlights
12     the disconnect that I see in their pleading.  You know, so
13     they've got these very specific allegations with respect to
14     these named plaintiffs, things that they complain about.  But
15     then none of the relief that they request really goes to the
16     harms that these plaintiffs allegedly suffered.
17         In other words, I'll go back to the child whose
18     medical records allegedly weren't given to his foster parents.
19     I mean, there's a very narrow form of relief that the Court
20     could order that would remedy that problem.
21         THE COURT:  But I can't, because if I did, then *O'Shea*
22     would be applicable, right?
23         Let's turn to Ms. Lowry, and that's sort of the rub
24     here I think from plaintiffs' perspective is there is this
25     delta between, you know, plaintiffs can't ask for the specific

1  relief without it implicating *O'Shea*.  And so in your briefing

2  you talked I think about a couple of the named plaintiffs'

3  placement issues.  If this Court were to provide some specific

4  remedy to that, would plaintiffs concede that *O'Shea* abstention

5  would apply under that scenario?

6        MS. LOWRY:  Your Honor, of course, *O'Shea* was directed

7  against a judge and a magistrate, and it was an unusual

8  situation.  And the Supreme Court decided that the only way

9  that relief -- meaningful relief could be granted in that case

10  was by an ongoing audit of the state court proceedings.  That's

11  not the case here by any means.

12        So, for example, we have named plaintiffs who have

13  been in 11 different placements.  We have named plaintiffs who

14  have been in the same institution five different times.  We

15  have a plaintiff who was sent to an out-of-state institution.

16  There is clearly -- this is a motion to dismiss so the

17  allegations, of course, have to be taken as true.  This isn't a

18  state system that is not providing the resources that children

19  need.  So it is not a question of going in and auditing; did

20  this child get one, did that child get one.  Relief in other

21  cases has been ordered with regard to what has to change in the

22  system, not in the state court proceedings.  In *O'Shea* there

23  was a question about the state court proceedings, and the

24  defendants were a judge and a magistrate.

25        We do not seek in any way to set aside any judgment of

1   the superior court.  What we do seek to do is change what OCS

2   is basically recommending to the superior court, what it is

3   providing, what it has available for the children.  And the

4   superior court would continue to make its own individual

5   decisions --

6           THE COURT:  But, Ms. Lowry, in your opposition you --

7   this is, quote:  "Jeremiah M., Hannah M., Hunter M., have

8   ongoing needs for which OCS is not properly providing services

9   and continue to languish in poor placement, and the same is

10  true for Rachel T., and Eleanor T."

11          What's implicit there is that your -- the plaintiffs

12  are arguing that it is the placement that they are taking issue

13  with.  And if this Court were to offer some remedy to the

14  placement itself, I guess the threshold question is, isn't

15  that -- doesn't that implicate *O'Shea*?

16          MS. LOWRY:  The remedy that we have proposed here, and

17  this is of course preliminarily, we have proposed, has nothing

18  to do with what's going on in the superior court.  So the

19  remedy has to do, again, with what OCS is doing and what it

20  makes available to the superior court.  And, in fact, that in

21  some of these decisions it discusses how not only is it not a

22  circumstance that is abstention worthy, it actually is going to

23  benefit the superior court, because the superior court is going

24  to have more options to choose from and more places to put

25  kids, workers who have lower caseloads, better --

1          THE COURT:  From a policy perspective, I understand

2    all of that.  But I don't know that a factor for the Court to

3    consider here is whether or not what I may or may not order

4    benefits or otherwise impacts the superior court.  It's whether

5    or not I'm interfering in superior court decisions.

6          MS. LOWRY:  Right.

7          THE COURT:  And so I guess, what I struggled with in

8    looking through the plaintiffs' opposition, particularly as it

9    relates to standing, is there were some casual references to

10   certain -- certain named parties -- or I guess children, for

11   lack of a better term.  But there wasn't this comprehensive

12   discussion that Mr. Robison brings up which is there is this

13   policy level relief that plaintiffs are asking for in the

14   version of a litany of injunctions.  And how do those

15   injunctions provide actual relief to the named plaintiffs?

