IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JEREMIAH M., HANNAH M., and
HUNTER M., by their next friend Lisa
Nicolai; MARY B. and CONNOR B.,
by their next friend Charles Ketcham;
DAVID V., GEORGE V.,
LAWRENCE V., KAREN V., and
DAMIEN V., by their next friend Merle
A. Maxson; RACHEL T., ELEANOR
T., and GAYLE T., by their next friend
Rebecca Fahnestock; and LANA H., by
her next friend Melissa Skarbek,
individually and on behalf of all others
similarly situated,

          Plaintiffs,

   vs.

ADAM CRUM, Director, Alaska
Department of Health and Social
Services, in his official capacity; KIM
GUAY, Director, Office of Children's
Services, in her official capacity;
ALASKA DEPARTMENT OF
HEALTH AND SOCIAL SERVICES;
and ALASKA OFFICE OF
CHILDREN'S SERVICES,

          Defendants.

Case No. 3:22-cv-00129-JMK

**ORDER GRANTING IN PART
AND DENYING IN PART
MOTION TO DISMISS**

Pending before the Court is Defendants' (1) Motion to Dismiss at Docket 23,[1] and (2) Motion for Judicial Notice at Docket 21. Both motions are fully briefed.[2] The Court heard oral argument on December 20, 2022,[3] and thereafter took the matter under advisement. For the reasons stated herein, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

This is a putative class action brought by fourteen children ("Plaintiffs" or the "Named Plaintiffs") who are in the custody of Alaska's Office of Children's Services ("OCS").[4] Defendants are (1) the Alaska Department of Health and Social Services ("DHSS"); (2) Adam Crum, the director of DHSS; (3) OCS; and (4) Kim Guay, the director of OCS.[5] DHSS is "the principal human services agency of the government of the state of Alaska," and OCS is the subdivision of DHSS that is "responsible for the safety and welfare of children in foster care in Alaska."[6] In this lawsuit, Plaintiffs seek wide-ranging reform of Alaska's foster care system, alleging that it has become so riddled with dysfunction that it harms the children it is designed to protect. These allegations, when taken as true, describe unacceptable governmental failures affecting society's most vulnerable members. The predominant question at this stage, one that is not easily answered, is to where Plaintiffs may turn for relief.

---

[1] An unredacted version of the Motion to Dismiss was filed under seal at Docket 25.
[2] Docket 29; Docket 30; Docket 32; Docket 36; Docket 38.
[3] Docket 43 (minute entry).
[4] Docket 16 ¶¶ 12–22.
[5] *Id.* ¶¶ 23–26.
[6] *Id.* ¶¶ 24–26.

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 2
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 2 of 73

## A.     Plaintiffs' Allegations

Plaintiffs assert that the structural failures within Alaska's child welfare system violate their federal statutory and constitutional rights.  These failures include high caseworker turnover and unmanageable caseloads, which together "prevent OCS from adequately supervising and providing services to the children in its protective custody."[7] Plaintiffs allege that foster children in OCS's custody are subjected to frequent destabilizing placement changes.[8]  This placement instability arises in part from OCS's failure to "recruit, reimburse and maintain enough foster homes and other community-based placements."[9]  Plaintiffs claim that OCS caseworkers fail to provide timely, appropriate case plans, and fail to engage in prompt permanency planning.[10]  According to the Complaint, OCS does not provide necessary services to foster children, and "[s]ervices pertaining to mental health and substance abuse [] are particularly lacking."[11]  The lack of appropriate foster homes and inadequate access to services particularly affects children with disabilities, who are often placed in inappropriately restrictive environments.[12] Plaintiffs allege that OCS frustrates the federal and state preference for kinship placements by failing to adequately support kinship foster families through financial assistance and help with licensure.[13]

---

[7]   *Id.* ¶ 168; *id.* ¶¶ 152–168.
[8]   *Id.* ¶¶ 172–73.
[9]   *Id.* ¶ 175.
[10]  *Id.* ¶¶ 182–202.
[11]  *Id.* ¶ 206.
[12]  *Id.* ¶¶ 177, 211.
[13]  *Id.* ¶¶ 216–41.

*M., et al. v. Crum, et al.*                                                                                     Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                    Page 3
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 3 of 73

In particular, Plaintiffs claim that OCS's practices particularly harm Alaska Native children, who are disproportionately represented in the Alaska foster care system.[14] The Complaint contains allegations that OCS overlooks or disregards potential placements within an Alaska Native child's family or community, and places Alaska Native children in non-Native placements, "severing them from their culture and identity."[15]

The Complaint details the foster care experiences of the fourteen Named Plaintiffs. These experiences are characterized by frequent placement disruptions, placements in foster homes that are ill-equipped to address the child's needs, institutionalizations, a lack of access to case plans, and inadequate access to services.[16] Plaintiffs bring claims on behalf of themselves and on behalf of a proposed class consisting of "all children for whom OCS has or will have legal responsibility and who are or will be in the legal and physical custody of OCS."[17] In addition, Plaintiffs bring claims on behalf of three proposed subclasses:

> (1)  Alaska Native children who are or will be entitled to federal Indian Child Welfare Act ("ICWA") protection (the "Alaska Native Subclass");

> (2)  Children who are or will be in foster care and experience physical, cognitive, or psychiatric disabilities (the "ADA Subclass");

> (3)  Children who currently reside or will reside in a kinship foster home—the home of a family member—who

---

[14] *Id.* ¶ 252.
[15] *Id.* ¶¶ 252, 259.
[16] *Id.* ¶¶ 41–140.
[17] *Id.* ¶ 28(a).

*M., et al. v. Crum, et al.*                                          Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                        Page 4

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 4 of 73

meet the criteria to receive foster care maintenance payments under 42 U.S.C. § 672 (the "Kinship Subclass").[18]

## B.  OCS and CINA Proceedings

In Alaska, children alleged to be at "high risk of maltreatment or unsafe by their caregiver [are] assessed by OCS."[19]  Alaska law requires OCS, after receiving a report of harm to a child, to conduct an initial assessment and determine whether the report is substantiated.[20]  If the allegation of harm to a child is substantiated, OCS may file a petition for adjudication of a child as a "child in need of aid" or "CINA."[21]  In certain circumstances, OCS may take emergency custody of a child, either with or without a court order.[22]  The Alaska Superior Court then must hold a temporary custody hearing, which is conducted within 48 hours if OCS took emergency custody of the child, or no later than five business days following the filing of a petition when the child was not taken into emergency custody.[23]  The child and parents may be present, and the parents may request a continuance to prepare a response to the allegations.[24]  At the temporary custody hearing, the Superior Court determines whether probable cause exists for believing the child to be a child in need of aid.[25]  Within 120 days after a finding of probable cause, the Superior

---

[18] *Id.* ¶¶ 28(b)–(d).

[19] STATE OF ALASKA, CHILD PROTECTION SERVICES (CPS) POLICY MANUAL, ch.2.1(A) (revised October 1, 2016): http://dpaweb.hss.state.ak.us/training/OCS/cps/index.htm#t=Policies%2FChapter_2_Intake_and_Investigation%2F1_Intake%2F2.1_PSR.htm (last accessed August 29, 2023).

[20] *See* Alaska Stat. § 47.17.030(a).  OCS may also refer the matter to a local governmental health agency, if appropriate.  *Id.*

[21] *See* Alaska Stat. § 47.10.020(e); CINA Rule 7(a).

[22] Alaska Stat. § 47.10.142.

[23] Alaska Stat. § 47.10.142(d); CINA Rule 10(a)(1)(A)–(B).

[24] Alaska Stat. § 47.10.142(d).

[25] Alaska Stat. § 47.10.142(e).

*M., et al. v. Crum, et al.*                                                                 Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                 Page 5

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 5 of 73

Court must hold an adjudication hearing, at the conclusion of which the court "shall find and enter a judgment that the child is or is not a child in need of aid."[26] If the court finds that the child is a child in need of aid, it may order the child committed to the temporary custody of OCS.[27] The Superior Court then holds a disposition hearing at which the court may either order the child committed to OCS for placement in an appropriate setting, or order the child released to a parent, adult family member, or other guardian.[28] If the Superior Court orders the child committed to OCS custody, it must hold a permanency hearing at least annually during the continuation of foster care to "determine if continued placement, as it is being provided, is in the best interest of the child."[29] At permanency hearings, the Superior Court makes written findings as to certain questions, including "whether the child continues to be a child in need of aid"; "whether the child should be placed for adoption or legal guardianship"; and "whether the parent or guardian has made substantial progress to remedy the parent's or guardian's conduct or conditions in the home that made the child a child in need of aid."[30]

While a child is in OCS custody, OCS has responsibility for the care and control of the child, including "the determination of where and with whom the child shall live," subject to any residual parental rights.[31] Thus, OCS, not the Superior Court, has the authority to direct placements of foster children in its care.[32] OCS is responsible for

---

[26] Alaska Stat. § 47.10.080(a).
[27] Alaska Stat. § 47.10.080(c)(1).
[28] Alaska Stat. § 47.10.080(c)(1), (2).
[29] Alaska Stat. § 47.10.080(f).
[30] CINA Rule 17.2(e)–(f).
[31] Alaska Stat. § 47.10.084.
[32] *Matter of B.L.J.*, 717 P.2d 376, 380 (Alaska 1986).

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                     Page 6

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 6 of 73

making "timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement or to enable the safe return of the child to the family home."[33] If OCS proposes to transfer a child from one placement setting to another, "the child, the child's parents or guardian, the child's foster parents or out-of-home caregiver, the child's guardian ad litem, the child's attorney, and the child's tribe are entitled to advance notice."[34] A party opposed to the proposed transfer may request a hearing and must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child for the court to deny the transfer.[35]

## II. DISCUSSION

Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 for violations of their (1) substantive due process rights under the Fourteenth Amendment; (2) rights to familial association under the First, Ninth, and Fourteenth Amendments; (3) rights under the ICWA, 25 U.S.C. §1901, *et seq.*; and (4) rights under the Adoption Assistance and Child Welfare Act of 1980 (the "AACWA"), 42 U.S.C. § 672(a).[36] Plaintiffs also bring claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794.[37] Defendants move to dismiss under various doctrines of abstention as well as Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[38]

---

[33] Alaska Stat. § 47.10.086.
[34] Alaska Stat. § 47.10.080(s).
[35] *Id.*
[36] Docket 16 ¶¶ 264–97.
[37] *Id.* ¶¶ 298–315.
[38] Docket 23.

## A. Judicial Notice

At Docket 21, Defendants request that the Court take judicial notice of several state court pleadings and orders filed in Plaintiffs' CINA cases (the "CINA filings"). Plaintiffs filed an opposition at Docket 29, arguing that Defendants seek judicial notice of the factual findings within the CINA proceedings in a "direct attempt[] to attack Plaintiffs' well-pleaded factual allegations and to misuse the judicial notice doctrine."[39] In reply, Defendants urge that the CINA filings are not being offered for the truth of the factual findings therein, but rather to demonstrate the scope of Plaintiffs' CINA cases to allow the Court to determine the appropriateness of abstention.[40]

Courts may take judicial notice of facts that are "not subject to reasonable dispute" because they are "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[41] Courts may judicially notice information in another courts' proceedings, such as the progress of a case, the issues that were litigated, and what the judge ordered; however, courts may not take judicial notice of the truth of any factual findings in other courts' documents.[42]

---

[39] Docket 29 at 6; *see also* Docket 29 at 5–7.
[40] Docket 32 at 2–4.
[41] Fed. R. Evid. 201(b).
[42] *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of court transcripts and briefs "[t]o determine what issues were actually litigated" in other courts); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'"); *see also Eliott v. Lions Gate Ent. Corp.*, No. 2:21-cv-08206-SSS-DFMx, 2022 WL 17408662, at *3 (C.D. Cal. Nov. 8, 2022).

The Court finds that the CINA filings are proper subjects of judicial notice. Plaintiffs do not dispute the authenticity or accuracy of the CINA filings, and Defendants rely on these filings for the fact of their existence, not the truth of the facts recited therein.[43] Defendants cite to the CINA filings to demonstrate which issues have been litigated in Plaintiffs' CINA cases and what the Superior Court judges have previously ordered; they do not attempt to import the Superior Court's factual findings.[44] This is a proper use of judicial notice. Accordingly, Defendants' Motion for Judicial Notice at Docket 21 is **GRANTED**.

## B. Abstention

Defendants argue that the Court should abstain from exercising jurisdiction over Plaintiffs' claims under (1) *Younger v. Harris*, 401 U.S. 37 (1971) ("*Younger* abstention"); (2) *O'Shea v. Littleton*, 414 U.S. 488 (1974) ("*O'Shea* abstention"); (3) the principle that child welfare proceedings fall within a traditional area of state authority; and (4) *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983) ("*Rooker-Feldman* abstention"). The Court begins its analysis by noting that abstention is the exception rather than the rule.[45] Federal courts

---

[43] Plaintiffs take issue that certain orders entered by the Superior Court in the CINA proceedings are forms on which the Superior Court judge checks boxes and then signs. Docket 29 at 7 n.4. Plaintiffs do not argue that these orders are not authentic or that they lack the force and effect of a court order. Rather, Plaintiffs claim these orders are "unreliable" because the Superior Court judge need not add additional information or explain their checking of a box. A court order whose authenticity is not questioned is properly subject to judicial notice. *United States v. Chaplin*, No. 3:19-cr-00121-SLG, 2021 WL 149677, at *1 (D. Alaska Jan. 15, 2021) (taking judicial notice of Alaska state court documents). A court order's brevity or format has no effect on this analysis.

[44] *See* Docket 23 at 34–35, 41–42; Docket 25 at 35–36, 42–43 (sealed).

[45] *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans ("NOPSI")*, 491 U.S. 350, 359 (1989).

have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."[46] Abstention therefore is appropriate only in limited, carefully defined circumstances.[47]

### (1) *Younger* abstention

Defendants argue that the Court must abstain from hearing this case because the broad injunctive relief sought by Plaintiffs would interfere with Plaintiffs' ongoing CINA proceedings.[48] In "exceptional circumstances" federal courts must abstain from adjudicating a case in deference to a parallel state court proceeding pursuant to *Younger v. Harris,* 401 U.S. 37 (1971) (hereinafter, "*Younger*").[49] Such "exceptional circumstances exist . . . in three types of proceedings": (1) "ongoing state criminal prosecutions"; (2) certain "quasi-criminal" civil enforcement proceedings; and (3) "pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions."[50] In *Sprint Communications, Inc. v. Jacobs,* the Supreme Court held that these three "exceptional" categories "define *Younger*'s scope."[51] Thus, if a case does not fit within these three categories, *Younger* abstention is not appropriate.[52]

---

[46] *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).
[47] *Gilbertson v. Albright*, 381 F.3d 965, 969 n.2 (9th Cir. 2004) (quoting *Green v. City of Tucson*, 255 F.3d 1086, 1089 (9th Cir. 2001)).
[48] Docket 23 at 21. No parties appear to dispute that Plaintiffs' CINA proceedings are "ongoing" state proceedings for the purposes of *Younger.* *See ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund,* 754 F.3d 754, 759 (9th Cir. 2014).
[49] *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (quoting *NOPSI*, 491 U.S. at 350).
[50] *Id.* (citations and internal quotation marks omitted).
[51] *Id.*; *see also ReadyLink Healthcare, Inc.,* 754 F.3d at 759 (observing that *Sprint* "squarely [held] that *Younger* abstention is limited to the 'three exceptional categories' of cases identified in [*NOPSI*].").
[52] *Sprint*, 571 U.S. at 81–82 ("In short, to guide other federal courts, we today clarify and affirm that *Younger* extends to the three 'exceptional circumstances' identified in *NOPSI*, but no further.").

