Marcia Robinson Lowry (*pro hac vice*)
mlowry@abetterchildhood.org
Julia K. Tebor (*pro hac vice*)
jtebor@abetterchildhood.org
Anastasia Benedetto (*pro hac vice*)
abenedetto@abetterchildhood.org
David Baloche (*pro hac vice*)
dbaloche@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456

Elena M. Romerdahl, AK Bar No. 1509072
eromerdahl@perkinscoie.com
Hannah Paton, AK Bar No. 2309095
hpaton@perkinscoie.com
**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Telephone: (907) 279-8561

James J. Davis, Jr., AK Bar No. 9412140
jdavis@njp-law.com
Nicholas Feronti, AK Bar No. 2106069
nferonti@njp-law.com
Savannah V. Fletcher, AK Bar No. 1811127
sfletcher@njp-law.com
**NORTHERN JUSTICE PROJECT, LLC**
406 G Street, Suite 207
Anchorage, AK 99501
Telephone: (907) 308-3395

Mark Regan, AK Bar No. 8409081
mregan@dlcak.org
**DISABILITY LAW CENTER OF ALASKA**
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Telephone: (907) 565-1002

***Attorneys for Plaintiffs***

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **1** of **37**

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 1 of 37

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Jeremiah M., Hannah M. and Hunter M. by their next friend Lisa Nicolai; Mary B. and Connor B. by their next friend Charles Ketcham; David V., George V., Lawrence V., Karen V., and Damien V. by their next friend Merle A. Maxson; Rachel T., Eleanor T. and Gayle T. by their next friend Rebecca Fahnestock, and Lana H. by her next friend Melissa Skarbek, individually and on behalf of all other similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>KIM KOVOL, Director, Alaska Department of Family and Community Services, in her official capacity; KIM GUAY, Director, Office of Children's Services, in her official capacity; ALASKA DEPARTMENT OF FAMILY AND COMMUNITY SERVICES; and ALASKA OFFICE OF CHILDREN'S SERVICES,<br><br>Defendants. | Case No. 3:22-cv-00129-SLG |

## PLAINTIFFS' REPLY TO RESPONSE IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION

## I.     INTRODUCTION

Defendants' argument boils down to a claim that Alaska is unique in geography and climate, and that this prevents it from meeting its constitutional and statutory duties. However, and even though not required at the class certification stage, Plaintiffs establish by a preponderance of evidence that Defendants have not only failed to take meaningful

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG        Page **2** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 2 of 37

steps to overcome those challenges and reduce the risk of harm to Alaska's foster children, but that their actions actually increase that risk of harm.

Plaintiffs have shown, and will show, that common practices put foster children at risk of harm. Defendants fail to, among other things: recruit and retain workers and to lower caseloads, which are sometimes so high that caseworkers must supervise over 100 children in locations across the state; track the number of types of service providers in any region, instead leaving caseworkers to resort to Google to find appropriate services; recruit and retain a sufficient number and type of foster homes, including having a severely deficient number of therapeutic foster homes, which puts children at risk of placement instability, moves far away from their communities, and institutionalization; timely create case plans and adequately involve children and families, instead sometimes creating "compliance-based" or "cookie cutter" plans, which provide no guidance to families and further delay the provision of services and permanency. Defendants do not dispute these claims, nor that there are many systemic problems that create a risk of harm for foster children. Rather, they resort to blaming factors purportedly outside of their control and misstating the law in the Ninth Circuit.

Defendants' expert, Jonathan Rubin, does not support their defenses. Instead, Rubin largely relies on one trip to Alaska and unvalidated hearsay of OCS employees who spoke either in group settings with OCS leadership and counsel present, or during short encounters like when they were "going to the restroom." Ex. 1, Rubin Dep. Tr., at 52:23-

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **3** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 3 of 37

53:9.[1] Neither Rubin's unsupported analysis, nor Defendants' misstatement of the law under Rule 23, is an availing opposition.

Contrary to Defendants' contentions, Plaintiffs have standing and have satisfied the requirements for class certification under Rules 23(a) and 23(b). Accordingly, the Court should grant Plaintiffs' Motion for Class Certification.

## II. PLAINTIFFS HAVE STANDING

Defendants allege that Plaintiffs lack standing. Article III standing requires three elements. First, "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Second, "there must be a causal connection between the injury and the conduct complained of[.]" *Id*. Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id*. at 561. "[O]nly one of the named plaintiffs in a class action seeking injunctive relief 'need demonstrate standing to satisfy Article III.'" *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1085 (D. Alaska 2023) (internal citations omitted). "[O]nce the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." *B.K. v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019) (citation omitted). Here, the standing requirements are met with respect to Plaintiffs' substantive

---

[1] Exhibits are to the Declaration of Marcia Lowry dated December 30, 2024.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG        Page **4** of 37
Case 3:22-cv-00129-SLG        Document 202        Filed 12/30/24        Page 4 of 37

due process, Adoption Assistance and Child Welfare Act ("CWA"), and Americans with Disabilities Act ("ADA") claims. *See Lujan*, 504 U.S. at 561.[2]

**Substantive Due Process.** In opposing class certification, Defendants begin by misstating the standard of liability under due process: that a "plaintiff must have been deprived of a 'basic human need.'" *See* ECF No. 157 at 8. Proceeding from this misstatement, Defendants argue that Plaintiffs "do not introduce evidence that any of the named plaintiffs suffered a deprivation of 'basic human needs' caused by those numerous moves"; or "because of inadequate community-based services or case planning." *Id*.

However, "due process requires the state to provide children in its care 'reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child.'" *B.K.*, 922 F.3d at 968 (9th Cir. 2019). And Plaintiffs need only show that

---

[2] *See also DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024). Defendants contend that out-of-custody Named Plaintiffs cannot form a basis for standing because their claims have been mooted. *See* ECF No. 157 at 4-5. Defendants' motions to dismiss these plaintiffs are pending. *See* ECF Nos. 97, 133. Plaintiffs maintain that the inherently transitory exception applies to the claims of these out-of-custody Named Plaintiffs. *See* ECF Nos. 104, 147. Like pretrial detention, foster care "is by nature temporary," the length of custody "cannot be ascertained at the outset," "it may be ended at any time," there is no certainty that any of the named plaintiffs "will be in state custody long enough for a district court to certify the class," and there is high certainty that the "constantly changing putative class . . . will become subject to these allegedly unconstitutional conditions." *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975); *Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997) (final quote). "In such cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution." *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991). Moreover, the evidence produced in discovery substantiates these out-of-custody Named Plaintiffs' allegations that they were exposed to substantial risks of harm and institutionalization traceable Defendants' conduct and redressable by this court. *See* Ex. 2 at 12-13 (David V., George V., Lawrence V., Karen V., and Damien V.); *id*. at 13-14 (Gayle T.); *id*. at 15-16 (Jeremiah M., Hannah M., Hunter M.).

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al*., Case No. 3:22-cv-00129-SLG          Page **5** of 37

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 5 of 37

state officials are deliberately indifferent to policies and practices that expose foster children to a substantial *risk* of harm.[3] Plaintiffs show that Defendants' practices expose foster children to substantial risks of harm of which Defendants are aware. Defendants do not dispute causation or redressability for Plaintiffs' substantive due process claims, *see* ECF No. 157 at 7-8, but Plaintiffs nevertheless establish both.

For example, despite Defendants' contention that "numerous moves" do not deprive foster children of basic needs, it is "undisputed" that placement instability exposes children to a substantial risk of emotional and psychological deterioration.[4] The placement instability that stems from a chronic and systemic lack of community-based placements has caused the Named Plaintiffs' mental and physical health to deteriorate significantly while in Defendants' care, and Defendants' ongoing policies and practices expose Plaintiffs to substantial risk of further deterioration. *See* Ex. 2 at 38-48, Amended Expert Report of Alicia Groh (Dec. 2, 2024).

