TREG R. TAYLOR
ATTORNEY GENERAL

Margaret Paton Walsh (Alaska Bar No. 0411074)
Christopher A. Robison (Alaska Bar No. 2111126)
Katherine Demarest (Alaska Bar No. 1011074)
Jennifer Teitell (Alaska Bar No. 2405054)
Maxwell Jenkins-Goetz (Alaska Bar No. 2408085)
Assistant Attorneys General, Alaska Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5275/Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov
Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Jeremiah M., et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>Kim Kovol, et al. )<br>)<br>Defendants. ) | Case No. 3:22-CV-00129-SLG |

## MOTION FOR SUMMARY JUDGMENT ON COUNTS SIX AND SEVEN

The plaintiffs have launched a wide-ranging attack on Alaska's child welfare system, raising both constitutional and statutory claims. Counts 6 and 7 of the plaintiffs' First Amended Complaint advance claims under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. The defendants seek summary judgment on those claims, which fail as a matter of law and fact. Legally, they rest on an extra-statutory theory of ADA liability that crumbles without the agency

deference that recent Supreme Court and Ninth Circuit cases squarely reject. And even under their own legal theory, the plaintiffs lack evidence to support their claims.

Counts 6 and 7 of the Amended Complaint allege that the defendants violated Title II and Section 504 by "failing to 'make reasonable modifications' in the policies, practices, and procedures of Alaska's foster care system."[1] Although this Court concluded that the plaintiffs had not adequately pled a claim that the State failed to make reasonable modifications to its policies to avoid discrimination based on disability,[2] it declined to dismiss these claims based upon a completely different theory, raised for the first time in the plaintiffs' briefing: that the State "violated the integration mandate" found in U.S. Department of Justice (DOJ) regulations implementing the ADA, by placing the plaintiffs "at risk of future institutionalization."[3] Judge Kindred concluded that a plaintiff asserting a violation of Title II or Section 504 "need only show that the state action at issue 'creates a *serious risk of* institutionalization.'"[4] And the Court read the Amended Complaint to contain allegations that the State had subjected some named plaintiffs to unjustified institutionalization and placed all putative ADA class members at risk of future unjustified institutionalization.[5]

---

[1]     Docket 16 ¶ 306.

[2]     Docket 55 at 63–66, 70.

[3]     *Id.* at 63, 66–70; *see also* Docket 30 at 87–89.

[4]     Docket 55 at 67 (quoting *M.R. v. Dreyfus*, 663 F.3d 1100, 1116 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012)) (emphasis added).

[5]     *Id.* at 68–70.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                              Page 2 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 2 of 29

That ruling relied on DOJ guidance interpreting the ADA and its regulations and, in turn, the Ninth Circuit's holding in *M.R. v. Dreyfus*.[6] But neither authority can support the claims. Intervening Supreme Court decisions strictly limit the deference that courts owe agency interpretations.[7] And without the deference that has long dissuaded courts from independently analyzing Title II, the statutes cannot be read to support a "serious risk of" unjustified institutionalization as a basis for a Title II or Section 504 claim.[8]

Controlling authority now requires this court to reevaluate the viability of the plaintiffs' ADA claims. The plain text of the statutes does not support the plaintiffs' "serious risk of unjustified institutionalization" claim, and the evidence developed in discovery establishes that the plaintiffs' claims cannot succeed under any theory. The defendants are therefore entitled to summary judgment on Counts 6 and 7 of the Amended Complaint.

## I.      Legal standard for summary judgment.

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[9] A motion for summary judgment

---

[6]      *Id.* at 66–70; *M.R.*, 663 F.3d 1100.

[7]      *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *Kisor v. Wilkie*, 588 U.S. 558 (2019) (limiting deference to agency interpretations of regulations).

[8]      *United States v. Mississippi*, 82 F.4th 387, 392–93 (5th Cir. 2023).

[9]      Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                              Page 3 of 29

Case 3:22-cv-00129-SLG      Document 210      Filed 01/30/25      Page 3 of 29

may present issues comprised solely of questions of law.[10] Statutory interpretation is a purely legal issue.[11] When a motion asserts factual insufficiency of claims, "the mere existence of *some* alleged factual dispute between the parties" is not sufficient to defeat a motion for summary judgment.[12] "[T]he requirement is that there be no *genuine* issue of *material* fact."[13]

## II. Congress did not create "serious risk of institutionalization" claims, and the DOJ guidance creating such claims cannot survive under current caselaw.

In denying the defendants' motion to dismiss Counts 6 and 7 in September 2023, this Court relied on *M.R.* to hold that Title II and Section 504 support a claim based on "serious risk of" unjustified institutionalization.[14] That conclusion rested upon two authorities: (1) the DOJ's position that Title II and its implementing regulations support such a claim, and (2) the Ninth Circuit's acceptance of that DOJ position in *M.R.*[15] Nine judges dissented from the denial of rehearing en banc in *M.R.*, observing that the panel majority's opinion gave "what amounts to controlling interpretive deference to a 'statement of interest' the DOJ filed in support of the plaintiffs" in that case.[16]

---

[10]   *See, e.g.*, *Asuncion v. Dist. Dir. of U.S. Immigr. & Naturalization Serv.*, 427 F.2d 523, 524 (9th Cir. 1970).

[11]   *In re Sankey*, 307 B.R. 674, 677 (D. Alaska 2004).

