Marcia Robinson Lowry (*pro hac vice*)
mlowry@abetterchildhood.org
Julia K. Tebor (*pro hac vice*)
jtebor@abetterchildhood.org
Anastasia Benedetto (*pro hac vice*)
abenedetto@abetterchildhood.org
David Baloche (*pro hac vice*)
dbaloche@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456

Elena M. Romerdahl, AK Bar No. 1509072
eromerdahl@perkinscoie.com
Hannah Paton, AK Bar No. 2309095
hpaton@perkinscoie.com
**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Telephone: (907) 279-8561

Mark Regan, AK Bar No. 8409081
mregan@dlcak.org
**DISABILITY LAW CENTER OF ALASKA**
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Telephone: (907) 565-1002

*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 1 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 1 of 41

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

Jeremiah M., Hannah M. and Hunter M. by
their next friend Lisa Nicolai; Mary B. and
Connor B. by their next friend Charles
Ketcham; David V., George V., Lawrence
V., Karen V., and Damien V. by their next
friend Merle A. Maxson; Rachel T.,
Eleanor T. and Gayle T. by their next friend
Rebecca Fahnestock, and Lana H. by her
next friend Melissa Skarbek, individually
and on behalf of all other similarly situated,

Plaintiffs,

v.

KIM KOVOL, Director, Alaska
Department of Family and Community
Services, in her official capacity; KIM
GUAY, Director, Office of Children's
Services, in her official capacity;
ALASKA DEPARTMENT OF FAMILY
AND COMMUNITY SERVICES; and
ALASKA OFFICE OF CHILDREN'S
SERVICES,

Defendants.

Case No. 3:22-cv-00129-SLG

---

## PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 CLAIMS

### INTRODUCTION

The question reprised by Defendants' motion for summary judgment (ECF No. 210)

is whether the Americans with Disabilities Act ("ADA") and Section 504 of the

Rehabilitation Act ("Section 504") protect individuals with disabilities who are at serious

risk of unnecessary institutionalization. The Ninth Circuit has repeatedly held that they do.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 2 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 2 of 41

*See, e.g., M.R. v. Dreyfus*, 663 F.3d 1100, 1116 (9th Cir. 2011); *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003). And Judge Kindred agreed. *See* ECF No. 55 at 67-68.

When Judge Kindred held that Plaintiffs' stated a claim under the ADA and Section 504, he relied on the facts of Lana H.'s situation, noting that "OCS has placed Lana H. at North Star Behavioral Health System five separate times due to a lack of available therapeutic foster homes," "sent Lana H. to a treatment center in Texas," and "placed [her] in a homeless shelter." ECF No. 55 at 68. Since then, Lana's situation has only grown worse. *See infra* III.D.

And yet, conspicuously absent from Defendants' motion for summary judgment is any mention of Lana or her worsening situation. Indeed, the State does not raise any specific factual arguments about anyone's case, choosing instead to assert the same rejected legal argument and one general factual argument that there are a lot more Alaskan children in foster care than there are Alaskan foster children in institutions.

This court should follow binding Ninth Circuit precedent and hold that the ADA and Section 504 require foster children's receipt of services in integrated settings and protect foster children at serious risk of institutionalization.

## PROCEDURAL HISTORY

In its motion to dismiss Plaintiffs' ADA and Section 504 claims, the State argued, without citing any authority, that "only 'unjustified' isolation in institutions constitutes discrimination under the ADA." ECF No. 23 at 74. While the State's motion to dismiss was pending, the Fifth Circuit rejected the longstanding "serious risk of

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 3 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 3 of 41

institutionalization" standard, splitting from the Second, Fourth, Sixth, Seventh, Ninth, and Tenth circuits. *See United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023). Defendants filed a notice of supplemental authority in support of its motion to dismiss, urging the district court to adopt the Fifth Circuit's reasoning. *See* ECF No. 53; ECF No. 53-1 at 8-9, 16-17. The district court considered this supplemental authority and found "no reason to deviate from Ninth Circuit precedent." ECF No. 55 at 67-68 n.318. Specifically, the Ninth Circuit's on-point holding in *M.R.*, 663 F.3d at 1116, that a plaintiff asserting a violation of the integration mandate need only show that the state action at issue "creates a serious risk of institutionalization." The district court held that Plaintiffs stated a claim for a violation of the integration mandate and denied Defendants' motion to dismiss those claims. *See* ECF No. 55, at 69-70. It specifically rejected Defendants' theory that *Kisor v. Wilkie*, 588 U.S. 558 (2019), invalidated Ninth Circuit precedent based on an at-risk standard.[1]

Nevertheless, Defendants have continued to relitigate the at-risk standard, again in its response to Plaintiffs' motion for class certification,[2] and now in its motion for summary judgment. Alaska also continues to challenge the at-risk standard in other jurisdictions.[3]

---

[1] As shown below, that explicit ruling on that issue is therefore law of the case. *United States v. Jingles*, 702 F.3 494, 499 (9th Cir. 2012).

[2] *See* ECF No. 157 at 5 (acknowledging that *M.R.* upheld the at-risk standard but disputing that the text of the ADA and Section 504 support the at-risk standard).

[3] *See Texas et al., v. Robert F. Kennedy et al.*, 5:24-cv-00225 (N.D. Tex. Feb. 19, 2025), ECF No. 50 (Joint Status Report) 2 (clarifying that the complaint is an as-applied challenge to "unconstitutional applications [of the Rehabilitation Act] includ[ing] the requirements the Final Rule imposes on recipients to adopt the "most integrated setting" and the "at serious risk of institutionalization" standards of care.").

## LEGAL STANDARD

The court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. As the moving party, Defendants have the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).

Facts are "material" when they "might affect the outcome of the suit under the governing law." *Id.* at 248. The materiality inquiry is not whether the disputed facts are supported by sufficient evidence but rather whether the disputed facts relate to the legal elements of the claim. *Id*. Its relation to the legal elements makes a fact material.

Disputes are "genuine" when there is enough "evidence supporting the claimed factual dispute" that "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248-49. At the summary judgment stage, the court is merely determining whether there are factual disputes that can be resolved by a jury at trial. The court's function is not to "weigh the evidence and determine the truth of the matter." *Id.* at 249.

## ARGUMENT

First, it would be procedurally improper for this court to try to overrule or question the Ninth Circuit's interpretation of the ADA and Section 504. Second, the Ninth Circuit's interpretation is fully consistent with the statutes and with *Olmstead*. Third, because there are factual disputes that relate to the elements of the ADA claim, and a reasonable jury could return a verdict for Plaintiffs on this record, there remain genuine disputes of material

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 5 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 5 of 41

fact that preclude the entry of summary judgment. Thus, the court should deny Defendants'
motion.

## I. THIS COURT LACKS AUTHORITY TO OVERTURN NINTH CIRCUIT PRECEDENT, AND THERE ARE OTHER PROCEDURAL REASONS WHY THE CURRENT MOTION MUST BE DENIED.

### A. *M.R.* remains binding authority.

Ninth Circuit caselaw remains binding on all courts in the circuit unless and until it
is overruled by the Supreme Court, the en banc Ninth Circuit, or a three-judge panel under
certain conditions. *M.R.* and other Ninth Circuit precedent upholding the at-risk standard
have not been overruled by any of these bodies, and so it remains binding on this court.

