TREG R. TAYLOR
ATTORNEY GENERAL

Margaret Paton Walsh (Alaska Bar No. 0411074)
Christopher A. Robison (Alaska Bar No. 2111126)
Katherine Demarest (Alaska Bar No. 1011074)
Jennifer Teitell (Alaska Bar No. 2405054)
Maxwell Jenkins-Goetz (Alaska Bar No. 2408085)
Assistant Attorneys General, Alaska Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5275/Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov
Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Jeremiah M., et al., | Case No. 3:22-CV-00129-SLG |
| Plaintiffs, | |
| v. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNTS SIX AND SEVEN** |
| Kim Kovol, et al. | |
| Defendants. | |

In their reply brief, the plaintiffs concede that "risk of institutionalization is not itself [] discrimination" under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act.[1] This remarkable concession dooms their claims, because the plaintiffs have not even alleged that the defendants have engaged in some other form of discrimination against the named plaintiffs or members of the putative ADA Subclass.

---

[1]      Docket 222 at 18.

Even if the plaintiffs had not made that concession, the Motion for Summary Judgment on Counts 6 and 7 should be granted for two independent reasons: (1) a "serious risk of unjustified institutionalization" alone is not (as the plaintiffs now concede) actionable discrimination under the ADA or Section 504; and (2) the plaintiffs have not pointed to any evidence that members of the putative ADA Subclass are subject to a "risk of unnecessary institutionalization" on a subclass-wide basis.

## I.     This Court is not bound by *M.R. v. Dreyfus*.

The plaintiffs argue that, even if the Ninth Circuit's reasoning in *M.R. v. Dreyfus*[2] is irreconcilable with the Supreme Court's intervening decisions in *Kisor v. Wilkie*[3] and *Loper Bright Enterprises v. Raimondo*,[4] this Court lacks the authority to depart from *M.R.* because the Supreme Court did not directly overturn that decision.[5]

Not so. The Ninth Circuit has squarely held that when a Court of Appeals decision is "clearly irreconcilable" with a Supreme Court decision, the earlier Court of Appeals decision no longer has binding effect and "*district courts* should consider themselves bound by the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively overruled."[6]

---

[2]     663 F.3d 1100, 1116–17 (9th Cir. 2011), *amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012)).

[3]     588 U.S. 558 (2019).

[4]     603 U.S. 369 (2024).

[5]     Docket 222 at 6–7.

[6]     *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (emphasis added); *see also Smith v. Helzer*, 614 F. Supp. 3d 668, 683 n.82 (D. Alaska 2022) (recognizing exception

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                Page 2 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 2 of 24

In this case, as explained in Defendants' Motion for Summary Judgment, *M.R.* is "clearly irreconcilable" with *Loper Bright* and *Kisor*. In *M.R.*, the Ninth Circuit concluded that "serious risk of" institutionalization could constitute actionable discrimination based on deference to DOJ's interpretation of the ADA.[7] But after *Loper Bright* and *Kisor*, it is "impermissible" for a court to defer to DOJ's interpretation of Title II to determine whether "serious risk of" institutionalization is unlawful discrimination.[8] *M.R.* did not independently evaluate whether the creation or exacerbation of a "serious risk of unjustified institutionalization" is actionable discrimination under Title II. In a case such as this one, where intervening authority is clearly irreconcilable with precedent, this Court has the responsibility—just as a three-member panel of the Ninth Circuit does—to "consider [itself] bound by the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively overruled."[9] As the Ninth Circuit has explained, after *Loper Bright*, courts are not compelled to use pre-*Loper Bright* decisions deferring to agency interpretations "as analytical building blocks

---

to the general rule that a district court is bound by Ninth Circuit precedent where a subsequent Supreme Court decision "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable").

[7]  *M.R.*, 663 F.3d at 1116–17.

[8]  *United States v. Castillo*, 69 F.4th 648, 663 (9th Cir. 2023); *see Loper Bright*, 603 U.S. at 412 (holding that "[c]ourts must exercise their independent judgment" in assessing what a statute requires); *Kisor*, 588 U.S. at 574 ("[A] court should not afford *Auer* deference unless the regulation is genuinely ambiguous.").

