TREG TAYLOR
ATTORNEY GENERAL

Margaret Paton Walsh (Alaska Bar No. 0411074)
Katherine Demarest (Alaska Bar No. 1011074)
Jessica Leeah (Alaska Bar No. 0412105)
Jennifer Teitell (Alaska Bar No. 2405054)
Maxwell Jenkins-Goetz (Alaska Bar No. 2408085)
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5275
Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov
kate.demarest@alaska.gov
jessica.leeah@alaska.gov
jennifer.teitell@alaska.gov
max.jenkins-goetz@alaska.gov
Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| Mary B., *et al.*, | ) |
| | ) Case No.: 3:22-cv-00129-SLG |
| Plaintiffs, | ) |
| v. | ) **DEFENDANTS' TRIAL BRIEF** |
| | ) |
| Kim Kovol, *et al.*, | ) |
| | ) |
| Defendants. | ) |

The defendants submit their Trial Brief pursuant to Local Rule 39.2 and the

Court's order at Docket 221.

## I. Operative complaint and substantive pretrial orders.

The operative complaint is the plaintiffs' First Amended Complaint at Docket 16.

| Docket | Substantive Pretrial Order |
|---|---|
| 55 | Order Granting in Part and Denying in Part Motion to Dismiss |

| 220 | Order on Defendants' Motions to Dismiss Several Named Plaintiffs, Plaintiffs' Motion to Substitute Next Friend, and Defendants' Cross-Motion to Disqualify Next Friend |
|------|------|
| 286 | Order on Defendants' Motion for Summary Judgment on Count Three |
| 332 | Order on Motions Regarding Expert Witness Testimony |
| 336 | Order on Class Certification and Related Motions |
| 338 | Order on Defendants' Motion for Reconsideration |
| 362 | Order on Defendants' Motion for Summary Judgment on Counts Six and Seven |
| 364 | Order on Defendants' Motion to Exclude Untimely Identified Witnesses |

## II.  The evidence at trial will not support rulings in the plaintiffs' favor on any of their three claims.

Three claims remain for trial: one regarding foster children's constitutional substantive due process rights and two statutory claims alleging violations of the Child Welfare Act (CWA) and the Americans with Disabilities Act (ADA). The Court certified two classes: for the substantive due process and CWA claims, "[a] General Class of all children for whom OCS has or will have legal responsibility and who are or will be in the legal and physical custody of OCS," and for the ADA claim, "an ADA Subclass of children who are or will be in foster care and experience physical, cognitive, and psychiatric disabilities."[1]

---

[1]      Docket 336 at 57–58.

*Mary B., et al. v Kovol, et al.*                                    Case No.:  3:22-cv-00129-SLG
Defendants' Trial Brief                                             Page 2 of 27

With respect to all three claims, the plaintiffs must show a class-wide legal violation.[2] In other words, they must prove that they are "subject to *statewide policies and practices* that apply *equally* to *every member* of the class."[3] In *Parsons v. Ryan*, a class-action challenge to prison healthcare policies in Arizona, the Ninth Circuit noted that the "district court identified 10 statewide ADC policies and practices to which *all members* of the class are subjected, and seven statewide policies and practices which affect *all members* of the subclass," calling "[t]hese policies and practices" the "'glue' that holds together the putative class[es]."[4] The plaintiffs must demonstrate "that the class members 'have suffered *the same injury*'"[5] as a result of the defendants' conduct. Isolated

---

[2] There is no universally agreed-upon threshold for determining that harms or risks are widespread enough to constitute a class-wide constitutional or statutory violation, but "class-wide" means what it says: even when over a third of foster children experience a harm (and perhaps even more are at risk), a class-wide violation is not established. *See Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 62 (1st Cir. 2014) (holding that as many as 35% of children lacking statutorily required case plans "is not enough to prove that [the agency] is out of compliance with the statute vis-à-vis the class").

[3] *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 970 (9th Cir. 2019) (emphasis added).

[4] *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (emphasis added).

[5] *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis added) (quoting *Southwest v. Falcon*, 457 U.S. 147, 157 (1982)); *see also Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 967 (9th Cir. 2020) ("Because there was no evidence that a class of employees suffered the same injury, [plaintiff] did not establish commonality." (citation omitted)); *Willis v. City of Seattle*, 943 F.3d 882, 885–86 (9th Cir. 2019) (holding that the alleged "practices" of "failing to provide adequate notice" and "destroying personal property" in "sweeps" of homeless encampments do not support commonality because they do not "appl[y] uniformly to all proposed class members" and "there is no evidence that every [putative class member] experienced the same challenged practice or suffered the same injury" as a result of the alleged "practices").