16         MS. LOWRY:  So the relief doesn't -- the relief has to

17   be redressable.  The claims of the plaintiffs have to be

18   redressable.  Ordering OCS to develop more placement,

19   because -- and there needs to be a predicate finding of course,

20   of constitutional or federal statutory violation, but with that

21   predicate this Court can direct that OCS provide more

22   placement.  We know, because of what's alleged in the

23   complaint, that children, for example, are over

24   institutionalized, children with handicaps are over

25   institutionalized, because that's all that OCS really has

1  available for the children.  If OCS provided sufficient

2  facilities and programs and services for kids with

3  disabilities, for example, those children would not have to be

4  institutionalized.  The child would not have to be at North

5  Star five different times.  Another child, I think it is Lana,

6  would not have to go to an out-of-state facility.  That is

7  within the purview of the Court.

8         Now with regards to the remedy, and that's what we're

9  talking about now, with regard to the remedy if there are any

10  remedies that we've proposed, and again, preliminary stage of

11  the proceedings, if there are any remedies that we're proposing

12  that cross over the line into something that is abstention

13  worthy, it is certainly possible for the Court not to allow it.

14         But in order to provide effective relief, redressable

15  relief to these kids, and to the thousands of other kids if we

16  get a class certified, then the Court has to realize that it

17  can in fact order remedies that require OCS to increase its --

18  basically its resources for these kids.

19         THE COURT:  Ms. Lowry, would you agree that the relief

20  requested here -- I mean, it's aspirational, but it's also

21  theoretical in the sense that I think we could all hope that

22  this would result in addressing the end reason of the named

23  plaintiffs, but does Mr. Robison have a point that -- maybe I

24  want to call it intuitively correct, but he referred to it as I

25  think speculative -- are the remedies requested here

1    speculative in nature, or speculative enough to the point where
2    it would be fatal through the lens of standing?

3          MS. LOWRY:  Your Honor, today we are not looking at
4    the ultimate goals of this lawsuit and whether or not the
5    relief that we have proposed is exactly on target.  If the
6    Court does not dismiss this case, it will go forward and there
7    will be discovery and we will learn a lot more about what OCS
8    is providing and what it's not providing.

9          So it is totally unrealistic to approach this from the
10   OCS standpoint and not from the superior court's standpoint.
11   There are two systems that function with regard to these
12   children.  There's the superior court system, which reviews
13   decisions.  There is the executive branch system, which
14   provides the resources for these kids.  They're separate.  We
15   have not targeted the superior court system, at all.  We do not
16   seek in any way to change individual decisions.

17         What we do seek to target is the OCS system and what
18   it provides.  And that is something the Court is certainly
19   competent to do and has the authority, under our laws, to
20   order.  And so if we prove that in fact kids are not going into
21   therapeutic foster homes, because there're too few of them,
22   this Court can order that the state increase the number of
23   therapeutic foster homes.  If this Court finds that the
24   caseloads are too high and turnover is too high and kids are
25   suffering as a result of that, as we think our plaintiffs have,

1    then this Court can issue that express relief.

2            This is really preliminary stage of issues that can't

3    be fully addressed now.  But it is likely and conceivable, and

4    other systems have done it, and other systems have in fact

5    addressed the fact that the resources are inadequate and has

6    ordered more resources and the systems have changed.

7            This is not -- perhaps my adversaries would say this

8    is aspirational.  It's realistic.  It's realistic --

9            THE COURT:  And I don't -- I mean, I guess reasonable

10   people can disagree whether or not it's speculative or whether

11   or not it's intuitive.  I guess, I would disagree, Ms. Lowry,

12   that this Court isn't required to think about the remedies

13   requested in concrete terms as it relates to standard, it is

14   required to do just that at this stage.

15           I recognize that what ultimately may result through

16   the, I guess, in the arena of remedies may look different at

17   the end of this litigation than it does now, but from a

18   standing perspective the Court is required to believe that the

19   relief requested actually addresses the injuries claimed.

20           But I would like to move, I know we're running short

21   on time here.  I would like to talk about ICWA.  Now I

22   recognize that the Supreme Court is hearing a case, *Haaland v.*

23   *Brackeen*.  I don't think that decision is likely to have any

24   impact on this proceeding.  Obviously, I expect to have our

25   decision out far in advance of the Supreme Court's decision.

1   But nevertheless, if either parties have anything that they
2   want to add about that sort of novelty, I'm happy to hear it.

3           With that being said, I want to talk, Mr. Robison,
4   about, I guess, the state's position as it relates to why a
5   1983 claim again, tied to the 1915(b) claim here, why the state
6   doesn't believe that is available for plaintiffs?