*M., et al. v. Crum, et al.*                                                                Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                          Page 10
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 10 of 73

However, if a civil case fits within one of the *Younger* categories, the court considers three additional factors to determine whether *Younger* abstention is warranted (the "*Middlesex* factors"): whether (1) there is an ongoing state judicial proceeding; (2) the proceeding implicates important state interests; and (3) there is an adequate opportunity in the state proceedings to raise federal challenges.[53] Defendants assert that this case fits into the two categories of civil cases to which *Younger* applies.[54]

### (a) "Quasi-criminal" civil enforcement proceedings

First, Defendants argue that state child welfare proceedings constitute quasi-criminal civil enforcement actions under *Younger*.[55] The Supreme Court has found that applying *Younger* to instances of civil enforcement actions is appropriate when the state proceedings are "akin to a criminal prosecution" in "important respects."[56] Such enforcement actions are (1) "characteristically initiated to sanction the federal plaintiff, *i.e.,* the party challenging the state action, for some wrongful act"; (2) often initiated by the state; and (3) "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges."[57] In *Moore v. Sims*, parents and their three minor children brought suit in federal court challenging the constitutionality of the Texas statutory scheme for temporary removal of children from their homes due to allegations of abuse.[58] The

---

[53] *Id.* at 81 (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

[54] The first category of cases to which *Younger* applies—ongoing state criminal prosecutions—plainly is inapplicable here.

[55] Docket 23 at 23–26.

[56] *Sprint*, 571 U.S. at 79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)).

[57] *Id.* at 79–80.

[58] 442 U.S. 415 at 421–22.

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 11

Case 3:22-cv-00129-JMK    Document 55    Filed 09/28/23    Page 11 of 73

Supreme Court held that state-initiated proceedings to gain custody of children allegedly abused by their parents fell under the umbrella of civil enforcement actions to which *Younger* applies because the "State . . . was a party to the state proceedings, and the temporary removal of a child in a child-abuse context is . . . 'in aid of and closely related to criminal statutes.'"[59] Defendants stand on *Moore* and argue that its holding compels this Court to abstain in this case.[60]

Post-*Sprint*, there is a circuit split regarding *Moore*'s reach. The Ninth Circuit has not yet lent its voice to this debate. Defendants cite cases from the Third, Seventh, and Eighth Circuits, contending that "the majority of circuit courts that have considered this issue . . . have followed *Moore* and held that state abuse-and-neglect proceedings are the type of proceedings to which *Younger* applies."[61] Plaintiffs counter with cases from the Fourth Circuit and a district court within the Ninth Circuit, arguing that "*Moore* is distinguishable from the case here in which Plaintiffs are foster children alleging constitutional and statutory violations while in the State's custody. Plaintiffs' claims here are not in aid of or closely related to criminal statutes."[62]

In 2022, the Seventh Circuit and the Fourth Circuit each considered the applicability of *Moore* to foster care class actions, reaching conflicting results as to

---

[59] *Id.* at 423 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)).

[60] Docket 23 at 24.

[61] *Id.* at 25. Defendants also rely on pre-*Sprint* caselaw to argue for abstention. (first citing *31 Foster Child. v. Bush*, 329 F.3d 1255 (11th Cir. 2003); and then citing *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1272 (10th Cir. 2002)). These cases analyzed *Younger* abstention utilizing only the *Middlesex* factors. Therefore, they are of limited assistance in resolving the issue before the Court.

[62] Docket 36-2 at 32–33.

*Younger* abstention. The Seventh Circuit concluded summarily that *Younger* abstention was appropriate because "[w]e know from [*Moore*] that *Younger* applies to state-initiated child-welfare litigation."[63] By contrast, the Fourth Circuit found that quarterly status review hearings conducted by state courts to review foster care children's placements "are simply not 'of the sort entitled to *Younger* treatment'" because "[t]hey do not fit any historical precedent applying the doctrine" and abstaining would "forward none of the comity interests our federalist system holds dear."[64] In so holding, the Fourth Circuit rejected defendants' comparison to *Moore*, noting that the Court in *Moore* was concerned with the impingement of parental rights in the *initial* child-removal proceeding, whereas "the *ongoing* individual hearings here serve to protect the children who would be plaintiffs in federal court."[65] The Court found that it would "turn decades of Supreme-Court jurisprudence—and logic—on its head to put these foster children in the shoes of the abusive parents in [*Moore*]."[66]

In *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1032 (D. Ariz. 2015), the U.S. District Court for the District of Arizona relied on the distinction between initial child removal proceedings and periodic placement review hearings to conclude that *Younger* abstention did not apply. The court found that the "animating purpose of the ongoing dependency proceedings in this case is to plan for and monitor the development and well-being of children, not to investigate or penalize those who might have contributed to their

---

63 *Ashley W. v. Holcomb*, 34 F.4th 588, 591 (7th Cir. 2022).
64 *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 328 (4th Cir. 2022).
65 *Id.* at 330.
66 *Id.*

M., et al. v. Crum, et al.                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                  Page 13

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 13 of 73

dependency."[67]   The court concluded that the juvenile court reviews have an "indirect relationship to the enforcement of criminal laws," and therefore are not quasi-criminal for the purposes of *Younger*.[68]

Following the logic of *Tinsley* and *Jonathan R.*, this Court finds that the state CINA court proceedings at issue here are not quasi-criminal proceedings under *Younger*. Plaintiffs' ongoing CINA proceedings are missing the defining feature of this *Younger* category—enforcement.  Unlike in the majority of cases that Defendants cite[69]—*Moore*; *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603 (8th Cir. 2018); and the unpublished *Vaughn:Douce v. New Jersey Div. of Child Prot. & Permanency*, No. 21-1596, 2021 WL 3403670 (3d Cir. Aug. 4, 2021)—parents of the plaintiff foster children are not parties in this suit.[70]  The absence of parties against whom criminal statutes would be enforced makes this suit fundamentally dissimilar from others that fall within the quasi-criminal category.[71]   And as the Ninth Circuit recently found in the insurance conservatorship context, "the complete lack of sanctions being sought against Appellants belie any punitive

---

[67] *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1034 (D. Ariz. 2015).

[68] *Id.*

[69] Docket 23 at 24.

[70] In *Oglala*, Indian tribes and parents of Indian children who had been removed from their homes amidst abuse allegations challenged a South Dakota law establishing the process for removal of children from their homes in exigent circumstances.  904 F.3d at 606.  The Eighth Circuit held that *Younger* abstention was appropriate because there was "no meaningful distinction between the custody proceedings in *Moore* and the temporary custody proceedings in South Dakota." *Id.* at 610.  In *Vaughn:Douce*, a father sued in federal district court for custody of his daughter after a state agency initiated proceedings against him to terminate his parental rights. 2021 WL 3403670, at *1 (3rd Cir. Aug. 4, 2021).  The Third Circuit found that this posture triggered *Younger* abstention. *Id.* at *2.

[71] *See Sprint*, 571 U.S. at 79 (noting that civil enforcement actions under *Younger* "are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act").

*M., et al. v. Crum, et al.*                                                        Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                         Page 14

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 14 of 73

character" to the state proceedings, which "underscores why *Younger* abstention is not proper in this case."[72]

Further, allegations of child abuse are not relevant to the relief sought. The Plaintiff foster children seek relief from treatment they have received while they were in state custody.[73] They do not challenge the initial custody decision or the CINA courts' determination that they are children in need of aid and should be committed to the custody of OCS. That Plaintiffs do not challenge the initial removal decision rids this suit of a close connection to the enforcement of criminal laws. Given the characteristics of this lawsuit, an expansion of *Younger* into this realm bloats the meaning of "quasi" in "quasi-criminal."[74]

Defendants take issue with an approach that distinguishes between an initial custody decision and ongoing child welfare proceedings. They argue that "nothing in *Moore* suggests courts should draw a distinction between the initial hearing, where the child is removed from his or her parents, and subsequent hearings in the same case, where that removal is re-evaluated and other decisions about the child are reviewed."[75] Defendants assert that this distinction is artificial because, "in Alaska[,] . . . the initial

---

[72] *Applied Underwriters, Inc. v. Lara*, 37 F.4th 579, 589 (9th Cir. 2022).

[73] *See Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 154 (D. Mass. 2011) ("Defendants' argument fails to appreciate that Plaintiffs' claims relate only to alleged injuries suffered while in DCF custody. TPR proceedings are the means by which Plaintiffs enter DCF custody, and Plaintiffs expressly state that they are not challenging any aspect of those proceedings in this case.").

[74] *Bryan C. v. Lambrew*, 340 F.R.D. 501, 510 (D. Me. 2021) ("The parallel proceedings involving the Plaintiffs may involve periodic reviews by the state court, but they lack any element that would put them into the quasi-criminal category.").

[75] Docket 38 at 5.

*M., et al. v. Crum, et al.*                                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                                Page 15
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 15 of 73

removal hearing is part of a single, unitary case bearing the same case number, before the same superior court judge."[76]  Defendants read *Moore* too broadly.  *Moore* stands for the proposition that state-initiated proceedings to gain custody of children from parents accused of abuse is sufficiently closely related to criminal statutes to warrant quasi-criminal treatment under *Younger*.  *Moore* and its progeny do not suggest that, if the initiation of a state proceeding is considered an act of civil enforcement, a state court's continuing oversight of one of the parties affected by that enforcement—here, the foster children—continues to bear the "enforcement" label.  *Moore* therefore does not demand the conclusion that, after a child is placed in OCS custody, proceedings to review the child's placements and permanency plans are akin to a criminal prosecution.  Although Defendants argue that the Court's decision relies on a hair-splitting distinction, this distinction is most faithful to the Supreme Court's consistent reminder that "[c]ircumstances fitting within the *Younger* doctrine . . . are 'exceptional.'"[77]

### (b)     State interest in enforcing state court orders and judgments

Second, Defendants argue that, even if Plaintiffs' CINA cases are not quasi-criminal, they fall into *Younger*'s third category:  "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."[78]  Defendants assert that the injunctive relief Plaintiffs seek would interfere with the state courts' decisions about foster children's placements and services.[79]

---

[76] *Id.*
[77] *Sprint*, 571 U.S. at 73.
[78] Docket 23 at 26.
[79] *Id.*

*M., et al. v. Crum, et al.*                                                        Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                        Page 16

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 16 of 73

The third *Younger* category is exceedingly narrow. It covers proceedings that implicate the "state courts' ability to enforce compliance with judgments already made."[80] It has been invoked in cases involving "'core' orders involv[ing] the administration of the state judicial process—for example, an appeal bond requirement, a civil contempt order, or an appointment of a receiver."[81] This case, by contrast, does not implicate the administration of the state judicial process or the state courts' ability to enforce compliance with their judgments. The relief in this case is directed at OCS, not the state courts. In *NOPSI*, the Supreme Court noted that "it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States."[82]

Still, Defendants urge that OCS's compliance with the injunctive relief sought here would "limit superior courts' authority to make the fact-intensive decisions they make every day in CINA cases."[83] They contend that "the relief Plaintiffs request would effectively enjoin superior courts from issuing orders or providing relief inconsistent with the requested injunction."[84] This logic is inconsistent with the narrowness of this *Younger* category. Every federal action challenging the constitutionality of a state law or

---

[80] *Cook v. Harding*, 879 F.3d 1035, 1041 (9th Cir. 2018).
[81] *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014) (citations omitted).
[82] *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 368 (1989).
[83] Docket 23 at 29.
[84] *Id.* at 29–30.

state action has an incidental effect on state courts to the extent the state courts must comply with the federal court's ruling.[85] If hypothetical inconsistent rulings, or the possible need to oversee a state court's compliance with a federal order, landed cases in this *Younger* category, abstention would be the norm rather than the exception. The Ninth Circuit rejected an argument similar to Defendants' argument in *Cook v. Harding*, 879 F.3d 1035, 1041 (9th Cir. 2018), where the defendants there argued that "challenges to parentage determinations could impede the state courts' ability to make other decisions based on that parental status, such as custody and child support." The Ninth Circuit declined defendants' invitation to broaden the third *Younger* category, stating that "[t]his is an argument regarding the state courts' power to apply its laws in subsequent proceedings and the state's interest in its interrelated family laws. It does not relate to the state courts' ability to enforce compliance with judgments already made."[86]

### (c) *Younger conclusion*

This case does not fit into either of the two civil *Younger* categories, therefore the Court need not address the *Middlesex* factors.[87] The Court declines to abstain under *Younger*.

---

[85] *See Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 331 (4th Cir. 2022) ("West Virginia points to no specific pending contempt orders this suit would undermine; it argues only that federal jurisdiction here would undermine the state courts' 'ability' to issue them. But if that sufficed to cram state-court proceedings into *Younger*'s third category, we would be hard pressed to find an order that would *not* do.").

[86] *Cook v. Harding*, 879 F.3d 1035, 1041 (9th Cir. 2018).

[87] *Cook*, 879 F.3d at 1039; *see also ReadyLink*, 754 F.3d at 759 ("*Sprint* . . . squarely h[eld] that *Younger* abstention is limited to the 'three exceptional categories' of cases identified in [*NOPSI*]." (citation omitted)); *Jonathan R.*, 41 F.4th 316 at 332 ("After *Sprint*, we believe it is enough that the quarterly foster-care hearings lie outside the three 'exceptional categories' the Court identified—*Younger* abstention is 'the exception, not the rule.'" (citation omitted)).