Lana H., for example, has cycled through more than 32 placements since entering OCS custody in 2018, including "six in-state institutional placements, a nine-day stay at a local hospital, five placements in emergency homeless shelters—often for more than a month, two months in juvenile detention, two placements in out-of-state institutions lasting

---

[3] *See B.K.*, 922 F.3d at 968; *Parsons v. Ryans*, 754 F.3d 657, 677 (9th Cir. 2014) (collecting cases).

[4] *See, e.g., Lehman v. Lycoming Cty. Children's Servs. Agency*, 458 U.S. 502, 513-14 (1982) ("It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged.").

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **6** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 6 of 37

11.5 months and 7 months, foster homes, and group homes." Ex. 2 at 11; ECF No. 135 at

19-20. As of November 2024, OCS had again placed Lana H. at North Star. Ex. 3, Updated

Rule 1006 Summary, at 2. Consequently, Lana H.'s mental and physical health deteriorated

significantly during her time in custody: her behavioral problems worsened, she was

physically restrained on many occasions, her reports of maltreatment went uninvestigated,

her diagnoses expanded, she expressed suicidal ideation, and she was prescribed multiple

psychotropic medications. Ex. 2 at 11; ECF No. 135 at 19-20.[5]

Additionally, Mary B., only six years old, has been moved multiple times. *See* ECF

No. 136-70 at 14. Despite concerns that Mary B. was being cared for by her 14-year-old

sister rather than an adult, Mary B. remained in the placement for seven months. *See id*. at

14-15. During this time, when safety concerns were known, OCS failed to visit Mary B.

for nearly four months. *See id*. at 27; *id*. at 45-46. When OCS finally removed Mary B., it

placed her with an uncle with maltreatment reports so severe and frequent that OCS was

unsure if it could approve a license or support guardianship. *See id*. at 15; *id*. at 54. Mary

B.'s sister also expressed concern that they could not afford food because OCS was not

providing financial support. *See id*. at 54. Despite these concerns, Mary B. remained in this

placement from April 2022 to September 2024. Meanwhile, OCS made no meaningful

efforts to reunify Mary B. with her parents or find an adoptive home. *See id*. at 45.

Plaintiffs show by a preponderance of evidence that the substantial risk of serious

---

[5] *See also* ECF No. 135 at 40 ("David V., George V., Lawrence V., Karen V., and Damien
V., for example, were moved 40 times during their brief stays in OCS custody, leading to
deteriorating mental health and institutionalization").

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al*., Case No. 3:22-cv-00129-SLG          Page **7** of **37**
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 7 of 37

harm is traceable to Defendants' practice of making "placements based on availability, rather than specific needs of children, due to Defendants' failure to maintain and develop an adequate number and range of foster placements." *See* ECF No. 135 at 39. Additionally, Plaintiffs' expert, Alicia Groh, concluded that Defendants' lack of sufficient, comprehensive diligent recruitment efforts of foster homes contributes to the placement deficit, *see* Ex. 2 at 49-51; that overburdened caseworkers and insufficient community-based services and supports contributes to the exodus of foster parents, s*ee id*. at 51-54; and unmanageable caseloads contribute to poor case planning, *see id*. at 56-61; and that Defendants' failure to establish a "routine system for collecting needs assessment data from communities regarding service array, resource development and service gaps" contributes to the statewide resource gap. *See id.* at 30-34.[6]

Finally, it is likely that a favorable decision would redress the risk of harm. *See Jeremiah M.,* 695 F. Supp. 3d at 1090 (finding that "[a]n order from this Court likely could redress these injuries by requiring systematic improvements" and citing *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 273-76 (5th Cir. 2018)).[7]

**ADA**. To show that Defendants violated the integration mandate, Plaintiffs "need

[6] Ex. 18, Jessie Mayes Deposition Transcript ("Mayes Dep. Tr.") at 159:2-160:2; Ex. 10, Centeno Dep. Tr. at 57:21-58:2; 92:8-11; 92:25-93:6.

[7] *See also* Lily T. Alpert & William Meezan, *Moving Away from Congregate Care: One State's Path to Reform and Lessons for the Field*, 34 CHILD. YOUTH SERV. REV. 1519 (2012) (analyzing how a class action lawsuit in Tennessee resulted in a significant decline in congregate care utilization); National Center for Youth Law, Strategies, *Charlie and Nadine H. v. Corzine* (Nov 18, 2016), https://youthlaw.org/case/charlie-nadine-h-v-corzine/ (analyzing how a class action lawsuit in New Jersey improved the foster care system across several metrics).

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al*., Case No. 3:22-cv-00129-SLG          Page **8** of 37

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 8 of 37

only show that the state action at issue 'creates a serious risk of institutionalization.'" *Jeremiah M.*, 695 F. Supp. 3d at 1107 (quoting *M.R. v. Dreyfus*, 663 F.3d 1100, 1116 (9th Cir. 2011)).[8] This Court held that Plaintiffs of the ADA Subclass plausibly alleged "that the state has deprived them of services provided in the least-restrictive setting." *Id*. at 1108 ("The persistent cycle of a lack of appropriate placements followed by institutionalizations plausibly alleges that Defendants' practices have placed Plaintiffs in this cycle at a serious risk of being forced from an integrated environment into an institutional or segregated setting"). The Court highlighted the example of Lana H. *Id.*

Little has changed since the Court held that members of the ADA Subclass adequately pled a violation of the integration mandate, and Defendants have not proffered any evidence of reasonable modifications since then. *B.D. v. Sununu*, 2024 U.S. Dist. LEXIS 167912, at *43 (D.N.H. Sept. 18, 2024) ("Although the defendants criticize B.D.'s evidence as stale, they have not provided any evidence of their own suggesting that circumstances have meaningfully changed."). Indeed, evidence produced in discovery, like Lana H.'s case file, reinforces Plaintiffs' allegations. Additionally, Plaintiffs' expert concluded that the combination of unmanageable caseloads, lack of foster homes, and lack of community-based services expose foster children to a substantial risk of institutionalization and are attributable to Defendants' statewide policies and practices. *See* Ex. 2 at 30-35, 49-54.

---

[8] Defendants rehash their objection to the standard of liability under the ADA. *See* ECF No. 157 at 5 n.12. The Court rejected Defendants' interpretation. *See Jeremiah M.*, 695 F. Supp. 3d at 1107 n.318.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **9** of **37**

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 9 of 37

Finally, "[c]lass actions are uniquely appropriate for litigating *Olmstead* cases precisely because these cases typically arise out of a common course of conduct by public entities, require a resolution of structural deficiencies in the entity's service system, and pose common questions including whether the government's systemic policies and practices result in the unnecessary segregation of people with disabilities, in violation of the ADA's integration mandate." Steven Schwartz & Kathryn Rucker, *The Commonality of Difference: A Framework for Obtaining Class Certification in ADA Cases After Wal-Mart*, 71 SYRACUSE L. REV. 841, 877 (2021). Indeed, federal courts routinely certify ADA classes and subclasses to redress the risk of institutionalization posed to foster children. *See Wellington v. Sununu,* No. 21-cv-4-PB, 2024 WL 4227544, at *17 (D.N.H. Sept. 18, 2024) (collecting cases).