[12]   *Anderson*, 477 U.S. at 247–48.

[13]   *Id.* at 248.

[14]   Docket 55 at 66–70

[15]   *Id.* at 62.

[16]   *M.R.*, 697 F.3d at 715 (Bea, J., dissenting).

And indeed, that deference has now been fatally undermined by two Supreme Court decisions defining when courts should and should not defer to agency interpretations of statutes and regulations.[17] The Ninth Circuit has recognized that this intervening Supreme Court authority supersedes the precedential value of decisions that deferred to agency interpretations in ways inconsistent with current Supreme Court cases.[18] That means, with *M.R.* superseded by intervening Supreme Court and Ninth Circuit precedent, this Court should interpret Title II anew.

Doing so requires applying the "traditional tools of statutory construction," rather than unquestioning deference to the DOJ's creation of a theory far outside what Congress wrote.[19] Applying those tools, "[m]indful that it is a statute [the Court is] construing," leaves no doubt that the statutes and the regulations cover *actual* present discrimination—which sometimes encompasses unjustified institutionalization—but do not allow claims based only on risk of potential *future* unjustified institutionalization.[20] Without its foundation of deference to the DOJ interpretation, the "risk of institutionalization" theory crumbles.

---

[17]     *Loper Bright Enters.*, 603 U.S. 369; *Kisor*, 588 U.S. 558.

[18]     *See United States v. Castillo*, 69 F.4th 648 (9th Cir. 2023).

[19]     *See id.* at 657.

[20]     *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 588 (1999).

*Jeremiah M., et al. v. Kim Kovol, et al.*           Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7          Page 5 of 29

**A.      The Supreme Court held in *Olmstead* that *actual* unjustified institutionalization can violate Title II.**

Title II provides that a qualified individual with a disability shall not "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[21] The Attorney General issues regulations implementing the statute.[22] Among other things, those regulations require public entities to administer their "services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[23]

In *Olmstead v. L.C. ex rel. Zimring*, the Supreme Court interpreted Title II and those regulations to encompass "unjustified institutional isolation of persons with disabilities" as "a form of discrimination."[24] The plaintiffs in *Olmstead* were two individuals who were institutionalized even though the state's own treatment professionals had determined that community placement was appropriate for them.[25] The Court held that Title II and its regulations require states providing treatment for "persons with mental disabilities" to

> provide community-based treatment . . . when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can

---

[21]     42 U.S.C. § 12132.

[22]     *Id.* § 12134(a).

[23]     28 C.F.R. § 35.130(d).

[24]     *Olmstead*, 527 U.S. at 600.

[25]     *Id.* at 603.

*Jeremiah M., et al. v. Kim Kovol, et al.*
Motion for Summary Judgment on Counts 6 & 7

Case No. 3:22-cv-00129-SLG
Page 6 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 6 of 29

be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.[26]

The Court in *Olmstead* did not discuss the concept of "risk" of institutionalization at all, nor did it recognize a possible Title II claim based on such risk. *Olmstead* involved two individual plaintiffs who were in fact institutionalized despite the state's professionals' determinations "that community-based treatment would be appropriate for [them]."[27] As the Fifth Circuit recently observed, the decision "turn[ed] on actual 'unjustifiable institutionalization,' not on hypothetical future events."[28] The Supreme Court held that "[u]njustified isolation" is "properly regarded as discrimination based on disability."[29] But nothing in the decision even hints that actions creating a "risk" of such future isolation might also constitute discrimination based on disability under the statute.

In fact, Justice Kennedy's concurrence specifically warned against expansive interpretations of *Olmstead* like the one the plaintiffs put forth here. He instructed that the decision should be "applied with caution and circumspection" so states would not "be pressured into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition."[30] He also warned of "the federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing

---

[26]     *Id*. at 607.

[27]     *Id.* at 603.

[28]     *Mississippi*, 82 F.4th at 394.

[29]     *Olmstead*, 527 U.S. at 597.

[30]     *Id*. at 610 (Kennedy, J., concurring in the judgment).

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                          Page 7 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 7 of 29

authority of the federal courts," urging that "[i]t is of central importance, then, that courts apply [*Olmstead*] with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers.[31]

### B. The Ninth Circuit in *M.R.* deferred to the DOJ's "serious risk of" institutionalization theory, but that holding has been superseded.

In *M.R. v. Dreyfus*, a divided panel of the Ninth Circuit went far beyond *Olmstead*. The court held that Title II prohibits not only *actual* unjustified institutionalization, but also "state action [that] creates a *serious risk of* institutionalization."[32] To arrive at this conclusion, the panel majority deferred to the DOJ's interpretation of Title II and its implementing regulations, as articulated in a DOJ Statement of Interest filed in the district court.[33] Dispensing with the traditional requirement that a plaintiff allege an injury-in-fact to vest the court with subject matter jurisdiction, DOJ's Statement contended that "[t]he integration mandate prohibits public entities from pursuing policies that place individuals at risk of unnecessary institutionalization" and that "[i]mminent risk of institutionalization is not required."[34]

---

[31]    *Id.*

[32]    *M.R.*, 663 F.3d at 1116 (emphasis added).

[33]    *Id*. at 1117.

[34]    *Id.* (first alteration in original); *see also* U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, https://archive.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020) ("Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent" to sue.).