"Circuit law . . . binds all courts within a particular circuit, including the court of
appeals itself. Thus, the first panel to consider an issue sets the law not only for all the
inferior courts in the circuit, but also future panels of the court of appeals." *Hart v.
Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). If "a controlling precedent is determined
to be on point, it must be followed," "unless and until overruled by a body competent to do
so." *Hart*, 266 F.3d at 1170, 1172. Only three bodies are competent to overrule binding
prior panel decisions: (1) "the [Ninth Circuit] itself sitting en banc," (2) "the Supreme
Court," or (3) a three-judge panel *if*, and only if, intervening Supreme Court decisions are
"clearly irreconcilable" with prior panel decisions. *Id*. at 1171; *United States v. Castillo*,
69 F.4th 648, 657 (9th Cir. 2023).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 6 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 6 of 41

"A district judge," however, "may not respectfully (or disrespectfully) disagree with his learned colleagues on his own court of appeals who have ruled on a controlling legal issue…" *Hart*, 266 F.3d at 1170. As the Ninth Circuit explained:

> Binding authority within this regime cannot be considered and cast aside; it is not merely evidence of what the law is. Rather, caselaw on point is the law. If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect.

*Id*. *M.R.* is on point and is the law. This court is bound to reach the same result, even if it considers the at-risk standard unwise or incorrect.

## B. Neither *Kisor* nor *Loper Bright* warrant reexamination of basic ADA principles.

The district court considered *Kisor* and decided explicitly that there was "no reason to deviate from" the Ninth Circuit's on-point holding in *M.R.* that a plaintiff asserting a violation of the integration mandate need only show that the state action at issue "creates a serious risk of institutionalization." ECF No. 55 at 67-68 n.318 (quoting *M.R.*, 663 F.3d at 1116). Because that issue was "decided explicitly," the law of the case doctrine applies, and this court is "precluded from reexamining [the] issue." *United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) (internal quotations and citations omitted).

The only decision handed down after the district court's ruling in *Loper Bright Enterprises. v. Raimondo*, 603 U.S. 369 (2024). But *Loper Bright*, which invalidated the interpretive method established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), does not undermine *M.R.*'s holding. As Justice Gorsuch explained in *Kisor*, "decisions construing particular statutes continue to command respect

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 7 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 7 of 41

even when the interpretive methods that led to those constructions fall out of favor." *Kisor*, 588 U.S. at 630 (Gorsuch, J., concurring in the judgment). Moreover, the Supreme Court in both *Kisor* and *Loper Bright* remanded to the lower courts for reconsideration of the statutory interpretation questions. *See Loper Bright*, 603 U.S. at 413, *remanded to Relentless Inc. v. United States DOC*, No. 21-1886, 2024 U.S. App. LEXIS 19654 (1st Cir. July 31, 2024); *Kisor*, 588 U.S. at 546, 590, *remanded to* 969 F.3d 1333 (Fed. Cir. 2020). The lesson from *Loper Bright* and *Kisor* is that Courts of Appeals must now reevaluate their precedent consistent with those opinions. But until an appellate court overrules its own precedent, it remains binding on all courts in the circuit.

Defendants also contend that the Ninth Circuit in *Castillo*, 69 F.4th 648 "recognized that [*Kisor* and *Loper Bright*] supersedes the precedential value of decisions that deferred to agency interpretations in ways inconsistent with current Supreme Court cases." ECF No. 210 at 5, 10. And based on this sweeping interpretation of *Castillo*, Defendants reason that all "Ninth Circuit precedent that has been superseded in this way, including *M.R.*" are no longer binding precedent. ECF No. 210 at 11.

Defendants' interpretation is wrong, and *Castillo* proves it. *Castillo* represents the proper method by which a three-judge panel may overrule a prior panel decision. The question before the three-judge panel was whether *Kisor* was an "intervening decision" "clearly irreconcilable" with prior panel decisions applying deference to commentaries to the sentencing guidelines (i.e. interpretations of the regulations). *Castillo*, 69 F.4th at 657. If so, the panel would be permitted to depart from the general rule that prior panel decisions

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 8 of 41

Case 3:22-cv-00129-SLG     Document 222     Filed 02/27/25     Page 8 of 41

can only be reexamined and "overruled by the court itself sitting en banc, or by the Supreme Court." *Hart*, 266 F.3d at 1171. Finding that *Kisor* was an intervening decision clearly irreconcilable with the two prior panel decisions, the *Castillo* panel reexamined those decisions and, after exercising its independent judgment, held that the commentary was inconsistent with the statute and remanded to the district court for resentencing. *See Castillo*, 69 F.4th at 664. *Kisor* did not oveerrule the prior panel decisions; a competent body (here, a three-judge panel) overruled the prior panel decisions after exercising independent judgment, as *Kisor* instructed.

Defendants' passing citation to *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) is also unavailing. *See* ECF No. 210 at 11 n.46. In *Miller*, a three-judge panel held that a social worker and therapist were entitled to absolute immunity based on a prior panel decision, *Babcock v. Tyler*, 884 F.2d 497 (9th Cir. 1989), which extended absolute immunity to "all actions taken [by a social worker] in 'connection with' and 'incident to' ongoing child dependency proceedings." *Miller*, 335 F.3d at 896 (quoting *Babcock*, 884 F.2d at 503). The en banc Ninth Circuit held that *Babcock* was clearly irreconcilable with two intervening Supreme Court decisions: one held "that absolute immunity shields only those who perform a function that enjoyed absolute immunity at common law"; the other "further emphasized that it is only the specific function performed, and not the role or title of the official, that is the touchstone of absolute immunity." *Miller*, 335 F.3d at 897 (citations omitted). The en banc court concluded that "the blanket absolute immunity for social workers recognized in *Babcock* is directly at odds with the functional approach taken

by the Supreme Court…" *Miller*, 335 F.3d at 900. Once again, the Supreme Court did not overturn prior panel decisions; a competent body (here, the en banc court) overturned prior panel decisions.

Even if this court had authority to overturn prior panel precedent, *Miller* emphasizes that the intervening authority must be "closely on point" and "directly at odds" with the prior panel decision to undermine its precedential value. *Babcock* was an easy case[4]: the panel held that absolute immunity extended to all functions, the Supreme Court held that absolute immunity extends only to those functions protected under common law. The entire foundation upon which *Babcock* rested was undermined by the Supreme Court.

Unlike *Babcock*, *M.R.* is based on more than the Department of Justice's interpretation (see below), and so *Kisor* and *Loper Bright* are not "directly at odds" with *M.R.* and do not undermine its reasoning. Moreover, Defendants interpret *Kisor* and *Loper Bright* at such a high level of abstraction—i.e. all agency interpretations are invalid, therefore all decisions involving agency interpretations are overruled—that they cannot reasonably be considered "closely on point." Accordingly, this court must deny Defendants' motion.