[9]  *Miller*, 335 F.3d at 900.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                   Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                Page 3 of 24

Case 3:22-cv-00129-SLG    Document 238    Filed 03/20/25    Page 3 of 24

in every case" to evaluate a new theory of liability.[10] Instead, courts "must exercise [their] 'independent judgment' in deciding the present case"[11] and "construe the statute independently."[12]

The plaintiffs assert that the effect of *Kisor* on *M.R.*'s continued validity was already settled in this case by Judge Kindred's decision on the motion to dismiss and therefore is binding law of the case.[13] However, for the law-of-the-case doctrine to apply, "the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'"[14] Moreover, there are exceptions to the general rule that a court will "refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case," including where "'(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, [or] (2) intervening controlling authority makes reconsideration appropriate.'"[15] Here, Judge Kindred's prior decision on the Motion to Dismiss did not even cite *Kisor*, nor did it explicitly or by implication decide whether *M.R.* remains good law in light of *Kisor*.[16] And even if this Court thinks that Judge Kindred found *Kisor* inapplicable by implication, his decision

---

[10]     *Murillo-Chavez v. Bondi*, 128 F.4th 1076, 1087 (9th Cir. 2025).

[11]     *Id.* at 1087 (citation omitted).

[12]     *Lopez v. Garland*, 116 F.4th 1032, 1043 (9th Cir. 2024).

[13]     Docket 222 at 7.

[14]     *United State v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) (alteration in original) (quoting *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000)).

[15]     *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (quoting *Jeffries v. Wood*, 114 F.3d 1484, 1488–89 (9th Cir. 1997) (en banc)).

[16]     *See generally* Docket 55.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                  Page 4 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 4 of 24

also did not address the impact of *United States v. Castillo*[17]—which confirmed that

*Kisor* should cause a reevaluation of earlier deferential precedents—on the continuing

validity of *M.R.*[18] -Rather, the Court simply found "no reason to deviate from Ninth

Circuit precedent" in light of the Fifth Circuit's decision in *United States v. Mississippi*.[19]

Further, even if the Court had addressed *Kisor*, "intervening controlling authority"

(*Loper Bright*) "makes reconsideration appropriate." Judge Kindred could not have found

*Loper Bright* inapplicable by implication because that case had not yet been decided

when he issued his order on the Motion to Dismiss.

## II.    Title II and Section 504 do not authorize claims based on an alleged "risk of institutionalization."

In light of *Loper Bright* and *Kisor*, this Court must analyze Title II and

Section 504 without deference to the DOJ's interpretation. Construing Title II and

Section 504 without "an eye to policy preferences that had not made it into the statute"

shows that neither statute authorizes a discrimination claim based on a "risk" of

unjustified institutionalization.[20] As explained in Defendants' Motion for Summary

Judgment, the plain text of each statute addresses only *actual* discrimination, not a "risk

of" discrimination.[21]

---

[17]    69 F.4th 648.

[18]    *See* Docket 210 at 10–11.

[19]    Docket 55 at 67 n.318 (citing *United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023)).

[20]    *Loper Bright*, 603 U.S. at 403–04; *see also* Docket 210 at 11–13.

[21]    *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a); *see also Mississippi*, 82 F.4th at 392

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 5 of 24

Case 3:22-cv-00129-SLG    Document 238    Filed 03/20/25    Page 5 of 24

The plaintiffs' opposition to summary judgment makes no effort to explain how the text of the ADA or Section 504 prohibits "risk of" unjustified institutionalization.[22] Instead, the plaintiffs pretend that the defendants' argument is that "the ADA and the integration regulation protect only those disabled persons currently institutionalized,"[23] and then spend nine pages of their opposition explaining how this interpretation is inconsistent with the text and history of the statute and the integration regulation.[24] But since the defendants never advanced this interpretation of the statute, their refutation is mostly unhelpful. However, as part of it, the plaintiffs make this critical assertion:

> [A]s the text, structure, history, and purpose of the statute and regulations make clear, the risk of institutionalization is not itself the discrimination that the ADA and the integration regulation proscribe. Rather, it is the *discrimination* that creates a risk of institutionalization. The serious risk of future institutionalization is created by *actual* present discrimination.[25]

This concession dramatically simplifies this Court's task because the parties agree on this part of the relevant legal rule: "risk of institutionalization" is not itself discrimination and is not, by itself, prohibited by the ADA or the integration regulation; only "*actual* present discrimination" violates the law.

---

("Nothing in the text of Title II . . . suggests that a *risk of institutionalization*, without actual institutionalization, constitutes actionable discrimination.").

[22]    Docket 222 at 11–19.

[23]    *Id*. at 11. Notably, the plaintiffs neither quote the defendants' motion nor provide any docket citation to support this mischaracterization of the defendants' position.

[24]    *Id*. at 11–19.

[25]    *Id*. at 18.