*Mary B., et al. v Kovol, et al.*
Defendants' Trial Brief

Case No.: 3:22-cv-00129-SLG
Page 3 of 27

Case 3:22-cv-00129-SLG    Document 374    Filed 08/04/25    Page 3 of 27

instances of harm or significant risk do not equal class-wide risk.[6]

### A. Law and evidence regarding Count 1: Substantive Due Process

The plaintiffs' first cause of action alleges the defendants have violated their Fourteenth Amendment substantive due process rights.[7] The constitutional concept of substantive due process generally imposes no affirmative obligations on states, but once a state takes a foster child into care, "the state owes the child . . . reasonable safety and minimally adequate care and treatment" under the "special relationship" and "state-created danger" exceptions to that rule.[8] To prevail on this claim, the plaintiffs must prove: (1) that foster children experience class-wide direct harm (or a substantial risk thereof) to constitutionally cognizable interests;[9] (2) that the defendants acted with

---

[6]    The plaintiffs have cited *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985), for the proposition that they "have the right not to be subjected to the unreasonable threat of injury or death" before seeking relief, so establishing an unreasonable risk of harm is sufficient. Disputes about the viability of risk-based claims aside, that case makes clear that the harm or substantial risk thereof must apply to *each class member* and cannot be inferred from isolated instances of harm. In that case, prisoners sued over substandard fire safety mechanisms in a prison that necessarily placed each prisoner at the same risk. *Id.* at 783–84. Unlike a substandard fire system, OCS's alleged shortcomings here apply differently to each class member. For example, a shortage of foster placements has no impact on the many foster children who spend their entire time in care with a relative.

[7]    Docket 16 ¶¶ 264–69.

[8]    *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012) (quoting *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992)); Docket 55 at 38 (quoting *Willden*).

[9]    Although every class member need not have experienced actual harm to a protected interest, widespread substantial risks of harm must be shown. *See B.K.*, 922 F.3d at 968 (asserting that if every class member is placed at a substantial risk of harm to a liberty interest, that is enough for class certification). In *B.K.*, the Ninth Circuit affirmed a grant of class certification, confirming that *alleging* class-wide risks of harm is sufficient at that procedural juncture; the case contains no analysis of *proof* that the alleged class-wide risks of constitutional harm existed.

deliberate indifference toward that harm or substantial risk; and (3) that deliberate

indifference caused the constitutional deprivation.[10]

The Constitution itself gives rise to a limited set of "basic needs" protections:

"[f]oster children have a constitutionally protected right to basic needs, such as food

clothing, shelter, medical care, and reasonable safety", but "'[t]he Fourteenth

Amendment does not entitle [foster children] to receive optimal treatment and

services.'"[11] In its order on the State's Motion to Dismiss, this Court found that just three

of the interests asserted in the plaintiffs' complaint fall within the reach of this protection:

the rights to be "free[] from the foreseeable risk of maltreatment while under the

protective supervision of the State," to "protection from unnecessary intrusions into the

child's emotional wellbeing" while a child is in the State's care, and to "treatment and

care consistent with the purpose and assumptions of government custody."[12] To prevail

on this claim, the plaintiffs must prove class-wide harm, or—at a minimum—a

---

[10]     *See M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 253 (5th Cir. 2018) ("In
addition to establishing that they were deprived of a constitutional right and that the State
acted with the requisite level of culpability, plaintiffs must show that the State is the
moving force behind the deprivation." (citation omitted)); *see also Connor B. ex rel.
Vigurs*, 774 F.3d at 55 (explaining that the plaintiffs failed to demonstrate that the
defendants caused harm to all or most of the plaintiff class).

[11]     Docket 55 at 39–40 (third alteration in original) (quoting *M.D.*, 907 F.3d at 251).

[12]     *Id.*; *see also* Docket 336 at 18. *Accord Connor B.*, 774 F.3d at 55 (The plaintiffs
have sought to take aspirational statutory, regulatory, and private standards as to a variety
of topics within the overall complex of foster child care and convert each of them to
constitutional requirements. The district court correctly rejected that attempt, as do we.").

*substantial risk* of actual class-wide harm to foster children's protected interests.[13]

Few class action cases have explored foster children's substantive due process claims on the merits, and those that have are meaningfully distinct from this case.[14] Most class-action decisions that even identify these constitutional interests do so only in the posture of pre-trial motions.[15] No robust standards therefore exist to guide the Court regarding determinations that these cognizable liberty interests have or have not been violated on a class-wide basis. Still, some limited guidance is available.

As the very language of the right to "freedom from the foreseeable risk of maltreatment" makes clear, this liberty interest is not *per se* violated whenever a foster child experiences maltreatment in care: maltreatment violates the constitution only when it was *foreseeable* to the defendants and, because of their deliberate indifference,

---

[13] A substantial risk of harm on a class-wide basis cannot be proven by simply identifying a few isolated events and then extrapolating that if a few class-members experienced risk or harm, all or most of them will too. Instead, the plaintiffs must prove that *every* class member (or at least enough of them to establish class-wide impact) faces a substantial risk that their cognizable liberty interests will be harmed. *See Hoptowit*, 753 F.2d at 783–84; *Connor B.*, 774 F.3d at 55.

[14] *E.g.*, *M.D. v. Abbott*, 152 F. Supp. 3d 684, 688 (S.D. Tex. 2015) (adjudicating distinct liberty interests from those at issue here), *aff'd in part, rev'd in part and remanded*, 907 F.3d 237 (5th Cir. 2018); *Connor B. ex rel. Vigurs v. Patrick*, 985 F. Supp. 2d 129 (D. Mass. 2013) (employing a different culpability standard than that used in the Ninth Circuit), *aff'd*, 774 F.3d 45 (1st Cir. 2014).