7           MR. ROBISON:  Because the ICWA statute has its own
8   enforcement mechanisms, and Congress elected to expressly --
9   maybe not expressly.  Congress did not include 1915 in the ICWA
10  enforcement mechanism.  And I think what the case law tells us
11  is when they decided not to include an enforcement mechanism
12  with respect to a particular portion of a statute, but they do
13  include a private right of action with respect to other
14  provisions in the same statute, that forecloses a remedy under
15  1983.

16          And then I would just also refer the Court to, I think
17  we cited two district court cases, one from the Northern
18  District of California and one from Wyoming, where courts found
19  that there is no private right of action under 1915.  And I did
20  go back and double check those cases.  Neither of those courts
21  suggested, despite there being 1983 claims in one of those
22  cases, neither court suggested that 1915 was enforceable
23  through 1983.

24          THE COURT:  Is it the state's position that even if I
25  weren't persuaded by your argument as it relates to the

1  availability of the 1983 claim, that this would fail the second

2  prong of the *Blessing* test?

3          It seemed implicit in your reply, but it wasn't

4  explicit, I should say.

5          MR. ROBISON:  I'm trying to get there, Your Honor.

6          Are you talking about the prong that the plaintiff

7  must demonstrate that the right asserted is so vague and

8  amorphous that its enforcement would strain judicial

9  competence?

10          THE COURT:  Yes.

11          MR. ROBISON:  I mean, I think our main point is that,

12  you know, I guess we've made that argument, but I think our

13  stronger argument is that there's simply no private right of

14  action.

15          I would add too, on this notion that children are left

16  without a remedy, if there's no private right of action under

17  1915 federal court, this again, is an issue that's dealt with

18  by superior courts regularly.  In the orders that we've

19  submitted to the Court, they contain expressed findings about

20  OCS's deviation from ICWA's placement preferences and whether

21  or not good cause supports it.

22          THE COURT:  Thank you.

23          MR. ROBISON:  So they absolutely have a remedy.

24          THE COURT:  So in the vein of the second prong of the

25  *Blessing* test, Ms. Lowry, I think it's difficult, when you look

1  at 1915(b) to understand, I guess what the private right of
2  action would look like given that it starts with a mandate, but
3  it's really a list of preferences with the caveat that good
4  cause can exist to not be able to satisfy these preferences.
5  And I guess I'm trying to wrap my mind around what that would
6  look like, what enforcement would look like.  Other than me
7  going over to OCS, looking through their files, having them
8  express to me or articulate, this is why we did this.

9       You know, looking at the statutes it seems like
10  1915(e) may be more appropriate, because then it is about the
11  documentation.  But 1915(b) in a vacuum it doesn't really have
12  I think sort of a binary approach where a Court could clearly
13  say, OCS failed or they achieved what they were requested to
14  do.  So maybe if I could understand a little bit more in your
15  mind what a 1915(b) claim would look like.

16       MR. ROBISON:  Your Honor, there are private rights
17  under other parts of the statute, but we're seeking a private
18  right, as the Court is aware, under *Blessing* and *Gonzaga* and
19  under 1983.  And we do not think that that is what -- we think
20  that is properly implied through the statute, and it has not
21  really been litigated before.  These have been individual
22  claims, but we do think that it is properly implied under the
23  statute, basically.

24       THE COURT:  But again, what -- if there was a claim
25  that an Alaska native child was not placed in the proper home

1    from plaintiffs' perspective, what does that claim look like,

2    given it's a mandate to consider certain preferences.  And if

3    there wasn't a home available, you know, you go through those

4    factors and OCS finds good cause I guess I'm trying to

5    understand what that would look like.

6             MS. LOWRY:  So, Your Honor, I think what that means is

7    that the -- OCS has to have more Native Alaskan homes available

8    for these children, and it does not.  Or it does not license

9    enough homes to be available for these children.  And so it

10   really does affect its ability to honor these preferences,

11   which it cannot now under some circumstances.

12            THE COURT:  So if I understand, from plaintiffs

13   perspective 1915(b) implicitly mandates that OCS ensure there

14   are sufficient homes available for these types of placements?

15            MS. LOWRY:  Yes, Your Honor.

16            THE COURT:  And failing to do so would be a violation

17   of 1915?