The Court makes two additional notes regarding *Younger* abstention, federalism, and comity. First, the Court is not persuaded by Defendants that CINA courts provide an adequate forum for Plaintiffs to seek the relief requested in this suit. The ongoing hearings in CINA cases are concerned with a particular child's immediate needs and circumstances.[88] None of the Plaintiffs challenge their current placements or current services in this suit. Rather, they seek systemic reform of OCS so that their problems—for example, being shuffled from placement to placement—do not persist. As the Fourth Circuit observed, "[r]eforming foster care case-by-case would be like patching up holes in a sinking ship by tearing off the floorboards."[89]

Second, any prospective relief from a federal court "does not asperse the 'competency' of state courts to conduct periodic individual foster-care hearings or to independently correct any structural problems state courts themselves identify."[90] This Court is acutely aware that cases seeking systemic reform of a state agency implicates the sensitive task of "managing the competing requirements of federal jurisdiction and state sovereignty."[91]

---

[88] *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1041 n.10 ("everything about dependency proceedings is tailored to the specific facts and circumstances of a particular child's life. Nothing in the statutes governing the authority or procedures of the juvenile court envisions or authorizes the court's adjudication of class action cases.").

[89] *Jonathan R.*, 41 F.4th at 336, *cert. denied sub nom. Justice v. Jonathan R.*, 214 L. Ed. 2d 137, 143 S. Ct. 310 (2022).

[90] *Id.* at 339.

[91] *Tinsley*, 156 F. Supp. 3d at 1044.

*M., et al. v. Crum, et al.*                                                                 Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                  Page 19

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 19 of 73

### (2) *O'Shea* abstention

Next, Defendants argue that, even if this case does not fit into any of the *Younger* categories, this Court must still abstain under *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974). *O'Shea* instructs federal courts to abstain "where the plaintiff seeks an 'ongoing federal audit' of the state judiciary, whether in criminal proceedings or in other respects."[92] *O'Shea* stands for the "general proposition that courts 'should be very reluctant to grant relief that would entail heavy federal interference in such sensitive state activities as administration of the judicial system.'"[93] After surveying cases applying *O'Shea,* the Ninth Circuit summarized its reach: "*O'Shea* abstention is inappropriate where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice, but is appropriate where the relief sought would require the federal court to monitor the substance of individual cases on an ongoing basis to administer its judgment."[94]

Courts within the Ninth Circuit have considered *O'Shea* abstention in the context of foster care class actions in *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1032 (D. Ariz. 2015), and *Wyatt B. by McAllister v. Brown*, No. 6:19-CV-00556-AA, 2021 WL 4434011, at *6 (D. Or. Sept. 27, 2021). Both courts concluded that *O'Shea* abstention was inappropriate. Given the factual parallels, this Court finds those cases persuasive and similarly concludes that *O'Shea* abstention is inappropriate here. As in *Tinsley* and

---

[92] *Courthouse News Serv. v. Planet*, 750 F.3d 776, 790 (9th Cir. 2014) (quoting *E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1124 (9th Cir. 2011) (per curiam)).
[93] *Id.* at 789–90 (quoting *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 703 (9th Cir. 1992)).
[94] *Id.* at 790.

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 20

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 20 of 73

*Wyatt B*, Plaintiffs' requested relief is directed at OCS, not the state judiciary.[95]  Similar to the child welfare systems in Arizona and Oregon, state courts are indisputably intimately involved in child welfare proceedings in Alaska; however, the specific relief sought here is targeted directly at the administration and functioning of OCS.[96]  This feature distinguishes this case from the majority of cases in which *O'Shea* is applied, which involved plaintiffs who requested federal court oversight of state courts' operations and procedures.[97]

Defendants argue that Plaintiffs' requested relief, although directed at OCS, would in effect "control future decisions made by superior courts" and place this Court in the position of having to review "the hundreds of placement decisions issued annually by superior courts" to ensure compliance with a federal injunction.[98]  *O'Shea* does not mandate abstention whenever litigants seek a federal injunction to reform the institutions

---

[95] *Tinsley*, 156 F. Supp. 3d at 1026–27; *Wyatt B.*, 2021 WL 4434011, at *1.

[96] *Compare* Docket 16 at 91–94 (seeking an injunction requiring OCS to "maintain caseloads for each case worker providing direct supervision and planning for children at accepted professional standards" and to "conduct annual case record reviews of a statistically significant sample of children in Defendants' custody to measure how likely children in Defendants' custody are to receive timely permanence"); *with Wyatt B.*, 2021 WL 4434011, at *6 ("Although the Oregon juvenile courts have an important role in the child welfare system, significant aspects of that system, such as the specifics of a child's placement or the planning and provision of services, are reserved to DHS . . . and Plaintiff's claims are directed at those very aspects of the dependency process.").

[97] *See, e.g.*, *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1270–72 (10th Cir. 2002) (applying *Younger* and *O'Shea* to a challenge to a settlement agreement setting benchmarks for child welfare agency to remove itself from a state court's jurisdiction based on findings that the agreement would impact juvenile court proceedings in New Mexico and attorneys' ability to present information to state courts); *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 612 (8th Cir. 2018) (seeking an injunction requiring defendants to "comply with numerous procedural requirements at future 48-hour hearings.").

[98] Docket 23 at 39; Docket 25 at 40 (sealed).

*M., et al. v. Crum, et al.*                                                  Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                              Page 21

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 21 of 73

of state government, even if those injunctions have incidental effects on state courts; that logic "would justify abstention as a matter of course in almost any civil rights action."[99] Further, the Court is not convinced that the requested relief requires the Court to delve into individual cases to monitor compliance with a federal injunction. Defendants' compliance with the injunctive relief in this case could be measured by statistics similar to those relied on by Plaintiffs in their Complaint.[100] Moreover, that "*some* additional litigation may later arise to enforce an injunction does not itself justify abstaining from deciding a constitutional claim."[101]

### (3) Traditional area of state authority

Defendants cite to *J.B. v. Woodard*, 997 F. 3d 714, 723 (7th Cir. 2021), for the proposition that federal courts should abstain if a case "risks a serious federalism infringement" even if no recognized abstention doctrine applies. In *J.B.*, the Seventh Circuit held that the adjudication of the plaintiff's due process claims "threaten[s] interference with and disruption of local family law proceedings—a robust area of law traditionally reserved for state and local government—to such a degree as to all but compel the federal judiciary to stand down."[102] As applied here, this free-floating doctrine seems an inelegant end-run around the Supreme Court's restrictions on the applicability of *Younger.* The Ninth Circuit has instructed that "federal courts cannot ignore *Sprint*'s strict

---

[99] *Courthouse News Serv.*, 750 F.3d at 792.
[100] *See* Docket 16 ¶¶ 4–5, 167, 172–173, 175, 184, 186 (citing statistics regarding OCS caseloads, employee turnover, visits, and number of placements per year for foster children, and rate of case planning).
[101] *Courthouse News Serv.*, 750 F.3d at 792.
[102] *J.B.*, 997 F.3d 714 at 723.

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 22

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 22 of 73

limitations on *Younger* abstention simply because states have an undeniable interest in family law."[103]    Additionally, because "the law of domestic relations often has constitutional dimensions properly resolved by federal courts," federal courts "must enforce the mandated constraints on abstention so that such constitutional rights may be vindicated."[104]    The Court therefore declines to reach outside of developed abstention doctrines and abstain solely because this suit implicates "an area of core state authority."[105]

### (4)    *Rooker-Feldman* abstention

Defendants argue that the *Rooker-Feldman* doctrine bars the Court from hearing Plaintiffs' claims based on their placements or services.[106]    *Rooker-Feldman* applies when a federal suit constitutes a de facto appeal of a state court judgment, meaning that "the plaintiff in federal district court complains of a legal wrong allegedly committed by the state court, and seeks relief from the judgment of that court."[107]    To determine whether an action functions as a de facto appeal, courts "pay close attention to the relief sought by the federal-court plaintiff."[108]    If the federal suit is a forbidden de facto appeal of a state court judgment, courts analyze whether the issue in the federal suit is "'inextricably intertwined' with an issue resolved by the state court judicial decision."[109] If the federal suit is a de facto appeal and the federal and state issues are inextricably

---

[103]    *Cook v. Harding*, 879 F.3d 1035, 1040 (2018).
[104]    *Id.*
[105]    Docket 23 at 8; Docket 25 at 9 (sealed).
[106]    Docket 23 at 41–42; Docket 25 at 42–43 (sealed).
[107]    *Cooper v. Ramos*, 704 F.3d 772, 778 (9th Cir. 2012).
[108]    *Id.* (quoting *Bianchi v. Rylaarsdam*, 334 F.3d 895, 900 (9th Cir. 2003)).
[109]    *Noel v. Hall*, 341 F.3d 1148, 1165 (9th Cir. 2003).

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 23
Case 3:22-cv-00129-JMK    Document 55    Filed 09/28/23    Page 23 of 73

intertwined, the federal court lacks jurisdiction over the action.[110] "On the other hand, where the federal plaintiff does not complain of a legal injury caused by a state court judgment, but rather of a legal injury caused by an adverse party, *Rooker-Feldman* does not bar jurisdiction."[111]

*Rooker-Feldman* does not apply here because Plaintiffs do not assert legal error by a state court as their injury and do not ask this Court set aside any of the state courts decisions in their CINA cases. Defendants argue that, "to the extent Named Plaintiffs complain about placements, it necessarily requires the Court to review superior court orders and issues 'inextricably intertwined' with" Superior Court orders approving Plaintiffs' placements.[112] Even if Plaintiffs did not assert their federal claims in state court, Defendants contend that *Rooker-Feldman* bars this court "from hearing any claims based on allegations that the Named Plaintiffs' placements or services violated the Constitution or federal law, since those claims could have been raised in superior court."[113]

This argument ignores the past two decades of Supreme Court and Ninth Circuit precedent indicating that the *Rooker-Feldman* doctrine is "confined to . . . cases brought by state-court losers complaining of injuries *caused by state-court judgments* rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."[114] Further, the Ninth Circuit has emphasized that "only

---

[110] *Id.*

[111] *Id.* at 1163.

[112] Docket 23 at 42; Docket 25 at 43 (sealed).

[113] Docket 23 at 42; Docket 25 at 43 (sealed).

[114] *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (emphasis added); *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004) ("Rooker-Feldman thus

*M., et al. v. Crum, et al.*                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss          Page 24

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 24 of 73

when there is already a forbidden de facto appeal in federal court does the 'inextricably intertwined' test come into play."[115]   Plaintiffs are not state-court losers; they do not complain of injuries caused by state courts; and they do not seek to undo any state-court judgments.  *Rooker-Feldman* is inapplicable.

## C.    Rule 12(b)(1)—Standing

If Plaintiffs' claims escape abstention, Defendants argue that Plaintiffs lack standing to bring those claims and that this action must be dismissed pursuant to Federal Rule of Procedure 12(b)(1).[116]  "Because standing . . . pertain[s] to federal courts' subject matter jurisdiction," it is "properly raised in a Rule 12(b)(1) motion to dismiss."[117]  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."[118]   "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."[119] Here, Defendants launch a facial attack.

Article III of the United States Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"[120]  "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words,

---

applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court *and* seeks as her remedy relief from the state court judgment.").

[115]  *Cooper,* 704 F.3d at 778 (quoting *Noel*, 341 F.3d at 1165).
[116]  Docket 23 at 44–52; Docket 25 at 44–53 (sealed).
[117]  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).
[118]  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).
[119]  *Id.*
[120]  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).

*M., et al. v. Crum, et al.*                                                                                            Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                                   Page 25
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 25 of 73

standing."[121]  As the party invoking federal jurisdiction, the plaintiff has the burden of proving that the following elements of standing are met:  (1) they "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) the "injury was likely caused by the defendant"; and (3) the "injury would likely be redressed by judicial relief."[122]  "Each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation."[123]  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice"[124] because, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party."[125]

Defendants' standing argument begins with a flawed premise.  Defendants assert that *each* of the fourteen Named Plaintiffs must establish standing for this action to proceed.[126]  Under Ninth Circuit law, only one of the named plaintiffs in a class action seeking injunctive relief "need demonstrate standing to satisfy Article III."[127]  "[O]nce the

---

[121]  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).
[122]  *Id.*
[123]  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).
[124]  *Id.*
[125]  *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).
[126]  Docket 38 at 16–17.  Defendants cite *Barapind v. Gov't of Republic of India*, 50 F. Supp. 3d 1388, 1391 (E.D. Cal. 2014), *aff'd*, 844 F.3d 824 (9th Cir. 2016), for this proposition. *Barapind* does not support Defendants' argument that each of the Named Plaintiffs must establish standing in a putative class action; rather, it states the unremarkable rule that plaintiff's burden at the pleading stage "must be met by pleading sufficient allegations to show a proper basis for the court to assert subject matter jurisdiction over the action."  *Id.*
[127]  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022); *see also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 865 (9th Cir. 2014); *Horne v. Flores*, 557 U.S. 433, 445 (2009); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).

*M., et al. v. Crum, et al.*                                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                      Page 26
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 26 of 73

named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met."[128]  Courts within this Circuit routinely apply this rule at the pre-certification motion to dismiss stage.[129]  Therefore, the fact that Plaintiffs did not address each Named Plaintiff for each element of standing is not the fatal blow that Defendants suggest.

### (1)  Injury-in-fact

In cases involving requests for prospective injunctive relief, a plaintiff must demonstrate that "he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'"[130]  A plaintiff must establish a "real and immediate" threat of injury.[131]  Past wrongs

---

[128] *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019) (citing *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015)).

[129] In *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), the Supreme Court held that "[e]very class member must have Article III standing in order to recover individual damages." The Supreme Court reserved the question of "whether every class member must demonstrate standing *before* a class certifies a class." *Id.* at 2208 n.4.  When interpreting *TransUnion*, the Ninth Circuit clarified that the law of the Circuit remains that, when a class seeks injunctive or equitable relief, only one plaintiff need demonstrate standing. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022).  Courts within the Ninth Circuit have applied this rule at the motion to dismiss stage, before a class is certified. *See, e.g.*, *Rutter v. Apple Inc.*, No. 21-CV-04077-HSG, 2022 WL 1443336, at *4 (N.D. Cal. May 6, 2022); *Fernandez v. CoreLogic Credco, LLC.*, 593 F. Supp. 3d 974, 983 (S.D. Cal. 2022); *Mendoza v. Electrolux Home Prod., Inc.*, No. 1:20-CV-01133-DAD-BAM, 2022 WL 4082200, at *6 (E.D. Cal. Sept. 6, 2022); *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1046 (N.D. Cal. 2022).

[130] *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal citation omitted).