**CWA**.[9] In response to Plaintiffs' claims under the CWA, Defendants argue that no named plaintiff has explicitly shown that they are not receiving case plans or that their permanency goals lack the required documentation of efforts to find a permanent home. But this argument misstates even their own expert's findings. For example, in his report, Defendants' expert admitted that after reviewing the case files for plaintiff Mary B., he could not "determine immediately from the record the cause of the delays in this case." ECF No. 159-1 at 64 (Rubin Report). And as discussed above, Mary B. has been in custody

---

[9] Defendants did not address the Child Welfare Act claims in their motion to dismiss but instead filed a "summary judgment" motion on October 28, 2024 (ECF No. 119), arguing that no individual right exists under the relevant provisions of the statute. In this motion, Defendants state that "the Amended Complaint does not allege that the named plaintiffs lack case plans" with no further discussion and without any statement as to why Defendants failed to raise this argument in their initial motion to dismiss. ECF No. 119 at 24.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al*., Case No. 3:22-cv-00129-SLG          Page **10** of 37
Case 3:22-cv-00129-SLG       Document 202       Filed 12/30/24       Page 10 of 37

since March 27, 2019 and is still in custody with no permanent placement identified.

Plaintiffs need not show that every single case plan is entirely absent or insufficient. Instead, the pattern of inadequate case planning is a clear violation of the CWA, which mandates that case plans be developed, timely updated, and include steps to secure permanent living arrangements, including adoption, when reunification is not feasible. 42 U.S.C. § 675(a). Plaintiffs' allegations show a systemic failure to adhere to the requirements of the CWA, putting foster children at risk of harm.

## III. PLAINTIFFS HAVE ALLEGED COMMON QUESTIONS OF LAW AND FACT

Defendants incorrectly argue that Plaintiffs' motion does not comply with *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 338 (2011). This is not so. In *Wal-Mart*, "one of the most expansive class actions ever," plaintiffs purported to represent approximately 1.5 million women, claiming "the discretion exercised by their local supervisors over pay and promotion matters violate[d] Title VII by discriminating against women." *Id.* at 342. The Supreme Court found that because plaintiffs' claims challenged "literally millions of employment decisions at once. Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was *I* disfavored." *Id.* What class certification requires is "a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. The *Wal-Mart* plaintiffs had no such "common contention"

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG                    Page **11** of 37

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 11 of 37

because their gender discrimination claims asked why employment decisions were made—which is not a "yes" or "no" question answerable in "one stroke." *Id.* at 350-52.

Tellingly, the defendants in *Parsons v. Ryan* (cited by Defendants) made a similar argument about *Wal-Mart*'s effect on class certification standards: according to the defendants in *Parsons*, the "systemic constitutional violation" alleged by plaintiffs was "a collection of individual constitutional violations, each of which hinges on the particular facts and circumstances of each case," and class certification was inappropriate because "Wal-Mart instructs that dissimilarities between class members impede the generation of common answers." 754 F.3d 657, 675 (9th Cir. 2014). The court disagreed: "Although the defendants assert that *Wal-Mart* prohibits class certification here, a comparison of *Wal-Mart* and this case strongly supports affirmance." *Id.* at 681. As the Ninth Circuit explained:

> This case is different than Wal-Mart in every respect that matters. It involves uniform statewide practices created and overseen by two individuals who are charged by law with ultimate responsibility for health care and other conditions of confinement in all ADC facilities, not a grant of discretion to thousands of managers. It involves 33,000 inmates in the custody of a single state agency, not millions of employees scattered throughout the United States . . .Whereas there may have been many answers in Wal-Mart to the question 'why was I disfavored?' here there is only a single answer to questions such as 'do ADC staffing policies and practices place inmates at a risk of serious harm?'

*Id*. "It is therefore not surprising," the Ninth Circuit observed, that "in deciding analogous class certification motions since Wal-Mart, numerous courts have concluded that the commonality requirement can be satisfied by proof of the existence of systemic policies

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG                    Page **12** of 37
Case 3:22-cv-00129-SLG        Document 202        Filed 12/30/24        Page 12 of 37

and practices that allegedly expose inmates to a substantial risk of harm."[10] *Id.* Other courts of appeal have similarly interpreted *Wal-Mart*. As the Second Circuit stated in *Elisa W. v. City of New York*, 82 F.4th 115, 123 (2d Cir. 2023), a similar lawsuit brought by a class of foster children, "[e]ven after *Wal-Mart*, we have emphasized [that] [c]laims for relief need not be identical for them to be common; rather, Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members. Where the same conduct or practice by the same defendant gives rise to the kind of claims from all class members, there is a common question." *Id.* (internal quotation omitted).[11] Thus, *Wal-Mart* does not impede class certification, but rather illustrates why class-wide resolution is appropriate here.

Defendants' next argument appears to be that they take no responsibility for any of the rampant issues in their child welfare system, or that their failures are not "practices" because they are not "doing the thing" to create a child welfare crisis. ECF No. 157 at 13. But the Ninth Circuit routinely finds commonality based on claims that Defendants failed to fulfill an affirmative constitutional duty. For example, in *Parsons*, the Court affirmed class certification of several prison policies and practices, including "'[i]nadequate staffing

---

[10] Defendants other cited case law is not in the child welfare context and is also inapposite. ECF No. 157 at 12; *See, e.g., Davidson v. O'Reilly*, 968 F.3d 955, 967 (9th Cir. 2020) (finding no commonality in the context of California employment law where plaintiff did not demonstrate that a facially defective written policy was implemented in an unlawful manner); *Willis v. City of Seattle*, 943 F.3d 882, 885-86 (9th Cir. 2019) (finding no commonality where the practice alleged was the non-uniform "pattern of destroying personal property" during sweeps of homeless shelters).

[11] In *Elisa W.*, the Second Circuit vacated the district court's denial of class certification. *Id.* at 128.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **13** of 37

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 13 of 37

levels in multiple program areas at multiple locations,' resulting in 'gaps in on-site medical coverage,'" and "existing staff to work excessive hours." *Parsons*, 754 F.3d at 688.[12] Whether Defendants' failure to ensure adequate placements for foster children amounts to deliberate indifference is a common question that can be resolved in one stroke for the entire class. *Wyatt v. Brown*, 2022 U.S. Dist. LEXIS 147091 (D. Or. Aug. 17, 2022) follows the solid finding in *B.K.* and is persuasive case law on which this Court is permitted to rely.[13]

---

[12] *See also B.K.*, 922 F.3d at 969 (finding the state's various "failures to" constituted policies and practices for commonality purposes, including failures to provide timely access to health care, to coordinate physical and dental care service delivery, to investigate reports of abuse timely, to document safety assessments, and to close investigations timely). Defendants inaccurately state that because the defendants in *Parsons*, "d[id] not seriously dispute the adequacy of the General Class in this regard," the Ninth Circuit had no occasion to address whether these were in fact "statewide practices." ECF No. 157 at 13. But as stated previously, this court directly addressed commonality and found that it was satisfied. *See also B.K.*, 922 F.3d at 969 (finding the state's various "failures to" constituted policies and practices for commonality purposes, including failures to provide timely access to health care, to coordinate physical and dental care service delivery, to investigate reports of abuse timely, to document safety assessments, and to close investigations timely).