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                    Page 8 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 8 of 29

The DOJ filed a similar Statement of Interest in this case, relying extensively on the Ninth Circuit's opinion in *M.R.*[35] But after two recent Supreme Court decisions rejecting the kind of deference that was afforded the DOJ, *M.R.* is no longer good law. And the Ninth Circuit has recognized the impact of these cases on decisions like *M.R.*

First, in *Kisor v. Wilkie*, the Supreme Court held that deference to an agency's interpretation of its own regulation "can arise only if a regulation is genuinely ambiguous . . . even after a court has resorted to all the standard tools of interpretation."[36] The Ninth Circuit's opinion in *M.R.* suffers from this precise flaw: the court deferred to the DOJ without first asking whether the regulation was "genuinely ambiguous."

Second, to the extent *M.R.* deferred to the DOJ's interpretation of Title II itself, the Supreme Court squarely rejected any such deference in a second decision, *Loper Bright Enterprises v. Raimondo*. There, the Supreme Court overturned *Chevron*'s holding that courts should defer to reasonable agency interpretations of ambiguous statutory provisions.[37] "[A]gencies have no special competence in resolving statutory ambiguities. Courts do."[38] Courts may give "respect" to agency interpretations, but they "may not defer to an agency interpretation of the law simply because a statute is ambiguous."[39]

---

[35]     *See* Docket 31.

[36]     *Kisor*, 588 U.S. at 573.

[37]     *Chevron*, 467 U.S. 837.

[38]     *Loper Bright*, 603 U.S. at 400–01.

[39]     *Id.* at 386, 412–13.

Instead, *Loper Bright* instructs courts to "exercise their independent judgment" when interpreting statutes.[40]

*Loper Bright* also implicitly rejected the idea that courts should defer to agency interpretations of ambiguous regulations, as described in *Kisor*. It did so by rejecting *Chevron* in part on the grounds that a framework requiring judges to determine whether a text is "ambiguous" is "unworkable" because "the concept of ambiguity has always evaded meaningful definition."[41] As the Supreme Court explained, "[o]ne judge might see ambiguity everywhere; another might never encounter it."[42]

The Ninth Circuit has recognized that these Supreme Court decisions may be "clearly irreconcilable" with its own cases that previously applied substantial deference, and in that situation, those Ninth Circuit cases lose their precedential effect.[43] In *United States v. Castillo*, the Ninth Circuit held that two of its cases could not survive after *Kisor* because they deferred to commentary interpreting the Sentencing Guidelines.[44] The court explained that "[a]pplying the traditional tools of statutory construction to the text of the guideline, as *Kisor* instructs," revealed that the guideline was unambiguously inconsistent with the government interpretation to which prior decisions had deferred.[45] And *Loper*

---

[40]    *Id.*

[41]    *Id.* at 407–08.

[42]    *Id.* at 408.

[43]    *Castillo*, 69 F.4th at 657–58.

[44]    *Id.*

[45]    *Id.*

*Jeremiah M., et al. v. Kim Kovol, et al.*                                          Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                                    Page 10 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 10 of 29

*Bright*'s rejection of deference to agency interpretations of ambiguous statutes makes even more clear that circuit precedents deferring to agency views, without independent application of the traditional tools of construction, have been superseded and are not controlling.

Simply put, this Court is not bound by Ninth Circuit precedent that has been superseded in this way, including *M.R.*[46] The Court must therefore take a fresh look at the statutes, rather than following *M.R.* and simply deferring to the DOJ.

### C.     Title II and Section 504 prohibit discrimination on the basis of disability, not a "serious risk of" institutionalization.

Reading Title II and Section 504 with fresh eyes and applying standard tools of statutory interpretation to determine their scope leads to a clear conclusion. The plain text of the statutes does not authorize a claim based on a "risk" of unjustified institutionalization.

The relevant provision of Title II reads:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[47]

Similarly, the relevant provision of Section 504 reads:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded

---

[46]     *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) ("[D]istrict courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.").

[47]     42 U.S.C. § 12132.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                                    Page 11 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 11 of 29

from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.[48]

Courts generally interpret these two similar statutory provisions coextensively.[49]

The plain text of both statutes addresses *actual* exclusion, denial, and discrimination, not mere "risks" of these things. *Olmstead* considered unjustified institutional isolation to be one form of "discrimination" prohibited under Title II. But a risk of possible *future* discrimination (whether in the form of institutionalization or otherwise) is not itself "discrimination." As the Fifth Circuit recently concluded, "[n]othing in the text of Title II . . . suggests that a *risk of institutionalization*, without actual institutionalization, constitutes actionable discrimination."[50] Title II "does not define discrimination in terms of a prospective risk to qualified disabled individuals. In stating that no individual shall be 'excluded,' 'denied,' or 'subjected to discrimination,' the statute refers to the actual, not hypothetical[,] administration of public programs."[51]

In addition to finding no basis in the statutory text, the plaintiffs' "at risk" theory runs headlong into both causation and redressability problems. As one federal court explained when granting summary judgment for the state on an ADA claim related to administration of a waiver program:

---

[48]     29 U.S.C. § 794(a).

[49]     *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021).

[50]     *Mississippi*, 82 F.4th at 392.