## II.    THE NINTH CIRCUIT'S INTERPRETATION IS CORRECT: THE ADA AND THE INTEGRATION REGULATION PROHIBIT

---

[4] *But see Miller*, 335 F.3d at 902 (O'Scannlain, J., concurring in the judgment) (noting that the three-judge panel that initially considered the question "did not believe that the Supreme Court's intervening precedent . . . had so clearly undermined *Babcock* as to allow a three-judge panel to overrule it."). If a competent body was so "uncomfortable" overturning prior precedent that was so clearly irreconcilable with intervening Supreme Court precedent, a noncompetent body should be especially wary of overturning prior precedents.

**DISCRIMINATION AGAINST ALL DISABLED PERSONS, NOT JUST THOSE IN INSTITUTIONS.**

The ADA, like all statutes, has "a single, best meaning. That is the whole point of having written statutes; 'every statute's meaning is fixed at the time of enactment.'" *Loper Bright*, 603 U.S. at 400 (quoting *Wisconsin Central Ltd. v. United States*, 585 U. S. 274, 284 (2018)). In cases involving agency interpretations of statutes and regulations, the "best reading" is "'the reading the court would have reached' if no agency were involved." *Id.* (quoting *Chevron*, 467 U.S. at 843 n.11). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). If the statute is genuinely ambiguous, courts must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Loper Bright*, 603 U.S. at 400. That means courts "must 'carefully consider[ ]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on. Doing so will resolve many seeming ambiguities out of the box," without deference to an agency's interpretations. *Kisor*, 588 U.S. at 575.

Defendants' interpretation—that the ADA and the integration regulation protect only those disabled persons currently institutionalized—is not the best reading of the statutory scheme. Indeed, considering the text, structure, history, and purpose of the ADA and the regulation mandate, Defendants' interpretation is not even a plausible reading. Accordingly, if the court concludes that it has the power to overrule *M.R.*, it should side with the six circuits that held, based on the purpose and text of the ADA, the text of the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 11 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 11 of 41

integration mandate, the rationale in *Olmstead*, and the Department of Justice's interpretive guidance, that Title II and the integration regulation protects individuals with disabilities at serious risk of institutionalization. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460-61 (6th Cir. 2020); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016); *Steimel v. Werner*, 823 F.3d 902, 914 (7th Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *M.R.*, 697 F.3d at 734-35 (9th Cir. 2012); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003).

To redress past and persistent discrimination against the disabled, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[5] The "integration regulation" requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). If "reasonable modifications in policies, practices, or procedures" would "avoid discrimination," then the state's failure to make those modifications violates the "reasonable-modification" regulation. 28 CFR § 35.130(b)(7).

---

[5] *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021) ("Section 504 similarly prohibits disability discrimination by recipients of federal funds. 29 U.S.C. § 794. The two laws are interpreted coextensively because 'there is no significant difference in the analysis of rights and obligations created by the two Acts.'") (citation omitted).

Start with the statute. "In enacting the ADA, Congress found that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.'" *M.R.*, 697 F.3d at 733 (quoting 42 U.S.C. § 12101(a)(2)). Congress also found that such discrimination persists in various forms, "including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, . . . [and] . . . segregation." *Id*. (quoting 42 U.S.C. § 12101(a)(5)). Motivated by these historical and present concerns, Congress by enacting the "ADA stepped up earlier measures to secure opportunities for people with developmental disabilities to enjoy the benefits of community living." *Olmstead v. L.C.*, 527 U.S. 581, 599 (1999). Unlike its predecessors, which stated protections in "aspirational terms" or applied only to entities receiving federal assistance, the ADA "required all public entities to refrain from discrimination." *Id*. at 599-600. By "explicitly identif[ying] unjustified 'segregation' of persons with disabilities as a 'form of discrimination,'" the ADA implicitly recognizes that discrimination takes many forms. *Id*. at 600. The ADA reflects Congress' "comprehensive view of the concept of discrimination." *Id*. at 598. Consistent with that recognition, Congress delegated to the Attorney General the power and responsibility to protect against all forms of discrimination against persons with disabilities.

The integration regulation was promulgated against this expansive backdrop. In line with Congress' comprehensive view of discrimination, the text of the integration regulation is "maximalist"—"it demands 'the *most* integrated setting appropriate,'" which is defined

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 13 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 13 of 41

as "'a setting that enables individuals with disabilities to interact with non-disabled persons *to the fullest extent possible*.' 28 C.F.R. pt. 35, App. B." *Steimel*, 823 F.3d at 911-12 (emphasis added). The word "setting" means much more that the institutionalized/non-institutionalized binary that Defendants' interpretation implies. Looking to the ordinary meaning of the text, *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014), the word "setting" "denotes an environment or situation rather than any particular physical structure." *Steimel*, 823 F.3d at 912.[6] "The regulation's use of the word 'most' (integrated) and its reference to 'a' setting also imply more than two possibilities." *Id*.

Critically, "there is nothing in the plain language of the regulations that limits protection to persons who are currently institutionalized." *Fisher*, 335 F.3d at 1181. This is because "the ADA's protections 'would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy,' — not least, since '[i]nstitutionalization sometimes proves irreversible.'" *Davis*, 821 F.3d at 263 (quoting *Fisher*, 335 F.3d at 1181 and *M.R.*, 697 F.3d at 735). Interpreting the integration mandate to limit its protection to those currently institutionalized, as Defendants urge, would be inconsistent with Congress' comprehensive understanding that discrimination takes many forms and occurs in a variety of settings, and

---

[6] *Steimel*, 823 F.3d at 912 ("THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1593 (4th ed. 2000) ("The context and environment in which a situation is set; the background."); RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1200 (2d ed. 1999) ("[T]he surroundings or environment of anything."); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1072 (10th ed. 1994) ("[T]he time, place, and circumstances in which something occurs or develops[.]").).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 14 of 41

Case 3:22-cv-00129-SLG     Document 222     Filed 02/27/25     Page 14 of 41

it would undermine the design of the ADA and the integration regulation to prevent discrimination on the basis of disability in *all* settings, not just in an institutional setting. *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS loc. 1138 (2012) (ebook) (explaining that the "presumption against ineffectiveness ensures that a text's manifest purpose is furthered, not hindered.").

The centerpiece of the ADA and the integration mandate is *discrimination*. The statute and regulations prohibit discrimination against disabled persons, and such discrimination may occur in community settings or institutional settings. Discrimination is not confined to institutions, and discrimination need not result in institutionalization to be actionable under the ADA. This is not merely a reasonable interpretation. It is the best interpretation because it "effectuates the purpose of the ADA 'to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.'" *M.R.*, 697 F.3d at 735 (quoting 42 U.S.C. § 12101(b)(2)).

This interpretation is further supported by the reasoning in *Olmstead*, where the Supreme Court "interpret[ed] discrimination forbidden under Title II of the ADA to include 'unjustified isolation of the disabled.' *Olmstead* held that Georgia's practice of institutionalizing mentally disabled persons rather than providing them with community-based treatment would violate the ADA unless Georgia could demonstrate that modifying state programs to provide community-based care would fundamentally alter the nature of the services it offered the mentally disabled." *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003) (reversing summary judgment on a claim for violation of the integration

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 15 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 15 of 41

mandate brought by a plaintiff currently living at home who had been informed that he would lose his benefits if he did not submit to institutionalization).