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 6 of 24

Case 3:22-cv-00129-SLG    Document 238    Filed 03/20/25    Page 6 of 24

But this begs the question: what is the actual "discrimination" alleged in this case? The plaintiffs' argument is internally contradictory and confusing. To the extent they argue that the "discrimination" itself is some sort of deficiency in the array of mental health care services available to foster children in Alaska, that legal theory was not advanced in their Amended Complaint,[26] and it is inconsistent with the Supreme Court's holding that the statutory prohibition of discrimination on the basis of disability does not entitle a person to "adequate health care" or particular services.[27]

This theory also parallels the claims made by the DOJ and rejected by the Fifth Circuit in *United States v. Mississippi*.[28] In that case, the Court recognized that "[a] claim of system-wide risk of institutionalizing some unspecified group of patients [was] incompatible with [the *Olmstead*] factors"[29] and "does not give rise to a cognizable claim under Title II."[30] The plaintiffs claim that "*Mississippi* provides little support for Defendant's interpretation"[31]—by which they mean the statutory interpretation they attribute to the defendants, but which the defendants did not actually advance—and they

---

[26]    *See* Docket 16 at 86–90.

[27]    *Alexander v. Choate*, 469 U.S. 287, 302–03 (1985); *see also Doe v. CVS Pharm., Inc.*, 982 F.3d 1204, 1211 (9th Cir. 2020); *Buchanan v. Maine*, 469 F.3d 158, 174 (1st Cir. 2006) (citing cases holding that the ADA and Section 504 do not "guarantee any particular level of medical care for disabled persons" (quoting *Cercpac v. Health & Hosps. Corp.*, 147 F.3d 165, 168 (2d Cir. 1998))).

[28]    82 F.4th 387.

[29]    *Id*. at 394.

[30]    *Id*. at 398.

[31]    Docket 222 at 18.

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 7 of 24

Case 3:22-cv-00129-SLG    Document 238    Filed 03/20/25    Page 7 of 24

assert that the "Fifth Circuit did not grapple with the statutory analysis conducted by its sister circuits"[32] or hold "that the other circuits were 'wrong' to uphold the at-risk standard."[33] But the plaintiffs misread *Mississippi* in two key ways.

First, the Fifth Circuit closely examined the text of the statute and the DOJ's integration mandate regulation and, based on that examination, held that "'at risk' claims of ADA discrimination are not within the statutory or regulatory language."[34] And, contrary to the plaintiffs' suggestion, the circuits that have upheld "at risk" claims have not analyzed the statutory text to find support for these claims. Instead, as *Mississippi* points out, "[l]egally, nearly all of the cases rely heavily, but mistakenly, on the DOJ guidance promoting 'at risk' Title II discrimination claims."[35]

Second, the Fifth Circuit noted an important factual distinction between these other circuit cases and the DOJ's claims against Mississippi: "All of the previous 'at risk' cases consider plaintiffs' individual or class claims for personal care services or medically necessary items pursuant to Medicaid."[36] The Court explained that "[l]ikening those cases factually to the present case involves a category error: what a physically disabled person needs to maintain life and health is not subject to the unpredictable and varied symptoms and needs of a patient who manifests serious mental illness . . . .

---

[32]      *Id.*

[33]      *Id.* at 19 (citing *Mississippi*, 82 F.4th at 396).

[34]      *Mississippi*, 82 F.4th at 392–93.

[35]      *Id.* at 396 (citing cases).

[36]      *Id.*

*Jeremiah M., et al. v. Kim Kovol, et al.*                Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7           Page 8 of 24

Case 3:22-cv-00129-SLG      Document 238      Filed 03/20/25      Page 8 of 24

'Appropriate' treatment of those with serious mental illness, as *Olmstead* clearly understood, must be individualized."[37]

The other "at risk" circuit cases are further distinguishable because the claims in those cases identified an existing "discriminatory law or policy" rather than resting on a mere "risk of institutionalization" due to allegedly inadequate service provision. For example, in *Fisher v. Oklahoma Health Care Authority*, a state agency enacted a policy change that would "not allow the plaintiffs to receive services for which they [were] qualified unless they agree[d] to enter a nursing home."[38] Similarly, *Pashby v. Delia* involved a new policy that would "impose stricter eligibility requirements for in-home personal care services," leaving those who were newly ineligible in the position of choosing between fewer services or entering institutions.[39] *Steimel v. Wenert* concerned a policy change that would reduce in-home care and services for many who were previously eligible,[40] and in *Waskul v. Washtenaw County Community Mental Health*, a state agency "modified the methodology through which it allocated funding to individuals with disabilities receiving community living support services."[41] Thus, these cases involved a clear *state action* reducing or eliminating coverage of services, not an alleged failure to ensure that services existed in the first place. Failing to expand services

---

[37]     *Id*.

[38]     335 F.3d 1175, 1182 (10th Cir. 2003).

[39]     709 F.3d 307, 313 (4th Cir. 2013).