[15] *E.g.*, *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833 (9th Cir. 2010) (vacating denial of defendants' motion for summary judgment and remanding for application of deliberate indifference standard); *B.K.*, 922 F.3d 957 (affirming in part and vacating in part trial court's order granting class certification); *Jonathan R. v. Justice*, No. 3:19-CV-00710, 2023 WL 184960 (S.D.W.Va. Jan. 13, 2023) (order on motion to dismiss); *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163 (4th Cir. 2010) (vacating in part and remanding trial court's order on summary judgment).

occurred anyway. A class-wide violation cannot be established absent a showing that a significant portion of the class experienced maltreatment: for example, the First Circuit found that evidence of a roughly 1% rate of maltreatment in foster care is insufficient.[16] Where a state foster system's rate of maltreatment is within "fractions of a percent" of other states, no class-wide constitutional violation has occurred.[17] In other words, the plaintiffs cannot prevail by simply pointing to individual examples or statistics showing that allegations of maltreatment of foster children are sometimes substantiated. They must prove that *foreseeable* maltreatment occurs such that risk is present class-wide, and that this happens because OCS, through its policies and practices, is deliberately indifferent to that risk.

The plaintiffs have not meaningfully engaged with their burden to demonstrate foreseeable maltreatment on even an individual, much less a class-wide basis. They identify not even one instance of foreseeable maltreatment experienced by a named plaintiff or any other foster child. Their closest attempt is found in Anne Farina's expert report, where she describes an interview with a former foster child who said he experienced abuse while in OCS custody. But Dr. Farina uncritically accepted that account; the interviewee's case file contains no evidence that he was abused, much less

---

[16]     *Connor B.*, 774 F.3d at 52 (affirming the trial court's finding of no substantive due process violation where the foster care agency "has consistently and successfully protected about 99% of children in its care from maltreatment").

[17]     *Connor B.*, 985 F. Supp. 2d at 161 ("[M]ost of Massachusetts's higher-ranked peers beat out the Commonwealth by mere fractions of a percent . . . .").

foreseeably abused, while in OCS custody.[18]

Although the plaintiffs have represented that the record includes numerous instances of children being placed in unsafe situations,[19] they offer scant specifics. For example, they fault OCS for having staff staying with children in hotel rooms or offices overnight in situations where no placement is available, without explaining why they consider safe, short-term accommodations for children to be "maltreatment." This evidence shows the lengths to which OCS caseworkers go to keep children safe.

Nor does evidence about perceived OCS institutional shortcomings, like purportedly inadequate staffing, foster placements, services, case planning, and visitation, amount to proof that any child has experienced maltreatment, much less maltreatment that is foreseeable and for which the entire class is at risk. The evidence will show that Alaska foster children experience maltreatment at a rate of roughly 1.1%, within "fractions of a percent" of higher performing states.[20] There is no evidence of *foreseeable* maltreatment at all. And OCS takes the prevention of maltreatment seriously—the opposite of deliberate indifference.

The second protected interest this Court recognized is "protection from unnecessary intrusions into the child's emotional wellbeing."[21] Only "egregious intrusions on a child's emotional well-being—such as, for example, persistent threats of

---

[18]     *See* Docket 232 at 23–24; Docket 233 ¶¶ 7–8.

[19]     *E.g.*, Docket 283 at 34.

[20]     *Connor B.*, 985 F. Supp. 2d at 161.

[21]     Docket 55 at 39.

bodily harm or aggressive verbal bullying—are constitutionally cognizable."[22] There is no "right to be free from any and all psychological harm at the hands of the State."[23] "[I]ncidental psychological injury that is the natural, if unfortunate, consequence of being a ward of the state does not rise to the level of a substantive due process violation."[24]

Put another way, most children whose circumstances require them to be cared for in OCS custody will experience some degree of emotional disruption as part of the cost of keeping them safe. This right does not and could not possibly guarantee freedom from all emotionally challenging circumstances that come with the disruption of OCS's involvement in a family. For example, the fact that some foster children experience emotional repercussions from placement changes or other challenges foster care requires them to experience does not mean constitutional rights are being violated. Only "*egregious* intrusions" like "threats of bodily harm or aggressive verbal bullying" violate this constitutional right. Severe emotional consequences of such "egregious" intrusions must be shown, along with the defendants' deliberate indifference to children's emotional protection and a causal connection with class-wide risk of harm.

Here again, the plaintiffs have ignored their evidentiary burden and focused instead on the non-controversial fact that OCS recognizes its own institutional challenges. The fact that some OCS caseworkers carry large caseloads does not mean those

---

22 *M.D.*, 907 F.3d at 251 (emphasis added); *see* Docket 55 at 39.

23 *M.D.*, 907 F.3d at 251.

24 *Id.*

caseworkers are indifferent to the emotional wellbeing of the children they serve. High caseloads do not by definition cause emotional harm at all.