18            MS. LOWRY:  Correct, Your Honor.

19            THE COURT:  Okay.  Let's move on to the Indian Child

20   Welfare Act.  So this seems -- and I don't know if it's -- is

21   it the state's position here that when it provides or refers to

22   approval, there are layers of whether or not a family, I guess,

23   is approved in the sense that for replacement versus for

24   licensing?  Is there a distinction there, Mr. Robison?

25            MR. ROBISON:  I think -- our position is in order to

1    get the foster care maintenance payments, they have to meet the

2    requirements to be approved for licensing.

3            THE COURT:  So when the state approves a family for

4    placement, that doesn't necessarily indicate that they are also

5    approved for licensing?

6            MR. ROBISON:  That's correct.

7            THE COURT:  Okay.  Ms. Lowry, does that distinction at

8    all alter plaintiffs' perspective as it relates to that --

9            MS. LOWRY:  Your Honor, I think we have laid out the

10   argument.  I think we have argued in the alternative.  So we

11   have said, the first part of that is that there are two

12   standards.  Second part of our argument though, in the

13   alternative is that federal law requires a preference for

14   kinship placements.  And the state does not honor that

15   preference by not helping native families and all families get

16   approved as licensed foster families.  And that is really the

17   gist of the argument.

18           So it is an argument in the alternative.  And as we

19   have alleged, the state does not in fact facilitate families

20   that are otherwise eligible for eligible children to get

21   approved.  They do not do anything, according to what we have

22   alleged in the complaint and we believe to be true.

23           THE COURT:  So I guess that begs a question.  Is there

24   any provision of the Child Welfare Act that requires OSC to

25   assist willing kinship providers in seeking licensure under the

1 law?

2         MS. LOWRY:  I'm sorry, Your Honor, I didn't...

3         THE COURT:  Is there any provision of the Child

4 Welfare Act that requires OCS to assist willing kinship

5 providers in seeking licensure under the law?

6         MS. LOWRY:  No.  The Child Welfare Act simply

7 expresses a preference.  And the state cannot exercise a

8 preference when it willfully looks the other way.

9         We did use a reference to state law.  We are not

10 seeking to enforce state law in the federal court, but it does

11 indicate that in fact the state -- to honor that preference has

12 to reasonably help families get approved and licensed to be

13 kinship families, and it does not do so.  Basically, that's the

14 gist of my argument.

15         THE COURT:  Thank you, Ms. Lowry.

16         Again, because of time I'm trying to move quickly

17 through my last few questions.

18         So another pointed question for you, Mr. Robison.

19 Would you agree that placing a foster child with disabilities

20 in an institutionalized setting solely because no other

21 placement was available is a violation of the integration

22 mandate?

23         MR. ROBISON:  I don't know -- I guess, why I'm

24 struggling with that, Your Honor, I don't know that that's

25 their claim.

```
 1          THE COURT:  And I appreciate that, but from a context
 2    standpoint, I'm curious whether or not you would agree with
 3    that statement?
 4          MR. ROBISON:  I mean, I guess if the placement -- if
 5    there's no other placement available, I'm not sure what OCS is
 6    to do.  Especially in the event the placement is approved by a
 7    superior court.  I mean, I think there are certain requirements
 8    on -- for institutionalizing a child.  We're a little bit
 9    outside the complaint.  I think, you know, our position would
10    be that we need those, but I'm not sure how else to answer that
11    question.
12          THE COURT:  Thank you, Mr. Robison.
13          I think that concludes my questions.  And I guess to
14    be fair to Mr. Robison, I don't think it's outside the
15    complaint, the question I posed to you, it does appears at
16    least from my reading of the complaint that is what is alleged
17    to have happened, but nevertheless I appreciate that answer.
18          So we've gone for the better part of an hour.  I did
19    promise the parties I'd give them an opportunity for any
20    closing remarks or anything else they wanted to address.  I
21    would ask that you keep those comments brief.
22          And I'll start with you, Ms. Lowry, if there is
23    anything additional you would like to add?
24          MS. LOWRY:  Yes.  Thank you, Your Honor.  We will be
25    very, very brief.
```

1          Alaska operates a child welfare system that violates
2    federal statute and constitutional law.  It, in fact, makes it
3    impossible for superior court to do what its job is, which is
4    to make decisions in the best interest of the child.  If the
5    superior court functions in a way that it attempts to do that,
6    but the question that you just asked my adversary I think is a
7    telling one, OCS is not going to put children on the street.
8    So they are putting them wherever they can.