[131] *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

*M., et al. v. Crum, et al.*                                                                 Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                 Page 27

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 27 of 73

"are evidence bearing on whether there is a real threat of repeated injury," but they do not "in themselves amount to a real and immediate threat of injury."[132]

Defendants argue that Plaintiffs' allegations consist wholly of past harms with no showing that those harms will be repeated. Defendants cite *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), and *Ashley W. v. Holcomb*, 34 F.4th 588, 593 (7th Cir. 2022), to argue that Plaintiffs have alleged mere exposure to past illegal conduct, which is insufficient to establish standing for injunctive relief.[133] Both cases are inapposite. In *Lyons*, the Supreme Court found that a plaintiff who had been placed in a chokehold by Los Angeles police officers and sued the city seeking injunctive relief barring the use of chokeholds did not have standing because he had not established that he was likely to again be stopped by police and placed in a chokehold, especially when the City had not "ordered or authorized" police officers to place people in chokeholds.[134] Here, unlike the plaintiff in *Lyons*, Plaintiffs remain in OCS custody and therefore are wholly subject to the conditions of that office.[135] The injuries alleged by the Named Plaintiffs are also connected to the practices of OCS.[136]

In *Ashley W.*, the Seventh Circuit found a lack of standing where "[m]uch of the relief proposed by plaintiffs' complaint and briefs concerns how child-welfare

---

[132] *Bates*, 511 F.3d at 985 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).
[133] Docket 23 at 44–45; Docket 25 at 45–46 (sealed).
[134] *Lyons*, 461 U.S. at 105–06.
[135] *See id.*
[136] *See 31 Foster Child. v. Bush,* 329 F.3d 1255, 1266 (11th Cir. 2003) ("As *Lyons* illustrates, future injury that depends on either the random or unauthorized acts of a third party is too speculative to satisfy standing requirements. However, when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again.").

*M., et al. v. Crum, et al.*                                           Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                        Page 28
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 28 of 73

investigations are handled and before [child welfare] proceedings begin."[137] Since the named plaintiffs were already in child welfare proceedings when the case began, the Seventh Circuit noted that "they do not have any current interest in how pre-litigation investigations are conducted."[138] Here, only three of the requested eighteen injunctions relate to the time period when a child enters foster care, and each is aimed at stemming an ongoing injury identified in the Complaint. For example, request for relief at paragraph "IV.e" seeks a requirement that "Defendants ensure all children who enter foster care placement receive within 30 days of entering care a comprehensive evaluation of the child's needs, . . . *and that the child be reevaluated as the child's needs and the information available to the Defendants change*."[139]

Plaintiffs have adequately alleged they are suffering a continuing injury or are under imminent threat of future injury. Each Named Plaintiff is in OCS custody and therefore "cannot avoid exposure to the defendants' challenged conduct."[140] The challenged conduct, if true, exposes them to a real and immediate threat of injury. For example, the Complaint alleges the Mary B. and Connor B. have experienced placement instability during their time in OCS and "remain subject to shifting custodial situations and are at risk of being moved again."[141] The Complaint alleges that Mary B., a member of the

---

137 *Ashley W. v. Holcomb*, 34 F.4th 588, 593 (7th Cir. 2022).
138 *Id.* (citations omitted).
139 Docket 16 at 91 (emphasis added).
140 *31 Foster Child.*, 329 F.3d at 1266; *see also Connor B. ex rel. Vigurs v. Patrick,* 771 F. Supp. 2d 142, 153 (D. Mass. 2011) ("Given that Plaintiffs remain in DCF custody and have not been placed in permanent homes, they may fairly argue that they suffer ongoing harm resulting from the alleged systemic failures within DCF.").
141 Docket 16 ¶ 73.

*M., et al. v. Crum, et al.*                                                                     Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                      Page 29
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 29 of 73

proposed Kinship Subclass, was removed from the custody of her grandmother in part because OCS did not provide her with necessary financial support, and is now placed with her uncle, who is also not receiving financial support, increasing the likelihood of another disrupted placement.[142]  OCS allegedly promised to place Connor B., a member of the proposed ICWA subclass, with his grandmother but never did so, leaving Connor B. in a non-Indian foster home.[143]  David V., George V., Lawrence V., Karen V., and Damien V. have been moved "40 times in the span of slightly over a year"[144] largely because foster parents were "provided with no information about the children's behavioral and physical issues"[145] leading to a "deterioration of the children's behavior and mental state."[146] David V. and George V., members of the proposed ADA Subclass, have not received any mental health services or medications while in OCS custody, and George V. has been placed in inappropriately restrictive placements due to lack of appropriate foster homes.[147]

The Complaint attributes these past and current injuries to OCS's systemic deficiencies, including unmanageable caseloads, understaffing, and failure to engage in permanency planning.[148]  The persistent deficiencies identified in the Complaint present a threat of repeated injuries connected to those deficiencies.  Courts analyzing similar foster care class actions have arrived at the same result.[149]  In *B.K. by next friend Tinsley v.*

---

[142] *Id.* ¶¶ 63–66.
[143] *Id.* ¶ 71.
[144] *Id.* ¶ 78.
[145] *Id.* ¶ 100.
[146] *Id.* ¶ 78.
[147] *Id.* ¶¶ 83, 86–89, 91.
[148] *See id.* ¶¶ 73, 77, 81, 110.
[149] *31 Foster Child.*, 329 F.3d at 1266; *Connor B. ex rel. Vigurs*, 771 F. Supp. 2d at 153; *Clark K. v. Guinn*, Civ. No. 2:06–cv–1068, 2007 WL 1435428, at *5 (D. Nev. May 14, 2007);

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 30

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 30 of 73

*Snyder*, 922 F.3d 957, 967 (9th Cir. 2019), the Ninth Circuit found that evidence that the plaintiff had "not received adequate medical care or appropriate placements in the past," coupled with evidence that "statewide policies and practices expose her to a risk of similar future harms" and that she "faces a risk of harm from DCS policies and practices that inadequately provide for children who do not have available kinship placements,"[150] was sufficient to establish the named plaintiff's standing. As such, the Court finds that Plaintiffs meet the injury-in-fact element of standing.

### (2) Causation

To satisfy the causality element of standing, "Plaintiffs must show that the injury is causally linked or 'fairly traceable' to [Defendants'] misconduct, and not the result of misconduct of some third party not before the Court."[151] Defendants assert that the Complaint is devoid of allegations "linking OCS's alleged historical problems to the circumstances of the Named Plaintiffs themselves."[152] Defendants also assert that the causal link between OCS's conduct and Plaintiffs' injuries is too attenuated because it rests upon the independent decisions of third-party actors.[153]

The Complaint adequately alleges a causal connection between Plaintiffs' injuries to OCS's conduct. For example, the Complaint states that OCS failed to properly support, supervise, or educate Lawrence V., David V. and George V.'s previous foster

---

*Dwayne B. v. Granholm*, Civ. No. 06–13548, 2007 WL 1140920, at \*3–4 (E.D. Mich. April 17, 2007); *see Carson P. v. Heineman*, 240 F.R.D. 456, 512–13 (D. Neb. 2007).

150 *B.K. by next friend Tinsley*, 922 F.3d at 972.
151 *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013).
152 Docket 23 at 48; Docket 25 at 49 (sealed).
153 Docket 23 at 47; Docket 25 at 48 (sealed).

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss

Case No. 3:22-cv-00129-JMK
Page 31

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 31 of 73

homes, leading to disrupted placements because the foster homes were unable to support the children's emotional and behavioral needs.[154] The Complaint alleges that Rachel T. and Eleanor T. have met with their caseworkers "four to five times and have provided little to no support to the children in obtaining required services" due to caseworker turnover and unmanageable caseloads.[155] This is not a case where Plaintiffs' asserted injuries "arise[] from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*"[156] and therefore causation and redressability hinge on "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict."[157] The party whose conduct is challenged—OCS—is before the Court, and its compliance with any relief in this case does not depend on absent third parties. In *B.K.*, the Ninth Circuit found that a named plaintiff's constitutional injuries were fairly traceable to the conduct of the Arizona Department of Child Safety because, "[i]f state officials failed and continued to fail to provide [plaintiff] 'reasonable safety and minimally adequate care . . .' through the deficient statewide policies and practices she alleges, the harm to her will have been caused by those officials."[158] Plaintiffs have sufficiently pled injuries that are fairly traceable to Defendants' misconduct.

---

[154] Docket 16 ¶¶ 81–82, 87, 95–96.
[155] *Id.* ¶¶ 109–10.
[156] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).
[157] *Id.* (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989)).
[158] *B.K. by next friend Tinsley*, 922 F.3d at 967.

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                     Page 32
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 32 of 73

### (3)     Redressability

"Redressability is satisfied so long as the requested remedy 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'"[159]  Defendants claim that Plaintiffs' requests for relief relate to grievances that can be raised in Plaintiffs' CINA cases, is divorced from Plaintiffs' individual injuries.[160]  These arguments rest on Defendants' misunderstanding of the nature of the injuries of which Plaintiffs complain.  Defendants direct Plaintiffs to CINA courts to address their individual placements and services.  But Plaintiffs do not seek changes to their individual placements and services through this lawsuit.  They seek systemic relief from injuries resulting from systemic flaws.  Instructing Plaintiffs to secure change by challenging OCS's placement decision in their individual case is a Sisyphean task that will not relieve Plaintiffs from their injuries—the constant placement disruptions, the lack of access to services, the lack of case planning.  If a CINA court orders OCS to come up with a different placement for a Plaintiff or to provide that Plaintiff particular services, the injures complained of here remain.  By contrast, the relief requested here—such as requiring OCS to provide services to all children whose case plans identify a need for services, manage caseloads at a certain level, and conduct annual case record reviews "to measure how likely children in Defendants' custody are to receive timely permanence"[161]—is likely to redress Plaintiffs injuries.

---

[159] *Mecinas v. Hobbs*, 30 F.4th 890, 900 (9th Cir. 2022).
[160] *See* Docket 23 at 49–50; Docket 25 at 50–51 (sealed).
[161] Docket 16 at 90 ¶ IV.

*M., et al. v. Crum, et al.*                                                           Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                              Page 33
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 33 of 73

Defendants also suggest that Plaintiffs' requested relief amounts to "ordering the state to come up with more money."[162]   According to Defendants, the problems Plaintiffs allege boil down to a lack of resources, and federal courts should not be the arbiters of state agency resource allocation.[163]   Cases involving the allocation of state resources "raise sensitive federalism concerns, which are heightened when . . . a federal-court decree has the effect of dictating state or local budget priorities."[164]   Still, these concerns must be balanced with the fact that "federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief."[165]   The Court cannot abdicate this duty because compliance with the Constitution may be expensive.

It is also worth noting that institutional reform injunctions must be aimed only at eliminating conditions that violate federal law, ensuring that "responsibility for discharging the State's obligations is returned promptly to the State and its officials."[166] Nor is the requested relief novel.  In *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 273–76 (5th Cir. 2018), the Fifth Circuit affirmed portions of a district court's injunction that ordered child welfare agencies to comply with a litany of mandates, including to report their caseloads, "ensure statewide implementation of graduated caseloads" for new hires, and inform a child's caregivers of confirmed allegations of sexual abuse at each present

---

[162] Docket 23 at 51; Docket 25 at 52 (sealed) (emphasis omitted) (quoting *Ashley W.*, 34 F.4th at 593–94).
[163] Docket 38 at 21.
[164] *Horne v. Flores,* 557 U.S. 433, 448 (2009).
[165] *Id.* at 450.
[166] *Id.*

M., et al. v. Crum, et al.                                                                  Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                        Page 34

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 34 of 73

and subsequent placement.[167]  Plaintiffs' requested relief is not fundamentally different from the relief granted in *M.D. by Stuckenberg*, so there is precedent for what this Court could order to redress Plaintiffs' injuries.

In sum, the placement instability and lack of adequate support services that Plaintiffs have alleged are concrete and particularized injuries-in-fact caused by OCS's systemic challenges, namely its unmanageable caseloads, understaffing, and failure to engagement in proper planning and reporting.  An order from this Court likely could redress these injuries by requiring systematic improvements, such as new systems for providing placements and services, enhanced and transparent reporting, better caseload management practices, and a requirement to conduct regular case record reviews.  Plaintiffs have established standing to bring their claims in federal court, and as such Defendants' Motion to Dismiss for Lack of Standing is **DENIED**.

### D.      Rule 65—Injunctive Relief

Defendants claim they are entitled to dismissal because certain requests for an injunction "violate" Federal Rule of Civil Procedure 65.[168]  Rule 65(d) provides that "[e]very *order granting an injunction* . . . must state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  By its plain terms, Rule 65 governs the scope and content of court orders granting an injunction; it does not impose a

---

[167]  The Fifth Circuit honed the injunction ordered by the district court to ensure that it was not "too blunt a remedy for a complex problem."  *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 274 (5th Cir. 2018).

[168]  Docket 23 at 53–55; Docket 25 at 54–56 (sealed).

*M., et al. v. Crum, et al.*                                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                          Page 35
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 35 of 73

heightened pleading standard on Plaintiffs seeking an injunction. Even at the class

certification stage, Plaintiffs need only describe the "general contours of an injunction that

would provide relief to the whole class, that is more specific than a bare injunction to follow

the law, and that can be given greater substance and specificity at an appropriate stage in

the litigation through fact-finding, negotiations, and expert testimony."[169] Plaintiffs have

done so here by detailing 17 specific actions they request this Court order Defendants to

undertake an done action they request the Court order Defendants to cease taking.[170] These

actions range from requiring Defendants to maintain caseloads for each case worker, recruit

and retain enough qualified and trained case workers, and place children in safe and

appropriate environments that are least restrictive to the children's needs, among many

other requests.[171] This is not a case where there is no conceivable way the Court could

fashion the requested relief in a way that meets the specificity requirements of Rule 65(d)

or the injunction requests simply that Defendants follow the law.[172] Therefore, Rule 65(d)

does not provide a basis for dismissal at this stage in the litigation. Defendants' request to

dismiss "a," "b," "p," and "q" of Plaintiffs' relief is **DENIED**.

---

[169] *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014)).

[170] Docket 16 at 90 ¶ IV.

[171] *Id.* at 91 ¶¶ IV.a–c.

[172] *See Littell v. Houston Indep. Sch. Dist.,* 894 F.3d 616, 631 (5th Cir. 2018) (collecting cases finding that Rule 65(d) usually does not justify dismissal of a complaint but noting that "[t]o the extent Rule 65(d) can theoretically justify a pleading-stage dismissal, moreover, we expect that it can do so only if there is no conceivable way to frame the requested relief in adequately specific terms.").

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                     Page 36
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 36 of 73

## E. Rule 12(b)(6)—Failure to State a Claim

Defendants seek dismissal of Counts One, Two, Four, Five, Six, and Seven under Rule 12(b)(6) for failure to state a claim.[173] A complaint will survive a Rule 12(b)(6) motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"[174] A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[175] If the facts alleged in the complaint do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed.[176] Courts assessing a Rule 12(b)(6) motion accept as true all factual allegations alleged in the complaint and construe the pleadings in the light most favorable to the plaintiff.[177] Courts need not, however, accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."[178]

### (1) Claim One—substantive due process

Claim One asserts that Defendants have violated Plaintiffs' substantive due process rights conferred by the Fourteenth Amendment.[179] The Due Process Clause of the Fourteenth Amendment "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the

---

[173] Docket 25 at 55–75, 56–76 (sealed).