[13] With regard to Plaintiffs' familial association claim, Defendants state that Plaintiffs have "abandoned the claim" and seemingly argue that in order to certify a class, Plaintiffs must show common practices for every issue. ECF No. 157 at 15, n.2. But that is not what is required. *See, e.g., Wang v. Chinese Daily* News, 737 F.3d 538, 544 (9th Cir. 2013) (citing *Wal-Mart*, 131 S.Ct. at 2556) ("Plaintiffs need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution. So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)."). And in any event, Plaintiffs can show Defendants' failure to maintain the relationship between children and their parents. For example, as the Court noted in its motion to dismiss order (ECF No. 55 at 44-45) and as supported by discovery, Gayle T.'s parents were not allowed to visit her while she was at Sitka for over eight months. ECF No. 135 at 198. And Alaska's Annual Progress and Services Review, showed that in 2023, Alaska was only at 68% in terms of the relationship of child in care with a parent, with the Anchorage area at only 39%. ECF No. 136-20 at 19.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **14** of 37

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 14 of 37

As stated above and in their initial Motion, Plaintiffs have adequately shown the failures discussed through both evidentiary support and through their expert's report.[14]

### A.      Overly High Caseloads and Inadequate Staffing Put Foster Children at Risk of Harm

Defendants wish to rewrite on-point Ninth Circuit case law about how excessive caseworker caseloads is a statewide practice that puts class members at risk of harm. *B.K.,* 922 F. 3d at 969; *see also Wyatt B*., 2022 U.S. Dist. LEXIS 147091 at *85. In doing so, they ignore that, from January 2018 to January 2024, on average 48% of workers had caseloads of at least 31 children, with 25% of workers having caseloads of 51-100 children. ECF No. 135 at 28. Even Defendants' expert agreed that a caseworker supervising 100 individual children would be problematic. Ex. 1 at 105:16-106:4 ("Q. if you know that there was no ORCA issue and that . . . 25 percent of caseworkers were actually seeing 51 to 100 children, would you think that was appropriate. A: I would think that would be a concern, right? I think we can be honest here; right? It's very hard to see let's just say 90 kids to see them every month, just doing the match, common sense is that would be a challenge, yes."). Defendants do not regularly track caseloads by individual children,

---

[14] Defendants incorrectly allege that Ms. Groh disclaimed any opinion as to the cause of the numerous deficiencies in the Alaska foster care system. Not so. Numerous times in her report and during her deposition, Ms. Groh stated that failures in Alaska's foster care stemmed from actions or inactions of OCS (e.g., failure to timely case plan, failures to provide services to parents and children). Ex. 2 and Ex. 20. For her expert report, she was not asked to identify the root cause of OCS's actions or inactions. For example, she was not asked to determine whether OCS's failure to case plan was due to overly high caseloads, failure to train workers, or both. This type of analysis is not necessary in connection with a motion for class certification.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG                    Page **15** of 37
Case 3:22-cv-00129-SLG      Document 202      Filed 12/30/24      Page 15 of 37

instead tracking them by family until parental rights are terminated. ECF No. 135 at 27. Thus, OCS's "caseloads" vastly understate the work of Protective Services Specialists.

Defendants next argue that they cannot be held at fault because of the "weather conditions" and "geography" of Alaska. ECF No. 157 at 19. Defendants base this argument in large part on their purported expert, who admitted during his deposition that he had never been to Alaska before taking only one trip in connection with his report and did not nothing to validate the hearsay on which he relied. Ex. 1 at 46:18-47:10; 51:13-52:16. Moreover, while each state has differing climates and geographies, each state has an obligation to meet the constitutional and federal statutory needs of foster children. Defendants cannot disclaim such an obligation.

Defendants argue that Plaintiffs have failed to show that workforce conditions drive a substantial risk of harm. But this argument belies the plethora of evidence and OCS's own statements that high caseloads drive harm and/or risk of harm, including but not limited to untimely permanency, failures to provide services, failures to case plan and visit children, and failures to investigate and address maltreatment. *See, e.g.* Ex. 4, Talia Robinson Dep. Tr., at 93:6-8. *See, e.g.,* Ex. 2 at 22.[15]

---

[15] *See also* Ex. 1 at 40:6-20 ("Q. You were concerned that if caseworkers didn't have sufficient time, it could impact the safety of the children or lessen the paperwork . . . They may still do their safety work, but other things might fall between the cracks[.]"); Ex. 5, Nicole Adair Deposition Transcript at 54:4-20. ("[If] [c]aseloads are too high, workers struggle to prioritize, they're juggling many different demands . . . So when a caseload grows to be too high, a caseworker with a reasonable caseload can struggle but still prioritize pretty well, but with a really high caseload it can be very difficult to manage many, many top priorities at one time. Q. So they may miss or not be able to meet some of those priorities because of a high caseload? Yes.").

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **16** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 16 of 37

Defendants also argue that Plaintiffs' allegations regarding a lack of training cite "anecdotal evidence" (ECF No. 157 at 17), but Plaintiffs cite numerous pieces of feedback regarding poor training (ECF No. 135 at 36-37) and Defendants do not say what "data" they have on training or how it does or does not support their contentions. Indeed, internal OCS emails and reports reflect a lack of training including being "underprepared for court." *See* Ex. 6, M118211; Ex. 7, M327503. Plaintiffs have thus shown commonality with respect to Plaintiffs' failure to lower caseloads and to support, train and retain caseworkers.

## B. Placement Failures Put Foster Children at Risk of Harm

Defendants' argument on the commonality of placement availability is based on three flawed premises, all of which the Ninth Circuit has soundly rejected. First, Defendants contend that OCS's alleged "fail[ure] to make available adequate and appropriate placements for foster children" "is not a 'policy' or 'practice' of OCS" but rather an unfortunate byproduct of external factors, like the pandemic. ECF No. 157 at 22-23. But as discussed above, a failure to act, is sufficient for commonality.

Further, OCS fails to track: children sleeping in offices or hotels (Ex. 8, M156211); "social admits" (or stays in hospitals without medical necessity) (Ex. 9, Kristen Moore Dep. Tr., at 65:15-66:17); youth in shelters (Ex. 10, Lacey Centeno Dep. Tr., at 57:21-58:2); the number of beds available in residential treatment homes (*id.* at 92:8-11); or the number of beds in therapeutic foster homes. (*Id.* at 92:25-93:6). This failure to track placement availability and use compounds OCS's failure to monitor and address the needs of children in its care. OCS is well aware that its lack of tracking is an issue. For example, Kim Guay stated in May 2021 that OCS needed to track children staying in offices because

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **17** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 17 of 37

it was "on the rise" and something OCS should "problem solve" (Ex. 11, M320944 at M320945), but as of March 2024, this had not been done. Ex. 8.

Indeed, a December 2024 Alaska State Ombudsman report on OCS practices found that "[c]hildren with complex needs have been taken to hospital emergency rooms, monitored by private contractors in hotels, and endured stopgap living arrangements that do not address the child's underlying trauma or behavioral concerns." Ex. 12 at 10. The report noted that "OCS had funds to spend on costly private security that could have been used to pay for care delivered by a licensed provider of services for people experiencing behavioral and/or intellectual disabilities. *Id.* at 11. The Ombudsman concluded that:

> OCS struggled to find effective solutions for a foster youth with complex needs and challenging behaviors. When the youth's behaviors escalated, OCS did not offer resources to the foster parents for crisis intervention, intensive mental health treatment, or stabilization – a recurrent theme in this investigation. Some of the issues identified in this complaint were due to mistakes by OCS staff, while others are part of a systemic problem: service gaps for children with complex and cooccurring intellectual and/or physical disabilities. However, that does not abrogate OCS's legal obligation to provide services to the children in its custody. *Id.* at 11.

The Ninth Circuit has consistently found that a "failure to" meet a constitutional duty is sufficient to establish commonality. Moreover, such a "failure to" can create conditions that compel defendants to act in ways that exacerbate the risk to the class. In this case, Defendants' practice of "making placements based on availability, rather than specific needs of children" creates additional risk. ECF No. 135 at 39. And as Plaintiffs' expert concluded, "[w]hen workers must place children in available settings, rather than in the best fit, children are moved quickly from one placement to another, causing additional trauma." Ex. 2 at 41. Defendants do not respond to this apparent and overt practice.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG                    Page **18** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 18 of 37

Whether Defendants' practice of placing children based on availability rather than need creates a substantial risk of serious harm is a common question.

Second, Defendants' list of purported initiatives cuts against them. Indeed, when Defendants' ask this court to recognize efforts they have made to redress longstanding systemic problems, they are asking the court to answer *for the entire class* whether Defendants are deliberately indifferent to the substantial risk of harm posed by lack of adequate placements in light of Defendants' purported efforts to address systemic harms.