[51]     *Id.*

Here, causation is speculative, and redressability is absent. To establish causation, the plaintiff must show the Agency's inactions have an impact on third parties (the providers) that then cause them to not serve developmentally disabled adults, either across the board or at a given location. Reimbursement rates are one—but only one—of the many factors a provider considers in deciding where and to whom to provide service. The difficulty faced by consumers of behavior-analyst services in rural areas is typical of difficulties across a range of products and services; consumers of products and services have fewer choices in rural areas. Increasing reimbursement rates might increase availability of behavior analysts in some areas, but might not—and the rate that would be required to make services available to an individual at a given location is unknowable.[52]

In sum, the text of Title II and Section 504 make clear that neither statute authorizes a claim based only on "serious risk of" institutionalization. A claim must be based on current discrimination in existing state services.

### D. The regulations also do not authorize claims based on "serious risk of" institutionalization and reading them otherwise would be inconsistent with the statutes.

The DOJ regulations implementing Title II do not authorize claims based on a "serious risk of" institutionalization either. The regulation at issue in *M.R.* and here, 28 C.F.R. 35.130(d), reads: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." This regulation is sometimes called the "integration mandate." Because the *Olmstead* Court "d[id] not understand petitioners to challenge the regulatory formulations themselves as outside the congressional authorization," the decision did not "determine the[] validity" of DOJ's implementing regulation requiring the "most

---

[52] *Disability Rts. Fla., Inc. v. Palmer*, No. 4:18CV342-RH/CAS, 2019 WL 11253085, at *7 (N.D. Fla. Aug. 29, 2019).

integrated setting."[53] Critically, the Court emphasized that it "d[id] not hold that the ADA imposes on the States a 'standard of care'" or "require[] States to 'provide a certain level of benefits to individuals with disabilities.'"[54] Rather, "[s]tates must adhere to the ADA's nondiscrimination requirement with regard to the *services they in fact provide*."[55] The Court thus remanded for an assessment of whether community placement for the plaintiffs could reasonably be accommodated without fundamentally altering state services, emphasizing that states must have "leeway" in this regard.[56]

Even assuming that the integration mandate regulation is authorized by Title II, nothing in this regulation's text suggests that allegedly creating a *risk of* institutionalization by not ensuring that relevant services are in fact provided could also constitute actionable discrimination.[57] The regulation simply mandates integration. Unless a plaintiff has been denied such integration, the regulation has not been violated. As the Fifth Circuit observed, the regulation, like the statutes, "does not speak to 'risks' of maladministration."[58]

---

[53] *Olmstead*, 527 U.S. at 592.

[54] *Id*. at 603 n.14.

[55] *Id.* (emphasis added).

[56] *Id.* at 605, 607.

[57] *Mississippi*, 82 F.4th at 392. Even if Section 35.130(d) did authorize such a claim, it would be invalid as inconsistent with Title II. *See, e.g.*, *Schneider v. Chertoff*, 450 F.3d 944, 954–55 (9th Cir. 2006) (holding that a regulation inconsistent with congressional intent is invalid); *In re Watson*, 161 F.3d 593, 597–98 (9th Cir. 1998) ("A federal regulation in conflict with a federal statute is invalid as a matter of law." (emphasis omitted)).

[58] *Mississippi*, 82 F.4th at 392.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                      Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                          Page 14 of 29

Case 3:22-cv-00129-SLG      Document 210      Filed 01/30/25      Page 14 of 29

Section 35.130(d) is not "genuinely ambiguous" on this point, such that the DOJ's contrary interpretation would warrant deference under *Kisor* (assuming that *Kisor* deference survives after *Loper Bright*). Nothing in the regulation's text creates ambiguity. Accordingly, the DOJ's interpretation is not entitled to deference after *Kisor*, and the "court decisions that upheld ['serious risk of' unjustified institutional] claims largely based on" the DOJ's interpretation—including *M.R.*—"have been superseded by *Kisor*."[59]

Unlike the DOJ regulations implementing Title II, the U.S. Department of Health and Human Services' (HHS) regulations implementing Section 504 were very recently amended to explicitly prohibit state actions that create "serious risk of" institutionalization.[60] The history of that rulemaking reflects that HHS believed that the change would "promote consistency with title II of the ADA and the corresponding [DOJ] ADA regulations," including the DOJ guidance on the scope of the "integration mandate" regulation and court decisions deferring to that interpretation.[61]

HHS's interpretation of Section 504 as reflected in these new regulations lacks plausibility as a reading of the statute and is not entitled to deference after *Loper Bright*. Nowhere does the text of Section 504 evince an intent to prohibit a "serious risk of" institutionalization. In fact, the Supreme Court observed in *Olmstead* that Congress did not even clearly intend Section 504 (unlike Title II) to encompass *actual* unjustified

---

[59]    *Id*. at 393–94, 394 n.10 (identifying *M.R.* as having been superseded by *Kisor*).

[60]    *See* 45 C.F.R. § 84.76(d)(4) (effective July 8, 2024).

[61]    Discrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 88 Fed. Reg. 63392, 63393, 63482 & nn. 514, 515, 520 (proposed Sept. 14, 2023) (codified at 45 C.F.R. pt. 84).

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                    Page 15 of 29

Case 3:22-cv-00129-SLG      Document 210      Filed 01/30/25      Page 15 of 29

institutionalization, let alone any risk of it.[62] HHS's recent Section 504 regulations are thus invalid as inconsistent with the statute.[63]

Because neither Title II nor Section 504 authorizes a claim based on a "serious risk of" institutionalization, the Court should grant summary judgment to the defendants on what remains of Counts 6 and 7 after the Court's earlier dismissal order.