Although "the plaintiffs in *Olmstead* were institutionalized at the time they brought their claim, nothing in the *Olmstead* decision supports a conclusion that institutionalization is a prerequisite to enforcement of the ADA's integration requirements." *Fisher*, 335 F.3d at 1181. To the contrary, *Olmstead*'s "rationale . . . reaches more broadly." *Steimel*, 823 F.3d at 910. The Court recognized "two evident judgments" in the integration mandate: one stigmatic, the other pragmatic. *Olmstead*, 527 U.S. at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id*. "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id*. at 601.

Based on this understanding, the Court explained that unjustified institutionalization is discrimination because "In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." *Id*. "Under this reasoning, individuals with disabilities are subjected to discrimination when they are forced to choose between forgoing necessary medical services while remaining in

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 16 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 16 of 41

the community or receiving necessary medical services while institutionalized—not just when they are actually institutionalized." *Waskul*, 979 F.3d at 460.

"In accordance with *Olmstead*," *Steimel*, 823 F.3d at 911, the Department of Justice issued interpretive guidance that "serious risk of institutionalization" is sufficient to establish an ADA claim. *See* U.S. Dep't of Justice, Statement of the Department of Justice on the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead* v. L.C.[7] To be sure, six circuit courts found the Department's interpretation reasonable. But, as evidenced in the analysis above, they did not simply "fall back on" the Department's interpretation. *Kisor*, 588 U.S. at 575. Rather, they found that the Department's interpretation was consistent with the court's independent judgment about "the text, structure, history, and purpose" of the ADA and the integration mandate. *Id. See, e.g.*, *M.R.*, 697 F.3d at 735-36 (finding that the at-risk interpretation was "not only reasonable" for purposes of *Auer* deference, but "also better effectuates the purpose of the ADA" and "accord[s]" with the rationale of its sister circuits). Having employed "every tool at their disposal to determine the best reading of the statute," these courts would have reached the same holding even "if no agency were involved." *Loper Bright*, 603 U.S. at 400. Defendants' motion does not contend with any of these alternative rationales.

Moreover, Defendants' contrary interpretation conflates discrimination and institutionalization. They presume that discrimination occurs only at the point of

---

[7]  https://www.ada.gov/resources/olmstead-mandate-statement/ (last updated Feb. 28, 2020).

institutionalization. But, as the text, structure, history, and purpose of the statute and regulations make clear, the risk of institutionalization is not itself the discrimination that the ADA and integration regulation proscribe. Rather, it is the *discrimination* that creates a risk of institutionalization. The serious risk of future institutionalization is created by *actual* present discrimination.

Defendants' invocation of Justice Kennedy's cautionary concurrence in *Olmstead* (at 7-8) is also misplaced. His concern was that an aggressive interpretation of the reasonable-modifications provision would "drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision"; it was not, as Defendants mischaracterize it, a concern about an expansive reading of the integration mandate. *Olmstead*, 527 U.S. at 610; *Steimel*, 823 F.3d at 914-15.

Defendants rest much of their case on the Fifth Circuit's contrary holding in *United States v. Mississippi*, but *Mississippi* provides little support for Defendants' interpretation. Like Defendants, the Fifth Circuit did not grapple with the statutory analysis conducted by its sister circuits[8] and mischaracterized their decisions as "largely based upon" the

---

[8] For example, the Fifth Circuit ignored entirely its sister circuits' analyses of the "structure, history, and purpose" of the ADA and the integration mandate. Excluding this backdrop makes space for its textual attack, which is based primarily on one cherry-picked cannon on construction. *See Mississippi*, 82 F.4th at 392-93 (applying the omitted-case canon). If, however, the Fifth Circuit had, as *Loper Bright* instructs, "use[d] every tool at their disposal to determine the best reading of the statute," *Loper Bright*, 603 U.S. at 400, it would have considered the principle of interrelating canons and the presumption against ineffectiveness. *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 18 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 18 of 41

Department of Justice's interpretive guidance when, in fact, they survive even without deference to the agency's interpretation. *See Mississippi*, 82 F.4th at 394. And even after all its flawed analysis, the Fifth Circuit concluded that because the facts were distinct from those in other circuits, it "need not say," and therefore did not say, that the other circuits were "wrong" to uphold the at-risk standard. *Id*. at 396.

## III. THERE ARE NUMEROUS DISPUTES OF MATERIAL FACT THAT PRECLUDE JUDGMENT AS A MATTER OF LAW

Plaintiffs' Amended Complaint (ECF No. 16) put Defendants on notice of the ADA claim, and Plaintiffs continue to pursue that claim.[9] We summarize the factual background established through discovery so far and then turn to the specific facts of Lana H.'s case.

### A. Services and placements are lacking across the state.

There can be no genuine dispute that there are not enough services or placements to ensure that Alaska's foster children receive timely and appropriate treatment in community settings.[10] As the former head of the MMHU put it: either "There's not enough providers . . . or there's wait lists."[11] State leadership readily admit to a lack of community-based

---

INTERPRETATION OF LEGAL TEXTS loc. 1102, 1138 (2012) (ebook). And in interpreting the text, it would have, considered "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341.

[9] There are multiple ways in which a state may violate the ADA, and Plaintiffs are not required to plead every theory of liability in the complaint. *See Fontana v. Haskin*, 262 F.3d 871, 877 (9th Cir. 2001) ("Pleadings need suffice only to put the opposing party on notice of the claim. . . . Specific legal theories need not be pleaded so long as sufficient factual averments show that the claimant may be entitled to some relief.") (internal citations omitted). Indeed, discovery may, as it has, reveal additional ways in which Defendants have violated the ADA.

[10] And to the extent Defendants dispute this, there is a genuine dispute of material fact.

[11] ECF No. 203-9 (Moore Dep.) 86:21-87:1.

services and placements statewide, and to the months-long waitlists for those services and

placements.[12]

The DOJ confirmed this in its December 2022 report detailing the findings of its

extensive investigation into Alaska's behavioral health system for children. ECF No. 136-

78.[13] The DOJ report stated:

> Community-based services that would enable children with behavioral health
> disabilities to live in their homes and communities are largely unavailable in
> Alaska. Shortages in community-based services are particularly acute in rural
> areas and for critical services like Home-Based Family Treatment, Crisis
> Services, and Therapeutic Treatment Home Services. The State's recent steps
> to reform its behavioral health service system have fallen short of addressing
> these deficiencies, which are widespread and ongoing.

---

[12] Exhibits referenced in this opposition are attached to the Declaration of Marcia Lowry
dated February 27, 2025 ("Lowry Decl.") submitted herewith. *See, e.g.*, Ex. 1 (Deposition
Testimony of Kim Kovol ("Kovol Dep.")) 69:22-70:3; ECF No. 203-10 (Deposition
Testimony of Lacey Centeno ("Centeno Dep.")) 154:1-155:8, 77:13-20, 82:11-83:8, 98:1-
99:7; Ex. 4 (Deposition of Travis Erickson ("Erickson Dep.")) 147:23-148:6; ECF No.
203-9 (Deposition Testimony of Kristen Moore ("Moore Dep.")) 79-81.