[40]     823 F.3d 902, 906 (7th Cir. 2016).

[41]     979 F.3d 426, 435 (6th Cir. 2020).

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 9 of 24

Case 3:22-cv-00129-SLG        Document 238        Filed 03/20/25        Page 9 of 24

to people with disabilities is not itself discriminatory, even if more services could help keep them from institutionalization.[42] Instead, each of those cases asked whether it was permissible to *curtail* existing services for certain beneficiaries, forcing them to choose between substandard in-home care and institutionalization.

Thus, even if these cases retain their vitality after *Kisor* and *Loper Bright*, they do not support the plaintiffs' novel claim here: that the ADA and Rehabilitation Act require the State to ensure that community-based services exist.[43]

## III. The plaintiffs have not raised a viable claim based on a "serious risk of" unnecessary institutionalization.

As an initial matter, the plaintiffs do not contest, and in fact appear to concede, that the Amended Complaint did not plead a violation of the ADA or Section 504 based on a "risk of unjustified institutionalization" theory.[44] On that ground alone, the defendants are entitled to summary judgment because a plaintiff may not pursue a claim that is not raised in the complaint.[45]

In any event, even if the plaintiffs had pled such a claim, and even if the plaintiffs' "risk of unjustified institutionalization" theory was viable under the ADA or Section 504, the defendants' Motion for Summary Judgment should be granted because the plaintiffs have not identified evidence to support their claim. Specifically, the plaintiffs have both

---

[42]     *See Olmstead*, 527 U.S. at 603 n.14.

[43]     *See* Docket 222 at 24 ("Plaintiffs do not dispute the *adequacy* of those services; they dispute the *existence* and *provision* of those services.").

[44]     *See id*. at 18–19.

[45]     *See* Docket 210 at 16 n.64 (citing cases).

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 10 of 24

Case 3:22-cv-00129-SLG          Document 238          Filed 03/20/25          Page 10 of 24

failed to identify a "state action" that has increased the putative ADA Subclass's alleged risk of institutionalization[46] and failed to proffer any evidence sufficient for the court to conclude at trial that members of the Subclass are actually at "risk of unjustified institutionalization" on a subclass-wide basis.[47]

> ### A. The plaintiffs have not shown that any action by the defendants increases their risk of institutionalization.

The defendants argued in their opening motion that the plaintiffs had not identified a "state action" that has led to an increased risk of institutionalization for the putative ADA Subclass.[48] In response, the plaintiffs argue that "when federal law imposes an affirmative obligation on a state, the state's failure to fulfill its affirmative obligation is treated as state action."[49] They point to two "ways" in which, they claim, "the Defendants exacerbate the placements and services crisis,"[50] and they cite two documents as evidence of "state actions that exacerbate the systemic crisis and increase the risk of institutionalization."[51] These arguments lack merit.

---

[46] *See M.R.*, 663 F.3d at 1116 ("[A] plaintiff need only show that the challenged state action creates a serious risk of institutionalization.").

[47] *See Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024) (providing that class action plaintiffs must "prove their case through common proof at trial" (emphasis omitted)).

[48] *See* Docket 210 at 20–22.

[49] Docket 222 at 24 (citing *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) and *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018)).

[50] Docket 222 at 22.

[51] *Id*. at 24.

First, emphasizing the importance of accurate data for improving systems, the plaintiffs fault OCS for "not track[ing] the number of disabled foster children waitlisted for services or the length of time they must wait to receive those services."[52] Setting aside the difficulties involved in a state agency attempting to track the waitlists of private providers, the plaintiffs do not identify the "federal law" that "imposes an affirmative obligation on [the] state" to track this data in a way that satisfies the plaintiffs. Nor do they explain how this failure to track waitlists "*exacerbates* the placements and services crisis."[53] Tracking waitlists—even if this was feasible—will not create new providers in remote communities.

Second, the plaintiffs suggest that the defendants' failure to issue requests for information (RFI) or proposals (RFP) to create "the kinds of programs that [OCS] needs" "also contributes to the problem."[54] But *Olmstead* is clear that the ADA does *not require* states to "provide a certain level of benefits to individuals with disabilities," so the statute does not impose any "affirmative obligation" on OCS to create programs.[55] There is also a factual problem with the plaintiffs' argument. Although the defendants may not have issued RFIs or RFPs for services in the last few years, they have issued numerous grants

---

[52]     *Id*. at 22.

[53]     *Id*. (Emphasis added).

[54]     *Id*. at 23.

[55]     *Olmstead*, 527 U.S. at 603 n.14.

*Jeremiah M., et al. v. Kim Kovol, et al.*                              Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                          Page 12 of 24

to community-based organizations to support needed services.[56] The ADA does not require them to do more.