The evidence will show that about half of foster children are placed with relatives. Most foster children have three or fewer placements; the most frequently experienced number is one. And most foster children receive adequate services to care for their medical, emotional, and educational needs. It is true that a minority of foster children experience placement disruptions; even fewer experience high numbers of placements. And OCS sometimes struggles to connect children with high needs with therapeutic placements and other services they need. But even for that minority of foster children, evidence of challenging experiences in custody is not the same as evidence of emotional harm caused by OCS's deliberate indifference to their needs. Even in the most complex cases where children have significant, challenging needs and multiple placement changes, the evidence will show that OCS works to prevent and heal trauma and does not cause emotional harm through its indifference. And evidence that some children experience those challenging circumstances is not evidence that the majority—children in stable placements receiving the services they need—are at risk of unnecessary intrusions on their emotional well-being.

The final constitutional interest—"[t]reatment and care consistent with the purpose and assumptions of government custody"[25]—has even less precedent illuminating its meaning. The Court's order recognizing that interest cited only one unreported district

---

[25]     Docket 55 at 39.

court case for the proposition that "courts have found that rights similar to" to this liberty interest are cognizable in the foster care context.[26] That decision in turn cited a single Fourth Circuit case for the proposition that "[d]ue process imposes a corresponding duty on Defendants to ensure that Plaintiffs are neither abused nor neglected while in their custody," and therefore foster children have a "right to treatment and care consistent with the purpose and assumptions of government custody."[27] But the Fourth Circuit was not recognizing a constitutional interest distinct from the right to be free of foreseeable abuse and neglect; it was merely affirming the existence of the special-relationship substantive due process exception.[28]

Neither the language of this purported interest nor the limited caselaw about it provides a judicially manageable standard through which to decide whether this right has been violated. The only helpful touchstone is the fact that substantive due process protects only foster children's "basic needs" and does not entitle them to "optimal treatment and services."[29] In other words, this right might be violated by a child protection system that failed to provide basic nutrition, clothing, shelter, education, and medical care to children in its custody. The plaintiffs have identified no examples of OCS

---

[26]  Docket 55 at 40 (citing *Jonathan R.*, 2023 WL 184960, at *7). *Jonathan R.* has since been dismissed on redressability grounds. No other case appears to exist that recognizes the "right to treatment and care consistent with the purpose and assumptions of government custody" as a distinct liberty interest.

[27]  *Jonathan R.*, 2023 WL 184960, at *7 (citing *Doe*, 597 F.3d at 175).

[28]  *Doe*, 597 F.3d at 175.

[29]  Docket 55 at 39–40 n.192 (quoting *M.D.*, 907 F.3d at 251); *accord Jonathan R.*, 2023 WL 184960, at *7.

failing to provide this constitutionally protected basic level of treatment and care for which children come into OCS custody. They have not even alleged that OCS is failing to take care of children's foundational needs on a class-wide basis, much less that OCS is deliberately indifferent to its legal and moral obligation to do so.

With respect to any of these protected interests, the well-established deliberate indifference standard unquestionably applies to foster care class-action claims in the Ninth Circuit.[30] Because these decisions were delivered in pre-trial contexts, they provide little guidance on adjudicating deliberate indifference on the merits. But the cases are clear that to prevail, the plaintiffs "must prove that state officials acted with such deliberate indifference to the plaintiffs' liberty interest that their actions 'shock the conscience.'"[31] That requires proof of "(1) an objectively substantial risk of harm, and (2) the official's subjective awareness of that risk."[32] And the defendants must have acted in

---

[30]     *E.g.*, *Momox-Caselis v. Donohue*, 987 F.3d 835, 845 (9th Cir. 2021); *Willden*, 678 F.3d at 1000; *Tamas*, 630 F.3d at 845; *Gutierrez v. Dep't of Child. & Fam. Servs. (DCFS)*, No. 21-cv-08238, 2023 WL 6192713, at *6 (C.D. Cal. Aug. 7, 2023); *Phillips v. County of San Bernardino*, No. 22-cv-00696, 2023 WL 12015535, at *9 (C.D. Cal. Aug. 7, 2023); *Ansara v. Maldonado*, 647 F. Supp. 3d 958, 974 (D. Nev. 2022); *A.A. v. County of Los Angeles*, No. 19-cv-10031, 2020 WL 6416997, at *3 (C.D. Cal. Sept. 3, 2020); *Shibley v. County of San Bernardino*, No. 19-cv-00065, 2019 WL 6317780, at *3 (C.D. Cal. July 8, 2019).

[31]     *B.K.*, 922 F.3d at 968 (quoting *Tamas*, 630 F.3d at 844); *see also* Docket 336 at 17–18 (quoting this passage); Docket 55 at 38–39 (affirming that deliberate indifference standard applies). The plaintiffs recently argued that this Court should apply a professional judgment or objective unreasonableness standard of liability to their substantive due process claims. Docket 283 at 16–19. This is at odds with all relevant Ninth Circuit precedent and this Court's prior orders addressing the topic. *See supra* note 30; Docket 55 at 38–39; Docket 291 at 4–8; Docket 336 at 17–18.

[32]     Docket 336 at 18 (quoting *B.K.*, 922 F.3d at 968).

*Mary B., et al. v Kovol, et al.*                          Case No.:  3:22-cv-00129-SLG
Defendants' Trial Brief                                      Page 12 of 27

a manner that disregarded that known risk of harm.[33]

Here, the evidence falls short on the first prong for the reasons explained above; it will not show that the plaintiffs face harms or objectively substantial risks of harm to their constitutionally protected interests. And on the second prong, the plaintiffs cannot show that OCS was aware of conditions creating risk of harm to these rights and failed to take steps to protect children. The fact that challenges remain does not render any of OCS's many efforts to achieve positive outcomes for families mere "gestures."[34] There is no evidence that OCS disregarded any risk that children's constitutional rights to basic needs were in danger of being violated.