9          But the problem is, and the constitutional violation,
10   federal statutory violation, is with OCS.  That is something
11   that this Court can address.  That is something that the Court
12   can enter appropriate relief on that will not run afoul of
13   abstention at all.  And that will make things much better for
14   the children we represent, both individually and we hope
15   ultimately as a class.  Thank you.

16          THE COURT:  Thank you, Ms. Lowry.

17          Mr. Robison.

18          MR. ROBISON:  Very briefly, Your Honor.  I did want to
19   introduce my clients.  They are in the courtroom today.  I
20   should have done that at the outset.  We have Kim Kovol, the
21   commissioner for the Department of Family Community Services
22   and also the Kim Guay, the director of OCS.

23          THE COURT:  Okay.

24          MR. ROBISON:  I'll try to wrap up quickly, Your Honor.
25   I'm going to start back where we left off on the ADA claim.  I

1    think, our complaint -- or our argument about the ADA and rehab

2    act claim is that there is no -- there's no plaintiff that's

3    currently in an institutionalized setting.  And there's no

4    plausible allegation that one will be placed in such a setting

5    again.  So there's no ongoing harm for the Court to remedy.

6         Other quick points that I wanted to make sure the

7    Court was aware of.  There's been a lot of discussion and

8    briefing about the Ninth Circuit opinion in *L.H. v. Jamison,*

9    it's 1981, the *Younger* case.  And I wanted to go back to the

10   very first thing the Court raised, which is, is this even the

11   type of proceeding to which *Younger* applies?

12        That case was a class action, and it was brought on

13   behalf of children.  And where it fell down was on whether or

14   not the claims could be adequately addressed by the state

15   court.  So we think that case is distinguishable for a few

16   reasons, but one point that I did want to make sure the Court

17   understood was the Ninth Circuit in that case did not in any

18   way suggest that that case was not the type of proceeding to

19   which *Younger* applies.  So in a way it actually supports us.

20        In terms of the question the Court kept coming back

21   to, which is where do we go to fix these problems, I think the

22   answer is the legislature.  And I would take the Court back

23   again to *Ashley W.,* at the end of that opinion Judge

24   Easterbrook writes:  "Short of ordering the state to come up

25   with more money, it is hard to see what options are open to a

1   federal court, but closed to the CHINS court." CHINS being the

2   Indiana equivalent of a CINA case. And I think that's what

3   they have here. I mean, everything we've talked about today

4   involves money. And it involves the state going out and hiring

5   more case workers, reducing case worker caseloads, findings

6   more placements, finding more native family placements. All

7   those things involve money and I'm not sure any of them have

8   been upheld by a circuit court anywhere in the country. In

9   fact, those types of relief they got those in Texas and the

10  Fifth Circuit struck them down.

11       I just think they are in a very tough spot having

12  pleaded for concrete relief that this Court can grant. And

13  I'll leave the Court here, I think *Ashley W.*, is a pretty

14  short, straightforward opinion. If the Court's inclined, the

15  oral argument audio from that case I think is really useful in

16  demonstrating why that court ended up where it ended up. And

17  there's a lot of discussion in that argument similar what we've

18  had here today about point me to some concrete relief in your

19  pleading that's not available in state court, that will benefit

20  the plaintiffs, the named plaintiffs. And just like here, they

21  were unable to do so. Thank you.

22       THE COURT:  Thank you, Mr. Robison. And I want to

23  thank both the parties for their patience today and for

24  answering my never-ending questions. It was very informative

25  and very helpful. I appreciate the discussion. I hope

1  everyone has a good day.

2          Madam Clerk, we may go off record.

3          DEPUTY CLERK:  All rise.  This matter is adjourned.

4  This Court stands in recess until 11:30 a.m.

5          (Whereupon, the Court adjourned at 11:02 a.m.)

6                      --oo0oo--

7                      CERTIFICATE

8      I, Stacy M. Baldwin, Federal Official Court Reporter in and
   for the United States District Court of the District of Alaska,
9  do hereby certify that the foregoing transcript is a true and
   accurate transcript from the original stenographic record in
10 the above-entitled matter and that the transcript page format
   is in conformance with the regulations of the Judicial
11 Conference of the United States.

12     Dated January 23, 2023.

13

14                      /s/ Stacy M. Baldwin
                        STACY M. BALDWIN, RCR, RMR
15                      FEDERAL OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25