[174] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[175] *Id.*

[176] *Id.*

[177] *E.g., Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

[178] *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

[179] Docket 16 ¶¶ 264–69.

government itself may not deprive the individual."[180]  There are two exceptions to this rule: the special relationship exception and the state-created danger exception.[181]

The special relationship exception provides that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."[182]  This exception applies to children in foster care.[183]  "Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child."[184]  To determine whether a foster child's substantive due process rights have been violated, courts apply the "deliberate indifference" standard, which requires "(1) a showing of an objectively substantial risk of harm and (2) a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and (a) the official actually drew that inference or (b) . . . a reasonable official would have been compelled to draw that inference."[185]

---

[180] *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).
[181] *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012).
[182] *Id.* at 1000–01.
[183] *Id.* at 1000.
[184] *Id.* (quoting *Lipscomb v. Simmons,* 962 F.2d 1374, 1379 (9th Cir. 1992)).
[185] *Id.* (citing *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 845 (9th Cir. 2010)); *see also Momox-Caselis v. Donohue*, 987 F.3d 835, 845 (9th Cir. 2021).  Confusingly, Plaintiffs argue that this three-part deliberate indifference test was overturned in *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016).  The fact that this test was cited with approval in a case five years after it was purportedly overturned is a strong indicator that *Castro* did not, in fact, overturn this test.  Further, *Castro* overturned an earlier case "to the extent that it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual defendant's subjective intent to punish in the context of a pretrial detainee's

*M., et al. v. Crum, et al.*                                                                          Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                              Page 38

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 38 of 73

To determine liability under the state-created danger doctrine, courts ask (1) whether any affirmative actions of the official placed the individual in danger he otherwise would not have faced; (2) whether the danger was known or obvious; and (3) whether the official acted with deliberate indifference to that danger.[186] The Court analyzes these exceptions in unison below.[187]

Plaintiffs contend Defendants violated their rights to (a) freedom from the foreseeable risk of maltreatment while under the protective supervision of the State; (b) protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child; (c) services necessary to prevent unreasonable risk of harm in the least restrictive environment; (d) conditions and duration of foster care reasonably related to the purpose and assumption of government custody; (e) treatment and care consistent with the purpose and assumptions of government custody; (f) not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody; and (g) receive or be reunited with an appropriate permanent home and family within a reasonable period.[188]

Defendants argue that Claim One fails because Plaintiffs assert the violation of rights that are not constitutionally recognized and fail to allege sufficient facts to support their claims.[189] Foster children have a constitutionally protected right to basic needs, such

---

failure-to-protect claim." The three-party deliberate indifference test remains the viable test in the foster care context. *See B.K. by next friend Tinsley v. Snyder,* 922 F.3d 957, 968 (9th Cir. 2019) (applying three-part test in foster care case).

[186] *Henry A.,* 678 F.3d at 1002.
[187] *Momox-Caselis,* 987 F.3d at 845.
[188] Docket 16 ¶ 269.
[189] Docket 38 at 21.

*M., et al. v. Crum, et al.*                                                  Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 39
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 39 of 73

as food clothing, shelter, medical care, and reasonable safety; however, unfortunately, "[t]he Fourteenth Amendment does not entitle [foster children] to receive optimal treatment and services."[190]  Surveying the relevant authorities, courts have found that rights similar to the rights alleged in Paragraph 269, Subparagraphs (a), (b), and (e) of Plaintiffs' Complaint, fall on the basic needs end of the spectrum.[191]  Regarding the rights alleged in Paragraph 269, Subparagraphs (c), (d), and (f) of Plaintiffs' Complaint, the weight of authority supports a finding that substantive due process does not encompass placement in the least-restrictive environment or being subject to either (1) conditions reasonably related to the purpose and assumption of government custody or (2) durational limitations on the government custody.[192]  Finally, as to the right alleged in Paragraph 269, Subparagraph (g),

---

[190] *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018).

[191] *Id.* at 251 ("[E]gregious intrusions on a child's emotional well-being . . . are constitutionally cognizable"); *Jonathan R. v. Justice*, No. 3:19-CV-00710, 2023 WL 184960, at *7 (S.D.W. Va. Jan. 13, 2023) (recognizing substantive due process rights to protection against maltreatment; "protection from unnecessary intrusions into the child's emotional wellbeing while in State custody"; and "treatment and care consistent with the purpose and assumptions of government custody."); *Wyatt B. by McAllister v. Brown*, No. 6:19-CV-00556-AA, 2021 WL 4434011, at *8 (D. Or. Sept. 27, 2021) (recognizing "the right to freedom from maltreatment while under the protective supervision of the state" and "[t]he right to freedom from bias-related violence, abuse and harassment while in state custody").

[192] *See M.D. by Stukenberg*, 907 F.3d at 268; *Wyatt B. by McAllister v. Brown*, No. 6:19-CV-00556-AA, 2021 WL 4434011, at *9 (D. Or. Sept. 27, 2021); *T.F. by Keller v. Hennepin Cnty.*, No. CV 17-1826 (PAM/BRT), 2018 WL 940621, at *4 (D. Minn. Feb. 16, 2018); *Clark K. v. Guinn*, No. 2:06CV1068-RCJ-RJJ, 2007 WL 1435428, at *15 (D. Nev. May 14, 2007); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D. N.J. 2000). *Jonathan R.* is the recent outlier here. While the *Jonathan R.* court found that foster children did not have the right to services in the least restrictive setting, the court did recognize the right to conditions and duration of foster care reasonably related to the purpose of government custody, and "the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody." 2023 WL 184960, at *7.  The *Jonathan R.* court reasoned that "Plaintiffs are in Defendants' custody largely because they have been abused or neglected by their parents . . . [o]nce these conditions cease, so do the justifications for removal." *Id.*  At least in theory, those conditions should cease immediately upon removing the child from parental custody.  This Court finds that recognition of this right translates to guaranteeing optimal treatment and services,

---

*M., et al. v. Crum, et al.*                                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                     Page 40

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 40 of 73

Plaintiffs do not cite to any cases that recognize a substantive due process right to receive or be reunited with permanent home and family within a reasonable period.[193] While that purported right assuredly captures society's most fervent hopes for children entering foster care, this elevated durational limitation extends much beyond what the courts have recognized as basic needs.

With respect to the rights alleged in Paragraph 269, Subparagraphs (a), (b), and (e), the Court finds that Plaintiffs have plausibly alleged deliberate indifference in relation to those rights. Plaintiffs allege that OCS was aware that David V. and Damien V. were subjected to physical and verbal abuse in their respective foster homes but did not transfer the children out of those placements.[194] Plaintiffs also allege that Jeremiah M., Hannah M., and Hunter M. are placed in a home that is visited by a sex offender and, despite the children's tribe's requesting that the children be moved to another foster home, OCS "failed to move the children or ensure their safety."[195] The Complaint also includes multiple allegations that Plaintiffs are not receiving medical or behavioral services, despite OCS's knowledge of their need for those services, and that OCS fails to notify foster parents of children's medical and behavioral needs.[196] These allegations, when taken as true, plausibly allege that OCS violated Plaintiffs' substantive due process rights. Defendants' Motion to Dismiss as to Claim One is thus **GRANTED** with respect to the

---

which as noted above is not a right that the Fourteenth Amendment guarantees, at least under existing caselaw.

[193] Docket 36-2 at 69. Neither of Plaintiffs' case citations address the right to receive or be reunited with an appropriate permanent home. *Id.* at 69 n.83.

[194] Docket 16 ¶¶ 81, 99.

[195] *Id.* ¶ 55.

[196] *Id.* ¶¶ 82–83, 87, 91, 96–97, 104, 107, 139.

*M., et al. v. Crum, et al.*                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 41
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 41 of 73

rights asserted in Paragraph 269, Subparagraphs (c), (d), (f), and (g); and **DENIED** with respect to the rights asserted in Paragraph 269, Subparagraphs (a), (b), and (e).

### (2) Claim Two—right to familial association

In Claim Two, Plaintiffs allege that OCS fails to take "all reasonable efforts toward fostering familial association and securing a permanent home and family for the named Plaintiffs"[197] in "violation of the First Amendment's right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections."[198] The Supreme Court has recognized that the freedom of association "afford[s] the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State."[199] The Supreme Court has also recognized that "[t]he integrity of the family unit has found protection" in the Fourteenth and Ninth Amendments,[200] though the "precise boundaries of this type of constitutional protection" remain somewhat elusive.[201]

Plaintiffs assert that "when the state involuntarily removes children from a family unit and/or separates siblings, the state assumes an affirmative obligation to restore the family unit to its condition prior to state interference."[202] Courts have consistently held that the right to familial association is a negative right—the right to be free from

---

[197] Docket 16 ¶ 275.
[198] *Id.* ¶ 276.
[199] *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).
[200] *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).
[201] *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987).
[202] Docket 36-2 at 76.

unwarranted or unjustified state interference in certain existing intimate relationships.[203] Plaintiffs attempt to transform this negative right into a broad affirmative right to restore the foster children's pre-custody family unit.[204] But Plaintiffs only weakly provide non-binding support for a finding that the state has an affirmative constitutional family building obligation.[205] In fact, courts have consistently been unwilling to place constitutional obligations on the state to build, rebuild, or preserve families.[206] Further, this purported right is incompatible with the facts alleged in this case. As with many constitutional rights, the right to familial association free from state interference is not absolute.[207] "Under certain circumstances, these rights must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as *parens patriae*."[208] None of the Named Plaintiffs claim that their removal from their parents' custody constituted unwarranted state interference into their relationship with their parents. These removals primarily occurred in the context of allegations of child abuse and

---

[203] *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996); *Rotary Int'l*, 481 U.S. at 545; *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).

[204] Docket 36-2 at 76.

[205] *Id.* at 75–76.

[206] *See Mullins v. State of Or.*, 57 F.3d 789, 794 (9th Cir. 1995) ("A negative right to be free of governmental interference in an already existing familial relationship does not translate into an affirmative right to create an entirely new family unit out of whole cloth."); *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 676 (S.D.N.Y. 1996) (rejecting challenge to state's alleged "general failure to provide services that function to preserve the family unit" pursuant to the First, Ninth, and Fourteenth Amendments, "even if that agency has a statutory duty to do so."), *aff'd sub nom. Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997).

[207] *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012).

[208] *Id.*

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 43

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 43 of 73

neglect. Thus, the condition of the family unit prior to state interference was the very danger that warranted state interference.

Plaintiffs instead allege that, while in state custody, their relationships with their parents, siblings, and grandparents "are systematically and improperly intruded upon by Defendants' policies and practices."[209] Plaintiffs cite as examples Defendants' practices of placing children in institutions, shuffling children through foster placements, and failing to arrange for visitation between separated siblings and parents.[210] Plaintiffs claim they have adequately pleaded violations of familial association with respect to Plaintiffs' parents, siblings, and grandparents.[211] The "constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents."[212] Courts applying this concept in the foster care context center the inquiry on whether foster children are denied meaningful contact with their parents.[213] The Court finds that distance or failure to "facilitate" visitation do not, without more, amount to unwarranted state interference in the child-parent relationship.[214]

However, the Complaint contains allegations that describe a denial or limitation of Plaintiffs' visitation. For example, the Complaint states that OCS only permitted the V. children to see their mother on Zoom for one hour a week until, in

---

[209] Docket 36-2 at 73.
[210] *Id.* at 73–74.
[211] *Id.* at 75.
[212] *Lee*, 250 F.3d at 685.
[213] *Connor B. ex rel. Vigurs v. Patrick*, 985 F. Supp. 2d 129, 164 (D. Mass. 2013), *aff'd,* 774 F.3d 45 (1st Cir. 2014).
[214] Docket 16 ¶¶ 54, 56, 71.

*M., et al. v. Crum, et al.*                                         Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 44

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 44 of 73

April 2022, OCS said the children could only see their mother in therapeutic visitation.[215] As OCS is aware, the backlog of therapeutic visitation providers means that the children will not be able to see their mother in person for many months.[216] The Complaint also alleges that OCS would not let Gayle T.'s family regularly visit her in an adolescent inpatient mental health unit in 2020.[217] OCS then did not respond to requests from Gayle T.'s family to visit her at her next placement, a nonprofit mental health agency.[218] These allegations plausibly state a claim for violation of the parent-child right of association.

Yet Plaintiffs fail to state a claim to relief for violation of familial association with regard to siblings and grandparents. The Ninth Circuit has held that adult siblings do not possess a cognizable liberty interest to assert a loss of familial association claim under the Fourteenth Amendment.[219] In an unpublished opinion, the Ninth Circuit found that "[n]o viable loss-of-familial-association claim exists for siblings" under the First Amendment and the Fourteenth Amendments, even with respect to child siblings who were raised together.[220] Thus, Plaintiffs' claim for loss of association with their siblings cannot survive.

---

[215] *Id.* ¶ 77.

[216] *Id.*

[217] *Id.* ¶ 113.

[218] *Id.* ¶ 118.

[219] *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1991).

[220] *J.P. by and through Villanueva v. Cnty. of Alameda*, 803 F. App'x 106, 109 (9th Cir. 2020) (unpublished); *see also Mann v. City of Sacramento,* No. 21-15440, 2022 WL 2128906, at *1 (9th Cir. June 14, 2022) (unpublished) (finding that the First Amendment did not cover intimate-association claims brought by adult siblings); *Olvera v. Cnty. of Sacramento*, 932 F. Supp. 2d 1123, 1148 (E.D. Cal. 2013).

*M., et al. v. Crum, et al.*                                                                 Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                              Page 45
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 45 of 73

Courts also have found that grandparents have no liberty interest in familial association with their grandchildren "by virtue of genetic link alone," but grandparents who have an existing "long-standing custodial relationship" with their grandchild may enjoy constitutional protection from interference with that relationship.[221] Here, the Court need not decide whether Plaintiffs have a cognizable liberty interest to familial association with their grandparents because the Complaint wholly fails to allege unwarranted state interference into the grandchild-grandparent relationship. Two grandparents are mentioned in the Complaint. The M. children were removed from a placement with their grandmother, Ms. S., due to an allegation of physical abuse.[222] Apart from faulting OCS for not providing details in their removal notice, the Complaint does not assert that this removal was unwarranted or unjustified.[223] The other grandmother, Ms. Y., gave up custody of Mary B.[224] While the Complaint asserts that OCS failed to help Ms. Y. obtain financial assistance, it does not assert that Mary B.'s removal from Ms. Y.'s custody was a product of state interference.[225] Thus, Plaintiffs' loss of grandparent association claim fails.