In invoking remedial efforts to dispute commonality, Defendants misunderstand the objective of class certification. Plaintiffs are not required at this stage to prove that Defendants are deliberately indifferent, nor are Defendants required to show that they are not. These are merits issues for trial. The question at the class certification stage is whether these questions of law or fact can be resolved in one stroke for the class. *See Parsons*, 754 F.3d at 682. Nevertheless, a peek at the merits reveals a system that has not moved with deliberate speed to address the long-known risks of harm posed to foster children. Defendants identify new projects (*see* ECF No. 157 at 23-26), but Plaintiffs, by contrast, provide evidence that Defendants' shiny new tools have not been implemented, are not effective, or are making problems worse. *See, e.g.,* ECF No. 135 at 45-46.

Third, Defendants contend that there is no commonality because "placement shortages do not affect children across the putative classes equally." ECF No. 157 at 26. Some children live in "geographically remote areas with small populations and few services," and others have "medical or behavioral needs" that present an "extra challenge." *Id.* And Defendants argue that even if Defendants' actions contribute to placement

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **19** of 37
Case 3:22-cv-00129-SLG          Document 202          Filed 12/30/24          Page 19 of 37

shortages, "most putative class members experience no instability as a result." ECF No. 157 at 27. But the standard of liability under due process is not injury; it is substantial *risk* of harm. "[A] 'remedy for unsafe conditions need not await a tragic event.'" *Parsons*, 754 F.3d at 677 (internal citation omitted). Moreover, diverse conditions do not defeat commonality because all foster children suffer "exactly the same constitutional injury when [they are] exposed to a single statewide . . . policy or practice that creates a substantial risk of serious harm." *Id*. at 678.

### C. Failure to Ensure Timely Permanency Puts Foster Children at Risk of Harm

The state is obligated to ensure that every child in foster care receives the necessary services to support reunification with their biological family, or, if reunification is not feasible, to create a case plan that facilitates a permanent and alternative placement. 42 U.S.C. § 671(a)(16), §675(1)(E). Defendants themselves admit that they are failing. *See e.g.* Ex. 13, M705168. Indeed, Defendants' practices of failing to file timely Termination of Parental Rights ("TPR") petitions, failing to meet with and provide support to biological parents, and failing to engage in case planning with parents expose *all* children entering Alaska's foster system to a substantial risk of harm of delayed permanency.

Defendants' own emails produced in discovery evince that the OCS leadership is aware of the systemic problem. For example, in an October 2023 email among OCS leadership states, "I wanted to bring to our attention a drastic drop in the timely identification and appropriateness of permanency goals in cases." Ex. 14, M075980. The email further states that "[w]e've been looking at permanency issues as a group...especially

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **20** of 37

Case 3:22-cv-00129-SLG          Document 202          Filed 12/30/24          Page 20 of 37

related to kids seemingly stuck in foster care for extended periods...it appears we are becoming less focused and less consistent in practice related to permanency," adding that, "...things within our own system continue to be drivers such as lack of focused leadership and staff, lack of ongoing training, lack of permanency planning conferences and general lack of focus on permanency are all factors." *Id.* Contrary to Defendants' assertion that permanency delays are beyond their control, Defendants have explicitly identified multiple practices that expose all foster children to the risk of harm from delayed permanency.

Defendants' argument that Plaintiffs' permanency claims are merely a claim that OCS fails to comply with federal statutory requirements is unconvincing. While compliance with federal statues is certainly a critical component of permanency, and a helpful benchmark in measuring permanency delays, Plaintiffs' motion for class certification clearly explains the other elements of Defendants' permanency failures. *See e.g.* ECF No. 135 at 46-49. OCS itself identified systemic barriers like obstacles to achieving permanent placement, including frequent changes in caseworkers—each adding at least three months to the case—insufficient parental engagement and poor documentation of such engagement, failure to meet children's needs, and untimely TPR petitions being filed with the court. Ex. 15, M502814 at M502814.

Defendants' arguments about the Named Plaintiffs' experiences are also unpersuasive. For example, Defendants claim that Connor B. has not experienced permanency delays because he now has a projected guardianship permanency date of 2025. ECF No. 157 at 29 n.115. However, Connor B. has been in OCS custody for more than four-and-a-half years and *still* has not achieved legal permanency. Ex. 3; ECF No. 138-4

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **21** of 37
Case 3:22-cv-00129-SLG          Document 202          Filed 12/30/24          Page 21 of 37

at 10-13. Mary B. also experienced permanency delays, and Defendants' expert acknowledged that he "cannot determine immediately from the case record the cause of the delays in this case." ECF 159-1 at 64. Thus, many Named Plaintiffs *did* and continue to experience permanency delays.[16]

### D.   Failure to Provide Sufficient Services Puts Foster Children at Risk of Harm

Defendants do not contend that they are providing sufficient services to children. Instead, Defendants argue (1) they are not responsible for *providing* services, but merely paying for services; and (2) the fact that foster children are not receiving adequate and timely services is not OCS's fault. But the State has a Constitutional duty to (i) protect children in foster care from foreseeable harm; (ii) ensure children receive necessary services for their physical, mental, and emotional wellbeing; and (iii) provide care consistent with the purpose of custody. *See Jeremiah M.*, 695 F. Supp. 3d at 1092-93. By claiming to be mere financial intermediaries, OCS disregards its broader responsibility to safeguard vulnerable children.

Moreover, as stated in Plaintiffs' Motion, the failure to provide services does not only stem from a lack of providers but stems in large part from OCS's failure to adequately case plan, visit children, and arrange for the necessary services. Indeed, as OCS's Child Welfare Administrator, admitted in a 2022 email to Kim Guay, there was a "major decline" in the provision of behavioral services to foster children and although OCS "could have

---

[16] Defendants also make misleading typicality arguments, but as discussed below, Plaintiffs need not have all suffered identical injuries to convey standing.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **22** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 22 of 37

arguments that Covid shut down non emergency services," they had "nothing concrete on it" and that they may need to "raise attention" "around case planning and assessment of needs/provision of services to children and youth." Ex. 16, M165815.

OCS's lack of knowledge about services in Alaska further undermines its argument. Despite overseeing foster children's welfare, OCS fails to track service providers or waitlists, leaving caseworkers unaware of the adequacy or availability of services. Ex. 10 at 83:14-16. Indeed, OCS does not maintain a comprehensive list of services or providers, forcing caseworkers to rely on informal solutions, such as googling providers or asking foster parents if they are familiar with providers in the area. Ex. 17, M1057231, Ex. 18, Jessie Mayes Dep. Tr., at 159:2-160:2. The failure to provide services leads to long waitlists sometimes stretching for months for critical services. Ex. 10 at 81:13-18, 83:3-8. In these instances, children may be forced to wait for essential services or placed far from their communities to receive them. *Id.* at 84:4-11. Without an organized tracking system, children endure prolonged waits, exacerbating their emotional and developmental challenges.[17] The head of the OCS Medical Mental Health Unit ("MMHU") admitted that the MMHU does not track the number of children with diagnosed disabilities, Ex. 10 at 93:9-16, and as a result, cannot assess how many children need services. Additionally, regional managers do not know how many children in their region have disabilities. Ex.

---

[17] *See* Ex. 10 at 83:17-25 ("Q. What are some of the negative consequences to children of having long wait lists for services? A. If we're talking about mental health services, that could be anything from not feeling that they have somebody to talk to and so potential decompensation, to just them having feelings for a longer time than what is necessary, whether that be feelings of sadness or depression.").

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **23** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 23 of 37

19, Mariah Johnson Dep. Tr. at 72:9-73:10. OCS cannot escape liability by stating that there are insufficient providers, while remaining ignorant of the existing provider number and type.