### III. Even if "serious risk of" institutionalization claims are viable, the plaintiffs have not raised one here.

Even if the Court rejects the analysis above and concludes that "serious risk of" institutionalization" claims remain viable, the plaintiffs did not plead one here. And the "risk of institutionalization" theory they have developed as the litigation has progressed bears no resemblance to the ones courts have previously recognized.

A plaintiff may not pursue a claim that is not raised in the complaint.[64] The Amended Complaint did not allege any "serious risk of" institutionalization, but rather alleged only that the defendants subjected foster children to *actual* unjustified

---

[62]     *See Olmstead*, 527 U.S. at 600 n.11 ("Unlike the ADA, § 504 . . . contains no express recognition that isolation or segregation of persons with disabilities is a form of discrimination.").

[63]     *See, e.g.*, *Schneider*, 450 F.3d at 954–55 (holding that a regulation inconsistent with congressional intent is invalid); *In re Watson*, 161 F.3d at 597–98 ("A federal regulation in conflict with a federal statute is invalid as a matter of law."). Presently, 17 states, including Alaska, are challenging HHS's new regulations on the basis that they are arbitrary and capricious and exceed the agency's authority. *See Texas et al. v. Becerra et al.*, 5:24-cv-00225 (N.D. Tex. Sept. 26, 2024).

[64]     *See, e.g.*, *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 637–38 (9th Cir. 2015); *Saccato v. Davis L. Firm*, No. 12-35133, 2012 WL 5951608, at *1 (9th Cir. Nov. 26, 2012); *De La Fuente v. Wyman*, No. 16-cv-5801, 2018 WL 646958, at *7 (W.D. Wash. Jan. 31, 2018).

*Jeremiah M., et al. v. Kim Kovol, et al.*                          Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                Page 16 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 16 of 29

institutionalization and failed to place them in the least restrictive settings.[65] When the defendants moved to dismiss these claims on the grounds that none of the named plaintiffs were currently in institutions, the plaintiffs suggested in their opposition to that motion that their complaint also raises a "risk of future institutionalization" claim.[66] Perhaps based on this inaccurate representation, this Court concluded that the Amended Complaint alleged that the defendants violated Title II and Section 504 by placing foster children "at risk of future institutionalization."[67] But no such allegation appears in the Amended Complaint, which does not use the phrase "risk of institutionalization" or any paraphrase of it, even though those are the words *M.R.* and other cases use to describe such claims.[68] Accordingly, the Court should grant this motion regardless of whether Title II or Section 504 allow claims based on risk of institutionalization.

Moreover, the novel "risk of institutionalization" theory the plaintiffs have since described as the litigation has progressed bears no resemblance to such claims as previously recognized by courts. The plaintiffs do not assert that the State discriminates against them by withholding certain services unless they enter institutions, or by providing community-based services to some ADA-eligible children but not others. Instead, it seems that the plaintiffs rest their claim entirely on the allegation that Alaska lacks adequate service providers to give disabled foster children in Alaska the care they

---

[65]     Docket 38 at 30 (citing Docket 16 ¶¶ 298–315)].

[66]     Docket 30 at 87–88.

[67]     Docket 55 at 63.

[68]     *See generally* Docket 16.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                        Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                            Page 17 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 17 of 29

need. The plaintiffs apparently contend that a broader service array would reduce the risk that children's symptoms will worsen while in foster care, in turn reducing the likelihood that some may need institutional care for mental health and behavioral health conditions. Such institutionalization, in the plaintiffs' view, would be "unjustified" not because the child's condition does not require it, but because that level of care theoretically could have been avoided if more services were available.[69]

This multi-step speculative exercise looks nothing like the typical "risk of institutionalization" claims some courts recognized before *Kisor* and *Loper Bright*. The text of Title II and Section 504 covers exclusion, denial, and discrimination with respect to *existing* state services. The statutes say nothing about the *adequacy* of those services. Neither statute requires states to satisfy a certain "standard of care" or "provide a certain level of benefits to individuals with disabilities."[70] As the Second Circuit has explained, *Olmstead* does not "stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions."[71] The Ninth Circuit has likewise recognized that "[t]he ADA prohibits discrimination because of disability, not inadequate

---

[69]     *See e.g.*, Docket 30 at 87–88; Docket 136-70 at 33–34; Docket 203-22 at 144–46.

[70]     *See Olmstead*, 527 U.S. at 603 n.14.

[71]     *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999).

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                          Page 18 of 29

Case 3:22-cv-00129-SLG          Document 210          Filed 01/30/25          Page 18 of 29

treatment for disability."[72] The statutes therefore cannot logically be read to authorize a claim that an inadequate service array might mean a child's condition will deteriorate, making them more likely to need institutional care they might not otherwise have needed.[73] Title II and Section 504 authorize only claims about *discrimination*, not inadequate treatment—even if better treatment could keep a person from needing an institution.