[13] The DOJ investigation involved extensive outreach to facility-based and community-
based service providers, tribal organizations, and state officials, as well as direct interviews
with affected children and their families. *Id.* The DOJ published its findings from the
investigation in December of 2022, finding that there was reasonable cause to believe that
Alaska's failure to provide sufficient community-based alternatives placed children at risk
of unnecessary institutionalization. *Id.* The State entered into an agreement with DOJ,
signed in January 2025, under which federal monitoring of Alaska's behavioral health
system will continue for an additional three years to ensure compliance with federal
disability rights laws. Ex. 8. However, it is unclear the exact steps OCS has taken and the
impact of those steps, if any, following the release of the DOJ findings. *See, e.g.,* Ex. 3 (
Deposition Testimony of Kim Swisher ("Swisher Dep.") 49:6-20 (stating that she did not
have knowledge of any actions taken following the DOJ findings); ECF No. 203-9 (Moore
Dep.) 146:22-147:10 (same); Ex. 4 (Erickson Dep.) 159:12-160:17 (same); Ex. 5
(Deposition Testimony of Sarah Abramczyk ("Abramczyk Dep.)) 85:24-88:6 (same); ECF
No. 203-5 (Deposition Testimony of Nicole Adair) 46:5-14 (same); ECF No. 203-10
(Centeno Dep.) 149:18-150:22.

*Id.* at 18. In response to the DOJ report, Ashley Christopherson, the Designated Evaluation and Stabilization (DES)/Designated Evaluation and Treatment (DET) Coordinator for DFCS, wrote to senior executive leadership: "there really just aren't the needed services available outside of [Alaska Psychiatric Institute] and North Star so although we can talk about efforts with complex case meetings, resource support etc. I don't think it gets at what DOJ wants: less restrictive placements statewide." The Alaska Hospital and Healthcare Association reported in 2022 that, "Alaska currently has minimal infrastructure for youth with complex needs or co-occurring conditions. Despite the increased need for higher level out-of-home care, overall capacity remains stagnant or has decreased, and many youth with complex needs end up in out-of-state programs or even in correctional facilities."[14] And the Alaska Department of Law recently admitted that its campaign against the at-risk standard of liability is motivated by its belief that the standard "is infeasible, especially for a state as vast as Alaska, with a lack of certain mental health community services at the community level."[15]

The record shows that the lack of services and placements persists.[16]

### B. Defendants' conduct exacerbates the statewide services and placements deficit.

Although there is no reasonable dispute that placements and services are lacking

---

[14] ECF No. 136-12.

[15] Hearing Before the S. Comm. on State Affs., 34th Legislature, at 1:00:24 (Feb. 20, 2025), https://www.akleg.gov/basis/Meeting/Detail?Meeting=SSTA%202025-02-20%2015:30:00#tab4_4.

[16] *See* Ex. 9 (Expert Report of Anne Farina ("Farina Report")).

statewide, there are genuine disputes of material fact over who and what is responsible for the problem. Plaintiffs contend that Defendants exacerbate the placements and services crisis is several ways.

First, Defendants understand that accurate data is "really critical" to "improvement strategies, implementation, identification of root cause[s]."[17] And yet, OCS does not track the number of disabled foster children waitlisted for services or the length of time they must wait to receive those services.[18] As OCS noted in its 2020-2024 CFSP, "Alaska does not have an established routine system for collecting needs assessment data from communities regarding service array, resource development and service gaps."[19] If Defendants do not measure the problem, they cannot solve the problem. Making matters worse, because OCS does not maintain a complete list of Medicaid providers, caseworkers continue to send children to the same providers, making waitlists longer.[20] This lack of tracking forces caseworkers to rely on informal solutions, such as Googling providers or asking foster parents if they are familiar with providers in the area.[21]

Because OCS fails to track these services and placements, it is impossible for Defendants to argue that there is no genuine dispute about Defendants' provision of services and placements, especially in light of overwhelming evidence to the contrary.

---

[17] Ex. 6 (Deposition Testimony of Tandra Donahue ("Donahue Dep.")) 16:14-17:19.
[18] ECF No. 203-9 (Moore Dep.) 81:6-20; ECF No. 203-10 (Centeno Dep.) 83:14-16.
[19] ECF No. 136-19 at M060098-99.
[20] ECF No. 136-53 at M647527.
[21] ECF No. 203-17; ECF No. 203-18 (Deposition Testimony of Jessie Mayes ("Mayes Dep.") 159:2-160:2.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 22 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 22 of 41

Regulatory uncertainty also contributes to the problem. Commissioner Kovol confirmed that OCS can, in fact, issue requests for information or proposals "for the kinds of programs that [OCS] needs."[22] But the Commissioner has not issued any such requests because she believes that she is not responsible "for the operational piece."[23] And the Commissioner has not directed any operational staff in her agency to issue such requests.[24]

OCS is responsible for licensing, contracting, and partnering with child placement agencies to license therapeutic treatment homes.[25] But despite state laws and regulations authorizing OCS to set the terms of licensing agreements, including rates to incentivize the procurement of services and placements in regions where they are lacking,[26] Director Guay has not done so based on her mistaken belief that OCS has no control over the homes that the agency brings in.[27] The regulatory uncertainty among senior executive leadership paralyzes the agencies and prolongs the systemic problems plaguing Alaska.

Defendants argue that the ADA and the integration mandate make actionable "exclusion, denial, and discrimination with respect to *existing* state services," not "the *adequacy* of those services." ECF No. 210 at 18 (emphasis in original). This

---

[22] Ex. 1 (Kovol Dep.) 100:25-101:4.

[23] *Id*. at 101:23-25.

[24] *Id*. at 103:22-25. According to Kim Guay, it "might have been [2022]" when some agency (maybe DCFS or DHSS) issued a request for information, and neither OCS nor DCFS have done so since. *See* Ex. 2 (Deposition Testimony of Kim Guay ("Guay Dep.")) 93:7-94:6.

[25] Ex. 2 (Guay Dep.) 97:1-6; 99:2-9; Ex. 5 (Abramczyk Dep.) 89:21-23; Ex. 3 (Swisher Dep.) 23:18-21.

[26] *See* AS 47.32.010(a), (c); 7 AAC 53.365(a)-(b), (c).

[27] Ex. 2 (Guay Dep.) 99:10-16.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 23 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 23 of 41

misunderstands Plaintiffs' argument. Plaintiffs do not dispute the *adequacy* of those services; they dispute the *existence* and *provision* of those services.[28]

Next, Defendants argue that Plaintiffs cannot win under an at-risk theory because "plaintiffs identify no 'state action,' no change in policy, and no 'elimination of services' that has caused an increased risk of institutionalization." ECF No. 210 at 20. Defendants further contend that they should not be held liable for failing to minimize the risk of institutionalization because members of the putative ADA class are already at heightened risk of institutionalization due to their disabilities and traumas.

These contentions are wrong. First, when federal law imposes an affirmative obligation on a state, the state's failure to fulfill its affirmative obligation is treated as state action. *See, e.g., Castro v. Cnty. of L.A.,* 833 F.3d 1060 (9th Cir. 2016) (failure to protect); *Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018) (failure to provide medical care). Second, as discussed above, the record contains numerous examples of state actions that exacerbate the systemic crisis and increase the risk of institutionalization.