The plaintiffs also mischaracterize the two pieces of evidence offered to support their claim that the defendants' actions increase the risk of institutionalization. First, they point to OCS's placement flowchart,[57] claiming that "OCS's official placement policy instructs caseworkers to bring foster children to the emergency room whenever their 'behavior or mental health is effecting placement options,'" and arguing that "OCS has lowered the bar for institutional placement below medical necessity simply because they are unable to provide community-based placements or services."[58] But the flowchart contradicts this claim. Instead, it directs that after a caseworker has exhausted a series of options, they should consult with the Medical Mental Health Unit "to determine if behavioral or mental health reasons may be effecting [sic] placement options," and—if the answer is yes—it instructs the caseworker to "[t]ake [the child] to the nearest psych ED or other facility *for level of care recommendation* if one is not already provided," and then to follow that recommendation.[59]

---

[56] *See, e.g.*, Docket 159 (Declaration of Tandra Donahue in support of opposition to motion for class certification) at 9–12 (describing numerous OCS grants); Ex. A (Deposition of Kim Swisher) at 19 (describing OCS grant to Alaska Center for Resource Families to help support and train foster families); *id.* at 100 (noting grants to service providers in Fairbanks and Utqiagvik).

[57] Docket 222-8 (Ex. 7).

[58] Docket 222 at 24–25.

[59] Docket 222-8 at 2.

*Jeremiah M., et al. v. Kim Kovol, et al.*                        Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7              Page 13 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 13 of 24

The plaintiffs also cite an email chain from nearly five years ago in which, they claim, "a Regional Manager explained how OCS had 'trigger[ed] a youth to escalate to get any of the providers in town to act,' an intentional act that she described as 'very gross.'"[60] But the email chain itself contradicts this narrative. The email expressed the manager's frustration that Bartlett Regional Hospital "wouldn't take [the foster child] as she was currently presenting," because "she wasn't acute enough."[61] The email went on: "So we were left with either, force the placement that [we] knew would cause her to act on her stated plans for aggression and call [the police department] back, or beg the aunt to take her. *The aunt finally answered our calls and took her which resolved the problem.* It feels very gross that we have to basically trigger a youth to escalate to get any of the providers in town to act."[62] That the plaintiffs' best evidence of how OCS has allegedly "lowered the bar for institutional placement below medical necessity" involves a scenario in which the foster child was finally placed with her aunt—not at an "institution"—demonstrates that they cannot show a "state action" that has created a risk of unjustified institutionalization.

### B. The plaintiffs' cited evidence does not show that the ADA Subclass faces a serious risk of unjustified institutionalization.

The plaintiffs do not point to any facts showing that any significant portion of the putative ADA Subclass is in fact subject to any institutionalization, let alone

---

[60]     Docket 222 at 25 (citing Docket 222-11 (Ex. 10)).

[61]     Docket 222-11 at 1.

[62]     *Id.* (emphasis added).

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                          Page 14 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 14 of 24

"unnecessary" or "unjustified" institutionalization. To the contrary, they do not dispute the key fact that, of the 441 foster children likely covered by the ADA on January 23, 2025, only 20 children were placed in psychiatric residential treatment facilities (PRTFs) at that time.[63] Indeed, Alaska has one of the lowest rates of placement of foster children in residential treatment in the country, with only about four percent of foster children being in residential treatment at any given time.[64] These undisputed facts demonstrate that it is highly *unlikely* for a member of the putative ADA Subclass to be institutionalized.[65]

The plaintiffs try to obfuscate this reality by arguing that "59 percent (261 of 441) of likely ADA-eligible foster children . . . were placed in foster homes not licensed to provide the level of care needed," and so (by implication), those children face a risk of institutionalization.[66] This conclusion relies on a misunderstanding of the nature of foster home licensing, difficulty-of-care augmented rates, and foster parent training requirements. The 261 children mentioned by the plaintiffs are those whose foster homes

---

[63]     Docket 210 at 23–24.

[64]     *See* Annie E. Casey Found., Kids Count Data Ctr., *Children in Foster Care by Placement Type in United States,* https://datacenter.aecf.org/data/tables/6247-children-in-foster-care-by-placement-type?loc=1&loct=1#detailed/2/2-53/false/2048/2623/12994,12995 (last accessed Mar. 7, 2025) (showing that only 4 percent of foster children in Alaska were placed in a "group home or institution," which is one of the lowest rates in the country and less than half of the national rate of 9 percent).

[65]     *Cf. Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 61–62 (1st Cir. 2014) (holding that plaintiffs failed to show a class-wide statutory violation when only 35.1 percent of class members were harmed).