Instead, the evidence will show that OCS works hard to care for children at a level well above the constitutional floor set by substantive due process. Ever-changing external conditions—ranging from geography and weather to pandemic-driven workforce and foster family recruitment and retention challenges to shifting conditions driving trauma in families—are stubbornly persistent. There is simply no evidence that OCS is passive or

---

[33]    Although not always specifically mentioned in the deliberate indifference inquiry, this final step (official action/inaction in the face of risk/harm) is logically necessary: an official who is subjectively aware of an objectively substantial risk of harm *and acts* to protect plaintiffs from experiencing harm is not deliberately indifferent to that risk.

[34]    The plaintiffs have framed the defendants' efforts to address systemic challenges and protect foster children are nothing more than "patently ineffective gestures" that "do not prove a lack of deliberate indifference" but instead "demonstrate it." *See, e.g.*, Docket 283 at 11, 32 (quoting *Coleman v. Wilson*, 912 F. Supp. 1282, 1319 (E.D. Cal. 1995)). But quoting a non-foster care case in which official actions *really were* patently ineffective (in *Coleman*, the state agency at issue faced a 300-employee deficit but requested only 21.25 new positions, *see Coleman*, 912 F. Supp. at 1318) in no way proves that OCS's ongoing efforts are mere gestures.

indifferent in the face of these obstacles. OCS makes continuous efforts to address

changing conditions while maintaining and improving upon the level of support it

provides for children and families. At the most basic level, OCS prioritizes basic safety

and prevention of maltreatment of children in its custody. Management and staff

understand the challenges they face better than any outsider could, and employ a strong

culture of creativity, flexibility, and data-driven self-evaluation to continuously improve.

 In sum, to prevail on their constitutional claim *at trial* as opposed to simply

accomplishing class certification, the plaintiffs must *prove* class-wide harm to the

cognizable constitutional interests of foster children. They must show and not simply ask

the Court to assume that OCS consciously disregards children's needs, causing class-

wide harm. Instead, the evidence will show that despite formidable obstacles, OCS

succeeds in providing foster children with their basic needs for care and safety.

### B. Law and Evidence Regarding Count 3: Child Welfare Act

Following this Court's order granting in part and denying in part the defendants'

motion for summary judgment on Count 3, the following claims under the CWA remain:

(1) violation of the right to "a written case plan" that (a) "includes a plan to provide safe,

appropriate and stable placements,"[35] (b) "ensures that the child receives safe and proper

care while in foster care and implementation of that plan,"[36] and (c) "ensures provision of

services to parents, children, and foster parents to facilitate reunification, or where that is

---

[35] Docket 16 ¶ 279(c) (citing 42 U.S.C. §§ 671(a)(16), 675(1)(A)).

[36] *Id.* ¶ 279(d) (citing 42 U.S.C. §§ 671(a)(16), 675(1)(B)).

*Mary B., et al. v Kovol, et al.*      Case No.: 3:22-cv-00129-SLG
Defendants' Trial Brief          Page 14 of 27

Case 3:22-cv-00129-SLG  Document 374  Filed 08/04/25  Page 14 of 27

impossible, the permanent placement of the child and implementation of that plan";[37]
(2) violation of the right to "a case review system in which each child has a case plan
designed to achieve safe and appropriate foster care placements in the least restrictive and
most family-like setting close to their community";[38] and (3) "the right to have a petition
to terminate parental rights filed if the child has been in foster care for 15 out of the last
22 months, unless doing so goes against the best interest of the child as documented in
the case record, or subject to a statutory exemption."[39]

To prove class-wide violations of the right to a written case plan with the requisite
features, the plaintiffs must show that all, or at least a substantial majority, of foster
children either lack a written case plan entirely or have case plans that are deficient in
some way. Here, the plaintiffs cannot show as an initial matter that any individual named
plaintiff lacks a written case plan that complies with federal law. With respect to the
class, the evidence will show that approximately 80% of foster children in Alaska have a
current case plan, that most children have stable placements where they are safe and
receive proper care, and that although service provision is challenging in some cases,
service availability is not a class-wide problem, much less one that can be tied to some
deficiency in OCS's case planning practices rather than other factors.

In *Connor B. ex rel. Vigurs v. Patrick*, the Massachusetts District Court found that

---

[37]     *Id.* ¶ 279(e) (citing 42 U.S.C. §§ 671(a)(16), 675(1)(B)).

[38]     *Id.* ¶ 279(f) (citing 42 U.S.C. §§ 671(a)(16), 675(5)(A)).

[39]     Docket 16 ¶ 279(g) (citing 42 U.S.C. § 675(5)(E)).

Massachusetts had not violated the CWA when it failed to provide case plans to between 15% and 35% of foster children, even when many of the case plans that did exist were incomplete.[40] And the First Circuit affirmed, holding that the record did "not show a *class-wide* failure to provide documentation in the form of individualized case plans."[41] Similarly here, OCS's compliance with the case plan requirements of the CWA well exceeds the level necessary to defeat this claim.