---

[221] *Mullins v. State of Or.*, 57 F.3d 789, 794 (9th Cir. 1995); *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 505 (1977); *Sanchez v. Cnty. of Santa Clara*, No. 5:18-CV-01871-EJD, 2018 WL 3956427, at *9 (N.D. Cal. Aug. 17, 2018) (declining to dismiss grandmother and step-grandfather's claims for violation of familial integrity and association); *Osborne v. Cnty. of Riverside*, 385 F. Supp. 2d 1048, 1054 (C.D. Cal. 2005) ("[G]randparents who have 'a long-standing custodial relationship' with their grandchildren such that together they constitute an 'existing family unit' do possess a liberty interest in familial integrity and association.").

[222] Docket 16 ¶ 52.

[223] *Id.* ¶ 54.

[224] *Id.* ¶ 65.

[225] *Id.* ¶ 62.

*M., et al. v. Crum, et al.*                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 46

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 46 of 73

Defendants' Motion to Dismiss is **GRANTED** as to the portions of Claim Two containing Plaintiffs' claims for familial association with their grandparents and siblings and **DENIED** as to the portion of Claim Two containing Plaintiffs' claims for familial association with their parents.

### (3) Claim Four—Indian Child Welfare Act

Plaintiffs allege that Defendants have violated certain rights under 25 U.S.C. § 1915 ("Section 1915"), a provision of the Indian Child Welfare Act ("ICWA") that Plaintiffs argue can be enforced through 42 U.S.C. § 1983.[226] ICWA established "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture."[227] Congress enacted ICWA in 1978 in response to a "rising concern . . . over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes."[228] These abusive child welfare practices stemmed from states' failures to

---

[226] *Id.* ¶¶ 281–91.
[227] 25 U.S.C. § 1902. ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). An "Indian tribe" refers to "any Indian tribe, band, nation or other organized group or community of Indians recognized as eligible for services provided to Indians by the Secretary . . . including any Alaska Native village as defined in section 1602(c) of Title 43." 25 U.S.C.A. § 1903(8). Finally, "Indian" is defined as "any person who is a member of an Indian tribe, or who is an Alaska Native and a member of a Regional Corporation as defined in section 1606 of Title 43." 25 U.S.C. § 1903(3). Certain Named Plaintiffs have alleged that they are Alaska Natives and that they belong to the Alaska Native Subclass, which is defined as "Alaska Native children who are or will be entitled to federal ICWA protection." Docket 16 ¶ 28(b).
[228] *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642 (2013).

"recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."[229] "'At the heart of ICWA' lies a jurisdictional scheme aimed at ensuring that tribes have a role in adjudicating and participating in child custody proceedings involving Indian children . . . ."[230]

Section 1914 of ICWA contains a private right of action that allows an Indian child, a parent or Indian custodian, or an Indian child's tribe to petition "any court of competent jurisdiction to invalidate" a state court foster care placement or termination of parental rights upon a showing that the state court's "action violated ICWA Sections 1911, 1912, or 1913."[231] Section 1915 prescribes, among other things, an express preference methodology for adoptive, preadoptive, or foster care placement of Indian children.[232] Section 1915(b) provides that

> [i]n any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with (i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

Section 1915(b) further requires that "[a]ny child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family

---

[229] *Haaland v. Brackeen*, 143 S. Ct. 1609, 1623 (2023) (citing 25 U.S.C. § 1901(5)).
[230] *Doe v. Mann*, 415 F.3d 1038, 1049 (9th Cir. 2005) (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989)).
[231] 25 U.S.C. §1914; *see also Doe*, 415 F.3d 1038 at 1047.
[232] 25 U.S.C. § 1915(a), (b).

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 48

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 48 of 73

and in which his special needs, if any, may be met." The Indian child "shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child."[233]

Defendants argue that Plaintiffs' ICWA claim fails because violations of Section 1915 do not fall within Section 1914's private right of action and courts have found that Section 1915 does not contain an implied right of action.[234] Plaintiffs counter that Defendants' argument misses the point; they seek to "enforce Section 1915 under Section 1983," not Section 1914 or through an implied right of action.[235] Defendants reply that, even so, Section 1915 may not be enforced via 42 U.S.C. § 1983.[236] "In order to seek redress through § 1983 . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."[237] To determine whether a federal statute creates an individual right, courts employ the test first announced in *Blessing v. Freestone*, 520 U.S. 329, 340 (1997), which requires that (1) Congress "intended that the provision in question benefit the plaintiff"; (2) "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute unambiguously imposes a binding obligation on the States."[238] In *Gonzaga University v.*

---

[233] 25 U.S.C. § 1915(b).

[234] Docket 23 at 65–67; Docket 25 at 66–28 (sealed); *see also Doe v. Mann,* 285 F. Supp. 2d 1229, 1240–41 (N.D. Cal. 2003), *aff'd*, 415 F.3d 1038 (9th Cir. 2005); *Navajo Nation v. Superior Ct. of State of Wash. for Yakima Cnty.*, 47 F. Supp. 2d 1233, 1243 (E.D. Wash. 1999), *aff'd sub nom. Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331 F.3d 1041 (9th Cir. 2003).

[235] Docket 36-2 at 78 ("This is not a Section 1914 case seeking to invalidate individual state court orders, but a class action seeking to enforce Section 1915's rules.").

[236] Docket 38 at 24–28.

[237] *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (emphasis in the original).

[238] *Id.* at 340–41.

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                      Page 49

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 49 of 73

*Doe*, 536 U.S. 273, 283 (2002), the Supreme Court clarified that the first prong of the *Blessing* test focuses on whether Congress intended to create a federal right.[239] Courts' role in discerning whether personal rights exist in the Section 1983 context therefore is no different from their role in discerning whether personal rights exist through an implied right of action because "both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries."[240] Evidence of congressional intent may be "found in the statute's language as well as in its overarching structure."[241] If the *Gonzaga-Blessing* test is satisfied, "'the right is presumptively enforceable' through § 1983."[242] However, Defendants may overcome this presumption "by demonstrating that Congress foreclosed private enforcement expressly 'or impliedly, by creating a comprehensive enforcement scheme that is incompatible with' individual private lawsuits."[243]

The Court's analysis under *Gonzaga* and *Blessing* is hamstrung by a lack of clarity surrounding what rights Plaintiffs claim under Section 1915. It is incumbent upon Plaintiffs to "identify with particularity the rights they claim[]" since it is impossible to determine whether Section 1915, "as an undifferentiated whole, gives rise to undefined

---

[239] *See also Anderson v. Ghaly*, 930 F.3d 1066, 1073 (9th Cir. 2019).
[240] *Gonzaga Univ.*, 536 U.S. at 285.
[241] *Anderson*, 930 F.3d at 1073 (quoting *Ball v. Rodgers*, 492 F.3d 1094, 1105 (9th Cir. 2007)). A statute's text evidences congressional intent to create a federal right if the text employs "explicit rights-creating terms." *Gonzaga*, 536 U.S. at 284.
[242] *Planned Parenthood Arizona Inc. v. Betlach*, 727 F.3d 960, 966 (9th Cir. 2013) (quoting *Gonzaga*, 536 U.S. at 284).
[243] *Id.* (quoting *Gonzaga*, 536 U.S. at 284 n.4).

*M., et al. v. Crum, et al.*                                                      Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                      Page 50
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 50 of 73

'rights.'"[244] The *Blessing-Gonzaga* framework was meant to be separately applied at the specific provision level.[245] Courts may not look at a statutory section in its entirety and "determine at that level of generality whether it creates individual rights."[246] Here, Plaintiffs have failed to articulate the claimed rights with any particularity; the Complaint simply recites the different provisions of Section 1915 and then generally alleges that Plaintiffs have been deprived of those rights under those provisions.[247] Further, Plaintiffs do not explain how Congress intended to create an individual right under any specific provision of Section 1915 and instead advance arguments that apply to ICWA as a whole.[248] The Court is left wondering what purported right to analyze, as Plaintiffs address different asserted rights at different stages in the *Blessing* analysis.[249] Plaintiffs cannot satisfy the *Blessing* test by pointing to a menu of potential rights under Section 1915 and hoping the Court chooses one.

---

[244] *Blessing v. Freestone*, 520 U.S. 329, 342 (1997); *see also Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 979 (9th Cir. 2010) ("We have held that *Blessing*'s first factor calls for evaluating the 'provision in question,' and requires that we identify the particular statutory provision at issue").

[245] *See Blessing*, 520 U.S. at 342.

[246] *ASW v. Oregon,* 424 F.3d 970, 977 (9th Cir. 2005).

[247] Docket 16 ¶¶ 281–290. For example, the Complaint alleges Plaintiffs have (1) a right "to placement in the least restrictive and most family-like setting, within reasonable proximity to their home communities"; (2) a right "to be placed with members of their extended families"; (3) a right for OCS "to consistently review how to move that child to a legally preferred placement"; and (4) a right to have OCS recruit and retain enough foster homes approved by Indian tribes. Plaintiffs' reply continues with the list, asserting Plaintiffs have (1) a right to have states maintain records of their compliance with ICWA placement preferences. Docket 36-2 at 78.

[248] Docket 36-2 at 79. Plaintiffs also choose to ignore that other courts in this Circuit have examined congressional intent and concluded that Section 1915(b) does not have an implied right of action. *Doe*, 285 F. Supp. 2d at 1240; *Navajo Nation*, 47 F. Supp. 2d at 1243. Under *Gonzaga*, 536 U.S. at 274, implied right of action cases "should guide the determination whether a statute confers rights enforceable under § 1983."

[249] *See* Docket 36-2 at 78–79 (relying on Section 1915(e) for the second *Blessing* prong and Sections 1915(a) and (b) for the third prong).

Plaintiffs were given an opportunity at oral argument to clarify what *specific* individual right they seek to vindicate under Section 1915. They responded, "OCS has to have more [Alaska Native] homes available for these children, and it does not."[250] Plaintiffs thus assert that Section 1915(b) implies an individual right for OCS to ensure that there are sufficient Alaska Native foster homes and its failure to do so amounts to a violation of that right.[251] Setting aside the vagueness of this purported right—*e.g.*, how many homes is "sufficient"?—the requirement that OCS develop or recruit Indian foster homes is not found in ICWA. In *Haaland v. Brackeen*, the Supreme Court found that Section 1915 does not violate the Tenth Amendment's anti-commandeering principles in part because "Section 1915 does not require *anyone*, much less the States, to search for alternative placements."[252] Instead, "the burden is on the tribe or other objecting party to produce a higher-ranked placement."[253] That logic is applicable here. Section 1915(b) plainly does not require OCS to cultivate a certain number of Alaska Native foster homes.[254] Thus, this purported right fails, at minimum, the third prong of the *Blessing* test because Section 1915 does not impose a binding recruitment obligation on the State.

Plaintiffs also allege that "Defendants have deprived the Alaska Native Subclass members of their rights to be placed with members of their extended families."[255] The Court understands allegations that OCS placed the Named Plaintiffs in "non-ICWA"

---

[250] Docket 47 (Oral Argument Tr. 32:6–8).
[251] *Id.*
[252] 143 S. Ct. at 1635.
[253] *Id.*
[254] Any such requirement would likely present serious anticommandeering concerns. *See id.*
[255] Docket 16 ¶ 289.

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 52
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 52 of 73

foster homes or failed to place the Named Plaintiffs in "ICWA-compliant" foster homes to be related to this purported right.[256] "Non-ICWA" and "ICWA-compliant" are legal conclusions not entitled to the presumption of truth on a motion to dismiss for failure to state a claim.[257] But more fundamentally, this purported right, as articulated by Plaintiffs, is far too blunt an instrument with which to effectuate the statute's language or achieve its purpose. By its plain terms, ICWA does not create an unqualified right for Alaska Native children to be placed with their extended families or with an Alaska Native foster home. Instead, the statutory language acknowledges the need for culturally appropriate preferences and oversight from tribes. Section 1915(b) provides "a preference shall be given, *in the absence of good cause to the contrary*" to foster care placements in a hierarchical order, beginning with a member of the Indian child's extended family.[258] The standards to be applied in meeting the preference requirements are the "prevailing social and cultural standards of the Indian community in which the parent or extended family resides or . . . maintain[s] social and cultural ties."[259] Under Section 1915(c), the Indian child's tribe may establish a different order of preference by resolution. Plaintiffs' implication that any placement outside of ICWA's preferences violates Plaintiffs' rights under ICWA seeks to calcify Section 1915(b)'s preferences in a manner inconsistent with the statutory language.

---

[256] *Id.* ¶¶ 20, 76, 80, 85, 90, 93.
[257] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[258] 25 U.S.C. § 1915(b).
[259] 25 U.S.C. § 1915(d).

*M., et al. v. Crum, et al.*                                                                  Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                              Page 53
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 53 of 73

The remainder of the litany of weakly defined rights articulated by Plaintiffs either are unrelated to the Named Plaintiffs' cases, untethered to the statutory language, or both. For example, Plaintiffs cite to Section 1915(a), which prescribes hierarchical adoptive placement preferences for Indian children.[260] The Complaint does not contain any allegations indicating that any of the Named Plaintiffs are up for adoption. Plaintiffs also cite to Section 1915(e), which mandates that records of Indian children's placements shall be maintained by the state and shall be made available at any time upon the request of the Secretary of the Indian child's tribes.[261] The Complaint is devoid of allegations regarding the maintenance of, or access to, the Named Plaintiffs' placement records. Plaintiffs assert that Section 1915(b)'s placement preferences must be "read in light of ICWA's requirement in [§ 1912(d)]" that OCS must make active efforts to "provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[262] Plaintiffs do not provide any support, from ICWA's statutory language or legislative history, to warrant the Court's importing a standard from a different section of ICWA and finding that the imported standard amounts to a right enforceable through 42 U.S.C. § 1983.