Without tracking services, OCS cannot provide necessary services. Indeed, per an Alaska Ombudsman report from December 2024, "OCS failed to meet state and federal statutory requirements in the provision of services to the child and their foster parents, due in large part to the lack of complete and easily accessible information in ORCA" which the Ombudsman called an "antiquated case management system that no longer supports the efficient or effective management of Alaska's child welfare system." Ex. 12 at 4.

Even when children are placed on waitlists, staff turnover often forces the agency to restart the process, further delaying care. Ex. 9 at 146:14-21; ECF No. 136-78 at 14. Moreover, as noted above, Defendants' "efforts" to increase the provision of services to children, like their failed 1115 Waiver (ECF No. 157 at 32), are not appropriate issues on class certification.[18] Ms. Groh's expert opinion highlights that service access could be

---

[18] Defendants argue that the injury claimed by Plaintiffs is based on the type of "allegation of systemic failures" that the Tenth Circuit held in *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999) ruled is insufficient to establish commonality. There, the named plaintiffs, children with mental and developmental disabilities, claimed that various state agencies failed to provide the necessary protections and therapeutic services required by multiple federal statutes and the United States Constitution for disabled children in their custody. *Id.* at 1282. The district court ruled that the plaintiffs failed to establish a common question of law because "there [was] no one statutory or constitutional claim common to all named Plaintiffs and all putative class members." *Id.* at 1289. However, in this case, Plaintiffs have not mixed multiple legal claims stemming from allegations of systemic failures. Instead, their shared claims are solely grounded in their substantive due process rights for the General Class and the ADA for the Subclass. *See also Tinsley v. Flanigan,* 2017 U.S. Dist. LEXIS 235866, at *30 (D. Ariz. Sept. 29, 2017), where the court certified

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG                    Page **24** of 37
Case 3:22-cv-00129-SLG          Document 202          Filed 12/30/24          Page 24 of 37

"significantly increased" in Alaska, pointing to a shortage of community-based services as a major problem. Ex. 20, Alicia Groh Dep. Tr., at 87:10-15. Ms. Groh also discussed how a lack of therapeutic placements can lead to unnecessary institutional placements. *Id.* at 144:13-22.

The claim that lack of services is solely a provider shortage and external issue overlooks OCS's responsibility to track and manage service availability and failure to do so. OCS staff admit that children are not receiving necessary services in a timely manner, if at all. Ex. 9 at 129:11-13. OCS's failure to provide timely and adequate services puts all children in its custody at risk of harm, which impacts all foster children.

### E. Case Planning Failures Put Foster Children at Risk of Harm

Defendants do not deny that they are failing at case planning and do not address that 57.32% of case plans are not done within the statutorily required time period of 60 days and only 61% of parent case plans are current. ECF No. 135 at 55-56. Instead, Defendants only argue: (1) that their policies do not lead to inadequate case planning; (2) that there is insufficient evidence that families and children are not included in case planning; and (3) that failures in case planning vary across the state. ECF No. 157 at 34-35.

As to the first argument, Defendants engage in inadequate case planning, which they do not appear to deny. To the extent that their written policies do not condone inadequate case planning, that is irrelevant where OCS's *practices* place children at risk of harm.

---

a class of all children in DSC custody ruling they are exposed to the same statewide policies and practices governing medical, mental health, dental care, and placement decisions, which create a substantial risk of harm, making individualized determinations unnecessary.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG            Page **25** of 37

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 25 of 37

Defendants also argue that there is insufficient evidence that families and children are not included in case planning. ECF No. 157 at 34. But as stated in the Motion, in 2023, Alaska did not meet its Program Improvement Plan ("PIP") goal and children and families were only adequately included in 47% of cases. ECF No. 135 at 56. When asked, Defendants' expert agreed that if a state did not meet its PIP goal, that would be a "problem." Ex. 1 at 188:18-189:20. Caseworkers also engage in "compliance-based case planning" for parents, or rather, the default is to create a "cookie cutter" case plan that does not have sufficient detail to enable the parent to follow it. *See, e.g.,* Ex. 21, M654621 at M654621-M654625. OCS caseworkers appear to use said compliance-based case plans to meet the statutory deadlines. And these compliance-based case plans are being counted in the completed case plan number. Ex. 4 at 114:1-3. Moreover, contrary to Defendants' arguments, Plaintiffs' expert pointed to numerous examples of deficient case planning. Ex. 2 at 58.

Last, OCS's argument that case planning failures vary across the state also fails. OCS's case planning practices across the state are still inadequate even if they vary in degree of inadequacy. Moreover, children in OCS custody are often moved all over the state (and out of state), and the fact that one region's case planning practices may be more problematic than that of another region is irrelevant.

### F. There is Substantial Evidence of Commonality as to the ADA Subclass

Despite the critical need for services, Defendants consistently fail to ensure that children with disabilities receive necessary services, putting them at risk of institutionalization. Defendants' argument that these failures are not connected to an OCS policy or practice overlooks the fact that this issue is not simply due to a shortage of private

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **26** of 37

Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 26 of 37

providers. Rather, it directly results from OCS's failure to ensure that foster children receive timely and appropriate services.[19] This one issue alone satisfies the commonality requirement for the ADA Subclass and can be addressed on a class-wide basis.

Moreover, Defendants ignore the DOJ's finding that Alaska was violating the ADA and putting children at risk of unnecessary institutionalization. ECF No. 136-78 at 2. These ADA violations are ongoing and have not been sufficiently addressed. As the former manager of the MMHU stated, "the systemic problem is high needs youth get institutionalized because there is nowhere for them to return to in Alaska that can meet there (sic) needs." Ex. 22, M298410. The DOJ further reported that "[c]hildren admitted to North Star Hospital between 2021 and 2022 have stayed, on average, for 40 days or longer. Inpatient service providers and administrators in Alaska report that lengths of stay at North Star Hospital have increased because of the lack of appropriate community-based services and supports for children in the state." ECF No. 136-78 at 7-8. An email between OCS leadership on February 3, 2023 states:

> After a mostly sleepless night thinking about the issues related to North Star, I felt it is my ethical duty to express my deep concern with the actions of the Department of Family and Community Services yesterday. The State of Alaska has no alternative for actively suicidal, or homicidal, children under the age of 13, or for children who are medically deemed a danger to self or others. Additionally, the only option for children in this situation over age 13 is API. API rarely has capacity due to systemic breakdowns in community-based behavioral health care and the unavailability of therapeutic foster homes in the continuum of care in Alaska.

---

[19] Defendants also make typicality arguments that disabled children suffer differently in OCS custody but as discussed below, this is irrelevant for the purposes of class certification.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **27** of 37
Case 3:22-cv-00129-SLG          Document 202          Filed 12/30/24          Page 27 of 37

Ex. 23, M081466. In situations where OCS has not identified a home that can meet a hospitalized child's needs, OCS can ask the hospital to "hold onto them socially" until they find a home. Ex. 9 at 62:3. The former head of the MMHU testified that medically complex children were held there "a while." *Id*. at 62:21-25.[20] This admission underscores that the over-reliance on institutional placements is a direct consequence of OCS's actions or inactions.

Additionally, in the specific context of the ADA, Plaintiffs' claim is rooted in the *risk* of unnecessary institutionalization—a claim that is relevant to all foster children who require behavioral health services, not just those with specific disabilities. *See Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999). Several of the Named Plaintiffs have been or continue to be institutionalized, and the fact that certain Named Plaintiffs have received services while remaining in community placements does not negate the systemic failures that place all children at risk of unnecessary institutionalization.