IV.     **The plaintiffs cannot show any state action subjecting the ADA subclass to risk of unjustified institutionalization.**

The defendants are also entitled to summary judgment on the ADA claims for the simple reason that the plaintiffs cannot point to evidence under a viable theory that would support them. The gravamen of the plaintiffs' ADA claim seems to be that the defendants do not provide sufficient community-based services, which allegedly creates a serious

---

[72]     *Simmons v. Navajo County, Arizona*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc); *see also Alexander v. Choate*, 469 U.S. 287, 309 (1985) (holding that Section 504 did not prohibit Tennessee from decreasing covered annual inpatient hospital days, even though it may negatively impact care for individuals with disabilities, because Tennessee "does not deny the handicapped access to or exclude them from the particular package of Medicaid services Tennessee has chosen to provide" and "the State is not required to assure the handicapped 'adequate health care' by providing them with more coverage than the nonhandicapped"); *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) ("It is clear from the language of Title II and the integration regulation that public entities are not required to create new programs that provide heretofore unprovided services to assist disabled persons."); *cf. Buchanan v. Maine*, 469 F.3d 158, 174 (1st Cir. 2006) (recognizing a "distinction between ADA claims based on negligent medical care and those based on discriminatory medical care").

[73]     *See e.g.*, Docket 135 at 57 ("Defendants consistently fail to ensure that children with disabilities receive the necessary support to prevent unnecessary placement changes or institutionalization in psychiatric hospitals, residential care facilities, and other institutional settings.").

risk of unjustified institutionalization for members of the putative ADA subclass, either

because insufficient services can cause deterioration and ultimately institutionalization, or

because they result in longer-than-necessary stays in institutions.[74] That theory does not

fit even the now-invalidated "risk of institutionalization" theory. It also misapprehends

Alaska's foster care program and lacks evidentiary support.

### A. The plaintiffs have not identified a state action or policy that has caused or created a serious risk of unjustified institutionalization.

In *M.R.*, the Ninth Circuit held that to state a claim under the ADA "a plaintiff

need only show that the *challenged state action* creates a serious risk of

institutionalization."[75] Similarly, the DOJ statement of interest, upon which the Ninth

Circuit (erroneously) relied, explained that

> [t]he integration mandate prohibits public entities from *pursuing policies* that place individuals at risk of unnecessary institutionalization . . . . [T]he *elimination of services* that have enabled Plaintiffs to remain in the community violates the ADA, regardless of whether it causes them to enter an institution immediately, or whether it causes them to decline in health over time and eventually enter an institution in order to seek necessary care.[76]

Here, the plaintiffs identify no "state action," no change in policy, and no "elimination of

services" that has caused an increased risk of institutionalization. A "risk of

---

[74]    *See* Docket 135 at 57 (characterizing the "common question of fact and law raised by all members of the ADA Subclass" as "[w]hether Defendants have failed to timely deliver behavioral healthcare and other disability-related community-based services needed to avoid unnecessary placement changes, or placement at psychiatric hospitals, residential care facilities and other institutional settings").

[75]    *M.R.*, 663 F.3d at 1116 (emphasis added).

[76]    *Id*. at 1117 (first alteration in original) (emphases added).

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                    Page 20 of 29

institutionalization" claim cannot simply show that the plaintiffs are in some danger of needing institutionalization and the state has not acted to eliminate that risk. Every person faces *some risk* that they will need institutional care during their lives. For many people, this baseline risk is low, and contingent on a significant change in circumstances—for example, the onset of mental illness, dementia, or physical incapacity from some cause. For others, like some named plaintiffs and other members of the putative ADA class, the baseline risk is elevated by the very traumas that make them children in need of aid in the first place. But simply being a person with elevated risk of having serious mental and behavioral health needs cannot alone establish an ADA violation.[77] A rule requiring states to eliminate, or even to take all possible actions to minimize, such risk would mean no state child protection system could possibly comply with the ADA.

The plaintiffs may argue that the defendants' failure "to ensure . . . timely delivery of behavioral healthcare and other disability-related community-based services"[78] should be considered an "action" sufficient to constitute a violation of the ADA. But the defendants are not service *providers*. Their responsibility is to identify the needs of, and appropriate services for, foster children and their parents and to pay for those services when they are delivered. The defendants are not responsible for directly providing or

---

[77]     *See, e.g.*, *Olmstead*, 527 U.S. at 603 n.14 (holding that states are not required to "provide a certain level of benefits to individuals with disabilities").

[78]     Docket 16 ¶ 306(c); *see also* Docket 202 at 28–29 ("The repeated inability to track service providers, identify waitlists, or provide necessary services in a timely and adequate manner create a clear pattern of harm across all foster children.").

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                          Page 21 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 21 of 29

creating healthcare services.[79] Indeed, any claim that the defendants must *create* community-based services to care for foster children, rather than paying existing private providers for such services, must fail. Requiring OCS to recruit, train, and employ psychiatrists, therapists, counselors, and others to care for foster children would fundamentally alter the child welfare system in Alaska.[80]

**B.    The evidence does not support the plaintiffs' claim that the putative ADA subclass faces a "serious risk of institutionalization."**[81]

Even accepting the plaintiffs' novel version of a "risk of institutionalization" claim for the sake of argument, the plaintiffs cannot support even that version of their claim with evidence. Their version of the facts, quite simply, lacks any basis in reality.

To get a picture of the "risk of institutionalization" faced by the putative ADA subclass, the defendants compared the number of children in out of home placements at a

---

[79]    *See* AS 47.10.086(a) (defining the "duty to make" "reasonable efforts *to provide* family support services to the child and to the parents" as the duty to "identify" and "refer" for such services (emphasis added)).

[80]    28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that *making the modifications would fundamentally alter the nature of the service*, program, or activity." (emphasis added)); *see also Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 861 (9th Cir. 2022) ("Caltrans's programs are far more limited than Plaintiffs contend . . . Caltrans collaborates with local partners to help people at the encampments connect with critical services and housing solutions. But Caltrans itself does not provide those services; it 'is not the appropriate entity to provide social services or relocation assistance.'").