For example, OCS's official placement policy instructs caseworkers to bring foster children to the emergency room whenever their "behavior or mental health is effecting placement options."[29] In other words, OCS has lowered the bar for institutional placement

---

[28] Defendants cite to *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999) and argue that *Olmstead* does not "stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions." But, in that case, which is both 26 years old and from outside of this Circuit, plaintiffs were asking that New York provide a *new* Medicaid benefit altogether, instead of suing for the state to adequately provide existing services.

[29] Ex. 7.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 24 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 24 of 41

below medical necessity simply because they are unable to provide community-based placements or services. And in a particularly egregious instance, a Regional Manager explained how OCS had "trigger[ed] a youth to escalate to get any of the providers in town to act," an intentional act that she described as "very gross."[30] "The issue," she explained, is that OCS "need[s] a middle ground for kids like this who don't meet acute criteria but aren't appropriate for standard foster care."[31]

Moreover, "[i]t is illogical to argue that because a child comes in already 'damaged' the State cannot be held liable for inflicting further harm that compounds that damage— even if it cannot be measured with mathematical certainty." *M.D. v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018). The record is replete with evidence showing that foster children in Alaska experience varying degrees of concrete harm *after* entering the State's care that "*exacerbate* Plaintiffs' already severe mental and physical difficulties." *M.R.*, 697 F.3d at 733 (emphasis added). *Cf. Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (finding plaintiffs were likely to suffer irreparable harm absent injunctive relief because "[a]lthough delays exist in the stretched county health care system already, exacerbation of the current overcrowded situation and additional suffering can be avoided" with the injunction).

Last, Defendants' entire reasonable-modifications defense is: "Requiring OCS to recruit, train, and employ psychiatrists, therapists, counselors, and others to care for foster

---

[30] Ex. 10.

[31] *Id.*

children would fundamentally alter the child welfare system in Alaska." ECF No. 210 at 22; *see also id.* at 26-27. First, this misinterprets Plaintiffs' allegations. Second, Defendants do not provide any factual support for this conclusory statement. *See Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 862 (9th Cir. 2022) ("The distinction between a reasonable modification and fundamental alteration is 'fact-specific, requiring case-by-case inquiry.'"). Third, a reasonable jury could find that Defendants' conclusory defense is insufficient under the ADA, and that OCS could, in fact, make reasonable accommodations that would reduce the serious risk of institutionalization.

The Ninth Circuit in *Townsend* found the state's fundamental alteration defense similarly unpersuasive. In particular, the state argued that it would fundamentally alter the nature of the services provided by the state to provide community-based treatment to the class because it would force the state "to make significant cuts in Medicaid service." 328 F.3d at 519. Recognizing that "*Olmstead* counsels that states must be able to take financial burdens into account in administering programs affecting the disabled," the court nonetheless held that "even if extension of community-based long term care services to the medically needy were to generate greater expenses for the state's Medicaid program, it is unclear whether these extra costs would, in fact, compel cutbacks in services to other Medicaid recipients." *Id*. at 520. Because there was insufficient factual support to evaluate the state's fundamental alteration defense, the court reversed summary judgment and remanded. *Id*.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 26 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 26 of 41

The one case that Defendants cite in support of their fundamental alteration defense, *Where Do We Go Berkeley*, militates in favor of Plaintiffs. There, the court held that requiring the California Department of Transportation "to provide social services or relocation assistance" to individuals in homeless encampments would require a fundamental alteration of an agency designed to ensure that state highways are safe for travel. 32 F.4th at 861-62. There is simply no comparison between the transportation agency there and the social services agencies here. Defendants already contract with providers to ensure services and placements for foster children, and Defendants do not articulate how, for example, issuing requests for proposals in areas lacking services would fundamentally alter the child welfare system in Alaska.

### C. The statewide services and placements deficit triggers a serious of harmful practices that create a serious risk that foster children with disabilities will be institutionalized.

When there are no community placements licensed to provide a higher level of care, OCS goes into "crisis mode"[32] and cycles foster children through a series of inappropriate placements: in foster homes that are not licensed to meet the child's level of care[33]; in homeless shelters that are not equipped to meets the child's needs[34]; in OCS offices supervised by caseworkers not trained to care for the child's individualized needs[35]; or in hotel rooms guarded by private security who, unbound by OCS policies or contracts, pose

---

[32] Ex. 11.
[33] *Id.*
[34] Ex. 12; Ex. 13.
[35] *See, e.g.*, ECF No. 136-38; ECF No. 136-48; Ex. 14; Ex. 15; Ex. 16.

a safety risk to foster children.[36] And when OCS forces "children and youth [to] leave their communities to receive care," as is often the case for children living in remote parts of the state, "it is more difficult for their families to participate in care, and other community supports and resources are more difficult to engage."[37]

Defendants' practices push foster children with disabilities into a "persistent cycle of a lack of appropriate placements followed by institutionalizations," and Plaintiffs caught "in this cycle [remain] at a serious risk of being forced from an integrated environment into an institutional or segregated setting." ECF No. 55 at 69; *see also M.R.*, 697 F.3d at 733 ("The loss of these services will exacerbate Plaintiffs' already severe mental and physical difficulties. These predictable consequences will put Plaintiffs at serious risk of institutionalization."). And the placement instability is getting worse.[38] OCS has attempted to interrupt this cycle by intentionally traumatizing children to force them out of the community and into institutional settings.[39]

These crisis conditions motivate unjust placement and retention in institutions. First, OCS unjustly places disabled foster children in institutions with no apparent or stated medical justification simply because there are no community-based alternatives. *See* ECF No. 55 at 69 ("the allegations contending that certain Plaintiffs were institutionalized solely

---

[36] Ex. 6 (Donahue Dep.) 99:15-101:15; 101:21-104:7.

[37] ECF No. 136-12 at M479061.

[38] The APSR noted that instability has worsened, dropping from 80% stability in 2021 to 62% in 2022, with children, particularly teens with mental health needs, often facing instability as foster families struggle to meet their needs. ECF No. 136-21 at M102003.