[66]     Docket 222 at 37.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 15 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 15 of 24

were receiving augmented rates.[67] In effect, the plaintiffs assume that any foster home receiving augmented rates to care for children with heightened needs is necessarily unequipped to provide heightened care, simply because that home possesses the same underlying foster license as homes not receiving augmented rates. This is wrong.

Foster home licensing and augmented rates (and the additional training that accompanies certain augmented rates) are two distinct areas of OCS operations. Augmented rates are administered in accordance with regulations at 7 AAC 53.010–.199 and the Child Protection Services Manual.[68] Pursuant to those authorities, foster parents caring for children with heightened needs are sometimes entitled to greater compensation.[69] In some cases, the additional burden on foster parents is fairly minor (for example, additional time spent with the foster child), and rates are augmented only slightly.[70] In others, a child may have very specialized needs; there, foster parents receive greater augmented rates and also must undergo specialized training to care for the foster child.[71] Foster home licensing, meanwhile, is covered by different regulations, including 7 AAC 67.005–.070. All licensed foster homes receive the same basic license even if they receive an augmented rate and have undergone specialized parent training.[72]

---

[67]    Docket 210 at 23.

[68]    Donahue Decl. in Supp. of Defs.' Summ. J. Reply ¶ 5.

[69]    Ex. B (CPS Manual, 6.2.2.2A).

[70]    *Id.*

[71]    *Id.*

[72]    Donahue Decl. in Supp. of Defs.' Summ. J. Reply ¶ 6.

*Jeremiah M., et al. v. Kim Kovol, et al.*          Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7          Page 16 of 24

The mere fact that all licensed foster homes receive the same basic license, and yet some foster parents receive augmented rates and/or specialized training to attend to heightened needs, by no means suggests that all foster homes receiving augmented rates are not licensed to provide the necessary level of care.[73] Making that jump requires multiple inferences that are completely unsupported by the facts or the law: first, that all foster children who qualify for augmented rates necessitate specialized foster parent training; second, that in most or all cases, this training is not happening; and third, that if additional training occurred, it would be reflected by some sort of specialized license.[74]

Beyond their misunderstanding of augmented rates, the plaintiffs do not point to any evidence that the small percentage of putative ADA Subclass members who are placed in residential treatment are placed there "unnecessarily" or "unjustifiably." *Olmstead* makes clear that the ADA does *not* prohibit institutionalization generally, but only restricts "unjustified" institutionalization, which Justice Ginsburg described as placement in an institution "[1] when the State's treatment professionals determine that [placement in the community] is appropriate, [2] the affected persons do not oppose such treatment, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."[75] In

---

[73]  Docket 222 at 37.

[74]  That the plaintiffs can so badly misunderstand the nature of foster home licensing, foster parent training requirements, and augmented rates policies does not bode well for their ability to effect positive change in the Alaska foster care system under their requested relief. *See* Ex. C (Pls.' Supp. Resp. to Defs.' 1st Set of Interrogs.).

[75]  *Olmstead*, 527 U.S. at 607.

*Jeremiah M., et al. v. Kim Kovol, et al.*                                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 17 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 17 of 24

this case, the plaintiffs do *not* point to any evidence showing that most or all of the small percentage of putative ADA Subclass members who are placed in residential treatment satisfy *Olmstead*'s requirements for "unjustified" institutionalization.

The plaintiffs claim that the defendants' data shows that in 2023, OCS placed 505 foster children "in institutions," suggesting that this figure is more probative of their claims than the number of children placed in PRTFs.[76] They are way off the mark. To support their assertion, the plaintiffs cite the Declaration of Erin Suh, who explains how she navigated data on foster child placements, provided in discovery, to identify instances of institutional placements in 2023.[77] Following Ms. Suh's steps, the defendants were able to isolate the same information, showing 505 instances of placement in some sort of "institution" in 2023.[78] But 505 *instances* do not equate to 505 foster children placed in institutions; in fact, as the data makes clear, only 171 foster children were placed in institutions of some kind in 2023, because some children had multiple institutional placements.[79] Further, it is patently false to suggest that all—or even most—of these placements have anything to do with "institutionalization" as the concept is understood under the ADA and described in *Olmstead*.

As caselaw has made abundantly clear, institutionalization within the meaning of the ADA involves elements of isolation and confinement of persons with disabilities,

---

[76]     Docket 222 at 37.

[77]     Docket 222-22 ¶ 3 (Ex. 21).

[78]     Donahue Decl. in Supp. of Defs.' Summ. J. Reply ¶ 2.