To prove a class-wide violation of the right to a case review system which ensures that each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting close to their community, the plaintiffs must show that OCS does not have an appropriate case review system. But the evidence will show that OCS has a robust case review system. Foster children receive an administrative review of their case every six months. And every year that a federally-mandated review is not required, OCS's quality assurance unit samples and reviews case files from each region.[42] Because the evidence does not support the plaintiffs' claims of a class-wide deficiency in case plans, the plaintiffs cannot rely on allegations regarding case plans to support an inference of deficiencies in the case review system, even if such

---

[40]     985 F. Supp. 2d at 166; *Connor B.*, 774 F.3d at 62; *cf. LaShawn A. v. Dixon*, 762 F. Supp. 959, 973–74 (D.D.C. 1991) (finding violation of the CWA when, among other serious deficiencies, 62% of children for whom the permanency goal was reunification did not have a written case plan and none of the named plaintiffs had a case plan "that contained all of the information required by federal and District law.").

[41]     *Connor B.*, 774 F.3d at 62.

[42]     In CFSR and PIP years, review sites are chosen in consultation with the federal government and extensive case file reviews are done at those sites.

an inference were sufficient to meet the plaintiffs' burden of proof, which it is not.

Finally, the plaintiffs cannot succeed on their claim that the defendants are violating foster children's right to have a petition to terminate parental rights filed if the child has been in foster care for 15 out of the last 22 months, unless certain statutory exceptions apply. Prevailing on that claim would require the plaintiffs to show that OCS fails, on a class-wide basis, to file petitions to terminate parental rights within that timeframe *and* that when OCS does not file petitions, no statutory exceptions apply.

But the evidence will show that in the majority of cases, petitions are either timely filed or an exception applies. Even in the remaining cases, the plaintiffs cannot establish that the statute was actually violated because that determination would require an individualized review of each case file to determine whether an exception was present.[43]

## C. Law and Evidence Regarding Counts Six and Seven: Americans with Disabilities Act and Rehabilitation Act Claims

Finally, the plaintiffs allege that OCS's policies and practices violate the Americans with Disabilities Act and the Rehabilitation Act, placing ADA Subclass members at a serious risk of unjustified institutionalization.[44] Their theory is that Alaska's lack of sufficient community-based services results in: (1) foster children's mental or behavioral health deteriorating, making institutional care necessary when it

---

[43]     *See* Docket 286 at 20 (order recognizing that the individualized review necessary to assess compliance with this statutory requirement may be incompatible with a class-action lawsuit).

[44]     The Amended Complaint made additional ADA and Rehabilitation Act claims, *see* Docket 16 ¶¶ 306(a), (b), (d), 314, but the Court dismissed those claims in September 2023, Docket 55 at 64–66.

would not have been otherwise; or (2) foster children spending longer in institutions than necessary because community placements are not immediately available when they are ready for discharge.[45]

Title II of the ADA and Section 504 of the Rehabilitation Act provide that individuals with disabilities cannot be excluded based on disability from participating in or receiving the benefits of services, programs, or activities offered by public or federally funded entities.[46] Both statutes' implementing regulations contain an "integration mandate" stating that those services, programs, and activities must be administered "in the most integrated setting appropriate to the needs of" individuals with disabilities.[47] In *Olmstead*, the U.S. Supreme Court interpreted these statutes and regulations to conclude that "unjustified institutional isolation of persons with disabilities" is a form of disability discrimination.[48] In *M.R. v. Dreyfus*, a divided Ninth Circuit panel extended *Olmstead*'s holding by accepting the DOJ's position that Title II's integration mandate also prohibits "state action [that] creates a *serious risk* of institutionalization."[49]

---

[45]    *See* Docket 135 at 41, 57; Docket 222 at 27–30.

[46]    42 U.S.C. § 12132; 29 U.S.C. § 794(a). Courts generally interpret these similar provisions coextensively. *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021).

[47]    28 C.F.R. §§ 35.130(d), 41.51(d).

[48]    *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

[49]    663 F.3d 1100, 1117 (9th Cir.), *amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2011). The defendants maintain that *M.R.* is no longer good law and was decided incorrectly. *See* Docket 210 at 8–11 (arguing *M.R.*'s deference was improper in light of superseding U.S. Supreme Court authority); Docket 238 at 2–10. This Court held that M.R. remains controlling here. Docket 362 at 7–10.

Even under the more expansive "serious risk" framework, the plaintiffs must show that: (1) the ADA class faces a serious risk of *unjustified* institutionalization; (2) the risk exists on a class-wide basis; (3) the risk was created by "state action"; and (4) reducing that risk would require only reasonable modifications to OCS's services and programs.

First, the serious risk must be of *unjustified* institutionalization. *Olmstead* explains that institutionalization is "unjustified" if it happens despite a determination by state treatment professionals that community placement is appropriate.[50] But in cases where community placement is inappropriate, institutionalization is justified. As *Olmstead* explained, "[s]ome individuals . . . may need institutional care from time to time to stabilize acute psychiatric symptoms," and "[f]or other individuals, no placement outside the institution may ever be appropriate."[51] The plaintiffs must therefore show that the ADA Subclass is at serious risk of being institutionalized *without medical justification*.