To seek redress under 42 U.S.C. § 1983, a plaintiff must assert the violation of a federal right, not simply a violation of federal law.[263] Plaintiffs have done neither here. The facts as alleged in the Complaint do not state a plausible violation of ICWA. Plaintiffs'

---

[260] Docket 16 ¶¶ 282, 289, 290; Docket 36-2 at 78.
[261] Docket 36-2 at 78.
[262] Docket 16 ¶ 287.
[263] *Blessing*, 520 U.S. at 340.

allegations regarding ICWA are vague or conclusory. Moreover, Section 1915(b) requires Indian children to be placed in the highest preference home available, but Plaintiffs' allegations fail to account for the fact that these preferences only apply in the absence of good cause to the contrary.[264] Plaintiffs assert that arguments relating to good cause are inappropriate for review on a motion to dismiss and that, in any event, the Complaint alleges that there was no good cause to deviate from ICWA's preferred placements in the Named Plaintiffs' cases.[265]

Plaintiffs' first argument as plead lacks merit. By the statute's plain language, a lack of good cause is required for any claim based on ICWA's placement preferences, and Plaintiffs cannot state a claim under ICWA without this assertion. Plaintiffs' second argument is unsupported by the Complaint. Plaintiffs point to two paragraphs in the Complaint that they assert indicates a lack of good cause.[266] The first describes Connor B.'s placement with a non-Indian family after his mother provided OCS with contact information for several relatives. The Complaint alleges that OCS "preliminary vetted the biological father as a potential placement . . . wait[ing] several months to even visit the father's home" before placing Connor B. with a non-Indian family.[267] The Complaint also asserts that OCS has not placed Connor B. with an uncle who is willing to take him.[268] ICWA certainly would require Connor B. to be placed with

---

[264] Plaintiffs inaccurately describe this as "good cause for deviating from ICWA." Docket 36-2 at 80. The good cause requirement is found in ICWA—complying with it complies with ICWA.

[265] *Id.* at 79–80.

[266] *Id.* at 80.

[267] Docket 16 ¶ 70.

[268] *Id.* ¶ 71.

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                    Page 55

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 55 of 73

his father or uncle above others in the absence of good cause. However, Plaintiffs simply have not alleged that OCS lacked good cause or that the Superior Court did not find good cause to deviate from the hierarchical preferences when reviewing Connor B.'s placement. Plaintiffs therefore have not adequately alleged that Defendants violated ICWA.

In sum, Plaintiff have not established that Section 1915 creates individual rights enforceable through 42 U.S.C. § 1983. To be clear, the Court does not hold that Section 1915 does not contain individual rights enforceable through 42 U.S.C. § 1983, only that Plaintiffs have not adequately established that any one of the unspecific rights Plaintiffs identify in their pleading passes the *Blessing* test. It is entirely possible that Plaintiffs can articulate a specific enforceable right under Section 1915, prove Congress's intent to create that right, and demonstrate that Defendants have violated that right in Plaintiffs' cases. They plainly have not done so here. Defendants' Motion to Dismiss Plaintiffs' Claim Four is **GRANTED**, and these claims are dismissed without prejudice.

### (4) Claim Five—Adoption Assistance Child Welfare Act

Plaintiffs' fifth claim alleges a violation of rights under the Adoption Assistance and Child Welfare Act ("CWA"), 42 U.S.C. § 672(a), that can be enforced through 42 U.S.C. § 1983.[269] The CWA, "also known as Title IV-E of the Social Security Act[,] was adopted in 1980 to enable states to provide foster care and adoption assistance

---

[269] *Henry A. v. Willden*, 678 F.3d 991, 996 (9th Cir. 2012). Plaintiffs refer to 42 U.S.C. § 670, *et seq.*, with the abbreviation AACWA. Ninth Circuit case law shortens this simply to CWA. For consistency with other Circuit opinions, the Court will continue with preexisting convention and use CWA; *see also Kirwin v. Kot*, Case No. Cv-22-00471-TUC-RRC-BGM, 2023 WL 4747396 at *5 (July 25, 2023); *Ah Chong v. McManaman*, 154 F. Supp. 3d 1043, 1046 (D. Haw. 2015).

*M., et al. v. Crum, et al.*                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 56

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 56 of 73

for children in need of such services."[270]  Section 672(a)(1) of the CWA provides, "[e]ach State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative . . . into foster care."  Section 672(b) provides that foster care maintenance payments may only be made on behalf of a child who is (1) in the "foster family home of an individual" or (2) "in a child-care institution."  "Foster family home" is defined as a home of an individual or family that is "licensed or approved by the State in which it is situated as a foster family home that meets the standards established for the licensing or approval."[271]  The Ninth Circuit has held that Section 672(a) confers an individually enforceable right to foster care maintenance payments and that foster parents have access to a remedy under 42 U.S.C. § 1983 to enforce that right.[272]  Here, Plaintiffs claims concern to whom that individually enforceable right is available.

Plaintiffs allege that "Defendants have an ongoing policy, pattern, or practice of not providing foster care maintenance payments to kinship caregivers of members of the Kinship Subclass who qualify as approved caregivers under 42 U.S.C. § 672(a)(1) unless they become licensed foster parents."[273]  In the alternative, Plaintiffs allege that "Defendants have an ongoing policy, pattern, or practice of failing to take necessary steps to ensure that relatives or community members who could appropriately provide homes for

[270] *California State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 978 (9th Cir. 2010).
[271] 42 U.S.C. § 672(c)(1)(A)(i).
[272] *California State Foster Parent Ass'n*, 624 F.3d at 982.
[273] Docket 16 ¶ 295.

*M., et al. v. Crum, et al.*                                                          Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                          Page 57
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 57 of 73

Plaintiff Kinship Subclass members . . . are licensed as kinship foster parents, and adequately reimbursed for their care[.]"[274]

Plaintiffs' first theory hinges on the interpretation of "foster family home" in 42 U.S.C. § 672(a)(1). Defendants assert that, under Section 672(a)(1), there are two types of foster families that are entitled to foster care maintenance payments: "(1) licensed foster parents; and (2) state-approved foster homes that meet the standards for licensing."[275] Defendants assert that Claim Five must fail because Plaintiffs have not alleged that any of the Named Plaintiffs' relatives fit into either of these two categories and were denied a foster care maintenance payment.[276] Plaintiffs claim that an "approved" foster family home does not have to meet the standards for licensing and that approval of a relative for the purposes of placement is sufficient to entitle that relative to foster care maintenance payments.[277] Plaintiffs argue that requiring "approved" foster families to meet the same standards as licensed foster families renders the statutory phrase "licensed or approved" redundant.[278]

Although courts within the Ninth Circuit have yet to address this issue, it is not wholly novel; a recent Sixth Circuit opinion addressed Plaintiffs' precise argument. Interpreting the statutory language in Section 672(a)(1), the court found that "an 'approved' relative caregiver is not eligible for [foster care maintenance payments] under Title IV-E

---

[274] *Id.* ¶ 296.
[275] Docket 23 at 69–70; Docket 25 at 70–71 (sealed).
[276] Docket 23 at 70.
[277] Docket 36-2 at 82.
[278] *Id.*

*M., et al. v. Crum, et al.*                                                          Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                          Page 58

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 58 of 73

unless the state 'approval' standards are the same standards that the state uses for licensing foster caregivers."[279] Addressing a redundancy argument identical to the one Plaintiffs make here, the Sixth Circuit found that "Congress had good reason to use a belt-and-suspenders approach by including what states might call 'licensed' and 'approved' foster family homes" because "approve" can function as a "catch-all" term for states that use different terminology, but the same standards must be met to qualify for foster care payments.[280] This interpretation argument is buttressed by the fact that the U.S. Department of Health and Human Services' regulations implementing the CWA and for the Title IV-E eligibility define "foster family home" to mean "the home of an individual or family licensed or approved as meeting the standards established by the licensing or approval authority(ies), that provides 24-hour out-of-home care for children."[281] The Court is persuaded by this line of reasoning. Because Plaintiffs do not assert that any of Plaintiffs' relative caregivers were licensed as foster parents or met the standards for licensing,[282] they do not have an individually enforceable right to foster care maintenance payments under the CWA.

As for Plaintiffs' second theory, Plaintiffs assert that OCS failed to assist, and in some cases actively frustrated, efforts by approved relatives to secure a foster care license.[283] While these allegations reveal potential incompetence on OCS's part, they do

---

[279] *T.M., Next Friend of H.C. v. DeWine*, 49 F.4th 1082, 1089 (6th Cir. 2022).
[280] *Id.* at 1090.
[281] 45 C.F.R. § 1355.20(a)(2).
[282] *See, e.g.,* Docket 16 ¶¶ 47–53.
[283] *Id.* ¶ 296.

*M., et al. v. Crum, et al.*                                        Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 59
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 59 of 73

not describe a violation of federal law. Section 672 does not require state agencies to take all necessary steps to assist kinship placements to become licensed. In their opposition to Defendants' Motion to Dismiss, Plaintiffs argue, for the first time, that Defendants' actions actually violate the "AACWA's due diligence requirement."[284] Section 671(a)(29) provides that "within 30 days after the removal of a child from the custody of the parent or parents of the child, the State shall exercise due diligence to identify and provide notice" to certain relatives that the child has been removed from the custody of the parents, explain the options that relative has to participate in the care of the child, explain the requirements to become a foster family home, and explain how to receive certain payments. Plaintiffs do not allege that relatives of the Named Plaintiffs did not receive the required notice after the children were placed in OCS custody. Instead, Plaintiffs attempt to convert this notice requirement into one requiring affirmative efforts from OCS to help relatives get licensed as foster parents. Section 671(a)(29) does not contain such a requirement and, even if it did, Plaintiffs have not established that purported requirement would amount to a right enforceable through 42 U.S.C. § 1983. Defendants' Motion to Dismiss is **GRANTED** as to Plaintiffs' Claim Five brought under 42 U.S.C. § 672(a).[285]

---

[284] Docket 36-2 at 81–82 n.98.
[285] Defendants argue that Plaintiffs' request for relief (m), which seeks an injunction requiring Defendants to "assist unlicensed kinship caregivers in obtaining foster care licenses to take care of members of the Kinship Class," is barred by *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984), because federal courts lack jurisdiction to order state actors to comply with state law. Docket 23 at 52–53; Docket 25 at 53–54 (sealed). Plaintiffs counter that *Pennhurst* is inapplicable because request for relief (m) is intended to address a violation of AACWA, not Alaska state law. Docket 36-2 at 81 n.96. Because the Court dismisses Plaintiffs' AACWA claim in Claim Five, it need not address Defendants' *Pennhurst* argument.

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 60

Case 3:22-cv-00129-JMK    Document 55    Filed 09/28/23    Page 60 of 73

**(5) Claims Six and Seven—Americans with Disabilities Act and The Rehabilitation Act**

In Claims Six and Seven, Plaintiffs assert claims under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").[286] The ADA provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[287] Section 504 prohibits disability discrimination by recipients of federal funds.[288] To state a prima facie case for disability discrimination under Title II of the ADA, a plaintiff must allege that they are (1) a "qualified individual with a disability"; (2) "excluded from participation in or denied the benefits of a public entities services, programs, or activities, or was otherwise discriminated against by the public entity"; and (3) "the exclusion, denial of benefits, or discrimination was by reason of [their] disability."[289] The elements of a prima facie Section 504 claim mirror those of an ADA claim "with the additional requirement that the plaintiff prove that 'the program receives federal financial assistance.'"[290] "Because the applicable provisions of the ADA and the

---

[286] Docket 16 ¶¶ 298–315.

[287] 42 U.S.C. § 12132.

[288] *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021). In *Payan*, Westlaw incorrectly links Section 504 references to 28 U.S.C. § 504, Prohibition against certain persons holding office. Section 504 refers to the original section of the Congressional legislation and is codified at 29 U.S.C. § 701, *et seq.*

[289] *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 860 (9th Cir. 2022) (quoting *Duvall v. Cnty of Kitsap*, 260 F.3d 124, 1135 (9th Cir. 2001)).

[290] *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th at 738 (9th Cir. 2021).

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 61

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 61 of 73

Rehabilitation Act are 'co-extensive,' [courts] discuss both claims together, focusing on the ADA."[291]

The U.S. Department of Justice ("DOJ") has promulgated regulations implementing the ADA. One such regulation, known as the "integration mandate," provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[292] The "most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."[293] Another regulation requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."[294] At Docket 31, DOJ has filed a Statement of Interest, offering its interpretation of its regulations as applied in this case. As the federal agency charged with the enforcement and implementation of the ADA, DOJ's views are entitled to "considerable respect."[295]

---

[291] *M.R. v. Dreyfus*, 697 F.3d 706, 733 (9th Cir. 2012); *accord Thomas v. Kent*, 385 F. Supp. 1048, 1053 (C.D. Cal. 2017); *Wyatt B. by McAllister v. Brown*, No. 6:19-cv-00556-AA, 2021 WL 4434011, at *11 (D. Or. Sept. 27, 2021).
[292] 28 C.F.R. § 35.130(d).
[293] 28 C.F.R. Pt. 35, App. B.
[294] 28 C.F.R. § 35.130(b)(7).
[295] *M.R. v. Dreyfus*, 663 F.3d 1100, 1117 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598, (1999) ("Because [DOJ] is the agency directed by Congress to issue regulations implementing Title II . . . its views warrant respect.").

*M., et al. v. Crum, et al.*                                                              Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                              Page 62
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 62 of 73

Plaintiffs assert two theories of violations under the ADA and Rehabilitation Act: (1) Defendants discriminated against Plaintiffs by failing to offer reasonable modifications to existing foster care programs, and (2) Defendants violated the integration mandate by placing them at risk of future institutionalization.[296] The Court addresses each of these theories in turn.

### (a) Reasonable modifications

A state may discriminate on the basis of disability if a "facially neutral and universally enforced policy 'burden[ed] [persons with disabilities] in a manner different and greater than it burden[ed] others.'"[297] When a state policy "discriminate[s] against the disabled in violation of the ADA, the ADA's regulations mandate reasonable modifications to those policies in order to avoid discrimination on the basis of disability, at least when such modification would not fundamentally alter the nature of the services provided by the state."[298] "The purpose of the ADA's reasonable [modification] requirement is to guard against the facade of 'equal treatment' when particular [modifications] are necessary to level the playing field."[299] Plaintiffs allege that Defendants have failed to modify their programs to ensure that foster youth with disabilities have an equal opportunity to obtain the benefits of:

> a. OCS 'Safety Plans' that would allow them to remain in their family home under OCS supervision;

---

[296] Docket 36-2 at 83–89; *see also* Docket 16 ¶¶ 298–315.

[297] *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).

[298] *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003).

[299] *McGary*, 386 F.3d at 1267.

*M., et al. v. Crum, et al.*                                         Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 63

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 63 of 73

      b. Appropriate healthcare and timely health screenings provided in the most integrated setting appropriate to their needs;

      c. Timely delivery of behavioral healthcare and other disability-related community-based services needed to avoid unnecessary placement changes, or placement at psychiatric hospitals, residential care facilities, and other institutional settings; and

      d. Services delivered to foster care providers to enable them to meet the need of foster youth with disabilities, including respite care services.[300]

Plaintiffs fail to state a claim in connection with OCS safety plans, health screenings, and respite care services because they do not allege that they were discriminated against or that any discrimination was by reason of their disabilities. None of the Named Plaintiffs allege that OCS's policies regarding these services burdened them in a manner different from and greater than it burdened non-disabled children.[301] The allegations regarding these services are scant and unconnected to Plaintiffs' disabilities. For instance, the Complaint mentions that George V. received "respite."[302] Plaintiffs assert that Defendants discriminated against Jeremiah M. by declining to make reasonable modifications to their "safety planning program" and thus denying him the same

---

[300] Docket 16 ¶ 306.