The repeated inability to track service providers, identify waitlists, or provide

---

[20] The current head of the MMHU noted an example of a foster child who has been in a hospital since September of 2024, awaiting a placement with the correct level of care and stated that the child was likely not going to be discharged soon and possibly would be held in the hospital as late as March 2025 due to an inability to staff a nurse in a proposed placement. Ex. 10 at 68:14-70:10. Additionally, there are instances where children placed out of state cannot return home because there is not a "step-down" option for them that would provide the sufficient level of care in a less restrictive setting. Ex. 9 at 115:12- 116:9. Also as discussed above, OCS does not track the number of children with disabilities (*id*. at 77:12-19), the number of children who need therapeutic homes (*id.* at 78:4-22), fails to maintain accurate lists of available providers (Ex. 24, M647524; Ex. 9 at 76:1-4; Ex. 17, M1057231; Ex. 18 at 159:2-160:2), and has not addressed the extensive waitlists that prevent children from accessing necessary care. Ex. 9 at 76:1-3, 146:14-21; Ex.10 at 81:1-18, 82:17-24.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al*., Case No. 3:22-cv-00129-SLG          Page **28** of 37
Case 3:22-cv-00129-SLG          Document 202          Filed 12/30/24          Page 28 of 37

necessary services in a timely and adequate manner creates a clear pattern of harm across all foster children. Ex. 8, ECF No. 136-78 at 14-15.[21] Thus, Plaintiffs have adequately alleged that Defendants' practices put children at risk of unnecessary institutionalization.

## IV.    THE CLAIMS OF NAMED PLAINTIFF CHILDREN ARE TYPICAL

The Ninth Circuit has consistently held that the typicality standard is "permissive" and that claims "need not be substantially identical" to be typical of the class, but rather "reasonably coextensive." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).[22] The "test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons*, 754 F.3d at 685. "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Plaintiffs' claims, as identified in Plaintiffs' Motion, are predicated on a number of system-wide practices impacting the class, exposing all foster children to the same substantial risk of serious harm in violation of the Constitution and federal law. *See B.K.*, 922 F.3d at 970. The Ninth Circuit has consistently found the typicality requirement satisfied where, as here, plaintiffs assert constitutional claims based on the risk of harm caused by state practices and policies.[23]

None of Defendants' arguments regarding typicality are availing, and all have been

---

[21] *See also* Ex. 10 at 57:21-58:2, 81:13-18, 83:14-25, 92:8-11, 92:25-93:6, 93:9-16.
[22] *See also Parsons*, 754 F.3d at 685; *B.K.*, 922 F.3d 957.
[23] *See Parsons*, 754 F.3d at 685; *B.K.*, 922 F.3d 957.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **29** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 29 of 37

rejected in the child welfare context. Defendants argue that the Named Plaintiffs had more placements than is typical for children in foster care in Alaska. ECF No. 157 at 39. But, the Ninth Circuit has observed that there is a difference between a claim that a plaintiff has "already suffered harm and a claim that he has been exposed to a substantial risk of serious harm." *Parsons*, 754 F.3d at 677. Also, Defendants assert that, because 13 of the 14 named plaintiffs are members of the ADA subclass, they cannot adequately represent the General Class. ECF No. 157 at 40. But courts have rejected this argument. *See, e.g., Jonathan R. v. Justice*, 344 F.R.D. 294, 314 (S.D. W.Va. 2023) (rejecting argument that "Named Plaintiffs are extraordinarily atypical of the putative General Class," particularly with respect to their age and "severe behavioral issues."). *See also Wyatt B.,* 2022 U.S. Dist. LEXIS 147091, at *98 (finding plaintiffs can satisfy typicality for a subclass by showing the challenged policies exposed both the Named Plaintiffs and absent class members to a substantial risk of harm). Approximately 38% of foster children have a disability.[24]

Factual differences between named plaintiffs and the class as a whole are irrelevant to "typicality" under Rule 23, as the Ninth Circuit has repeatedly confirmed. *See Parsons*, 754 F.3d at 686.[25] Factual variances do not defeat typicality because Plaintiffs' claims challenge Defendants' uniform practices, to which all foster children are subject.

---

[24] Of the approximately 2,500 children who are in foster care custody of the OCS (ECF. No. 135 at 23-24), there are approximately 965 children with disabilities. Ex. 25, Declaration of Erin Suh (Dec. 30, 2024) ¶ 3 (analyzing M069231 and M069232).

[25] *See also Rodriguez v. Hayes*, 578 F.3d 1032, 1049-50 (9th Cir. 2009); *Armstrong v. Davis*, 275 F.3d 849, 868-69 (9th Cir. 2001); *Penk v. Or. State Bd. of Higher Educ.*, 93 F.R.D. 45, 50 (D. Or. 1981).

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **30** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 30 of 37

## V. THE NAMED PLAINTIFF CHILDREN WILL ADEQUATELY REPRESENT THE CLASS

"The adequacy inquiry is addressed by answering two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023).[26] The adequacy requirement "is satisfied as long as one of the class representatives is an adequate class representative." *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 n.2 (9th Cir. 2001).

"Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement. A conflict is fundamental when it goes to the specific issues in controversy." *Resnick v. Frank*, 779 F.3d 934, 942 (9th Cir. 2015) (internal citation omitted). Typicality and adequacy are often analyzed together because if a class representative's claims are not typical of the class, the representative may prosecute their own claims vigorously while neglecting the claims of other class members, which threatens absent class members' due process rights. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 588-89 (9th Cir. 2010).[27]

---

[26] *See also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)) (The "critical purpose of the adequacy inquiry" is to "uncover[] conflicts of interest between the named parties and the class they seek to represent.")

[27] In *Hesse*, the Ninth Circuit held that a class representative from Missouri could not adequately represent a class of plaintiffs from Washington because the Missouri-based plaintiff "did not share the Washington Plaintiffs' B&O Tax Surcharge claims, or even pretend to prosecute those claims on their behalf." *Hesse*, 598 F.3d at 589; *see also Amchem*

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **31** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 31 of 37

The primary concern in these adequacy-of-representation cases is that named plaintiffs with atypical claims are unlikely to prosecute the action vigorously on behalf of *all* class members. Accordingly, courts must ensure that "the plaintiffs maintain a sufficient interest in, and nexus with, the class so as to ensure vigorous representation." *Resnick*, 779 F.3d at 943 (internal citations omitted). Defendants do not contend that the named plaintiffs, next friends, or their counsel have *any* conflicts of interest, fundamental or otherwise. *See* ECF No. 157 at 40-45. Instead, Defendants argue that the next friends are not sufficiently familiar with the litigation. *See id.* at 41.

Defendants' concern about the next friends' familiarity with the litigation and relationship to the Named Plaintiffs "is an issue separate and distinct from the Named Plaintiffs' adequacy for purposes of Rule 23(a)." *Wyatt B.*, 2022 U.S. Dist. LEXIS 147091, at *99 (rejecting Defendants' adequacy-of-representation arguments and inviting briefing on the adequacy of next friends separate from class certification). Rule 23(a)(4) concerns whether the Next Friend representatives' interests conflict with those of other class members such that they will not prosecute the action vigorously on behalf of the entire class. Rule 17(c), by contrast, concerns whether the Next Friends' relationship with the minor is sufficient to "be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990). Defendants can, as

*Prods.*, 521 U.S. 591 (finding that plaintiffs with asbestos-related injuries could not adequately represent a class of individuals with asbestos exposure because the interests of the presently injured plaintiffs conflicted with those of the exposure-only class members— the former had an interest in maximizing immediate payouts, while the latter had an interest in preserving the settlement funds for future claims).

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **32** of 37

Case 3:22-cv-00129-SLG          Document 202          Filed 12/30/24          Page 32 of 37

they have done for one Next Friend, file a motion to disqualify.[28] But these concerns are not relevant to the conflict-of-interest question at the heart of the adequacy.