[81]    *M.R.*, 663 F.3d at 1116 ("[A] plaintiff need only show that the challenged state action creates a serious risk of institutionalization.").

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                    Page 22 of 29

Case 3:22-cv-00129-SLG      Document 210      Filed 01/30/25      Page 22 of 29

single point in time with the number of children likely covered by the ADA and the number of children in residential treatment facilities.

On January 27, 2025, there were 685 children in OCS custody with some kind of diagnosed condition.[82] But the ADA does not cover every person who has a diagnosed condition. Instead, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual."[83] To get a more accurate count of the number of foster children with a disability as defined by the ADA, defendants looked at data for January 23, 2025 and determined: (1) the number of foster children for whom OCS was paying an augmented foster care rate (261),[84] (2) the number of foster children placed in therapeutic treatment homes through Child Placement Agencies (132),[85] and (3) the number of foster children placed in residential treatment facilities of all kinds (48).[86] Adding these numbers together produces an estimate of foster children covered by the ADA on January 23, 2025 (441).

On January 23, 2025, there were 20 foster children in a psychiatric residential treatment facility (PRTF).[87] That is approximately 4.5 percent of the estimated number of

---

[82]     Declaration of Tandra Donahue ¶4.

[83]     42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).

[84]     Donahue Declaration ¶ 6.

[85]     *Id*.

[86]     *Id*. ¶ 10, and Exhibit H.

[87]     Donahue Declaration ¶11 and Exhibit I.

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                    Page 23 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 23 of 29

foster children with disabilities. A 4.5 percent rate of institutionalization does not represent a "serious risk of institutionalization." Moreover, even including the foster children placed in less restrictive residential treatment settings—48—does not add up to the "over-reliance on institutional placements" claimed by the plaintiffs.[88] In fact, the undisputed facts show that only approximately 4.7 percent of foster children are placed in residential facilities of any kind,[89] significantly less than national average (in 2021, 9 percent of foster children nationwide were placed in group homes or institutions).[90]

The plaintiffs also misunderstand or misrepresent the evidence in other critical ways. For example, they appear to rely primarily on the DOJ's "Investigation of the State of Alaska's Behavioral Health System for Children,"[91] presenting its findings as if they applied primarily, or even exclusively, to children in foster care.[92] But, as the report

---

[88]    *See* Docket 202 at 28.

[89]    *See* Donahue Declaration ¶ 8 and Exhibits E and F. 113 children in residential facilities compared to 2385 foster children: 113/2385=4.7%.

[90]    *See* Annie E. Casey Found., *Children in Foster Care by Placement Type (Group Home or Institution Only) in the United States*, https://datacenter.aecf.org/data/tables/11844-children-in-foster-care-by-placement-type-group-home-or-institution-only?loc=1&loct=2#detailed/1/any/false/2048/2623/23206 (last visited Jan. 26, 2025) (showing the national average of percent of foster children placed in "Group Home or Institution" was 9 percent in 2021).

[91]    Docket 136-78.

[92]    *See, e.g.*, Docket 135 at 57–58.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                              Page 24 of 29

makes clear, that investigation focused on Alaska's Medicaid program. Its conclusions are not solely—or even primarily—about the experience of children in OCS custody.[93]

Given the undisputed facts about the small percentage of ADA Subclass members placed in PRTFs, institutions, or other residential treatment, the plaintiffs cannot prove that ADA Subclass members are at "serious risk of institutionalization" on a *subclass-wide basis*.[94]

Finally, even if the evidence suggested that the putative ADA subclass faces a "serious risk of institutionalization"—and it does not—the plaintiffs have no evidence that any foster children face a risk of *unjustified* institutionalization as required by *Olmstead*.[95] A state does not violate the ADA by institutionalizing individuals who

---

[93]     Docket 136-78 *passim* (referring repeatedly to the State's Medicaid program). Notably, the DOJ recently decided *not* to sue the State over its alleged deficiencies after reviewing recent data regarding Alaska's service improvements. *See* Declaration of Chris Robison ¶ 2 and Exhibit A.

[94]     If the Court grants the plaintiffs' *Motion for Class Certification*, Docket 134, the plaintiffs must "be able to prove their case through common proof *at trial*." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024) (emphasis in original). At the summary judgment stage this requires, at a minimum, a showing that the plaintiffs possess evidence demonstrating class-wide harm (here, a class-wide serious risk of institutionalization), "so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole" Fed. R. Civ. P. 23(b)(2). *See also Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 61–62 (1st Cir. 2014) (holding that finding that between 15 percent and 35 percent of class members did not have a case plan, and many others had incomplete case plans that did not comply with the statute, was "not enough to prove that [defendant] is out of compliance with the statute vis-à-vis the class").

[95]     *Olmstead*, 527 U.S. at 599 ("Congress explicitly identified *unjustified* 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" (emphasis added). Indeed, the plaintiffs have declined to identify even a *single instance* of allegedly unjustified institutionalization among the named plaintiffs. *See* Robison Declaration ¶ 4 and Exhibit C.