[39] *Id.*

because OCS had nowhere else to send them at that moment strongly suggests that Plaintiffs could have received treatment in a less restrictive environment were it not for OCS's restraints."). Indeed, OCS's official placement policy instructs caseworkers to bring foster children to the emergency room whenever their "behavior or mental health is effecting placement options," not when children have acute medical needs that require immediate hospitalization.[40]

Even when institutionalization placement is warranted, there is a serious risk that children will be unjustly retained in an institutional setting beyond medically necessary because the lack of community-based placements and services persist. *See, e.g.*, *Olmstead*, 527 U.S. at 593.[41] Plaintiffs' expert discussed hearing from staff at the facilities that "one of the challenges at discharge is getting OCS caseworkers to show up to discharge meetings and follow up with action items identified during the meetings. This can also impact delays in the whole discharge process."[42] Staff at the facilities further informed her that "one of the challenges at discharge is lack of responsiveness of OCS and destination availability, noting that if they are unable to discharge due to these reasons, youth may have to stay beyond what is medically necessary and acknowledged that the lowest level of care is always the best.'"[43] Inpatient service providers and administrators agree that lengths of stay at North Star Hospital have increased because of the lack of appropriate community-based

---

[40] Ex. 7.
[41] ECF No. 203-18 (Mayes Dep.) 72:11-73:9; 78:2-25.
[42] Ex. 9 (Farina Report) at 23.
[43] *Id.*

services and supports for children in the state.[44] And emails from the head of the MMHU and other OCS agency executives discuss children staying in hospitals and institutions beyond the recommended thirty days.[45]

Making matters worse, OCS's over reliance on institutions reduces the capacity of in-state institutions.[46] Consequently, when in-state institutions run out of beds, OCS sends children with disabilities to out-of-state facilities located thousands of miles away from their community.[47] And those children placed in out-of-state institutions often cannot return to Alaska because there is not a "step-down" option for them that would provide the sufficient level of care in a less restrictive setting.[48]

This record shows that there are at least three ways in which Defendants violate the ADA. Contrary to Defendants' assertions, none of these theories are "novel," all are claims "previously recognized by courts," ECF No. 210 at 17, and none of which require that complainants be institutionalized at the time of filing, or at any other point in the litigation.

**First**, deprivation of community-based placements and services driven by Defendants' conduct forces children to forgo living in the community to receive necessary medical services. *See Townsend*, 328 F.3d at 517 ("Mr. Townsend simply requests that the

---

[44] ECF No. 136-78 atM098780-81.

[45] Exs. 17-19.

[46] According to the December 2022 DOJ report, Alaska "acknowledged that limited services contribute to facility-based placements," with an average of 130 children placed outside Alaska every month due to a shortage of therapeutic foster care and community-based services. ECF No. 136-78 at M098787.

[47] ECF No. 203-10 (Centeno Dep.) 84:18–25.

[48] ECF No. 203-9 (Moore Dep.) 115:12-116:9. *See, e.g.*, Ex. 20.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 30 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 30 of 41

services he is already eligible to receive under an existing state program (assistance in dressing, bathing, preparing meals, taking medications, and so on) be provided in the community-based adult home where he lives, rather than the nursing home setting the state requires.").

**Second**, the deprivation of community-based placements and services driven by Defendants' conduct creates a serious risk that children will be unjustly placed in an institution. Similarly, in *M.R.*, the Ninth Circuit granted a temporary restraining order because reducing the number of compensated hours of in-home assistance created a serious risk that *M.R.* and others would be forced to receive care in an institutional setting. 697 F.3d at 729. And even though the risk was "not exclusively attributable to" the defendants' conduct, the failure to provide the necessary services "exacerbate[s] that risk" of institutionalization. *Id*.

**Third**, the deprivation of community-based placements and services driven by Defendants' conduct creates a serious risk that children will be unjustly *retained* in an institutional setting after their condition has stabilized and the treatment team had determined that it is no longer medically necessary for the child to remain in the institution. This fact pattern was illustrated in *Olmstead* where both plaintiffs had "a history of treatment in institutional settings." 527 U.S. at 593. One plaintiff, L.C., was admitted to a hospital "where she was confined for treatment in a psychiatric unit." *Id*. Later, her condition stabilized and her treatment team "agreed that her needs could be met appropriately in one of the community-based programs the State supported." *Id*. But

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 31 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 31 of 41

despite the recommendation of her treatment team, L.C. remained institutionalized for several years until "the State placed her in a community-based treatment program." Similarly, E.W. was admitted to a hospital for psychiatric treatment. *Id*. After her condition stabilized, her "treating psychiatrist concluded that she could be treated appropriately in a community-based setting," but she "nonetheless remained institutionalized until a few months after the District Court issued its judgment." *Id*.

Both plaintiffs were admitted based on medical necessity. But when the treatment professionals concluded that community-based treatment and placement was appropriate, the plaintiffs were forced to remain in the institution because Georgia was allegedly unable to provide community-based services due to budgetary constraints. The Court held that "unjustified institutional isolation," i.e. unjustified placement or retention in an institution, "is properly regarded as discrimination based on disability." *Id*. at 597, 600. After holding that unjustified placement or retention in an institution constituted discrimination in violation of the ADA and the integration regulation, the Court remanded for consideration of whether requiring Georgia to provide such services would be a "reasonable modification that is required by the ADA or a fundamental alteration that is not." *Where Do We Go Berkeley*, 32 F.4th at 861.

These theories of liability are also represented in the district court's order dismissing Defendants' motion to dismiss Plaintiffs' ADA claims. *See* ECF No. 55 at 69 ("Plaintiffs of the ADA Subclass have plausibly alleged that the state has deprived them of services provided in the least-restrictive setting. The persistent cycle of a lack of appropriate

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 32 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 32 of 41

placements followed by institutionalizations plausibly alleges that Defendants' practices have placed Plaintiffs in this cycle at a serious risk of being forced from an integrated environment into an institutional or segregated setting. . . . Further, the allegations contending that certain Plaintiffs were institutionalized solely because OCS had nowhere else to send them at that moment strongly suggests that Plaintiffs could have received treatment in a less restrictive environment were it not for OCS's restraints."). Far from novel, Plaintiffs' claims strike at the heart of the ADA. And the robust record rebuts Defendants' misleading arguments and illustrates genuine disputes of material fact.

Unjust placement and/or prolonged retention in institutional settings aggravates children's mental and physical conditions.[49] As the Executive Director of Behavioral Health at Mat-Su Regional Medical Center explained to OCS leadership, a child in custody was "decompensating (self-harming, barricading herself in the bathroom, attacking staff)" in the emergency department, and "was being placed in restraints and receiving [Intra Muscular] injections due to the lack of appropriate placements."[50]

And in the absolute worst-case scenario, children caught in this cycle, who are routinely and unjustly placed or retained in institutional settings, are more likely to deteriorate so significantly that they end up in the most restrictive setting of all: jail.[51]

---

[49] *See* ECF No. 136-57; ECF No. 203-10 (Centeno Dep.) 68:14-70:10.
[50] ECF No. 136-57.
[51] *See* Amy C. D'Andrade and Sigrid James, *Placement Stability*, *in* CHILD WELFARE FOR THE TWENTY-FIRST CENTURY 590 (2d ed. 2014) (("Multiple placements were linked to juvenile delinquency filings for a sample of 4,085 10–16-year-old boys in foster care in Illinois, with 2 placements increasing the odds over only 1 placement, and 3 or more placements increasing the odds again (Ryan & Testa 2005)").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 33 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 33 of 41

**D.    The facts of Lana H's case, and other cases, show that Defendants are systematically violating the ADA.**

Named plaintiff Lana H. represents this entire spectrum of ADA violations. She was deprived appropriate services and placements in a community-based setting, she was shuttled through a series of inappropriate placements, she was unjustly placed in institutions and then unjustly retained in institutions due to the lack of services and placements, and now she is sitting in a cell block without any of the services she needs to thrive in the community.