[79]     *Id.*

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 18 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 18 of 24

which serves both to perpetuate social stigma and to diminish everyday activities.[80] ADA-related institutionalization must therefore involve ADA-covered foster children receiving ADA-related services in *segregated institutional settings*. The 505 institutional placements identified by the plaintiffs have, for the most part, nothing to do with the ADA: they include placements with boarding schools, emergency shelters, "medical services" (which includes things like admission to the hospital for temporary physical ailments), and many other providers.[81] Simply because all of these different providers were coded as an "institution" within the dataset used by Ms. Suh, the plaintiffs suggest that all 505 placements were institutionalizations relevant to their ADA claims. The reality of ADA-related placements in Alaska is of course quite different, as described above.[82]

Moreover, the plaintiffs cannot point to any evidence proving that an OCS action has caused the named plaintiffs or other class members to be *unjustifiably* institutionalized or face a heightened risk of *unjustifiable* institutionalization.[83] The plaintiffs cite evidence that they claim supports their allegations about challenges facing

---

[80] *See, e.g.*, *Olmstead*, 527 U.S. at 600–01 (recognizing that "unjustified institutional isolation of persons with disabilities is a form of discrimination" in part because "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions" and "confinement in an institution severely diminishes the everyday life activities of individuals").

[81] Ex. D (spreadsheet showing 505 placements); Donahue Decl. in Supp. of Defs.' Summ. J. Reply ¶ 3 (describing steps taken to isolate the 505 placements in 2023).

[82] *See supra* note 64.

[83] *See M.R.*, 663 F.3d at 1116 (stating that a plaintiff must show that "the challenged state action creates a serious risk of institutionalization").

*Jeremiah M., et al. v. Kim Kovol, et al.*          Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7          Page 19 of 24

Case 3:22-cv-00129-SLG          Document 238          Filed 03/20/25          Page 19 of 24

the programs operated by the defendants, such as evidence about a lack of capacity among private community-based mental health providers and OCS's data on such providers.[84] However, the plaintiffs at no point provide evidence—as opposed to pure speculation—that any of these actions or inactions *cause* members of the putative ADA subclass to be placed in institutions unjustifiably, or to face a materially increased risk of such placement, *on a subclass-wide basis*.

The plaintiffs' reliance on facts related to Lana H. and "other cases" is insufficient to survive summary judgment. To begin with, this anecdotal evidence about a handful of foster children cannot prove that there is a subclass-wide violation of the ADA or Section 504 on behalf of a putative subclass of hundreds of children.[85]

Further, while the plaintiffs describe some of Lana H.'s placement history, they fail to provide evidence that any of Lana H.'s placements in residential treatment were "unjustified." They fail to point to any evidence that "the State's treatment professionals determine[d] that [placement in the community] [was] appropriate" for Lana H. at the time of placement, that Lana H's parent or guardian favored community-based treatment,

---

[84]     *See, e.g.*, Docket 222 at 22. The plaintiffs cite cases to assert that the defendants have an "affirmative obligation" that they have not fulfilled, but those cases relate to claims of substantive due process violations; they do not support the proposition that a state agency has an "affirmative obligation" to undertake any action pursuant to Title II or Section 504. *See* Docket 222 at 24 (citing *Castro*, 833 F.3d 1060; *Gordon*, 888 F.3d 1118).

[85]     *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 358 n.9 (2011) ("[W]hen the claim is that a company operates under a general policy of discrimination, a few anecdotes selected from literally millions of employment decisions prove nothing at all.").

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7          Page 20 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 20 of 24

or that Lana H's placement in the community could have been "reasonably

accommodated, taking into account the resources available to the State and the needs of

others with mental disabilities."[86] Although the plaintiffs emphasize that Lana H. has

been admitted to North Star multiple times, they fail to note that each instance was

accompanied by a court order, finding that placement justified and necessary.[87] And they

do not provide evidence that any of Lana H.'s placement changes or lack thereof were

caused by an act or omission on the part of the defendants.

The plaintiffs' loose grip on Lana H.'s experiences and their connection to their

ADA claims is apparent when they describe a series of alleged institutionalizations

between 2018 and 2024, apparently with the goal of framing those placements as

unjustified.[88] First, the plaintiffs neglect to acknowledge that Lana H.'s 2018, 2020, and

2024 placements in North Star or San Marcos were subject to judicial oversight and

accompanying orders.[89] Next, their characterization of events relies on a highly selective

and biased narrative summary of Lana H.'s experience, prepared by the plaintiffs' *own*

*attorneys*.[90] This summary, which comprises inadmissible hearsay, fails to include

---

[86]     *Olmstead*, 527 U.S. at 607.

[87]     Docket 237-1: Ex. E (copies of court orders approving placement at North Star, including in 2024).