The plaintiffs attempt to sidestep this requirement by making an attenuated argument that an inadequate service array exacerbates foster children's mental and behavioral health issues, making it more likely they will require institutionalization that they would not otherwise have needed. But Title II and Section 504 concern exclusion, denial, and discrimination with respect to *existing* state services—not the adequacy of services. As *Olmstead* noted, neither statute requires states to "provide a certain level of

---

[50]     527 U.S. at 602–03.

[51]     *Id.* at 605 (citation omitted).

benefits to individuals with disabilities."[52] "The ADA prohibits discrimination because of disability, not inadequate treatment for disability."[53]

Second, as discussed above, a class action lawsuit alleging violation of the ADA and Rehabilitation Act must show that the violation is occurring on a *class-wide* basis.[54] It is not enough for the plaintiffs to show that a handful of foster children face a serious risk of unjustified institutionalization; they must show that the ADA Subclass *as a whole* faces that risk. Because the ADA Subclass includes children with physical disabilities as well as children with mental and behavioral health conditions along a spectrum of severity, the plaintiffs must show that children with varying types and degrees of disabilities experience the same or similar risk of unjustified institutionalization.[55]

Third, the plaintiffs must show that the serious risk of institutionalization was "create[d]" by "state action."[56] It is not enough to speculate that foster children are more likely to require institutionalization than they would be if Alaska had a more robust array of therapeutic treatment homes and other community-based providers of lower level services. OCS is not a mental and behavioral health service provider and is not

---

[52]    *Id.* at 603 n.14 (quoting *id.* at 624 (Thomas, J., dissenting)).

[53]    *Simmons v. Navajo County, Arizona*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

[54]    *See Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024) (noting that class actions plaintiffs must "be able to prove their case through common proof *at trial*").

[55]    *B.K.*, 922 F.3d at 970 (noting that the "test of typicality is 'whether other members have the same or similar injury')

[56]    *M.R.*, 663 F.3d at 1117.

responsible for creating or directly providing healthcare services; it can only identify and refer foster children to existing services.[57]

Fourth, the plaintiffs must show that reducing the risk of unjustified institutionalization would require only reasonable modifications to OCS's services and programs. Contrary to the Court's suggestion in its recent order denying summary judgment,[58] this is a *required element* of an affirmative showing for ADA and Rehabilitation Act claims—not merely an issue of remedy.[59] As *Olmstead* acknowledged, the State's responsibility under the ADA is "not boundless"; though it is required to make "reasonable modifications" to avoid disability discrimination, it need not make modifications that would be unreasonable or constitute a "fundamenta[l] alter[ation]" of its services and programs.[60] The *Olmstead* court therefore concluded that states are required to provide community-based treatment *only if* "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."[61]

Under this reasoning, the ADA does not require states to ensure that anyone who no longer requires institutionalization be *immediately* moved to a community placement.

---

[57]    *See* AS 47.10.086(a) (defining OCS's "duty to make" "reasonable efforts to provide family support services to the child and to the parents" as the duty to "identify" and "refer" for such services).

[58]    *See* Docket 362 at 17 n.67.

[59]    *Olmstead*, 527 U.S. at 603–04; *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 862 (9th Cir. 2022).

[60]    *Olmstead*, 527 U.S. at 603 (quoting 28 C.F.R. § 35.130(b)(7)).

[61]    *Id.* at 607.

Nor do they require states to, as the plaintiffs suggest, "ensure" that an "adequate array" of therapeutic treatment homes and community-based services exists. Given the "financial and other logistic limitations" that OCS faces in this area, neither requirement would constitute a reasonable modification to Alaska's programs and services but would in fact fundamentally alter Alaska's child welfare program.[62]

The evidence will show that very few children in OCS custody are institutionalized. Among foster children covered by the ADA, less than 5 percent are placed in residential facilities of any kind. And when foster children require care in residential facilities, multiple layers of oversight ensure institutional care is justified. Those protections include the recommendations of the child's treatment providers, the evaluation of the facilities themselves that the child's needs align with the level of care they provide, and required court approval.

The plaintiffs have not identified any child, named plaintiff or otherwise, who was unjustifiably institutionalized. Among the named plaintiffs, only Lana H. has spent time in residential treatment, and none of Lana's institutional care was "unjustified." Each time she was admitted to residential treatment, a state superior court found the placement justified and necessary. Lana's next friend, her previous guardian ad litem, testified at his deposition that he agreed each of these placements was necessary and that community-based services would have been insufficient to meet Lana's needs. He also testified,

---

[62]     *Where Do We Go Berkeley*, 32 F.4th at 862 (quoting *Townsend v. Quasim*, 328 F.3d 511, 519 (9th Cir. 2003)).

contrary to the inadmissible attorney-written summaries the plaintiffs rely upon, that most of Lana's foster placements were therapeutic treatment homes. Additional witnesses and the documentary evidence from Lana's case file will support that testimony at trial.