[301] *See McGary*, 386 F.3d at 1265 ("McGary alleges that the City's nuisance abatement policy burdened him in a manner different from and greater than it burdened non-disabled residents, solely as a result of his disabling condition. McGary was physically impaired from meningitis and hospitalized. He claims that the City's denial of a reasonable time accommodation prevented him from complying with the ordinance due to this disability."); *Smith v. City of Oakland,* 612 F. Supp. 3d 951, 965 (N.D. Cal. 2020) ("Plaintiffs have alleged that Oakland's [Residential Rent Assistance Program] unduly burdens them because, as disabled individuals, they are not able to access the program or must do so at great cost.").

[302] Docket 16 ¶ 84.

opportunity afforded to other children to remain in their parent's homes.[303] The Complaint contains allegations that Jeremiah M. came to OCS's attention because, "[w]hile no longer living with the children, their father visited the family one night while intoxicated. The police came to the home and called OCS and the children's mother's, Ms. N.'s, landlord later evicted her because of the incident."[304] Plaintiffs assert this removal evinces discrimination since, "[l]ikely because of his disabilities and because of prejudiced notions about the difficulty of parenting children with disabilities, . . . Defendants appear to have made no attempt to explore other arrangements, such as an in-home safety plan, that might have allowed Jeremiah M. and his siblings to remain in their mother's care."[305] The facts as alleged in the Complaint have nothing to do with Jeremiah M.'s disability. In their opposition to Defendants' Motion to Dismiss, Plaintiffs attempt to connect Jeremiah M.'s removal from his mother's custody and disability discrimination through extrapolation. Finally, none of the Named Plaintiffs assert that they were unduly burdened by OCS's provision of health care or health screenings or that OCS denied or excluded them from healthcare services because of their disabilities.[306]

In short, Plaintiffs' reasonable modification claims brought under Paragraphs 306(a), (b), and (d) fail for the simple reason that the Complaint barely mentions these services, thereby falling far short of pleading a plausible claim that

---

[303] Docket 36-2 at 86–87.
[304] Docket 16 ¶ 44.
[305] Docket 36-2 at 87.
[306] The Complaint distinguishes between healthcare in Paragraph 306(b) and behavioral healthcare in Paragraph 306(c). The Court does the same.

*M., et al. v. Crum, et al.*                                              Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                    Page 65
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 65 of 73

Defendants denied Plaintiffs reasonable modifications which would level the playing field and ensure that Plaintiffs have equal access to foster care services. While the Court can imagine that Plaintiffs' disabilities might have played a role in the provision and allocation of these services, speculation alone cannot state a claim under the ADA. Because the allegation contained in Paragraph 306(c) relates to the integration mandate, the Court addresses it in the next section.

### (b) *Integration mandate*

The integration mandate "serves one of the principal purposes of Title II of the ADA: ending the isolation and segregation of disabled persons."[307] Applying the "integration and anti-isolation principles"[308] embodied in this mandate, the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 588 (1999), held that unjustified isolation constitutes discrimination based on disability. The Supreme Court held that the ADA requires "community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated . . . ."[309]

Defendants assert that Plaintiffs' Claims for violation of the integration mandate fail because every Named Plaintiff in the ADA subclass is currently living in a home or community-based setting and any previous institutionalization was temporary in nature.[310] Defendants also assert that Plaintiffs' prior institutionalizations were not

---

[307] *Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005).
[308] *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003).
[309] *Olmstead*, 527 U.S. at 607.
[310] Docket 23 at 73–74; Docket 25 at 74–75 (sealed).

"unjustified" because Plaintiffs do not allege that the state's treatment professionals determined that community placement was appropriate during Plaintiffs' previous institutionalizations.[311]  Further, Defendants assert that children in Alaska may only be placed in psychiatric treatment centers if a Superior Court judge determines the placement is justified and in the children's best interest.[312]  Defendants also contend that, "to the extent that the State should ensure" there are more mental health providers in Alaska, that "is not something that OCS or this Court can reasonably do."[313]  Plaintiffs respond by pointing out that a claim under the integration mandate can be based on a risk of future institutionalization.[314]  Plaintiffs also refute the suggestion that state-court reviews of psychiatric placements render institutionalizations "justified" under *Olmstead* because the state statute at issue only applies to placement in secure residential psychiatric treatment centers.[315]  DOJ echoes this argument, adding that temporary institutional placements can violate the integration mandate.[316]  DOJ also asserts that, "[w]hen alleging a violation of the integration mandate, plaintiffs need not rely on a determination by a state's treatment professional to demonstrate the appropriateness of services in a community setting."[317]

A plaintiff asserting a violation of the integration mandate need only show that the state action at issue "creates a serious risk of institutionalization."[318]  Further, "'[a]

---

[311] Docket 23 at 74–75; Docket 25 at 75–76 (sealed).
[312] Docket 23 at 74–75; Docket 25 at 75–76 (sealed).
[313] Docket 23 at 75; Docket 25 at 76 (sealed).
[314] Docket 36-2 at 87–88.
[315] *Id.* at 88.
[316] Docket 31 at 8–10.
[317] *Id.* at 11.
[318] *M.R. v. Dreyfus*, 663 F.3d 1100, 1116 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012).  The Court notes Defendant's Notice of

*M., et al. v. Crum, et al.*                                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                      Page 67
Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 67 of 73

state's reduction in services may violate the integration mandate where it unjustifiably forces or will likely force beneficiaries from an integrated environment into institutional care' or a segregated setting."[319]  In order to comply with the integration mandate, states must implement reasonable modifications to avoid unnecessary institutionalization or isolation, at least where the modifications do not fundamentally alter the state's program or activity.[320]

Plaintiffs allege that Gayle T., a member of the ADA Subclass, has been subject to two unduly restrictive institutionalizations and that her prior caseworker threatened that she would be sent back to a treatment center if she misbehaves.[321]  Another member of the ADA subclass, George V., has been moved eleven times, including to two institutions, in part due to lack of appropriate foster homes and failure to properly notify foster parents of George V.'s medical and behavioral needs.[322]  OCS has placed Lana H. at North Star Behavioral Health System five separate times due to a lack of available therapeutic foster homes.[323]  OCS then sent Lana H. to a treatment center in Texas.[324]  She is currently placed in a homeless shelter.[325]  These allegations state a claim for a violation

---

Supplemental Authority at Docket 53, *United States v. Mississippi*, ___ F.4th ___, No. 21-60772, 2023 WL 6138536 (5th Cir. Sept. 20, 2023), and finds no reason to deviate from Ninth Circuit precedent.

[319] *A.H.R. v. Washington State Health Care Auth.*, 469 F. Supp. 3d 1018, 1044 (W.D. Wash. 2016) (quoting *G. v. Hawaii*, No. CIV. 08-00551 ACK-BM, 2010 WL 3489632, at *9 (D. Haw. Sept. 3, 2010)).

[320] *M.R.*, 663 F.3d at 1116; *see Olmstead*, 527 U.S. at 596–97.

[321] Docket 16 ¶¶ 116, 119, 123.

[322] *Id.* ¶¶ 85–89.

[323] *Id.* ¶¶ 126–32.

[324] *Id.* ¶ 132.

[325] *Id.* ¶ 135.

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 68

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 68 of 73

of the integration mandate and a failure to implement reasonable modification to avoid unjustified isolation.[326]

Plaintiffs of the ADA Subclass have plausibly alleged that the state has deprived them of services provided in the least-restrictive setting. The persistent cycle of a lack of appropriate placements followed by institutionalizations plausibly alleges that Defendants' practices have placed Plaintiffs in this cycle at a serious risk of being forced from an integrated environment into an institutional or segregated setting. The Court finds DOJ's view that Plaintiffs need not plead that the state's treatment professionals determined they could be served in the community compelling.[327] The Court is loath to require that Plaintiffs' claims depend on securing an evaluation from the same entity accused of subjecting them to unjustified isolation due in part to the lack of adequate alternative options. Further, the allegations contending that certain Plaintiffs were institutionalized solely because OCS had nowhere else to send them at that moment strongly suggests that Plaintiffs could have received treatment in a less restrictive environment were it not for OCS's restraints. Finally, a state court's review of some of these placements does not remove the taint of an ADA violation from these institutionalizations unless the state court applies the standards of *Olmstead*. Finally, to the extent the Defendants assert a fundamental alteration defense, and it is not clear that

---

[326] *See Wyatt B. by McAllister v. Brown*, No. 6:19-cv-00556-AA, 2021 WL 4434011, at *13 (D. Or. Sept. 27, 2021) (finding that allegations that named plaintiffs had been unnecessarily placed in institutional facilities and deprived of placement in the least-restrictive settings sufficient to state a claim for a violation of the integration mandate.).

[327] Docket 31 at 11.

*M., et al. v. Crum, et al.*                                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                    Page 69

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 69 of 73

they do, this defense is undeveloped and inappropriate for resolution on a motion to dismiss.[328]

Defendants' Motion to Dismiss is **GRANTED** as to Plaintiffs' reasonable modification claims in Paragraphs 306(a), (b), and (d); and **DENIED** as to Plaintiffs' claims in Paragraph 306(c) and for violations of the integration mandate.

### (6) Leave to amend

Consistent with the liberal spirit of Federal Rule of Civil Procedure 15(a), to the extent the Court has granted Defendants' Motion to Dismiss under Rule 12(b)(6), it will permit Plaintiffs to amend their Complaint.[329] Although Plaintiffs already have amended their Complaint once, the Court does not find that the pleading deficiencies identified herein could not possibly be cured by the allegation of other facts.[330]

## F. Interlocutory Appeal

Under 28 U.S.C. § 1291, appellate review is normally available only after a final judgment has been entered by a district court. However, a district court's order may be certified for interlocutory appeal if "(1) 'the appeal involves a controlling question of law;' (2) there is a 'substantial ground for difference of opinion' on that question; (3) 'an immediate appeal would materially advance the ultimate termination of the litigation;' and

---

[328] *See generally* Docket 23 at 70–75; Docket 25 at 71–76 (sealed); *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004) ("This court has recognized that whether an accommodation causes a fundamental alteration is 'an intensively fact-based inquiry.'"); *Smith v. City of Oakland*, 612 F. Supp. 3d 951, 967 (N.D. Cal. 2020) (declining to consider fundamental alteration defense at the motion-to-dismiss stage).

[329] Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires").

[330] *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) ("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.").

*M., et al. v. Crum, et al.*
Order Granting in Part and Denying in Part Motion to Dismiss
Case No. 3:22-cv-00129-JMK
Page 70

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 70 of 73

(4) failure to certify the order 'would result in wasted litigation and expense.'"[331]  A district court may certify an order for interlocutory appeal *sua sponte*.[332]

A question of law is controlling if its resolution on appeal "could materially affect the outcome of litigation in the district court."[333]  Here, immediate appeal on the issue of whether ongoing child custody proceedings are the type of proceedings to which *Younger* applies would materially affect the outcome of this case.[334]  As for the second requirement, "[c]ourts traditionally will find that a substantial ground for difference of opinion exists where 'the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.'"[335]  *Younger*'s applicability in the foster care class action context is an issue on which reasonable jurists could reach, and have reached, contradictory conclusions.[336]  The Fourth and Seventh

---

[331] *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 996 (N.D. Cal. 2022).

[332] *See Deutsche Bank Nat. Tr. Co. v. FDIC,* 744 F.3d 1124, 1133–34 (9th Cir. 2014); *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1071 (9th Cir. 2006).

[333] *In re Cement Antitrust Litig.* (MDL No. 296), 673 F.2d 1020, 1026 (9th Cir. 1981).

[334] While the applicability of *Younger* in this case is the controlling question of law that this Court believes warrants an interlocutory appeal, "[a]n appellate court's interlocutory jurisdiction under 28 U.S.C. § 1292(b) permits it to address any issue fairly included within the certified order because it is the order that is appealable, and not the controlling question identified by the district court." *Deutsche Bank*, 744 F.3d at 1134.

[335] *Couch v. Telescope Inc*., 611 F.3d 629, 633 (9th Cir. 2010) (quoting 2 FED. PROC., Law. Ed. § 3:212 (2010)).

[336] The District of Oregon refused to certify its Motion to Dismiss Order in *Wyatt B. v. Brown*, No. 6:19-CV-00556-AA, 2022 WL 4547903, at *1 (D. Or. Sept. 29, 2022).  However, this case involved only *O'Shea* abstention for which there is no substantial ground for difference of opinion in the foster care class action context.

Circuits reached conflicting decisions on this issue in 2022.[337]  The Ninth Circuit has not addressed *Younger* abstention in the foster care class action context since *L.H. v. Jamieson*, 643 F.2d 1351, 1354 (9th Cir. 1981), well before the Supreme Court's winnowing of *Younger* in *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 78–82 (2013).  Finally, an appeal will materially advance the ultimate termination of this litigation and ensure litigation resources are not wasted unnecessarily.  Should the Ninth Circuit reverse this Court and find that *Younger* applies in this case, that decision would terminate the litigation.  Although in this Order the Court grants Plaintiffs leave to amend their Complaint, any amendments to add, delete, or modify a claim will have no effect on the threshold issue of whether this Court should abstain from hearing this case under *Younger*. If the interlocutory appeal is not granted and the Ninth Circuit reverses the Court's holding after final judgment, the parties and the Court will have wasted significant time and expense throughout the litigation.

### III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss.  The Court *sua sponte* **CERTIFIES THIS ORDER FOR IMMEDIATE INTERLOCUTORY APPEAL**.  This certification does not stay the proceedings in the district court.[338]  Should Plaintiffs wish to file a Second Amended Complaint, they shall do so within sixty (60) days of this Order.

---

[337] *Compare Ashley W. v. Holcomb*, 34 F.4th 588, 594 (7th Cir. 2022), *with Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 328 (4th Cir. 2022).

[338] 28 U.S.C. § 1292(b).

*M., et al. v. Crum, et al.*                                                                 Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                                              Page 72

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 72 of 73

IT IS SO ORDERED this 28th day of September, 2023, at Anchorage, Alaska.

_/s/ Joshua M. Kindred_
JOSHUA M. KINDRED
United States District Judge

_M., et al. v. Crum, et al._                                    Case No. 3:22-cv-00129-JMK
Order Granting in Part and Denying in Part Motion to Dismiss                Page 73

Case 3:22-cv-00129-JMK   Document 55   Filed 09/28/23   Page 73 of 73