Further, Defendants' attempt to convert Rule 17(c) issues into a Rule 23(a)(4) problem by invoking a third adequacy "requirement": that "the named plaintiff or next friend must be sufficiently familiar with the case to 'serve the necessary role of check[ing] the otherwise unfettered discretion of counsel.'" ECF No. 157 at 41 (quoting *Welling v. Alexy* (In re Cirrus Logic Sec.), 155 F.R.D. 654, 659 (N.D. Cal. 1994).[29] However, this familiarity factor is not an independent basis for finding inadequacy; it merely relates back to the conflict-of-interest concerns at the heart of the adequacy-of-representation inquiry.

For example, in a class action alleging misrepresentations about the safety of a baby stroller, the class representative failed to satisfy the typicality requirement because she suffered economic loss while other class members suffered personal injuries, and her atypical claims created adequacy problems because "her counsel has chosen not to pursue any personal injury claims on behalf of those class members, but rather to limit their claims to 'economic injury.'" *Sanchez v. Wal Mart Stores, Inc.*, 2009 U.S. Dist. LEXIS 48428, at *9-10 (E.D. Cal. May 28, 2009). In the cases cited by Defendants, the class representatives' unfamiliarity and/or disinterest in the claims of other class members presented a conflict

---

[28] ECF No. 110 (Plaintiffs' motion to substitute Melissa Skarbek as the next friend of Mary B. and Connor B.); ECF No. 141 (Defendants' opposition, and cross-motion to disqualify Melissa Skarbek as the next friend of Lana H.); ECF No. 149 (Plaintiffs' reply).

[29] *Welling*, 155 F.R.D. at 659 is also inapposite. In that case, a securities class action, the interests of the named plaintiffs—one a speculative trader, the other an in/out trader—were not typical of the class, which raised concerns about their interest in prosecuting claims of retention plaintiffs. *Id.* at 658-61.

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **33** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 33 of 37

of interest such that they were unlikely to vigorously prosecute the claims of absent class members. Defendants do not, and cannot, explain how the Next Friends have such a conflict. Indeed, in one case cited by Defendants, the district court rejected the defendants' argument that the class representatives were "impermissibly unfamiliar with the case," noting that "the Ninth Circuit has set a low bar for the level of knowledge required of class representatives, and a named plaintiff can be an adequate representative if he merely 'understands his duties and is currently willing and able to perform them. The Rule does not require more.'" *Red v. Kraft Foods, Inc.,* 2012 U.S. Dist. LEXIS 186948, at *49 (C.D. Cal. Apr. 12, 2012). At any rate, the remedy in that case was greater involvement with counsel, not denial of class certification. *See id*. at *50.

None of Defendants' authorities involve next friends acting on behalf of minors, and none account for the unique circumstances presented in cases seeking injunctive and declaratory relief, or in the foster care context.[30] Federal courts routinely certify classes represented by next friends who, despite varying degrees of familiarity with the litigation, are willing and able to represent the best interests of the child.[31]

---

[30] *See Elisa W. v. City of New York*, 2018 U.S. Dist. LEXIS 33857 (S.D.N.Y. Feb. 28, 2018); *Sam M. v. Carcieri*, 608 F.3d 77, 93 (1st Cir. 2010); *Tinsley v. Flanagan*, 2016 U.S. Dist. LEXIS 193289, at *24 (D. Ariz. May 13, 2016).

[31] *See, e.g., M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013) (granting class certification); *B.K.*, 922 F.3d 957 (affirming certification of general class but not subclass), *on remand Tinsley v. Faust*, 411 F. Supp. 3d 482 (D. Ariz. 2019) (certifying class and subclass); *Wellington*, 2024 WL 4227544, at *14 (granting class certification); *S.R. v. Pa. Dep't. of Hum. Servs.*, 325 F.R.D. 103, 109 (M.D. Pa. 2018) (same); *Connor B., ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 31 (D. Mass. 2011) (denying motion to decertify the class after *Wal-Mart*).

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **34** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 34 of 37

## VI.    PLAINTIFFS SATISFY RULE 23(B)

In arguing that Plaintiffs have failed to satisfy Rule 23(b)(2), Defendants make the same argument that the *Parsons* court found unpersuasive. In *Parsons*, the Ninth Circuit noted that "defendants' reliance on [*Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*, 543 F.3d 597, 604-07 (10th Cir. 2008)] here is ill-founded." *Parsons*, 754 F.3d at 689 n.35. The *Parsons* court went on to state "we seriously doubt that the degree of specificity suggested in *Shook II's* wide-ranging dicta is properly required at the class certification stage for a Rule 23(b)(2) class" and that the "requirement ordinarily will be satisfied when plaintiffs have described the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at the appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *Id.*[32] Last, Defendants make the meritless argument, as discussed above, that Plaintiffs have not identified the root cause of the

---

[32] *See also B.K.*, 922 F.3d at 972 ("Plaintiffs do not need to specify the precise injunctive relief they will ultimately seek at the class certification stage."); *Wyatt B.*, 2022 U.S. Dist. Lexis 147091, at *101 (finding Rule 23(b)(2) met in the context of a foster care class action); *Parsons*, 754 F.3d at 657 (citing *D.G. v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) ("Named Plaintiffs allege the same injury on behalf of all class members as a result of excessive caseloads—exposure to an impermissible risk of harm . . . . To remedy this alleged harm, Named Plaintiffs propose an injunction requiring OKDHS assign no more than 15 foster children to each caseworker . . . . As the district court noted, such an injunction applies to the proposed class as a whole without requiring differentiation between class members.")); *id.*(citing *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) ("Defendants argue that because the plaintiffs have alleged differing harms requiring individual remedies, no injunction will be appropriate for the entire class . . . . We disagree. Insofar as the deficiencies of the child welfare system stem from central and systemic failures, the district court did not abuse its discretion in certifying a 23(b)(2) class[.]")).

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG                Page **35** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 35 of 37

systemic failures. But Defendants cite no case law, and Plaintiffs have adequately identified actions or inactions of OCS that lead to a risk of harm for foster children.

## VII.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant their Motion and certify the General Class and the ADA Subclass.

DATED: December 30, 2024.

Respectfully submitted,

/s/ *Marcia Robinson Lowry*
Marcia Robinson Lowry (*pro hac vice*)
mlowry@abetterchildhood.org
Julia K. Tebor (*pro hac vice*)
jtebor@abetterchildhood.org
Anastasia Benedetto (*pro hac vice*)
abenedetto@abetterchildhood.org
David Baloche (*pro hac vice*)
dbaloche@abetterchildhood.org
Molly Davis (*pro have vice*)
mdavis@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456

Elena M. Romerdahl, AK Bar No. 1509072
eromerdahl@perkinscoie.com
Hannah Paton, AK Bar No. 2309095
hpaton@perkinscoie.com
**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Telephone: (907) 279-8561

James J. Davis, Jr., AK Bar No. 9412140
jdavis@njp-law.com
Nicholas Feronti, AK Bar No. 2106069
nferonti@njp-law.com

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG        Page **36** of 37
Case 3:22-cv-00129-SLG        Document 202        Filed 12/30/24        Page 36 of 37

Savannah V. Fletcher, AK Bar No. 1811127
sfletcher@njp-law.com
**NORTHERN JUSTICE PROJECT, LLC**
406 G Street, Suite 207
Anchorage, AK 99501
Telephone: (907) 308-3395

Mark Regan, AK Bar No. 8409081
mregan@dlcak.org
**DISABILITY LAW CENTER OF ALASKA**
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Telephone: (907) 565-1002

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2024, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court – District of Alaska by using the CM/ECF system. Participants in Case No. 3:22-cv-00129-SLG who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry
(pro hac vice)

Plaintiffs' Reply to Response in Opposition to Motion for Class Certification
*Jeremiah M. et al. v. Kim Kovol et al.*, Case No. 3:22-cv-00129-SLG          Page **37** of 37
Case 3:22-cv-00129-SLG     Document 202     Filed 12/30/24     Page 37 of 37