*Jeremiah M., et al. v. Kim Kovol, et al.*                           Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                          Page 25 of 29

Case 3:22-cv-00129-SLG          Document 210          Filed 01/30/25          Page 25 of 29

urgently need the sort of intensive care and supervision that can best be provided in an institutional setting. The plaintiffs, therefore, cannot prevail on this claim—even if it were still colorable under controlling Supreme Court and Ninth Circuit precedent, which, as explained above, it is not.

### C. The plaintiffs have not met their burden of identifying a reasonable modification that would redress the alleged discrimination.

Even if the plaintiffs could prove a class-wide "serious risk of" "unjustified" institutionalization, they still cannot prevail on their Title II and Section 504 claims unless they meet their burden of proving that the relief they seek is a "reasonable modification" of defendants' programs.[96] "The distinction between a reasonable modification and fundamental alteration is 'fact-specific, requiring case-by-case inquiry.'"[97] "A modification's reasonableness depends on how it impacts the goals of an agency's program," taking into account "financial and other logistical limitations on the program."[98]

In this case, the only relief that the plaintiffs identify relating to their ADA claims is to "require" Defendants to "ensure" that all ADA Subclass members "receive foster care services in the most integrated setting appropriate to the child's needs" and have an

---

[96] *See, e.g.*, *Olmstead*, 527 U.S. at 603–04; *Where Do We Go Berkeley*, 32 F.4th at 862.

[97] *Where Do We Go Berkeley*, 32 F.4th at 862 (quoting *Crowder*, 81 F.3d 1480, 1486 (9th Cir. 1996)).

[98] *Id.*

*Jeremiah M., et al. v. Kim Kovol, et al.*                      Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                     Page 26 of 29

Case 3:22-cv-00129-SLG      Document 210      Filed 01/30/25      Page 26 of 29

"adequate array" of "community-based therapeutic services" and "community-based therapeutic foster homes and therapeutic placements."[99]

The plaintiffs' requested relief does not even "describe in reasonable detail . . . the acts or acts restrained or required,"[100] and plaintiffs certainly cannot point to evidence that "ensuring" the availability of community-based services and placements for all ADA Subclass members in all areas of Alaska is a "reasonable modification" of Alaska's child welfare and Medicaid programs, taking into account the "financial and other logistical limitations" on those programs.[101]

## V.    Conclusion

Because the plaintiffs' ADA and Rehabilitation Act claims rest on a legal theory that is not supported by the language of these statutes, and because the plaintiffs do not have evidence to support their claims, this Court should grant the defendants' motion for partial summary judgment and dismiss Counts 6 and 7 of the First Amended Complaint.

---

[99]    Docket 16 at 93, ¶¶ IV(o), (p), and (q).

[100]    Fed. R. Civ. P. 65(d)(1)(C).  The defendants served the plaintiffs with an interrogatory asking for plaintiffs to identify the relief they seek in this case, and thus far the plaintiffs have failed to provide a substantive response.  *See* Robison Declaration ¶ 3 and Exhibit B.

[101]    *See, e.g.*, *Where Do We Go Berkeley*, 32 F.4th at 862 (quoting *Townsend*, 328 F.3d at 519).

*Jeremiah M., et al. v. Kim Kovol, et al.*                                            Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                              Page 27 of 29

Case 3:22-cv-00129-SLG    Document 210    Filed 01/30/25    Page 27 of 29

DATED: January 30, 2025.

TREG TAYLOR
ATTORNEY GENERAL


By:  */s/Margaret Paton-Walsh*
     Margaret Paton-Walsh
     (Alaska Bar No. 0411074)
     Christopher R. Robison
     (Alaska Bar No. 2111126)
     Katherine Demarest
     (Alaska Bar No. 1011074)
     Jennifer Teitell
     (Alaska Bar No. 2405054)
     Maxwell Jenkins-Goetz
     (Alaska Bar No. 2408085)
     Department of Law
     1031 West Fourth Ave., Ste. 200
     Anchorage, AK 99501
     Telephone: (907) 269-5275
     Facsimile: (907) 276-3697
     Email: margaret.paton-
     walsh@alaska.gov
     Attorneys for State of Alaska

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Motion for Summary Judgment on Counts 6 & 7                   Page 28 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 28 of 29

Certificate of Service
I certify that on January 30, 2025, the foregoing **Motion for Summary Judgment on Counts 6 & 7** was served electronically on:

Marcia Robinson Lowry
Julia Tebor
David Baloche
Anastasia Benedetto
**A BETTER CHILDHOOD**
mlowry@abetterchildhood.org
jtebor@abetterchildhood.org
dbaloche@abetterchildhood.org
abenedetto@abetterchildhood.org

Elena M. Romerdahl
Hannah Paton
**PERKINS COIE LLP**
eromerdahl@perkinscoie.com
hpaton@perkinscoie.com

James J. Davis, Jr.
Nicholas Feronti
Savannah V. Fletcher
**NORTHERN JUSTICE PROJECT, LLC**
jdavis@njp-law.com
nferonti@njp-law.com
sfletcher@njp-law.com

Mark Regan
**DISABILITY LAW CENTER OF ALASKA**
mregan@dlcak.org

*/s/Margaret Paton-Walsh*
Margaret Paton-Walsh, Assistant Attorney General

*Jeremiah M., et al. v. Kim Kovol, et al.*
Motion for Summary Judgment on Counts 6 & 7
Case No. 3:22-cv-00129-SLG
Page 29 of 29

Case 3:22-cv-00129-SLG     Document 210     Filed 01/30/25     Page 29 of 29