In the beginning, she was placed in an Anchorage-based foster home because "No therapeutic homes exist on the peninsula" where Lana's mother resides.[52] Because there were no therapeutic foster homes where Lana could receive necessary medical or stabilization services while OCS searched for residential placements, Lana was bounced between a series of youth shelters for homeless and runaway youth.[53] Caught in this "persistent cycle of a lack of appropriate placements," Lana's mental health deteriorated significantly. ECF No. 55 at 69. Predictably, "the persistent cycle of a lack of appropriate placements [was] followed by institutionalizations." *Id*. OCS placed Lana in institutional settings 16 times, including North Star 6 times.[54]

---

[52] ECF No. 136-77 (Summary of Lana H.) at 5.
[53] *Id.* at 5, 14. In one homeless shelter, she reported that she was sexually assaulted by another teenager, but OCS screened out the case, noting that it did "not meet IA criteria." *Id.* at 13.
[54] Lowry Decl. at ¶ 24; ECF No. 158 at 3-4.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 34 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 34 of 41

When Lana was admitted in June 2018 (under questionable justification), her treating psychologist recommended discharge, but she remained in North Star for the entire summer.[55] When she was shipped to a treatment center in Texas in August 2020, her anticipated discharge date was noted to be June 2021, but the potential discharge location was left blank with a notation that no home for her had been found yet.[56] Lana remained in the out-of-state treatment center far beyond the anticipated discharge date and long after her treatment team saw her condition stabilize.[57] In February 2022, Lana was apparently admitted to North Star because she was considered a threat to herself.[58] But after an evaluation, the treatment professional notified OCS that Lana was not "acute" and needed to be discharged.[59] In response, the caseworker requested that Lana remain in the hospital overnight because it was "late in the day" and OCS did not have a placement available.[60]

The most recent update in Lana H.'s case files is that she "required treatment at North Star Hospital beginning in October 2024," ECF No. 158 at 3-4, and Plaintiffs' counsel has been informed that Lana is currently at McLaughlin Youth Center, a juvenile detention center, where she was moved after allegations of assault at North Star against a staff member. Decl. at ¶2.[61]

---

[55] ECF No. 136-77 at 4.
[56] *Id.* at 9.
[57] *Id.* at 10.
[58] *Id.* at 11.
[59] *Id.*
[60] *Id.* at 12.
[61] The child welfare files of and interviews with named plaintiffs that have now been dismissed from this action as moot show similar violations of the ADA. *See, e.g.*, ECF No.

Responsibility here rests with the State, and specifically with OCS. The State's motion does not raise any factual assertions against this account of Lana H's cycling or of the description of former named plaintiffs' factual circumstances. Instead, there is an argument that so many children are in foster care, many more children than are in institutions, that there is no serious risk of any foster child's being institutionalized. The facts of Lana H's case are to the contrary.

Defendants' methodology for determining whether there is a systemic risk of institutionalization cuts against them. Defendants looked at: (1) children in foster homes paid at augmented rates (261); (2) children in therapeutic treatment homes (132), and (3) children in residential treatment facilities "of all kinds" (48). ECF No. 210 at 23.

Based on these numbers, Defendants estimate that there were 441 foster children covered by the ADA on January 23, 2025.[62] Defendants then isolate one kind of residential treatment facility (PRTF), identify 20 children placed in those types of facilities, and then conclude that "4.5 percent rate of institutionalization does not represent a 'serious risk of institutionalization.'" *Id*. at 24.

---

136-79, Summary of V. Children at 5 (describing how Lawrence V. was retained at the hospital long after the treating physician informed OCS that discharge and community-based services were appropriate). Named Plaintiff George V. was placed at NorthStar and provided no reasoning for his institutionalization and was even told by his therapist that they did not know why he was there. Ex. 9 (Farina Report) at 28.

[62] Likely an underestimate considering that ADA-eligible children may not fall into any of these placement categories.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 36 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 36 of 41

First, Defendants' analysis is based on a single point in time and does not account for all of the children institutionalized over any given year. For example, Defendants' data shows that in 2023, OCS placed 505 foster children in institutions.[63]

Second, Defendants' methodology suffers from a deductive fallacy. The percentage of children placed in a PRTF does not represent the percentage of children who are at serious risk of unjust placement or retention in institutional settings, and no reasonable jury would deduce such.

Third, Defendants focus on the wrong number. The most concerning statistic proffered by the State is that 59 percent (261 of 441) of likely ADA-eligible foster children were placed in foster homes where the "level of care a child requires has been assessed and determined by OCS to exceed the basic level of care provided in a foster home licensed under 7 AAC 50.050 – 7 AAC 50.990." ECF No. 212, Donahue Decl., Ex. D. In other words, 59 percent were placed in foster homes not licensed to provide the level of care needed.

The former head of the MMHU warned about this exact situation in an email exchange with DCFS leadership, explaining that "Foster homes without medical experience taking high needs medical kids is a very huge liability."[64] She noted that "[m]ultiple cases have ended up with harm to children due to incompetency in the foster parents ability to provide care," citing an example where a child with Type 1 Diabetes was

---

[63] Ex. 21, Declaration of Erin Suh dated February 27, 2025 at ¶ 3 (analyzing M069232).
[64] ECF No. 136-53.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 37 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 37 of 41

placed with a foster parent who "claimed to have diabetes experience to caseworker," and taking the foster parent at their word, the "caseworker placed [the] youth in home."[65] Soon after, the child "entered Diabetic Keto-Acidosis was emergently hospitalized as [the] foster parent did not get training."[66]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment.

---

[65] *Id*.
[66] *Id*.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 38 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 38 of 41

Dated: February 27, 2025

Respectfully submitted,

/s/ Marcia Robinson Lowry
Marcia Robinson Lowry (admitted pro hac vice)
mlowry@abetterchildhood.org
Julia K. Tebor (admitted pro hac vice)
jtebor@abetterchildhood.org
Anastasia Benedetto (admitted pro hac vice)
abenedetto@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456

Elena M. Romerdahl, AK Bar No. 1509072
eromerdahl@perkinscoie.com
Hannah Paton, AK Bar No. 2309095
hpaton@perkinscoie.com
**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Telephone: (907) 279-8561

Mark Regan, AK Bar No. 8409081
mregan@dlcak.org
**DISABILITY LAW CENTER OF ALASKA**
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Telephone: (907) 565-1002

**ATTORNEYS FOR PLAINTIFFS**

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 39 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 39 of 41

## WORD COUNT CERTIFICATION

Pursuant to Local Civil Rule 7.4, the undersigned certifies that the foregoing Memorandum of Law, excluding the case caption and certificates of counsel, brief contains 9,686 words according to the word-count function of Microsoft Word, the word-processing program used to prepare this brief.

Respectfully submitted on February 27, 2025.

/s/ Marcia Robinson Lowry

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 40 of 41

Case 3:22-cv-00129-SLG    Document 222    Filed 02/27/25    Page 40 of 41

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2025, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court – District of Alaska by using the CM/ECF system. Participants in Case No. 3:22-cv-00129-SLG who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Marcia Lowry*
Marcia Lowry (pro hac vice)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Jeremiah M., et al., v. Kim Kovol, et al.*; Case No.: 3:22-cv-00129-SLG
Page 41 of 41

Case 3:22-cv-00129-SLG     Document 222     Filed 02/27/25     Page 41 of 41