[88]     Docket 222 at 35.

[89]     Docket 237-1: Ex. E (June 2018 North Star Order; Aug. 2020 Texas Order; Nov. 2024 North Star Order).

[90]     *See, e.g.*, Docket 222 at 35 nn.55–60 (citing "ECF No. 136-77," which the plaintiffs describe as a "Summary of Lana H"). The plaintiffs miscite their own exhibits: their Summary of Lana H. is actually at Docket 138-3.

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7              Page 21 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 21 of 24

meaningful context about Lana H.'s experiences. Finally, as to Lana H.'s purported North Star admission in February 2022,[91] the plaintiffs are just dead wrong. Lana H. was never admitted to North Star in February 2022; following a series of severe incidents in her foster home that included attempted self-harm, she was briefly admitted to the Mat-Su Regional Hospital.[92]

That the plaintiffs are so unfamiliar with Lana H.'s experiences is perhaps not so surprising: Lana H.'s putative next friend—who in theory would be the one representing her interests to the plaintiffs' attorneys—lacked any real connection to her and was recently disqualified from this case.[93] But a clearer look at the facts surrounding Lana H. demonstrates that, once again, the plaintiffs cannot support their ADA claims as to even one individual named plaintiff, let alone the subclass as a whole.

Finally, the plaintiffs have not introduced any evidence that the relief they seek would be a "reasonable modification" of the challenged program and would effectively remedy the harms alleged.[94]  The plaintiffs seek an order from this Court that would, among other things, require the defendants to "ensure equitable access to services across all regions of Alaska, ensuring that children receive timely and appropriate care regardless of location" and impose several new requirements related to when a foster

---

[91]     Docket 222 at 35.

[92]     Docket 237-2: Ex. F (excerpted pages from Lana H. ORCA notes).

[93]     Docket 220.

[94]     *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021).

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 22 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 22 of 24

child may be placed in an institution.[95] In their opposition, the plaintiffs do not even attempt to explain why this expansive, intrusive relief would be a reasonable modification to OCS's foster care program, let alone point to evidence proving this relief would redress their alleged injuries.[96]

## IV. Conclusion

For the foregoing reasons, this Court should grant the defendants' motion for partial summary judgment and dismiss Counts 6 and 7 of the Amended Complaint.

DATED: March 20, 2025.

TREG TAYLOR
ATTORNEY GENERAL


By:     */s/Margaret Paton Walsh*
        Margaret Paton Walsh
        (Alaska Bar No. 0411074)
        Christopher A. Robison
        (Alaska Bar No. 2111126)
        Katherine Demarest
        (Alaska Bar No. 1011074)
        Jennifer Teitell
        (Alaska Bar No. 2405054)
        Maxwell Jenkins-Goetz
        (Alaska Bar No. 2408085)
        Department of Law
        1031 West Fourth Avenue, Ste. 200
        Anchorage, AK 99501
        Telephone: (907) 269-5275
        Facsimile: (907) 276-3697
        Email: margaret.paton-
        walsh@alaska.gov
        Attorneys for State of Alaska

---

[95]     *See* Ex. C (Pls.' Supp. Resp. to Defs.' 1st Set of Interrogs.).

[96]     *See, e.g.*, Docket 222 at 25–26.

*Jeremiah M., et al. v. Kim Kovol, et al.*                    Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7                    Page 23 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 23 of 24

I certify that the word count complies with Local Rule 7.4(a)—the document contains 5,684 words.

*/s/Margaret Paton Walsh*
Margaret Paton Walsh

Certificate of Service
I certify that on March 20, 2025, the foregoing **Reply in Support of Motion for Summary Judgment on Counts 6 & 7** was served electronically on:

Marcia Robinson Lowry
Julia Tebor
David Baloche
Anastasia Benedetto
**A BETTER CHILDHOOD**
mlowry@abetterchildhood.org
jtebor@abetterchildhood.org
dbaloche@abetterchildhood.org
abenedetto@abetterchildhood.org

Elena M. Romerdahl
Hannah Paton
**PERKINS COIE LLP**
eromerdahl@perkinscoie.com
hpaton@perkinscoie.com

Mark Regan
**DISABILITY LAW CENTER OF ALASKA**
mregan@dlcak.org

*/s/Margaret Paton Walsh*
Margaret Paton Walsh, Assistant Attorney General

*Jeremiah M., et al. v. Kim Kovol, et al.*          Case No. 3:22-cv-00129-SLG
Reply in Support of Summary Judgment on Counts 6 & 7          Page 24 of 24

Case 3:22-cv-00129-SLG     Document 238     Filed 03/20/25     Page 24 of 24