Review of the documentary evidence will also show that many of the plaintiffs' central contentions, some of which the Court has accepted in orders, rely on misunderstandings or misrepresentations of the evidence. For example, in its order denying summary judgment on Counts 6 and 7, the Court repeated the plaintiffs' claim that "OCS's official placement policy instructs caseworkers to bring foster children to the emergency room whenever their 'behavior or mental health is effecting placement options.'"[63] But the placement flowchart the plaintiffs cited for this claim says no such thing. It directs caseworkers to bring a child to "the nearest psych ED or other facility" only after exhausting a series of other options, and only in order to obtain a "level of care recommendation," not to place the child at the facility.

In its class certification order, the Court cited the plaintiffs' claim that 505 foster children were placed "in institutions" in 2023,[64] but that assertion was based on a misreading of OCS's data. The plaintiffs overlooked the fact that some children had multiple institutional placements, meaning only 171 children in the dataset were placed in what OCS's ORCA system categorized as "institutions." More importantly, many of the so-called "institutional" placements were not placements in segregated institutional care

---

[63]     Docket 362 at 15 (quoting Docket 222 at 24–25).

[64]     Docket 336 at 48 (citing Docket 135 at 58).

settings at all. The ORCA category of "institutions" includes placements having no relationship to the ADA claim, such as boarding schools and brief hospital admissions for temporary physical ailments.

Finally, to the extent the ADA and Rehabilitation Act require OCS to make efforts to increase the availability of therapeutic treatment homes or community-based services, the evidence will show that OCS makes those efforts and has a "comprehensive, effectively working plan" for placing qualified individuals in less restrictive settings.[65] OCS has issued numerous grants to community-based organizations to support needed services, works in collaboration with child placement agencies to recruit additional therapeutic treatment homes, and has recently introduced a special needs hotline and respite program to help reduce burnout for foster parents caring for children with complex mental and behavioral health needs. Ultimately, though, OCS has only limited tools with which it can exert any influence over Alaska's service array. For example, merely increasing the number of therapeutic treatment homes would not necessarily increase the chances of finding a suitable placement quickly for every child for whom that level of care is appropriate; many therapeutic homes cannot provide care for children with the highest level of needs, such as those with a history of absconding or engaging in assaultive or sexualized behavior.

---

[65]   *Olmstead*, 527 U.S. at 606-07.

*Mary B., et al. v Kovol, et al.*
Defendants' Trial Brief

Case No.:  3:22-cv-00129-SLG
Page 24 of 27

## III. Anticipated evidentiary issues.

*Admissibility of Exhibits*: The plaintiffs provided a preliminary exhibit list containing 516 exhibits, which they declined to narrow to a number that they might reasonably expect to admit at trial. As a result, the defendants anticipate that the plaintiffs may seek the wholesale admission of categories of exhibits—including but not limited to federal data and various government reports—without a sponsoring witness. The defendants object to the admission of exhibits other than through a witness who can explain what the exhibit represents and its relevance to the claims at issue in this case. The wholesale admission of dozens of documents without testimony to provide context and explain their significance allows the plaintiffs to obscure their legal and factual arguments about those documents until closing or even post-trial briefing, undermining the defendants' ability to elicit testimony explaining the evidence through the lens of witnesses rather than attorneys.

*Admissibility of expert testimony*: the parties briefed objections to each other's expert witnesses and the court largely deferred deciding the issues until trial.

*Plaintiffs' attorney summaries*: cross motions regarding summaries of current and former named plaintiffs' case files prepared by their attorneys are ripe for decision.

*Portions of the named plaintiffs' case files:* Significant portions of the named plaintiffs' case files contain hearsay within hearsay, for example by reporting statements of third parties (teachers, doctors, family members, etc.). Some of this multi-layered hearsay may be inadmissible and should addressed on a case-by-case basis at trial.

DATED: August 4, 2025.

TREG TAYLOR
ATTORNEY GENERAL


By:      */s/Margaret Paton Walsh*
         Margaret Paton Walsh
         (Alaska Bar No. 0411074)
         Katherine Demarest
         (Alaska Bar No. 1011074)
         Jessica Leeah
         (Alaska Bar No. 0412105)
         Jennifer Teitell
         (Alaska Bar No. 2405054)
         Maxwell Jenkins-Goetz
         (Alaska Bar No. 2408085)
         Department of Law
         1031 West Fourth Ave., Ste. 200
         Anchorage, AK 99501
         Telephone: (907) 269-5275
         Facsimile: (907) 276-3697
         Email: margaret.paton-
         walsh@alaska.gov
         Attorneys for State of Alaska

Certificate of Service

I certify that on August 4, 2025, the foregoing **Defendants' Trial Brief** was served electronically on:

Marcia Robinson Lowry
Julia Tebor
David Baloche
Anastasia Benedetto
**A BETTER CHILDHOOD**
mlowry@abetterchildhood.org
jtebor@abetterchildhood.org
dbaloche@abetterchildhood.org
abenedetto@abetterchildhood.org

Elena M. Romerdahl
**PERKINS COIE LLP**
eromerdahl@perkinscoie.com

Mark Regan
**DISABILITY LAW CENTER OF ALASKA**
mregan@dlcak.org

Galen D. Bellamy
Kevin D. Homiak
**WHEELER TRIGG O'DONNELL LLP**
bellamy@wtotrial.com
homiak@wtotrial.com

*/s/Margaret Paton Walsh*
Margaret Paton Walsh, Chief Assistant Attorney General