Marcia Robinson Lowry (admitted *pro hac vice*)
mlowry@abetterchildhood.org
Julia K. Tebor (admitted *pro hac vice*)
jtebor@abetterchildhood.org
Anastasia Benedetto (admitted *pro hac vice*)
abenedetto@abetterchildhood.org
David Baloche (admitted *pro hac vice*)
dbaloche@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone:    (646) 795-4456
Facsimile:    (212) 692-0415

Elena M. Romerdahl, AK Bar No. 1509072
eromerdahl@perkinscoie.com
**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Telephone:    (907) 279-8561
Facsimile:    (907) 276-3108

Mark Regan, AK Bar No. 8409081
mregan@dlcak.org
**DISABILITY LAW CENTER OF ALASKA**
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Telephone:    (907) 565-1002
Facsimile:    (907) 565-1000

Galen D. Bellamy (*pro hac vice*)
bellamy@wtotrial.com
Kevin D. Homiak (*pro hac vice*)
homiak@wtotrial.com
Colleen Koch (*pro hac vice*)
koch@wtotrial.com
**WHEELER TRIGG O'DONNELL LLP**
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: (303) 244-1800
*Attorneys for Plaintiffs*

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 1 OF 112

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Mary B. et al., | Case No. 3:22-cv-00129-SLG |
| Plaintiffs, | |
| v. | |
| Kim Kovol, et al., | |
| Defendants. | |

## PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

## TABLE OF CONTENTS

FINDINGS OF FACT ................................................................. 7

I. OCS'S POLICY AND PRACTICE OF MAINTAINING OVERBURDENED CASEWORKERS POSES AN OBJECTIVELY SUBSTANTIAL RISK OF HARM TO ALL FOSTER CHILDREN. ............ 7

    A. Caseworkers Have Several Essential Duties. .......................................... 7

    B. OCS's Workforce Is Chronically Understaffed and Overburdened. ................................................................. 10

        1. Defendants are aware of the substantial risks of unmanageable caseloads and high caseworker turnover. .......... 10

        2. OCS's policies and practices prevent OCS and the Alaska Legislature from adequately addressing high caseloads and caseworker turnover. .......................................... 13

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 2 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 2 of 112

C.     Overburdened Caseworkers Cannot Complete the Essential Tasks of Their Jobs, Posing a Risk of Harm to Foster Children..........21

     1.     OCS's workforce struggles cause infrequent and poor quality caseworker visits. ...........................................................21

     2.     Workforce problems lead to untimely and insufficient case planning. ...........................................................................23

     3.     OCS's systemic failures lead to untimely investigations and risks of maltreatment. ...........................................25

     4.     OCS struggles to establish appropriate permanency goals and achieve timely exits from foster care.................................28

D.     OCS's Delayed and Inadequate Remedial Efforts Aimed at the Workforce Do Not—and Cannot—Remedy the Longstanding Problems. .................................................................................32

II.     OCS'S LACK OF SUPPORT FOR FOSTER PARENTS AND INADEQUATE PLACEMENT ARRAY POSES A SUBSTANTIAL RISK OF HARM TO ALL FOSTER CHILDREN.........................................34

A.     OCS's insufficient foster home capacity is a longstanding problem.................................................................................34

B.     A Lack of Foster Parent Support Further Risks the Availability of Foster Homes and Necessary Care for Foster Children..................35

     1.     Foster parent surveys consistently demonstrate the lack of foster parent support...............................................................35

     2.     Autumn Smith-Amy experienced a lack of necessary support while fostering...............................................................37

     3.     Foster parent Danyelle Galles likewise experienced a lack of OCS support..........................................................................39

     4.     OCS's attempts to support foster parents are recent, untracked, and ineffective. .........................................................41

C.     Because of the Lack of Appropriate Placements, Foster Children Are Kept in Inadequate Placement Substitutes. .....................43

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 3 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 3 of 112

D.     A Lack of Appropriate Placements Creates Placement Instability and a Further Risk of Harm. ................................................................ 45

     1.     Former foster child Matthew Vandenberg was harmed by placement instability. ................................................. 46

     2.     Former foster child Levi Vandenberg also experienced detrimental placement instability. ............................... 47

III.     OCS'S POLICY AND PRACTICE OF MAINTAINING OUTMODED AND INADEQUATE TECHNOLOGY POSES AN OBJECTIVELY SUBSTANTIAL RISK OF HARM TO ALL FOSTER CHILDREN. ................................................................ 49

IV.     FOSTER CHILDREN FACE A SUBSTANTIAL RISK OF UNJUSTIFIED AND UNNECESSARY PLACEMENT AND RETENTION IN INSTITUTIONS. ................................................ 52

     A.     OCS Fails to Evaluate Service Needs and Provide Necessary Interventions. ............................................................. 52

     B.     OCS's Lack of Placements and Interventions for Foster Children with Disabilities Lead to Unjustified and Unnecessary Placement and Retention in Institutions. ............................... 54

     C.     Plaintiffs Identified Several Reasonable Modifications, and Defendants Offered No Rebuttal. ........................................ 62

V.     THE NAMED PLAINTIFFS DEMONSTRATE THE SUBSTANTIAL RISKS ALL FOSTER CHILDREN IN ALASKA FACE. ............................. 64

     A.     Lana H. ................................................................ 64

     B.     Mary B. and Connor B. ...................................... 68

     C.     Rachel T. and Eleanor T. .................................... 69

CONCLUSIONS OF LAW ................................................ 71

I.     STANDING .............................................................. 71

     A.     Plaintiffs Have Standing to Pursue Their Substantive Due Process Claim. ..................................................... 73

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 4 OF 112

B.    Plaintiffs Have Standing to Pursue their Americans with
      Disabilities Act (ADA) Claim. ............................................................ 73

C.    Plaintiffs Have Standing to Pursue Their Child Welfare Act
      (CWA) Claim. ..................................................................................... 74

II.   PLAINTIFFS HAVE PROVEN A VIOLATION OF THEIR
      SUBSTANTIVE DUE PROCESS RIGHTS ................................................... 75

      A.    Governing Law ...................................................................................... 76

            1.    The scope of Plaintiffs' substantive due process rights ............ 76

            2.    Deliberate indifference ............................................................... 79

      B.    OCS's Policies and Practices Violate Plaintiffs' Substantive Due
            Process Rights. ...................................................................................... 80

            1.    OCS's policies and practices deprive Plaintiffs of their
                  Fourteenth Amendment substantive due process rights. ............ 80

                  a.    Unmanageable caseloads and high staff turnover ......... 82

                  b.    Inadequate placement array .......................................... 84

            2.    Defendants have acted with deliberate indifference to
                  Plaintiffs' constitutional rights. ................................................ 87

III.  OCS'S SYSTEMIC FAILURES HAVE RESULTED IN
      VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT. ......... 91

      A.    OCS fails to provide services in the most integrated setting
            appropriate, creating a serious risk of institutionalization. .................. 91

            1.    OCS is responsible for providing services to foster
                  children in the state, including those with behavioral
                  health disabilities. ...................................................................... 93

            2.    OCS's actions and inactions increase the risk of
                  institutionalization. ..................................................................... 95

      B.    The provision of community-based services will not
            fundamentally alter the nature of the services OCS provides. ............. 97

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 5 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 5 of 112

IV.     DEFENDANTS VIOLATED THE CHILD WELFARE ACT......................99

        A.     The CWA Requires Strict Compliance from Alaska. ........................103

        B.     Defendants Failed to Comply with the CWA's Case Plan
               Requirements....................................................................................104

        C.     Defendants Failed to Monitor and Petition to Terminate Parental
               Rights for Foster Children.................................................................106

V.      PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF. ....................107

# FINDINGS OF FACT[1]

## I. OCS'S POLICY AND PRACTICE OF MAINTAINING OVERBURDENED CASEWORKERS POSES AN OBJECTIVELY SUBSTANTIAL RISK OF HARM TO ALL FOSTER CHILDREN.

### A. Caseworkers Have Several Essential Duties.

OCS is legally responsible for all foster children; the OCS Director is ultimately responsible for their safety, permanency, and well-being; and OCS caseworkers are responsible for the safety, permanency, and well-being of the children on their caseloads.[2]

Caseworkers are responsible for a variety of tasks. Each caseworker must visit foster children, parents, and foster parents on a monthly basis.[3] Travis Erickson, the OCS Division Operations Manager for "most of the last 15 years or so,"[4] testified that caseworker visits are part of OCS's "essential services," which are "the most important

---

[1] Pursuant to the Court's directive following closing arguments on September 11, 2025, Plaintiffs attach two exhibits to these Supplemental Proposed Findings of Fact and Conclusions of Law. **Exhibit 1** is a redlined version of Plaintiffs' initial Proposed Findings of Fact and Conclusions of Law (ECF No. 403), with statements that did not come into evidence deleted. Given the extent of the testimony, Plaintiffs have added additional facts and testimony that came into evidence into the instant document. **Exhibit 2** is a full redlined comparison between the initial Proposed Findings of Fact and Conclusions of Law and the instant document; however, given the substantial changes in formatting and wording, the redline may not be particularly helpful in illustrating the extensive *additional* testimony and evidence propounded during trial.

[2] Trial Tr. AT 68:4–8; 101:23—102:1 (Guay); Ex. A at 102-03.

[3] DX A at 102-04.

[4] Trial Tr. at 1549:18-21 (Erickson).

things that we do in the organization related to accomplishing our mission. . . ."[5] Monthly caseworker visits are important for ongoing monitoring of individual needs and assessing for safety.[6] At each visit, caseworkers must visually assess the environment and talk to the foster child to determine whether the placement remains safe; work with families with an eye towards permanency; and assess and assist with meeting medical, educational, and other service needs.[7]

The caseworker and other stakeholders must also develop and update an individualized case plan for each foster child and the child's parents.[8] An initial case plan must be developed within the first 60 days of OCS assuming custody.[9] The case plan must satisfy both federal and state law, and include essential information—such as a description of the child's placement and its appropriateness, relevant health and educational information, and permanency goals.[10] Once the caseworker develops the case plan, it must be evaluated and updated at least every six months or whenever there is a "major change" requiring an updated plan.[11]

---

[5] *Id.* at 1551:22—1552:18 (Erickson).

[6] *Id.* at 1553:23—1555:2 (Erickson).

[7] *Id.* at 1555:11—1556:6; 1556:23—1557:7; 1557:16-23 (Erickson).

[8] *See* DX A at 83-87; *see also* Trial Tr. at 1589:23—1590:12 (Erickson) (noting that a current case plan is part of OCS's essential services).

[9] DX A at 85; Trial Tr. at 1590:19-20 (Erickson).

[10] DX A at 83-87; Trial Tr. at 1590:25—1592:25 (Erickson).

[11] DX A at 89; Trial Tr. at 1594:6-9 (Erickson).

Caseworkers must find each foster child a safe placement "in the least restrictive setting in reasonable proximity to the child's home, extended family or siblings meeting the needs of the child."[12] Caseworkers must also identify a permanency goal for each foster child and continue to plan for the child's permanency,[13] fulfill court-related responsibilities,[14] and "provide case management, direct services, and purchase[] services" for each child.[15]

Caseworkers are also required to perform secondary tasks—like providing overnight supervision of children in OCS offices and hotels[16] or fulfilling out-of-town requests—which are requests that a caseworker in a receiving geographic region (rather than the child's primary region) perform casework duties like monthly visits.[17]

---

[12] DX A at 110; *see also* Trial Tr. at 1608:8—1609:4 (Erickson).

[13] DX A at 97-100.

[14] *Id.* at 169-70.

[15] *Id.* at 105.

[16] Trial Tr. at 703:11-13; *id.* at 783:11-13 (Adair); *see also id.* at 1479:19—1480:7 (Kovol) (agreeing that it is "disruptive" when children are kept in offices and workers have to take care of those children and that these disruptions "derail tasks").

[17] *Id.* at 1558:5-17 (Erickson).

**B.    OCS's Workforce Is Chronically Understaffed and Overburdened.**

**1.    Defendants are aware of the substantial risks of unmanageable caseloads and high caseworker turnover.**

At trial, Director Guay admitted: "We need more workers. We know we need more workers."[18] Between January 2018 and January 2024, an average of 45% of caseworkers had caseloads with more than 30 children on their primary family services caseload.[19] On average, 25% of caseworkers had caseloads between 51-100 children.[20]

Large majorities of frontline caseworkers report that there are not enough staff to manage the workload,[21] that work assignments are unmanageable,[22] and that they work in "'crisis' mode trying to do too much, too quickly."[23] Caseworkers and OCS staff describe how OCS's chronically excessive caseloads—compounded by a toxic culture and management practices that push workers into unfamiliar, unsustainable roles—force constant triage that delays or prevents documentation and monthly visits, leaves critical contacts undocumented, erodes individualized case planning and support, burns staff out, and ultimately hinders adequate care for parents, children, and

---

[18] Trial Tr. at 140:6–7 (Guay).

[19] PX177–PX181.

[20] *Id.*

[21] PX31-0073 (OCS Staff Survey 2022); PX29-0087 (OCS Staff Survey 2023).

[22] PX30-0036 (OCS Staff Survey 2022); PX29-0051 (OCS Staff Survey 2023); PX27-0092 (OCS Staff Survey 2024).

[23] PX27-0087 (OCS Staff Survey 2024).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 10 OF 112

foster families.[24] In the most recent survey, only 62% of caseworkers agreed that "Child safety is never sacrificed to get other job requirements done."[25]

Excessive workloads are a primary driver of worker turnover.[26] Internal staff surveys and staff surveys conducted by the Alaska Citizen Review Panel consistently cite unmanageable caseloads as a primary cause of stress and burnout.[27] High turnover and vacancy rates further compound OCS's workforce problems, and the risk those problems pose to all foster children.

The turnover rate among OCS caseworkers has consistently been over 35% for the past 20 years.[28] According to the latest Annual Report to the Legislature, the statewide turnover rate for frontline workers was 36%, the number of caseworkers available for a full caseload decreased to its lowest percentage since 2019, and the number of caseworkers on partial caseloads increased to its largest percentage since 2019.[29]

---

[24] PX31-0048 (OCS Staff Survey 2022); PX29-0075 (OCS Survey); PX65-0066–68 (CRP Survey).

[25] PX27-0038 (2024 OCS Survey).

[26] Trial Tr. at 189:10-20 (Guay); PX30-0028-29 (Longevity Study); PX63-0015 (literature review).

[27] PX32-0008, 0017; PX31-0048 (narrative response describing workers as operating in a "crisis mode" and noting "[a] high caseload means an increased number of daily interruptions, more court dates, more court reports, and a larger net of people that must be kept in the loop in varying ways"); PX29-0075-76; PX65-0011-18; *id.* at 0063-71.

[28] Trial. Tr. at 187:9-11 (Guay).

[29] *Id.* at 117:19—118:11 (Guay); PX21-0004-5.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 11 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 11 of 112

Plaintiffs' child welfare expert, Alicia Groh, testified that caseworker turnover creates a risk of harm to foster children.[30] It risks delayed communication and access to necessary services and supports, delays in addressing concerns raised by children or families, and postponement of reunification.[31] OCS agrees. As OCS stated in its 2020 Annual Report to the Legislature, "[t]he long-lasting and pervasive negative impact on children and families involved in the child welfare system due to the lack of a stable and sufficient workforce cannot be overstated. High staff turnover continues to overburden the system affecting OCS ability to assess for safety and achieve safe and timely exits of children from foster care."[32]

Director Guay agrees that instability in the workforce is both a cause and consequence of heavy caseloads;[33] that getting stuck in the cycle of high caseloads and high turnover creates a domino effect that exposes all foster children to systemic risk of harm;[34] and that "[h]igh caseworker turnover continues to be the number one barrier

---

[30] *Id.* at 495:22-24 (Groh). Ms. Groh is a child welfare expert with over 26 years of experience. *Id.* at 342:9—346:12 (Groh). She has worked for the Children's Bureau, the federal organization that oversees child welfare, and separately has consulted with 25 states, five native tribes, and two U.S. territories on a vast array of child welfare issues. *Id.*

[31] *Id.* at 495:24—496:10 (Groh).

[32] PX25-0005.

[33] Trial Tr. at 196:22—197:6 (Guay); PX63-0021 (literature review).

[34] Trial Tr. at 197:12-16 (Guay); PX66-0003 (Court Improvement Project summary).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 12 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 12 of 112

to achieving timely and acceptable outcomes based on national standards for children in the state's child welfare system."[35]

> **2. OCS's policies and practices prevent OCS and the Alaska Legislature from adequately addressing high caseloads and caseworker turnover.**

The key to achieving manageable caseloads is to ensure that there are enough caseworkers. Director Guay is responsible for identifying trends and patterns within OCS and for communicating needs and budget recommendations to Department of Family and Community Services leadership and the Alaska State Legislature.[36] And she must determine whether and the extent to which caseworkers have manageable caseloads.[37] To do this, Director Guay relies on data and conversations with her staff.[38] This quantitative and qualitative information helps her determine OCS's workforce needs and communicate budget recommendations.[39]

Of particular importance is the statewide caseload averages generated quarterly for internal review and reported annually to the legislature pursuant to House Bill 151.[40] Only primary Family Services cases and Investigations & Assessments cases

---

[35] Trial Tr. at 210:11-19 (Guay); PX55-1-0021 (GOB FY2021).

[36] Trial Tr. at 70:1-3; Trial Tr. 70:23-71:2 (Guay).

[37] Trial Tr. at 110:23—111:2 (Guay).

[38] Trial Tr. at 139:13–21 (Guay).

[39] Trial Tr. at 111:7—112:10 (Guay).

[40] Trial Tr. at 111:14-19 (Guay); Trial Tr. 113:1-17 (Guay); PX21 (2024 Annual Report).

assigned to frontline caseworkers are counted. Those employed for more than six months and eligible for a full caseload receive full weight (100%), new caseworkers capped at 12 cases count as 90%, and new caseworkers capped at six cases count as 50%.[41]

This methodology significantly understates OCS caseworkers' workload.

First, it defines one case as one family rather than one child, which means a caseworker with 16 cases could have 35 children on their caseload.[42] And with an "uptick in very large sibling groups" entering OCS custody, the workload picture is further distorted.[43]

Second, it does not count cases assigned to supervisors and non-case carrying staff, which manipulates the caseload average downward.[44]

Third, it does not count secondary case assignments. This means out-of-town request assignments, which require the same degree of care and oversight as primary cases, and require coordination between the primary caseworker and secondary caseworker.[45] This also means the secondary Investigations & Assessments assignments that over 50% of caseworkers consistently carry in addition to their

---

[41] Trial Tr. at 118:12—119:13 (Guay); PX21-0011 (2024 Annual Report).

[42] Trial Tr. at 122:7-16 (Guay).

[43] Trial Tr. 791:24—792:1 (Mayes); *Id.* at 1425:24-1426:3 (Swisher).

[44] Trial Tr. at 157:22—160:16 (Guay); PX50-0023 (Legislative Audit finding OCS excluded 402 cases assigned to supervisors and non-case carrying staff).

[45] Trial Tr. at 154:11—155:8 (Guay); PX49-0378–379.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 14 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 14 of 112

primary caseloads are not counted.[46] Brand new caseworkers are assigned secondary caseloads before they become eligible to carry full primary caseloads.[47] Nor are secondary tasks—like child-watch shifts at OCS offices or hotels, on-call shifts, or other tasks unrelated to their primary caseloads—counted.[48]

Fourth, it includes caseworkers who are on the OCS payroll but who are out on leave and physically unable to do their job.[49]

This data is available in ORCA, but Director Guay attributed the failure to account for these additional workload burdens to limitations of the ORCA system.[50] Director Guay has never run or requested a report showing the average number of children on caseworkers' caseloads.[51] She agreed that, if OCS leadership did perform the necessary calculations, they would see, and legislators would see, that nearly 25%

---

[46] Trial Tr. at 151:15—152:19 (explaining that I&A cases are counted on the primary caseworkers' caseload but not the secondary worker who may actually be responsible for the I&A case). PX182–PX186.

[47] Trial Tr. at 162:9—163:5 (Guay); PX21-0024.

[48] Trial Tr. at 155:9—156:4 (Guay)

[49] *Id.* at 121:21-25 (Guay).

[50] *Id.* at 124:13—125:6 (Guay) (per-child reports); *id.* at 128:22—129:3 (Guay) (open versus closed cases); *id.* at 151:21-22 (Guay) (I&A assignments); *id.* at 158:9-10 (Guay) (cases assigned to supervisors and non-case carrying staff); *id.* at 163:11-12 (Guay) (secondary assignments).

[51] *Id.* at 124:5-17 (Guay); *id.* at 125:7-10 (Guay).

of caseworkers consistently carry more than 50 children on their primary caseload, and nearly 25% consistently carry between 30 to 50 children on their primary caseload.[52]

As Ms. Groh testified, these caseloads far exceed accepted professional standards, which recommend caseload ranges between 12–15 children.[53] Ms. Groh testified that more than 50 children on a primary caseload would be "an unreasonable load to carry in providing good child welfare practice" and would put those children at risk of harm, even when caseload responsibilities are shared with others.[54] And yet, when presented with data showing that some caseworkers consistently carry more than 100 children on their primary caseload and asked whether this poses a substantial risk of harm, Director Guay said "it would depend on the cases and the situation."[55] Defendants' expert Jonathan Rubin agreed that it is "very hard, if not impossible, for a caseworker to see . . . 90 children every month,"[56] and a caseload of 90 children is "unmanageable."[57]

Although the statewide caseload averages generated quarterly for internal review and reported annually to the legislature are critical to understanding and

---

[52] *Id.* at 139:4-12 (Guay); *id.* at 162:1-7 (Guay); PX177–PX181.

[53] Trial Tr. at 505:1-20 (Groh); *id.* at 509:5—510:2 (Groh); PX84-0128 (CWLA); PX87-0010 (COA).

[54] Trial Tr. at 516:2—517:11 (Groh).

[55] *Id.* at 135:11-15 (Guay)

[56] *Id.* at 1720:10-14 (Rubin).

[57] *Id.* at 1722:10-14 (Rubin).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 16 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 16 of 112

communicating workforce needs, Director Guay testified that "[t]here's more to it than just the data," and agreed that, to see the reality that frontline workers face, one must dig deeper than the caseload averages.[58]

OCS leadership relies on field supervisors and regional managers to account for nuances and complexities when distributing and balancing caseloads; and they must dig deeper precisely because the caseload numbers do not fully reflect caseworkers' workloads.[59] But Director Guay does not dig deeper than the per-family caseload averages "unless something comes to [her] attention," and OCS leadership does not routinely discuss per-child caseloads across the OCS workforce.[60] Director Guay continues to rely on this data and these discussions when operating the agency and communicating workforce needs to the legislature.[61]

Compounding the problems of its caseload counting practices is the fact that Defendants have not commissioned a workload study for frontline workers since 2006. Director Guay agreed that fixing the workload problem requires an understanding of the workload demands.[62] This is why OCS commissioned workload studies in the past—to understand workload demands and to accurately convey workforce needs to

---

[58] *Id.* at 136:14-21 (Guay).

[59] *Id.* at 136:22-137:16 (Guay).

[60] *Id.* at 137:17-138:11 (Guay).

[61] *Id.* at 139:13-22 (Guay).

[62] *Id.* at 214:13-19 (Guay).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 17 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 17 of 112

legislators.[63] As Mr. Erickson explained, a workload study serves an important "advocacy purpose"; it is a tool to inform legislators that "if you want services delivered at an acceptable level, the facts are telling us we need more staff to do that."[64] And just as intended, the workload study commissioned by OCS in 2006 equipped OCS with a tool to accurately convey workforce needs to the legislature, and the legislature responded by allocating additional funding for OCS caseworker positions.[65]

The 2006 workload study made several findings and recommendations. Critically, it found that Alaska's definition of a "case" as a family unit masked the true intensity of worker responsibilities because "caseworkers spend 71% more time on [multiple children] cases than when there is only one child in placement."[66] The study noted that "the most appropriate way to determine whether some offices are generally over- or under-staffed is to perform these calculations repeatedly over an extended period of time" and recommended that OCS "repeat the calculations by counting cases . . . and applying the weights each month to identify patterns of under- and overburden among the offices."[67] With respect to multiple-child cases, the study recommended that OCS distinguish between single-child cases and multiple-child

---

[63] *Id.* at 214:20-22 (Guay).

[64] *Id.* at 1863:15-23 (Erickson).

[65] *Id.* at 1862:1-24 (Erickson).

[66] PX70-0008.

[67] PX70-0011.

cases and weight multiple-child cases "by multiplying it by 1.71, i.e., increasing it by 71%."[68]

Director Guay confirmed that OCS does not distinguish between single-child and multiple-child cases and does not apply the recommended weights.[69] Although OCS previously weighted positions by regions, those weights were applied for purposes of redistributing positions across the state, not for assessing statewide workloads, and Mr. Erickson testified that he has not applied these weights in years.[70]

OCS staff have warned about "a disconnect with management when it comes to expectations of the work" and suggested that an updated workload study would "help to get a clear picture of what the day-to-day really entails."[71] The CRP-commissioned workload literature review also confirmed that an "updated workload study would give a better understanding of the current workload of Alaska's child welfare workers that takes into account those changes and the contemporary position vacancies."[72]

Despite these warnings and recommendations, OCS does not currently plan to commission an updated workload study. Among the stated reasons for deprioritizing a

---

[68] PX70-0043.

[69] Trial Tr. at 222:6-8 (Guay).

[70] *Id.* at 222:8-17 (Guay); 227:16—228:13 (Guay); 1576:7—1578:3 (Erickson); 1579:14—1581:14 (Erickson).

[71] PX29-0062 (2023 OCS Survey).

[72] PX63-0015-16 (literature review).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 19 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 19 of 112

workload study—including the cost and the urgent need to fill vacant positions—is that it would merely confirm what OCS already knows: that there are not enough caseworkers to meet workload demands.[73] But as Mr. Erickson testified, the purpose of a workload study is not merely to identify a generalized need for additional caseworkers; rather "the purpose of the workload study is to come in and actually analyze it in the level of detail that can be scientific about it rather than theory based."[74]

OCS's failure to conduct a workload study in over 20 years also marks a substantial departure from accepted professional standards. Recognizing that the recommended caseload standards do not adequately account for the myriad complexities and diverse circumstances that affect caseworker workloads in different states, accepted professional standards recommend that state child welfare agencies conduct a workload study to develop their own agency-specific caseload standards, and then regularly review those caseloads standards to ensure that they reflect newly implemented policies and practices.[75]

---

[73] Trial Tr. 226:21—227:15 (Guay); *id.* at 1864:10-19 (Erickson).

[74] *Id.* at 1863:2-14 (Erickson).

[75] *Id.* at 507:21—508:12 (Groh); 661:11—662:7 (Groh); PX83-0019-20.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 20 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 20 of 112

**C.    Overburdened Caseworkers Cannot Complete the Essential Tasks of Their Jobs, Posing a Risk of Harm to Foster Children.**

When a caseworker has too much work, it becomes difficult to manage their primary caseload.[76] As Anchorage Regional Manager Jessie Mayes testified, at some point, it is a "mathematical impossibility" to perform the essential tasks for the children on their caseload.[77] The evidence shows that OCS's caseworkers are unable to perform their essential tasks, posing a substantial risk of serious harm to foster children.

**1.    OCS's workforce struggles cause infrequent and poor quality caseworker visits.**

Caseworker visits with children and parents are "the heart of child welfare work,"[78] yet OCS data shows that caseworker visits are consistently and dangerously low.[79] For example, in the month of January, less than 70% of out-of-home children have been visited by a caseworker since 2022.[80] And total for the year 2023, over 37% of monthly caseworker visits were not performed at all.[81] In its 2024 Annual Report to the Legislature, OCS reported that only 61% of foster children in out-of-home

---

[76] *Id.* at 106:2-22 (Guay).

[77] *Id.* at 101:19—103:25 (Guay); *id.* at 765:9-12 (Mayes); *id.* at 768:25—769:1 (Mayes).

[78] PX4-0018.

[79] PX175, PX176, PX194, PX196, PX197.

[80] PX194.

[81] PX175.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 21 OF 112

placements received monthly visits—a decrease from 72% in 2019.[82] In its 2025 APSR, OCS reported the percentage of children visited every month decreased 8% over 5 years, from 71% in 2020 to 63% in 2024.[83] Unsurprisingly, between 2019 and 2023, Alaska ranked 51st out of 52 jurisdictions in monthly caseworker visits for children, except in 2020—when Alaska ranked 50th.[84]

Since 2002, OCS has attributed infrequent and poor quality caseworker visitation to "high caseloads" and "worker turnover."[85] As recently as its 2025-2029 CFSP, OCS stated that caseworker visits "continue to fail to meet the national standard" due to "high caseloads and record high staff turnover rates."[86]

Infrequent and poor quality case worker visits "result[] in poor ongoing assessment of safety, needs and case planning" which "results in children languishing and staying longer in foster care."[87] And, as Ms. Groh testified, a lack of caseworker visits risks a child's physical safety, because the caseworker cannot assess the child's

_____

[82] PX21-0008.

[83] PX13-0019.

[84] PX15.

[85] PX3-0050; *see also* PX4-0019.

[86] PX5-0055.

[87] PX25-0005.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 22 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 22 of 112

current environment or living conditions.[88] Similarly, a lack of caseworker visits to parents risks delays in case planning or receiving necessary approvals.[89]

OCS also fails to perform adequate visits with parents, leading to delays in permanency. As of January 2025, OCS made only 17% of monthly visits to fathers and 28% of monthly visits to mothers.[90] In its 2025-2029 CFSP, OCS reported that in 2023, caseworker visits with parents were of sufficient frequency and/or quality in only 19% of cases reviewed, down from 34% in 2021.[91] By 2024, only 27% caseworker visits with parents were sufficient (unweighted average of regions).[92]

### 2. Workforce problems lead to untimely and insufficient case planning.

Timely case planning also does not occur due to overburdened and understaffed case workers. In 2023, only 57% of case plans were established in the required 60-day window.[93] Initial case plans are also not routinely or consistently updated. OCS

---

[88] Trial Tr. 533:21—534:3 (Groh).

[89] *Id.* at 536:5—537:8 (Groh).

[90] PX196; PX197.

[91] PX5-0021.

[92] PX13-0019.

[93] PX187.

reported that in 2024, only 55% of parent case plans were current.[94] As of January 2025, only 66% of parent case plans were current.[95]

OCS also fails to involve parents and children in the case-planning process consistently. In the 2002 CFSR, reviewers found that OCS was effective at involving parents or children in the case planning process in only 57% of foster care cases reviewed (13 of 23).[96] By 2017, only 50% of foster care cases reviewed showed that "concerted efforts were made (or are being made) to involve parents and children (if developmentally appropriate) in the case planning process on an ongoing basis."[97] By 2024, that number dropped to only 42% of cases reviewed.[98] Nicole Adair, the regional manager for the Southeastern Region, acknowledged that ensuring the quality of case plans has been a challenge in her region.[99]

The federal government attributes delays in initiating and updating case plans to caseworkers' caseload burden and high turnover.[100] OCS likewise acknowledges

---

[94] PX21-0008.

[95] PX195.

[96] PX3-0048 (Item 18).

[97] PX1-0013 (Item 13).

[98] PX13-0017.

[99] Trial Tr. at 717:17-20 (Adair).

[100] PX2-0084.

that decreases in caseworker visits[101] and challenges in staffing levels[102] compound the challenges for case planning.

If a case plan is not updated, delivery of essential services to foster children and their families may be delayed.[103] Untimely or outdated case plans also risks putting or leaving children in inappropriate placements and delaying progress toward reunification.[104]

### 3. OCS's systemic failures lead to untimely investigations and risks of maltreatment.

Federal and state law require OCS to establish procedures for the immediate screening, risk and safety assessment, and prompt initial assessment of reports of child abuse or neglect, and to take actions necessary to prevent further harm to the child.[105] For Priority 1 reports (indicating a "present danger"), investigations must be initiated within 24 hours of the report. For Priority 2 reports (indicating an "impending danger"), investigations must be initiated within 72 hours of the report. For Priority 3 reports (indicating a "high risk of maltreatment"), investigations must be initiated within seven days of the report.[106]

---

[101] PX5-0020.

[102] PX13-0026.

[103] Trial Tr. 1594:16—1595:6 (Erickson); *id.* at 527:14-21 (Groh).

[104] *Id.* at 527:22—528:23 (Groh).

[105] PX49-0044-46.

[106] PX49 at 32, 402–40.

Every CFSR since 2002 has cited a lack of concerted efforts to assess and address safety concerns.[107] OCS reported that, in 2023, "the agency made concerted efforts to assess and address the risk and safety concerns relating to the child(ren)" in 43% of total cases reviewed.[108] And most recently, OCS reported that in 2024, only 49% of total cases reviewed show concerted efforts to assess and address the risk and safety concerns (unweighted average of regions).[109]

Timeliness of investigation responses has also consistently been a problem for OCS.[110] OCS reported that timeliness of investigation response rose from 23% in 2017 to 60% in 2023.[111] In 2024, timely initiation of investigations dropped to 57%.[112] And the lower the priority of the investigation, the less likely it is to be timely initiated.[113] Alaska consistently ranks among the worst states for timely investigations, ranking 50th in 2021 and 49th in 2023.[114]

---

[107] PX3-0026 (2002); PX2-0037 (2008); PX1-0008 (2017).

[108] PX5-0013.

[109] PX13-0011.

[110] PX3-0020 (in 2002, OCS timely responded to maltreatment reports in only 70% of cases reviewed); PX2-0031 (in 2008, only 56% of cases reviewed showed timely investigations); PX1-0007 (in 2017, only 72% of cases reviewed were initiated within prescribed timeframes).

[111] PX21-0008; PX5-0011.

[112] PX13-0008; PX21-0008.

[113] PX5-0012.

[114] PX16.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 26 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 26 of 112

Untimely investigations have long been attributed to high caseloads and caseworker turnover.[115] Because of a lack of timely investigations, maltreatment rates in Alaska consistently rank among the worst in the country.[116] As timely investigations have fallen, "repeat maltreatment for Alaska Native children has gone up to 18%" and "has remained below the national performance level" for non-Native children.[117] The maltreatment rate for foster children in Alaska (1.09%) is also significantly higher than that of all Alaskan children (.0146%).[118] The untimeliness of investigations also impacts children in foster care, as caseworkers also perform investigations into allegations of abuse and neglect in foster placements licensed by OCS.[119]

OCS does not track or investigate maltreatment of foster children housed in placements not licensed by OCS, including institutional facilities, hotels, offices, or other alternate settings.[120] In those cases, "the protected services report would be screened out because it's outside of a jurisdiction for [OCS] to investigate."[121] As early as 2002, "stakeholders and reviewers suggested that the repeat maltreatment rate may

---

[115] PX3-0020; PX5-0011; PX13-0046.

[116] PX17.

[117] PX5-0013.

[118] PX14-0002, 0007.

[119] Trial Tr. at 175:18-25 (Guay).

[120] *Id.* at 2332:12—2333:2 (Abramczyk).

[121] *Id.* at 2352:20-24 (Donahue).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 27 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 27 of 112

be even higher than the officially reported rate, because not all incidents of repeat maltreatment are being investigated."[122]

Even as child maltreatment deaths remain "alarmingly high" and OCS remains concerned that child maltreatment deaths are "underreported," OCS "continues the trend of investigating fewer number of fatalities over previous years," and as of 2024, still "does not have a comprehensive plan to address child maltreatment deaths."[123]

### 4. OCS struggles to establish appropriate permanency goals and achieve timely exits from foster care.

Federal law, state law, and OCS policy require OCS to identify the most appropriate permanency goal for the child (such as reunification or adoption), document compelling reasons for that permanency goal, and implement the permanency plan.[124] OCS has long struggled to meet these requirements.[125] By 2024, only 45% of permanency goals were determined to be appropriate, realistic, and timely established.[126] And in cases with permanency goals of reunification, guardianship or permanent placement with relatives, OCS fails to achieve them or even make diligent

---

[122] PX3-0022.

[123] PX10-0055–56; PX12-0087.

[124] PX49-0097-100.

[125] PX3-0032 (in 2002, only 61% of cases reviewed had appropriate, realistic, and timely permanency goals); PX2-0045 (in 2008, only 45%); PX1-0009 (in 2017, only 50%); PX5-0015 (50% in 2023).

[126] PX13-0012.

efforts to achieve them.[127] In 2024, only 35% of cases reviewed showed that permanency goals were met or diligent efforts were made.[128] Consequently, Alaska consistently ranks among the worst states for length of stay in foster care.[129] In 2023, Alaska ranked 49th out of 52 jurisdictions for median length of stay in foster care,[130] and in 2024, OCS reported that the average length of time in care has increased steadily since 2017.[131]

OCS is also required by federal law to have a procedure for assuring the timely termination of parental rights where appropriate.[132] But OCS does not have such a procedure.[133] OCS reported that, in 2025, parental rights were timely terminated in 19% of cases.[134] In those cases where termination of parental rights petitions were not timely filed, compelling reasons existed for 29%.[135] In 52% of cases, there were no

---

[127] PX3-0033 (in 2002, only 31% of cases reviewed); PX2-0048 (2008: 33%); PX1-0009 (2017: 25%); PX5-0016 (2023: 44%).

[128] PX13-0012.

[129] PX18.

[130] *Id.*

[131] PX21-0008.

[132] 42 U.S.C. § 675(5)(E); § 475(5)(E)(i) – (iii); 45 CFR 1356.21(i)(2).

[133] *See* Trial Tr. 2431:8—2432:2 (Donahue).

[134] PX13-0028.

[135] *Id.*

compelling reasons documented.[136] These figures have stayed consistent since 2022.[137] While the 2025 APSR notes that "children placed with a relative is an automatic compelling reason that is only documented through the placement,"[138] OCS's permanency officer did not know what percentage of children without any compelling reason were placed with a relative.[139] Thus, many of the children placed with relatives could also be children where a TPR was already filed or who had other compelling reasons documented.

OCS has identified the lack of caseworker visits to parents and children as a cause of the failure to timely file petitions to terminate parental rights.[140] And every CFSR since 2002 has warned that OCS's infrequent and poor quality caseworker visits threaten the safety and wellbeing of foster children and hinder permanency goals.[141] Most recently, reviewers noted that "infrequent and insufficient quality caseworker visitation with children and families was a critical factor in the lack of comprehensive and accurate risk, safety, and needs assessments, resulting in children, in almost half

---

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] Trial Tr. at 2166:17-24 (Tandeske).

[140] PX101-0003.

[141] PX1-0013; PX2-0069; PX3-0050.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 30 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 30 of 112

of the applicable cases remaining in their homes despite unmitigated safety concerns."[142]

There is a "longstanding recognition" in child welfare work that there are worse outcomes for foster children who do not achieve permanency.[143] Despite this longstanding risk of harm, OCS failed to put forth any evidence at trial that its system for ensuring timely filing of TPR petitions—such that one exists—has improved. The best OCS could offer is that "[i]t is possible, in the future, that an updated CCWIS [comprehensive child welfare information system] could interface with the court system to inform ORCA on the status of a TPR petition."[144] But for now, in order to determine whether a TPR petition has been filed timely or whether compelling reasons have been documented, the Department of Law had to do a manual review for the purposes of this litigation, calling into question the accuracy of Defendants' data regarding compliance with 42 U.S.C. § 675(5)(E).[145] And even then, in at least 15% of cases, the Department of Law could not determine why a petition for termination of parental rights had not been filed.[146]

---

[142] PX1-0005.

[143] Trial Tr. at 489:22—490:4 (Groh).

[144] PX10-0019.

[145] *Id.* at 2431:8—2432:2 (Donahue); *see also* DX TTTT.

[146] DX TTTT.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 31 OF 112

**D.     OCS's Delayed and Inadequate Remedial Efforts Aimed at the Workforce Do Not—and Cannot—Remedy the Longstanding Problems.**

OCS said it best in its 2020-2024 CFSP: "OCS is great at new ideas, and starting new initiatives, but is lacking on the necessary focused follow-through of implementation that allows for changes to new initiatives along the way. If new efforts do not work, they are generally eliminated with little assessment, evaluation or changes that could make the effort successful."[147]

Director Guay agrees that more manageable caseloads decrease the systemwide risks of harm to foster children.[148] Likewise, Anchorage Regional Manager Jessie May testified that because there is not enough staff to adhere to the staffing requirements in HB 151, those requirements are treated as a "guideline."[149]

But OCS's remedial efforts aimed at addressing its workforce problems and ameliorating caseloads have proven ineffective. The 2024 Public Consulting Group Report, attached to the Division of Legislative Audit Report, found that OCS's hiring process and recruitment strategy were ineffective and contrary to best practices.[150] With respect to the hiring process, the PCG Report found that "the current hiring process has many steps, is administratively arduous, takes a long time to play out (we

---

[147] PX4-0035.

[148] *Id.* at 110:2-4 (Guay).

[149] *Id.* at 767:10-22 (Mayes).

[150] PX50-0055, 0107-114.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 32 OF 112

consistently heard 'around five months'), and has poor communication throughout."[151] PCG determined that, with respect to recruitment, "OCS does not currently appear to be consistently utilizing creative recruitment methods that might better market its jobs to either non-traditional applicants or to younger workers coming into the workforce" who may be attracted to Alaska's unique geography.[152]

Competency-based hiring, which was adopted as a means of expanding the applicant pool, is insufficient without additional training of these caseworkers.[153] As the 2024 Legislative Audit determined, "[w]ithout a rigorous training program . . . caseworkers may not be adequately prepared to provide services, which may contribute to higher turnover and lower outcomes."[154] And OCS was unable to demonstrate that its training program "adequately prepared new caseworkers hired with core competencies to proficiently provide services."[155]

Although OCS has adopted other workplace-wellness initiatives in an effort to improve retention, staff survey responses reveal that they are ineffective as well.[156] By

---

[151] PX50-0107.

[152] PX50-0110.

[153] PX50-0040.

[154] PX50-0040.

[155] *Id.*

[156] *E.g.,* PX29-0089; PX27-0086; PX28-0036-37.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 33 OF 112

2024, only 61% of respondents agreed that OCS "supports my health and well-being."[157]

## II. OCS'S LACK OF SUPPORT FOR FOSTER PARENTS AND INADEQUATE PLACEMENT ARRAY POSES A SUBSTANTIAL RISK OF HARM TO ALL FOSTER CHILDREN.

In addition to caseload and workforce problems, OCS demonstrates a lack of support for foster parents and an inadequate placement array designed to meet the needs of foster children. As Ms. Groh credibly opined, "without an adequate placement array that align[s] with the specific needs and characteristics of children in out-of-home care, there is a risk of increased instability for children."[158]

### A. OCS's insufficient foster home capacity is a longstanding problem.

As acknowledged by almost every regional manager, there are not enough placements to meet the needs of Alaska's foster children.[159] In April 2025, 2,495 children were in out-of-home care.[160] That month, there were only 1,038 licensed foster homes, of which just 602 were non-child-specific homes, and 436 were child-

---

[157] PX27-0085.

[158] Trial Tr. 566:21-24 (Groh).

[159] *See* Trial Tr. at 676:14-15 (Johnson); 721:13-22 (Adair); 769:2-16 (Mayes); 808:6-10, 811:7-9 (Robinson).

[160] PX13-0037.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 34 OF 112

specific foster homes.[161] The data shows a steady decline in numbers of foster homes since 2020.[162]

Every CFSR since 2002 has found that OCS did not have an effective process for ensuring the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State for whom foster and adoptive homes are needed.[163] And while the South-Central Regional Manager, Mariah Johnson, stated that OCS is "constantly working on recruitment" of foster homes within her region, she has not seen data on the outcomes of those recruitment efforts.[164]

**B.** **A Lack of Foster Parent Support Further Risks the Availability of Foster Homes and Necessary Care for Foster Children.**

**1.** **Foster parent surveys consistently demonstrate the lack of foster parent support.**

OCS's failure to support foster parents exacerbates placement shortages and directly undermines the stability and safety of placements for children in state custody.[165] In the 2024 Foster Parent Survey, foster families "expressed frustration and

---

[161] *Id.*

[162] DX Z at 12-15.

[163] PX3-0081-82; PX2-0113-115; PX1-0024.

[164] Trial Tr. at 679:4, 11-16 (Johnson).

[165] *See, e.g., id.* at 1299:3-14 (Galles), 1301:15-22 (Galles), 1307:14-19 (Galles); 1314:1-6 (Galles); 1089:3-10 (Smith); 1089:18-22 (Smith); 1097:1-8 (Smith); 1100:15-19 (Smith); 1102:4-7 (Smith).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 35 OF 112

concern about the level of communication and support from OCS."[166] 51% of respondents said they did not receive monthly contact with a caseworker, with 10% reporting they received no visits.[167] 42% of respondents said they were unable to reach the child's caseworker when needed.[168] And 37% of respondents stated caseworkers "sometimes" provide sufficient information prior to placement to allow them to meet the children's needs—28% said "Never."[169]

Foster parents "reported that they found out later that the foster children had special needs, and that information was not relayed when accepting the children. There was no background information about the foster child, no history of medical records or behavioral problems."[170] By 2025, these numbers improved only marginally.[171] And foster parents consistently reported that children placed in their homes were not provided with the services necessary to meet their educational, medical, or mental health needs.[172] Childcare was identified as a major barrier to serving as a foster parent, particularly in rural areas.[173] Even when childcare is found, foster parents are plagued

---

[166] *Id.* at 578:2-9 (Groh).

[167] PX35-0049.

[168] PX35-0050.

[169] PX35-0045.

[170] PX35-0023-24.

[171] PX204-0028-30.

[172] PX37-0029 (2017); PX36-0045 (2019); PX35-0048 (2024).

[173] *E.g.,* PX36-0010,14 (citing lack of childcare as a reason why prospective foster parents were unable to attend foster parent training necessary to become licensed); PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW *Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG PAGE 36 OF 112

by inadequate childcare cost reimbursement and delays in receiving reimbursements.[174]

Surveys of foster parents show that OCS's failure to support them has undermined their willingness to continue taking in children. In 2017 and 2019, nearly one-third of respondents unwilling to continue fostering cited insufficient support from OCS as the reason.[175] By 2025, that figure had risen to 47%.[176] Respondents noted that "they received little to no support from OCS, and communication was often poor or non-existent."[177]

## 2. Autumn Smith-Amy experienced a lack of necessary support while fostering.

Former foster parent Autumn Smith-Amy testified about the lack of support she received from OCS for the foster children placed in her home.[178] Her first placement, two siblings ages three and five, arrived in October 2018.[179] Before placement, she met the OCS caseworker, the guardian ad litem, and the Court Appointed Special Advocate once at a café. She was told the children had no special needs and were simply "shy"

---

PX35-0011 (identifying childcare as "one of the most serious challenges foster parents face," particularly in rural areas).

[174] PX35-0036, 0042, 0058.

[175] PX37-0023; PX36-0033.

[176] PX204-0010.

[177] PX204-0010.

[178] *E.g.,* Trial Tr. at 1090:12—1093:19 (Farina).

[179] *Id.* at 1083:11-25 (Smith); 1084:1-2 (Smith).

and "reserved," coming from a crowded foster home.[180] No OCS worker attended the drop-off at Ms. Smith-Amy's home; the prior foster parent delivered the children.[181]

OCS provided no information about the children's prior dental care, behavioral-health evaluations, or any neuropsychological assessments.[182] The only information Ms. Smith-Amy received was a single, double-sided "hello" sheet listing things like the children's likes, bedtimes, and a property list.[183] Within the first week, Ms. Smith-Amy suspected the children had special needs.[184] She raised her concerns with the caseworker—who encouraged her to contact the CASA but offered no other specific plan.[185] Ms. Smith-Amy ultimately had to secure the children's neuropsychological evaluations herself.[186] The neuropsychologist concluded both children had special needs and suspected Fetal Alcohol Spectrum Disorder.[187] Ms. Smith-Amy continued to have to coordinate the necessary services for the children, including obtaining a handicapped placard for her vehicle.[188]

---

[180] *Id.* at 1085:15—1088:18 (Smith).

[181] *Id.* at 1089:23—1090:1 (Smith).

[182] *Id.* at 1092:8—1093:9 (Smith).

[183] *Id.* at 1090:23—1092:7, 14-25 (Smith).

[184] *Id.* at 1093A:20—1095:8 (Smith).

[185] *Id.* at 1095:9—1096:3 (Smith).

[186] *Id.* at 1096:11-25 (Smith); 1097:1-17, (Smith).

[187] *Id.* at 1097:19 —1098:24 (Smith).

[188] *Id.* at 1099:5—1102:12 (Smith).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 38 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 38 of 112

Throughout the placement, caseworkers rotated without transition meetings.[189] Monthly visits were brief (under an hour) and did not include specific questions about medical or dental care, school, or developmental milestones, nor did workers review the medical and education binders Ms. Smith-Amy kept despite her offers.[190] No one discussed a case plan with her.[191]

### 3. Foster parent Danyelle Galles likewise experienced a lack of OCS support.

Danyelle Galles became a licensed foster parent in 2020 when OCS took her three younger half-sisters Rachel, Eleanor, and Gayle into custody and asked her to serve as a familial placement.[192] OCS told her the girls would be transported from Fairbanks to Anchorage,[193] but she received an emergency call that the Fairbanks placement "needed them out that night," so she drove to Fairbanks after work and brought them back herself.[194] The drive is seven hours,[195] she arrived between midnight and 2:00 a.m.,[196] and no caseworker accompanied the girls.[197] They were

---

[189] *Id.* at 1103:18-23 (Smith).

[190] *Id.* at 1103:24—1105:3 (Smith).

[191] *Id.* at 1105:4-6 (Smith); 1106:4-6 (Smith).

[192] *Id.* at 1286:22—1287:15 (Galles).

[193] *Id.* at 1289:8-11 (Galles).

[194] *Id.* at 1289:15-19 (Galles).

[195] *Id.* at 1289:20-21 (Galles).

[196] *Id.* at 1290:9-10 (Galles).

[197] *Id.* at 1289:24—1290:1 (Galles).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 39 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 39 of 112

disheveled and each had only a pillow and a grocery bag[198]; no documentation or medical histories were provided.[199]

After Gayle's removal for mental health treatment,[200] Rachel began weekly severe outbursts—self-injury (e.g., head-banging), violence, prolonged screaming, and property damage.[201] OCS told Ms. Galles to use the psych emergency department and to report every episode.[202] At the emergency department, a nurse gave Ms. Galles a provider list, and she scheduled a March 2021 neuropsychology exam herself.[203] Ms. Galles testified OCS had not provided those names and did not help schedule any appointments.[204]

Rachel's first wisdom-tooth extraction was cancelled the day before, because permissions were not given, requiring a reschedule and a $100 fee that OCS only reimbursed 6–7 months later.[205] Although a hearing had determined OCS had authority for surgical and medication decisions,[206] the second surgery was also canceled the day

---

[198] *Id.* at 1290:11-12 (Galles).

[199] *Id.* at 1290:13-21 (Galles).

[200] *See id.* at 1296:8-12 (Galles).

[201] *Id.* at 1296:23—1297:4; 1302:10-20 (Galles).

[202] *Id.* at 1296:12-19 (Galles); 1297:10-16 (Galles).

[203] *Id.* at 1298:3—1299:4 (Galles).

[204] *Id.* at 1297:25—1299:4 (Galles).

[205] *Id.* at 1303:15—1304:24 (Galles).

[206] *Id.* at 1304:9-11 (Galles).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 40 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 40 of 112

before when she was not on the schedule due to missing permissions, pushing the surgery another six months out; Rachel suffered daily pain (cheek-biting, headaches) and Ms. Galles reported it to OCS.[207]

Overall, Ms. Galles estimates that she worked with about a dozen providers, and that she—not OCS—identified and scheduled every one of them.[208] In roughly five years, she recalls "about six" primary caseworkers split between Fairbanks and Wasilla, and never having a primary caseworker in Anchorage; some workers changed without notice.[209] Managing care sometimes meant 2–3 appointments per week, and she left her day job for an overnight position to accommodate this.[210]

### 4. OCS's attempts to support foster parents are recent, untracked, and ineffective.

Recent efforts to support foster parents have been ineffective. For example, the Placement Search and Support Unit ("PSSU"), implemented in October 2023, was created in part to provide support to placements.[211] The December 2024 PSSU Report by the OCS Quality Assurance Unit concluded that "both ORCA and PSSU data

---

[207] *Id.* at 1305:8-21 (Galles).

[208] *Id.* at 1306:8-19 (Galles).

[209] *Id.* at 1306:20—1307:13 (Galles).

[210] *Id.* at 1307:4-17 (Galles); 1309:1-13 (Galles).

[211] PX69-0003.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 41 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 41 of 112

suggest little success in achieving most of the objectives that PSSU had aimed to achieve."[212]

OCS created the Special Needs Hotline to assist foster parents in obtaining vouchers and other items necessary to support the children in their care.[213] But this, too, has had limited success in achieving the desired outcomes.[214] In the 2025 Foster Parent Survey, respondents reported that response times increased[215] and satisfaction rates went down.[216] OCS noted that "the current system is hindered by poor communication, and financial strain."[217]

OCS has also tried to implement a respite care program for foster parents, which was only rolled out statewide in the summer of 2025.[218] However, respondents to the 2025 foster parent survey "commonly reported that respite care was hard to access, and often unavailable when needed," and found the system "fragmented and lacking in support for those needing breaks."[219]

---

[212] PX69-0016.

[213] *See* Trial Tr. 2295:1-20(Abramczyk).

[214] *See* PX204-0041-43.

[215] PX204-0042-43.

[216] PX204-0043-44.

[217] PX204-0005.

[218] Trial Tr. 2298:1-10 (Donahue); 2340:13-22 (Donahue).

[219] PX204-0005.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 42 OF 112

**C.** **Because of the Lack of Appropriate Placements, Foster Children Are Kept in Inadequate Placement Substitutes.**

OCS's failures to recruit and maintain adequate foster placements have forced the agency to house foster children in inappropriate, makeshift environments.[220]

According to OCS's Statewide Placement Search Flowchart, if a child's "Behavior or mental health is effecting placement options," but "Acute Care/Residential" is not recommended, caseworkers are instructed to consider youth homeless shelters, including "Covenant House (ages 18+), MACK House (ages 13-17), The Door, SOAP, Nome Children's Home, Putyuk Children's Home."[221] Forrest Clough is the shelter supervisor for Spruce Root House in Juneau.[222] Mr. Clough testified regarding OCS using his shelter as an overflow foster placement.[223] He also noted that children in OCS custody get "stuck" at his shelter and end up being there long-term, causing them to deteriorate.[224]

OCS also houses foster children in OCS offices or hotels when no placements are available.[225] When caseworkers are unavailable to supervise children, OCS hires

---

[220] Trial Tr. 771:14-17 (Mayes), 812:2-9 (Robinson).

[221] PX68-0002.

[222] Trial Tr. 1256:19-20 (Clough).

[223] *Id.* at 1260:10-12 (Clough), 1262:17-19 (Clough); 1269:11-18 (Clough).

[224] *Id.* at 1268:23 – 1269:4 (Clough); *see also* DX DD.

[225] *See, e.g.,* Trial Tr. at 775:7—777:8 (Mayes); 782:11-13 (Mayes); 782:18—785:6 (Mayes); 794:5-22 (Mayes) (describing necessary accommodations and protocols for children staying overnight at OCS offices due to the frequency of such stays); 805:4-

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG

private security guards to supervise children in hotels overnight, paying them thousands of dollars per night.[226] When private security services are unavailable to supervise children, OCS hires private individuals, including "DJJ [Department of Juvenile Justice] history employees or current employees" or "retired police officers."[227] The OCS Policy Manual does not contain any policies or guidelines governing the transport and supervision of foster children by these private companies—so, for example, nothing prohibits security guards from carrying or using firearms, or from using physical or chemical restraints on children.[228]

The 2024 Ombudsman Report noted that "OCS had funds to spend on costly private security that could have been used to pay for care delivered by a licensed provider of services for people experiencing behavioral and/or intellectual disabilities," and that OCS can fulfill its obligation to these children "within the current framework by recruiting providers who can serve children with intellectual and/or physical disabilities while pursuing future systems improvements."[229]

---

9) (Robinson) (agreeing that infants stay overnight in OCS offices in the Western Region).

[226] *E.g.,* PX76; Trial Tr. at 692:11-13 (Johnson) (agreeing that private security services stay with children with behavioral concerns, and this this practice is a "serious matter").

[227] Trial Tr. at 907:11-18 (Moore).

[228] *See generally* DX A.

[229] PX51-0011.

**D.    A Lack of Appropriate Placements Creates Placement Instability and a Further Risk of Harm.**

OCS has long known that "[n]ot having enough appropriate placement options also increases the likelihood of multiple placements for children and is contradictory to the best interests of a child."[230] Placement instability nevertheless worsened from 2018 to 2022.[231]

Until January of 2025, OCS did not track stays in hotels or offices as "placements," because they are not licensed.[232] So a stay in a hotel or office would not be counted in the number of placement moves for each foster child—which, in turn, calls into question Defendants' placement stability statistics.[233] And even if those statistics were not undercounting placement changes (they are), they would still show that 43% of children have three or more placement moves, with 121 children having over 20 placement changes.[234]

OCS acknowledges that if a placement disrupts "it's not good for people; transitions are hard and it's very hard for children."[235] Placement disruptions can also

---

[230] PX55-1-0022.

[231] PX14-0010.

[232] *See* Trial Tr. 1336:24—1337:11 (Centeno); 2495:8—2497:3 (Donahue), 2497:12-19 (Donahue).

[233] *See* DX UUUU; DX IIIII.

[234] DX UUUU.

[235] Trial Tr. at 1609:14-20 (Erickson).

sever attachments with caregivers, interrupt the continuity of medical care, and have educational impacts.[236]

### 1. Former foster child Matthew Vandenberg was harmed by placement instability.

Matthew Vandenberg testified that he entered foster care at age 14 in 2021 and remained there until 2023 or 2024.[237] During that time, he estimated that he was moved to between 13 to 14 different placements—including group homes, hospitals, and about nine or ten different foster families.[238] He also spent nights in OCS offices in Wasilla, when no placements were available.[239]

At one foster home, referred to by foster children as the "Ramen House," he was given only two ramen noodle packets per day to eat.[240] There, the foster parent threatened to shoot Matthew's brother when he knocked on a window at night,[241] and Matthew himself was shoved into a wall and then kicked out of the home for allegedly breaking the wall.[242] Despite repeatedly telling OCS about the mistreatment, OCS failed to act until he refused to leave their office without being moved.[243] Matthew also

---

[236] *Id.* at 1610:1-13 (Erickson).

[237] *Id.* at 14:3-12 (Vandenberg).

[238] *Id.* at 14:22—15:11 (Vandenberg).

[239] *Id.* at 15:2-4 (Vandenberg).

[240] *Id.* at 24:22—25:4 (Vandenberg).

[241] *Id.* at 25:8-18 (Vandenberg).

[242] *Id.* at 25:21-25 (Vandenberg).

[243] *Id.* at 26:1-6 (Vandenberg).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 46 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 46 of 112

spent nights in the Wasilla OCS office—where he was locked in a room from 8:00 p.m. until noon the next day without a blanket, pillow, food, or water. He could not leave the locked room, even to use the bathroom.[244]

Matthew described feeling mentally exhausted and unmotivated, unable to complete schoolwork, and physically run down.[245] The placement moves strained his relationships with siblings, causing built-up anger and distance between them.[246] Moving schools four or five times because of placement changes left him academically behind.[247]

### 2. Former foster child Levi Vandenberg also experienced detrimental placement instability.

Levi Vandenberg entered foster care in April 2021 at age 11 and remained until 2024.[248] In those three years, he estimated he was moved about 30 to 32 times, including 26 foster families and 4 hotels.[249]

Levi testified that he only received medical care when living in a foster home, and constant moves interrupted both medical treatment and access to therapy.[250] He

---

[244] *Id.* at 26:11—28:10 (Vandenberg).

[245] *Id.* at 20:5-19 (Vandenberg).

[246] *Id.* at 20:20-21:3 (Vandenberg).

[247] *Id.* at 24:4-17 (Vandenberg).

[248] *Id.* at 41:1-9 (Vandenberg).

[249] *Id.* at 41:14—42:4 (Vandenberg).

[250] *Id.* at 42:8-13 (Vandenberg).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 47 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 47 of 112

explained that he was never in one place long enough to establish therapy, and being shifted on and off medications weakened their effectiveness and eventually made him unwilling to take them.[251]

He testified that the constant moves were stressful and exhausting, eroding his relationships with his siblings and leaving him emotionally drained.[252] His moves caused him to miss a lot of school and that sometimes he was not in a place long enough to be enrolled.[253]

Levi also described the time he spent living in hotels under the watch of JACE staff.[254] At the North Pole Hotel, where he stayed, he testified that staff tied his hands behind his back with shoelaces as part of a "bet."[255] On another occasion, after an argument, he tied sheets together and climbed out a second-story window to escape. When he returned hours later, JACE staff tackled and restrained him in the parking lot, laying on his back for 30–40 minutes until police arrived.[256]

---

[251] *Id.* at 43:17—44:12 (Vandenberg).

[252] *Id.* at 43:1-16 (Vandenberg).

[253] *Id.* at 42:14-24 (Vandenberg).

[254] *Id.* at 46:1-8 (Vandenberg).

[255] *Id.* at 46:18—47:8 (Vandenberg).

[256] *Id.* at 47:10—48:10 (Vandenberg).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 48 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 48 of 112

Because there were no other placements for him, Levi also spent over a year at Copper Hills Youth Center in Utah,[257] where he was supposed to be for 6–9 months but was held for more than a year.[258]

### III. OCS'S POLICY AND PRACTICE OF MAINTAINING OUTMODED AND INADEQUATE TECHNOLOGY POSES AN OBJECTIVELY SUBSTANTIAL RISK OF HARM TO ALL FOSTER CHILDREN.

Having a well-functioning data system is integral to ensuring foster children's safety, wellbeing, and permanency. As Ms. Groh explained: *"Having a data system that is really conducive to efficient and effective practice can help make that easier for workers. It can hopefully take a little bit of the burden of the more administrative part of the job to a lower level, so that they can put more of their time into the really important direct service that they do."*[259]

For the past 15 years, OCS has noted that technology limitations are a key challenge to working effectively and efficiently in the field.[260] In surveys, OCS staff expressed concerns about severe and pervasive technology failures, including caseworkers using laptops that overheated, caught fire, or failed to hold a charge; field

---

[257] *Id.* at 48:11-19 (Vandenberg).

[258] *Id.* at 48:20-23 (Vandenberg).

[259] Trial Tr. at 580:8—583:2 (Groh).

[260] PX54-1-0002 (FY2010 Budget); PX54-1-0003–9 (FY2011–2017); PX54-1-0010–11 (FY2018–2019).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 49 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 49 of 112

staff left without working phones; and case documentation delayed by hours or even days because workers could not access ORCA in real time.[261]

In 2022, OCS contracted with consulting firm, Berry Dunn, to conduct an analysis of potential alternatives to upgrade or replace ORCA. As Commissioner Kovol testified, the report analyzed "five options. Basically Option 1 is like don't do anything, up to Option 5 which was like the Cadillac version, and everything kind of in between."[262] The report identified several challenges with the current system,[263] and warned that if OCS chose Option 1—that is "continue[ing] to use ORCA without significant modifications or enhancements"—it would result in a cascade of serious systemwide harms.[264]

In 2023, OCS stated that ORCA is an "end of life" system,[265] and that "[d]esired modernization" of ORCA had not occurred "due to lack of resources, and other priorities."[266] In its 2024 APSR, OCS reported that "[w]ork with Berry Dunn was closed out in November 2023 without issuing an RFP due to no money being allotted in the Governor's FY25 budget for a new system."[267] In its 2025 APSR, OCS

---

[261] PX62-0009, 0012.

[262] Trial Tr. at 1500:1-3 (Kovol).

[263] PX57-0322–323.

[264] PX57-0348.

[265] PX55-1-0023 (FY2023 Budget).

[266] PX54-1 at 14 (FY2023 Budget).

[267] PX12-0025.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 50 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 50 of 112

confirmed that it was choosing Option 1: "Despite the challenges faced with the ORCA system, including its outdated infrastructure and inability to meet current child welfare program needs, significant efforts have been made to improve data quality and system functionality. Moving forward, it is essential to focus on optimizing existing resources and enhancing internal processes."[268]

Commissioner Kovol's testimony that ORCA "still works, just not fancy with the apps" is flatly contradicted by Berry Dunn's assessment, OCS's determination that ORCA is an "end of life" system, and OCS's statement in 2025 that it "continues to be challenged with the lack of appropriate technology resources to do the job effectively and efficiently."[269] Commissioner Kovol declined to answer when OCS expects to replace the ORCA system, citing "privileged [conversations] with OMB," but testified that "it could be approximately one to two years" to complete the transfer to the new system after the new system comes online.[270] Division Operations Manager Erickson "expect[s] it to take longer than that."[271]

---

[268] PX13-0026.

[269] PX55-1-0023 (FY2023 Budget); PX55-1-0024 (FY2025 Budget).

[270] Trial Tr. at 1501:7——1502:9 (Kovol).

[271] *Id.* at 1809:19-25 (Erickson).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 51 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 51 of 112

## IV. FOSTER CHILDREN FACE A SUBSTANTIAL RISK OF UNJUSTIFIED AND UNNECESSARY PLACEMENT AND RETENTION IN INSTITUTIONS.

### A. OCS Fails to Evaluate Service Needs and Provide Necessary Interventions.

Foster children often enter the foster care system already having a variety of medical and mental health issues, including those related to the trauma of abuse and neglect as well as the trauma of being removed from their caregiver.[272] To ensure the health and wellbeing of foster children and ameliorate the conditions that led to their removal, caseworkers must "capture and address underlying problems for both children and parents."[273] Caseworkers are responsible for obtaining early, comprehensive, and ongoing assessments, and connecting children to appropriate treatment necessary to address any needs, including mental health need.[274]

Commissioner Heidi Hedberg of the Department of Health agreed that "the increased availability of behavioral health services and mental health services, [and] an increase in the number of providers of those services, does not necessarily mean that those services end up provided to a youth in OCS custody"; and she agreed that "in order to receive the appropriate behavior and mental health service, somebody has

---

[272] *Id.* at 935:23—936:21 (Farina).

[273] PX3-0048; Trial Tr. at 935:23—937:11 (Farina).

[274] *Id.* at 937:12—938:1 (Farina).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 52 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 52 of 112

to identify that the child requires some sort of assessment or is in need of those services."[275]

CFSRs have consistently identified systemic failures in OCS's ability to evaluate service needs and provide necessary interventions.[276] The 2017 CFSR found that OCS adequately assessed the needs of children, parents, and foster parents and provided the services necessary to meet those needs in only 40% of cases.[277] In 2023, OCS reported that the service needs of children, parents, and foster parents were adequately assessed and met in only 24% of cases reviewed.[278] The most recent data shows that, in 2024, needs were assessed and met in only 40% of cases reviewed.[279] OCS employees testified that their Medical and Mental Health Unit does not even have immediate access to children's medical records.[280]

Since 2002, these failures have consistently been attributed to "overworked caseworkers who falter in maintaining consistent contact and follow-through with the

---

[275] Trial Tr. at 1170:14–24 (Hedberg).

[276] PX3-0047 (Item 17) (2002 CFSR); PX2-0064–65 (Item 17) (2008 CFSR).

[277] PX1-0012 (Item 12) (2017 CFSR).

[278] PX5-0020.

[279] PX13-0016.

[280] Trial Tr. 1354:2-6 (Centeno) (testifying that testified that OCS "recently got the functionality to upload school [records], like, IEPs and eSERS, but not medical records at this point."); *see also id.* at 1353:2-7 (Centeno) ("[W]e don't have just immediate access to every youth's [medical] records.").

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 53 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 53 of 112

provision of needed services."[281] Poor quality case plans and infrequent caseworker visits are also cited as reasons for OCS's systemic failure to assess and meet needs.[282] In its 2025 Annual Progress and Services Report, OCS reported that caseworker visits with children were of sufficient frequency and quality in only 50% of cases reviewed.[283] And in is latest report to the legislature, OCS reported that nearly 40% of children did not receive monthly visits in 2024.[284]

Foster parent surveys also reveal how OCS's actions and inactions deprive children of needed medical services. In the latest survey, published in August 2025, 24% of foster parents reported that caseworkers "Never" provide sufficient information to meet the child's needs, and 40% reported that caseworkers only "Sometimes" provide sufficient information to meet the child's needs.[285]

**B.      OCS's Lack of Placements and Interventions for Foster Children with Disabilities Lead to Unjustified and Unnecessary Placement and Retention in Institutions.**

OCS does not recruit and retain a sufficient number and type of placements, including placements that are able to support and house children with medical and mental health disabilities. For example, there are an insufficient number of foster

---

[281] PX2-0065–66 (Item 17); PX3-0047.

[282] PX3-0048; PX13-0015.

[283] PX13-0018.

[284] PX21-0008.

[285] PX204-0029.

homes for children who require more support than a traditional foster home can provide but who do not necessarily need to be institutionalized.[286] These homes include therapeutic foster homes (i.e., homes for children with mental health needs) and family habilitation or medically intensive foster homes (i.e., homes for children who will need increased medical care for the rest of their lives).[287] And Alaska also has no intermediate care facilities (i.e., facilities that are a lower level of care than a hospital or psychiatric residential treatment facility, but a higher level of care than a therapeutic treatment home).[288]

---

[286] Trial Tr. at 725:5-14 (Adair) ("[T]here's lots of foster children [in her region] who fit into this middle ground category where they have some escalated behaviors that require more than a traditional foster home but not so acute that they need to be institutionalized . . . But the problem is that there are not enough intermediate placement settings.").

[287] *Id.* at 859:8—860:5 (Moore) (testifying that there were not enough family habilitation homes); *see also* PX115-0001 (discussing that as of October 2022, there were 17 family habilitation homes in Alaska, with a limit of 3 children in each home and there were 50 children waitlisted for these homes); Trial Tr. at 869:6-21 (Moore) (testifying regarding a lack of facilities that will take children with low IQs);

[288] Trial Tr. at 857:17-25 (Moore); *see also id.* at 1358:9—1359:9 (Centeno) ("[T]here's other states have intermediate care facilities that are eligible for youth under the age of 18 to enter into. Those can help address the needs of medical complex youth or even youth with developmental disabilities. We don't have those here. So, something along those lines would be extremely helpful."); 874:4-21 (Moore) (agreeing with the DOJ report that therapeutic foster homes are "rare" in rural areas of Alaska and discussing that there are only six child placement agencies which license therapeutic foster homes."); 1358:9–17 (Centeno) ("[I]n the State of Alaska, we don't have like this unlimited number of, say, therapeutic treatment homes. We don't have medically intensive foster homes; we don't have a vast number of those. In fact, it's very difficult to find a home that is wheelchair accessible, especially in – you wouldn't necessarily think this, but in Anchorage in the Mat-Su Valley where you have access to the majority of your medical providers, a wheelchair accessible home is very

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 55 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 55 of 112

Ms. Moore, the former head of the MMHU, testified that, without intermediate care facilities, it is possible to "have youth linger in hospitals longer than needed, and then there's a lack of beds for a youth that would actually need it, whether in OCS or not."[289] The lack of intermediate placements forces OCS to choose between placing a child in a setting that cannot meet the child's needs or placing the child in a hospital. Ms. Moore confirmed that, given the choice between discharging a child to an unsafe home or keeping the child in a hospital when it's no longer medically necessary, OCS prefers to keep the child in the hospital setting as a "social admit"—leading OCS to pay thousands of dollars per day to hold a child in a hospital.[290]

There are also an inadequate number of emergency foster homes in Alaska. There is only one emergency foster home in the Southeast Region.[291] And, while there are eight emergency homes in the Anchorage Region, children from other regions are

difficult to find."); 779:3-12 (Mayes) (agreeing that there are not enough therapeutic homes in Anchorage even though the majority of therapeutic homes are located in Anchorage).

[289] *Id.* at 858:16—859:3 (Moore).

[290] *Id.* at 869:22—870:7 (Moore) ("Q. Can you tell us what a social admit is? A. Yes. Social admit is when we are asking the hospital to take a youth, whether it's mentally or physically, but they do not meet hospital level of care. Q. So, this is a situation when a youth is placed in a hospital unnecessarily; right? A. It's a safe place for them because at the time we do not have anybody who can meet their needs. Q. But it's, it's unnecessary in the sense that they really should be placed in a lower level of care; right? A. Yes."); *see also* PX113-0001 (Adair).

[291] *Id.* at 726:10-15 (Adair).

often sent to Anchorage which "results in beds being held up long term" and children are sometimes "stuck there for several months."[292]

There is an inadequate array of services and providers in Alaska, including for children, and OCS faces "roadblocks" in getting necessary services for foster children.[293] Ms. Centeno, the current head of OCS's MMHU, testified that "we lack the number of providers in the state. Just occupational therapy, speech therapy, that can work with medically complex children is, is lacking. And I'm thinking primarily in the hub areas, not to mention our outlying village areas which is difficult then to keep our youth in their home communities."[294]

Plaintiffs' expert, Dr. Anne Farina, testified that children who are not receiving the mental health services needed in an ongoing, intentional, comprehensive way in the community are at risk of "hospitalization or restrictive level, high level of services."[295] Alaska's Deputy Commissioner of the Department of Health agreed that increased access to home-based family treatment can "at least reduce the risk of

---

[292] *Id.* at 772:1-7 (Mayes); 770:13—771:17 (Mayes).

[293] *Id.* at 862:6-9 (Moore) (testifying regarding "roadblocks" in "getting [] services, whether it's [a] higher level of care or treatment, you know, inpatient/outpatient therapies, whichever it is, getting them on the SDS waiver."); 884:20-885-4 (Moore) (testifying that she did not see any improvement in the services made available to foster children during the period of time from 2020 to 2024); PX134 (listing "gaps in mental health for Alaska's youth").

[294] *Id.* at 1359:4-9 (Centeno).

[295] *Id.* at 938:2-9 (Farina).

institutionalization."[296] This is, in part, because if a child is not receiving the services that they need, then there is an "exacerbation of symptoms" which may get to a point of "aggression behaviors," including "harm to self and others," and "suicidal ideation."[297] Community-based intervention can lessen the risk of a child being hospitalized and that there are situations where the child would not have been institutionalized if they had timely received services in the community.[298]

This lack of adequate services has plagued Alaska for years. The United States Department of Justice found in a December 2022 report that there was reasonable cause to believe that Alaska was violating the Americans with Disabilities Act, and that children with behavioral health disabilities in Alaska face a substantial risk of unnecessary institutionalization.[299] With respect to foster children, the Department of Justice found that

> [l]ong standing gaps in the availability of Therapeutic Treatment Home Services—a critical intervention for children at risk of institutional placement, particularly children in the State's custody—persist in Alaska. The State has capacity to serve about 150 children in therapeutic foster homes, although many more children are appropriate for this service and unable to access it. Therapeutic foster homes are

---

[296] *Id.* at 1237:23—1238:1 (Ricci).

[297] *Id.* at 938:10-939:11 (Farina).

[298] *Id.* at 940:21—941:7 (Farina). For example, in the case of P., a seven year old that Dr. Farina interviewed North Star, the case files showed that the child was not placed in a therapeutic foster home and had "escalating symptoms" for many months but that no additional supports, other than continued weekly therapy sessions, were put into place. *Id.* at 953:1-959:12 (Farina); 1076:2-14 (Farina); DX NNNN.

[299] PX52.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 58 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 58 of 112

concentrated in the southcentral region, around Anchorage, and are rare or nonexistent in many rural communities.[300]

The Department of Justice also found that

due to insufficient therapeutic foster homes and other community-based service options, children who are in the custody of OCS are more likely than other children to move from one institution to the next and often experience unnecessarily long institutional placements, sometimes months past the point of therapeutic value. Lengths of stay in psychiatric hospitals for OCS-involved children exceed 80 days on average. In out-of-state PRTFs, according to facility staff, there are children in OCS custody who, though ready for discharge, remain at the PRTF because there are no community placements available for them in Alaska.[301]

The DOJ determined that "[c]hildren in OCS custody are also at heightened risk of experiencing inappropriate placements outside institutions . . . Some children end up sleeping on the floor of an OCS office or at a shelter. Others stay in a traditional foster home without appropriate services and supports until they experience a behavioral health crisis and are hospitalized."[302] "Multiple providers in Alaska report that OCS keeps children in general hospitals because there are no safe places to maintain them, such as crisis or respite foster homes."[303]

---

[300] PX52-0021.

[301] *Id.*

[302] *Id.*; *see also* Trial Tr. at 877:21-25 (Moore) (agreeing with DOJ's finding that "children in OCS custody were at a heightened risk of experiencing inappropriate placements when they couldn't access therapeutic homes").

[303] PX52-0021.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 59 OF 112

The DOJ also found that, due to the lack of services and appropriate placements, Alaskan children were likely to be sent out of state. While a committee reviews out of state placements, "[r]ecords produced by OCS for approximately 160 of these meetings between 2016 and 2020 involving children in the State's custody did not contain a single instance where the committee denied approval for out-of-state placement. . . . The average age of the children referred was just 13" years old.[304]

In January of 2025, the DOJ and Alaska entered into an agreement, which allowed Alaska three years to try to address the issues documented in the DOJ Report.[305] OCS has the statutory authority to address service shortages by using licensing and rate-setting powers under Alaska Stat. § 47.32.010(c) (2023) and Alaska Admin. Code 7, § 53.365 (2022), including incentivizing the development of placements and services in underserved regions. Yet, the agency does not maintain basic data necessary to do so. OCS does not track the number of children in foster care with diagnosed disabilities, the number of beds in therapeutic foster homes, the availability of service providers statewide, or provider waitlists.[306] OCS also does not track the average length of stay in institutions for foster children other than in acute

---

[304] PX52-0010.

[305] DX JJJ.

[306] Trial Tr. 850:24—860:2 (Moore); 1349:25—1350:8 (Centeno) (testifying that she did not believe that there was a list of children with a diagnosed disability under the ADA). There was some testimony that Medicaid created a list of providers in 2025, but this list was not offered in evidence and Plaintiffs have yet to review this list.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 60 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 60 of 112

psychiatric care, and does not track the average length of stay for foster children in out-of-state psychiatric residential treatment facilities.[307] Nor does the Department of Health track the number of community-based providers for foster children or waitlists for services for foster children.[308]

Department of Health Commissioner Hedberg testified that her Department "does not oversee or have jurisdiction over foster children" and explained that "[OCS and DOH] work together, and so we ensure that, that children in foster care have access to healthcare services."[309] Defendants also elicited testimony about payments for services rising since 2018, but the Deputy Commissioner of DOH agreed that healthcare costs have gone up nationally since 2018.[310] Defendants also did not provide any evidence of an increase in services as a result of an increase in spending.[311] OCS also provided information on the number of children generally at psychiatric residential treatment facilities[312] but did not provide information at the hearing on the number of children placed at all institutions, as that term is defined on OCS's own

---

[307] *Id.* at 1343:17—1344:1 (Centeno); 1345:11-20 (Centeno).

[308] *Id.* at 1238:21—1241:9 (Ricci).

[309] *Id.* at 1127:5–8 (Hedberg); 1160:1–5 (Hedberg).

[310] *Id.* at 1213:20-25 (Ricci).

[311] *Id.* at 1214:22—1215:1 (Ricci).

[312] DX FFF.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 61 OF 112

website.[313] OCS's reporting showed that between 53 and 72 children were placed in institutions each month in 2025.[314]

The data Defendants provided also did not show the average length of stay for foster children in psychiatric residential treatment facilities, and it excluded youth that were still in treatment in psychiatric residential treatment facilities at the time the data was collected.[315] So if a child were placed in such a facility years earlier and still there as of the date the data was collected, it would not be reflected in the data that Defendants presented.[316] Defendants did not provide testimony or evidence regarding any other steps taken to address their ADA violation.

### C. Plaintiffs Identified Several Reasonable Modifications, and Defendants Offered No Rebuttal.

Over the course of the hearing, several witnesses identified potential reasonable modifications, including:

- **Tracking the number of foster children with one or more disabilities under the ADA.** The MMHU currently does not keep a list of all foster children with one or more qualified disabilities under the ADA.[317]

---

[313] DX AA; Trial Tr. at 1230:1—1232:11 (Ricci) (DOH's Deputy Commissioner testifying that she had not reviewed the information OCS publishes about the number of children institutionalized).

[314] DX AA at 5.

[315] Trial Tr. at 1233:9-25 (Ricci).

[316] *Id.* at 1234:1-8 (Ricci).

[317] *Id.* at 1349:25—1350:4 (Centeno).

- **Hire more nurses for the MMHU.** The MMHU has only four nurses for the approximately 500 children with complex needs at any given time.[318]

- **Upload medical records to ORCA.** Medical records are not uploaded to ORCA. Ms. Centeno testified that OCS "just recently got the functionality to upload school [records], like, IEPs and eSERS, but not medical records at this point."[319]

- **Educate healthcare providers and foster parents about the MMHU.** Ms. Centeno did not know whether foster parents are trained on what the MMHU does or when the MMHU should be consulted,[320] and she did not believe that healthcare providers who care for foster children are notified of MMHU's role or given materials about what it is.[321] Nor did Defendants otherwise present evidence that this training has occurred or is expected to be implemented.

- **Include the MMHU in case-planning meetings for higher-needs children.** Ms. Moore testified that the MMHU is not typically involved in OCS's case-planning meetings and could not explain why.[322]

- **Empower the MMHU to conduct comprehensive medical records reviews of high-needs foster children.** Aside from doing a quarterly of psychotropic medications that various foster children are taking, the MMHU does not perform any systematic medical record review for the children with complex needs.[323]

---

[318] *Id.* at 1351:22–25 (Centeno).

[319] *Id.* at 1354:2–6 (Centeno); *see also id.* at 1353:1–7 (Centeno) ("we don't have just immediate access to every youth's [medical] records.")

[320] *Id.* at 1360:7-9.

[321] *Id.* at 1360:10—1361:3.

[322] *Id.* at 1359:10-18.

[323] *Id.* at 1355:18—1357:1 (Centeno).

- **Consult with the MMHU when a high-needs child is brought into custody.** Mr. Rubin said that there was nothing other than a "written policy or practice that [he is] not familiar with" that would prevent OCS "from having caseworkers consult with" the MMHU "any time or every time a child is brought into OCS custody regarding whether that child can benefit from additional services."[324]

- **Contract directly with healthcare providers for increased home-based services.** Mr. Rubin agreed that child welfare agencies in other states "contract directly with healthcare providers to provide foster children services in a foster home"—this could include "any service," such as "home health aides or nurses."[325]

## V. THE NAMED PLAINTIFFS DEMONSTRATE THE SUBSTANTIAL RISKS ALL FOSTER CHILDREN IN ALASKA FACE.

### A. Lana H.

Lana H.'s experience illustrates the substantial risks that children in Alaska's foster care system face. When she entered state custody, Lana had several diagnosed mental health conditions, including attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder, and oppositional defiant disorder. While in care, she was later diagnosed with additional conditions, including major depressive disorder with anxious distress, social anxiety disorder, and reactive attachment disorder.[326]

---

[324] *Id.* at 1743:21—1744:10 (Rubin).

[325] *See id* at 1741:7-10 (Rubin) (discussing that child welfare agencies in other states "contract directly with healthcare providers to provide foster children services in a foster home."); *see also id.* at 1741:24—1742:11 (Rubin) ("In my experience, some agencies might contract out mobile mental health or family engagement work . . . . Really, it could be the range of any service if they wanted to contract for it and pay for it themselves. . . . It could include home health aides or nurses").

[326] *Id.* at 477:12-22 (Groh).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 64 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 64 of 112

Despite her significant needs, Lana endured extreme placement instability, moving through more than thirty different placements, including shelters, group homes, and institutional settings both in and out of state.[327] Dr. Farina testified that, after reviewing Lana's case file, that there was no record of consistent services between her hospitalizations, which put her "at risk of further hospitalization."[328]

Even Defendants' expert, Mr. Rubin, acknowledged critical failures in Lana's care. He testified there was no indication that Lana ever received psychological or neuropsychological treatment or testing after entering care, nor was there evidence she received any psychotropic medications before being placed in an institutional setting in May 2018.[329] He acknowledged there was no indication that OCS ever considered placing Lana in a therapeutic foster home or referred her to the Medical and Mental Health Unit for an initial evaluation during this period.[330] These failures ultimately led to her being placed at North Star—a psychiatric residential treatment facility.

Case notes confirm these gaps. On February 23, 2022, Ms. Centeno recorded that she had "received a call from Katelyn at Mat-Su Regional regarding Lana H.," who stated that Lana "is not deemed to be acute" but "needs more residential, not acute

---

[327] *Id.* at 478:4-14 (Groh).

[328] *Id.* at 1077:15—1078:25 (Farina).

[329] *Id.* at 1673:5-12 (Rubin); 1683:11-15 (Rubin).

[330] *Id.* at 1677:14-18; 1682:14-18 (Rubin).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 65 OF 112

care."[331] Later, on October 16, 2022, Fairbanks Memorial Hospital informed OCS that "the doctor treating Lana H. is unable to say that she is a danger to herself or others. This means that the Title 47 will be revoked."[332] The notes emphasized that "Lana H. has been at Fairbanks Memorial Hospital on hold, and Dr. Dunlap doesn't see a reason to keep her there any longer. He needs someone to discharge the child to."[333] Four days later, notes again reflected that "Lana H. is ready for discharge but no one there," and that OCS arranged for JACE to house her for the night.[334] In other words, Lana H. was kept in an institutional setting for longer than necessary: She was ready for discharge, but she had no placement in the community that she could be moved to.

At one out-of-state facility, it was reported that staff physically restrained her at least seven times, and she was exposed to bedbugs and ringworm.[335] She reported that her basic needs were neglected, including not being able to change her clothes for three days.[336] When a protective services report was filed about her treatment at this facility, OCS claimed it lacked jurisdiction because the placement was out-of-state— even though OCS itself had placed her there.[337]Although Ms. Centeno testified that

---

[331] *Id.* at 1400:22-1401:23 (Centeno).

[332] *Id.* at 1409:5-16 (Centeno).

[333] *Id.* at 1409:20-25 (Centeno).

[334] *Id.* at 1410:16-24 (Centeno).

[335] *Id.* at 478:15-22 (Groh).

[336] *Id.* at 657:19—658:5 (Groh).

[337] *Id.* at 479:6-10 (Groh).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 66 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 66 of 112

she visited Lana at the facility after an "allegation of harm," she admitted she did not review the protective services report, nor did she recommend moving Lana to a lower-level placement.[338]

At times, Lana's instability resulted in incarceration. During a detention hearing in March 2022, the court order instructed OCS to "give OCS two weeks to find a placement," to "focus more on the mental health aspect of the case," and to "find safe release plan and placement for Lana. State will release."[339] In other words, the judge gave OCS two weeks to find Lana an appropriate placement, but OCS failed to do so. Instead, she was unnecessarily incarcerated for approximately three months—after which the charges against her were dismissed.[340]

After her release, Lana was placed at Mack House in Anchorage from May through July 2022.[341] Because of her constant placement changes, Lana was forced to move schools repeatedly, missed large amounts of instruction, and at times did not attend school at all for extended periods.[342] Ms. Groh agreed that Lana was institutionalized "due to a lack of sufficient placement options with access to support

---

[338] *Id.* at 1413:7—1415:2 (Centeno).

[339] *Id.* at 1402:20—1403:3 (Centeno).

[340] *Id.* at 1403:16—1405:3 (Centeno).

[341] *Id.* at 1405:4-19 (Centeno).

[342] *Id.* at 479:16—480:5 (Groh).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 67 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 67 of 112

services."[343] In other words, "[s]he needed to be institutionalized because . . . there weren't options . . . in a less-restrictive environment" for her to receive the treatment that she needed.[344]

## B. Mary B. and Connor B.

Mary B. and Connor B. both entered foster care as infants. OCS removed Mary when she was less than a year old, and Connor was removed at birth.[345]

Mary was initially placed in a foster home where some of her older siblings already lived, and she appeared to do well there.[346] But that home was located many hours from Anchorage, creating ongoing disputes over visitation with her biological family.[347] Mary and her sister Bailey were next moved to their grandmother Betty's home.[348] Much of Mary's care in that home fell to Bailey, who was only 13 or 14 years old at the time, a fact that caseworkers themselves viewed as concerning.[349]

There were further concerns that a multi-month gap occurred in caseworker visits to the home.[350] Eventually, OCS placed the girls with their uncle, yet Bailey

---

[343] *Id.* at 655:9-12 (Groh).

[344] *Id.* at 655:14-17 (Groh).

[345] *Id.* at 470:15-22 (Groh).

[346] *Id.* at 471:2-8 (Groh).

[347] *See id.* at 471:9-16 (Groh).

[348] *Id.* at 471:18-20 (Groh).

[349] *Id.* at 471:21—472:5 (Groh).

[350] *Id.* at 473:22-474:2 (Groh).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 68 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 68 of 112

continued to act as Mary's primary caregiver.[351] Case notes from 2023 reflected ongoing uncertainty over whether the Department could approve a license for this uncle, given his past history and prior involvement with Protective Services Reports.[352]

Connor, meanwhile, was placed in a foster home with a family he appeared to bond with.[353] He remained with this family for four years, but OCS still has not secured permanency for him.[354]

### C.     Rachel T. and Eleanor T.

Rachel T., Eleanor T., and their sister Gayle were initially placed with a family friend in Fairbanks.[355] In August 2020, that placement ended abruptly. Late one night, their 23-year-old half-sister Danyelle Galles received a call from OCS and had to drive seven hours from Anchorage to Fairbanks to retrieve them.[356] When Ms. Galles picked them up, Rachel had head lice and a severe staph infection in her throat. [357]

OCS did not provide Ms. Galles any information about the girls' medical or disability needs when she became their foster parent.[358] Nor did OCS provide any

---

[351] *Id.* at 472:6-13 (Groh).

[352] *Id.* at 472:18-24 (Groh).

[353] *Id.* at 473:6-9 (Groh).

[354] *Id.* at 473:13-16 (Groh).

[355] *Id.* at 1288:6-16 (Galles).

[356] *Id.* at 464:22-24 (Groh); 1289:10-23 (Galles).

[357] *Id*. at 1291:13-19 (Galles).

[358] *Id.* at 1290:13-21 (Galles).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 69 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 69 of 112

training on how to care for children with special needs.[359] Throughout the case, both Ms. Galles and OCS caseworkers raised concerns about the lack of support provided to help her manage Rachel's and Eleanor's behavioral needs.[360]

Ms. Galles repeatedly requested help from OCS in obtaining services and support for the children. As Ms. Groh explained: "My understanding from the case file was that [Ms. Galles] was seeing a real need for support, including medication for this child to help manage behaviors . . . My understanding more broadly . . . is that [Ms. Galles] was experiencing and expressing a lot of challenges and frustrations in trying to get more consistent communications and responses from OCS throughout the time that she was caring for these children."[361]

At times, Ms. Galles had to advocate directly to OCS for Eleanor's and Rachel's needs without receiving the necessary support. As Ms. Groh testified: "For Eleanor and Rachel, as I mentioned earlier, [Ms. Galles] was advocating as the caregiver for their services and their needs. There is a kind of gut-wrenching email, for me, to read from Darcy to OCS at one point saying, 'I've been trying to do this. I feel like I'm doing it all on my own. I'm having to navigate trying to get access to services or find out what's happening with services I've asked about.'"

---

[359] *Id.* at 1293:1-6 (Galles).

[360] *See, e.g., id.* at 1299:10-14 (Galles), 1301:15-24 (Galles), 1307:16-19 (Galles), 1314:1-6 (Galles); *id.* at 466:21-467:16 (Groh), 660:10-24 (Groh).

[361] *Id.* at 448:14-25 (Groh).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 70 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 70 of 112

Ms. Groh noted that, at the time, Ms. Galles was "pursuing various waivers, like an IDD waiver, and trying to get other psychological evaluations and therapeutic services. She said she didn't want to get anyone in trouble and hadn't made a report to a supervisor, although she noted perhaps, she should have. But she was really trying to keep the girls together, despite feeling like she wasn't supported." Ms. Groh acknowledge that OCS expressed concern that the placement would disrupt and, specifically that "[t]here was also some communication in the case file from an OCS worker expressing concern that if OCS couldn't provide better support to Darcy, she wouldn't be able to keep that placement."[362]

## CONCLUSIONS OF LAW

### I.    STANDING

As this Court has already recognized in the Order Granting Class Certification (ECF No. 336), "[s]tanding is a 'threshold issue' and an 'essential and unchanging part of the case-or-controversy requirement of Article III.'"[363] To establish standing, a plaintiff must demonstrate (1) an injury in fact that is concrete, particularized, and

---

[362] *Id.* 466:17-467:16 (Groh).

[363] *Horne v. Flores,* 557 U.S. 433, 445 (2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) that the injury is likely to be redressed by a favorable ruling.[364],

     The law is clear that "in a class action, standing is satisfied if at least one named plaintiff meets the requirements."[365] Once a named plaintiff demonstrates standing to bring a claim, "the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met."[366] That is exactly what occurred here: This Court has already certified the class after finding that standing requirements were satisfied. Nothing has changed to undermine that conclusion, as the evidence and testimony at trial continues to be based on the exact same case files and expert testimony that the Court reviewed in connection with class certification. Plaintiffs continue to meet Article III's requirements for their substantive due process, Child Welfare Act, and Americans with Disabilities Act claims.

---

[364] *Id.* (citing *Lujan*, 504 U.S. at 560-61). Defendants relied on their expert, James Dimas, to argue that consent decrees do not improve child welfare systems. But Dimas admitted that the only quantitative data he reviewed was a single round of CFSR results, a snapshot in time, and while that data could be used to assess whether states improved over time, he chose not to do so; instead, he relied on cross-state comparisons that ignored whether any state, including Alaska, achieved better outcomes under consent decrees, leaving his testimony speculative and divorced from the actual evidence.

[365] *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

[366] *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015) (citation omitted).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 72 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 72 of 112

**A.    Plaintiffs Have Standing to Pursue Their Substantive Due Process Claim.**

Plaintiffs continue to have standing to pursue their substantive due process claim. Children in state custody have a substantive due process right to reasonable safety, stability, and services. Defendants' practices discussed above, including their practice of maintaining overburdened caseworkers, failing to recruit and retain adequate placements, and failing to provide needed services expose foster children to serious and imminent risks of harm. As this Court has already found, those injuries are particularized, traceable to Defendants' practices, and redressable by Court-ordered reforms.[367] Moreover, all of the Named Plaintiffs are at risk of harm as a result of these practices, and in many instances, have been harmed by these practices. Specifically, in the Order Granting Class Certification, the Court discussed that Lana H. experienced severe placement instability and was exposed to abuse and neglect while in institutional settings.[368]

**B.    Plaintiffs Have Standing to Pursue their Americans with Disabilities Act (ADA) Claim.**

Plaintiffs continue to have standing to pursue an ADA claim. The ADA subclass has plausibly alleged ongoing violations of the integration mandate. To establish Article III injury, Plaintiffs "need only show that the challenged state action creates a

---

[367] ECF No. 336 at 19.

[368] *Id.* at 18-19.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 73 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 73 of 112

serious risk of institutionalization."[369] This Court, in its Order Granting Class Certification, already found that Plaintiffs alleged precisely that: a persistent cycle of a lack of appropriate placements, followed by institutionalization that forces children with disabilities out of integrated settings.

This Court found that Lana H. had shown injury-in-fact, causation, and redressability by a preponderance of the evidence and she therefore had standing to bring the ADA claim.[370] This was only further supported by evidence presented at trial regarding Lana that showed she experienced extreme placement instability and institutionalization,[371] and lack of access to the appropriate mental health services.[372]

### C. Plaintiffs Have Standing to Pursue Their Child Welfare Act (CWA) Claim.

The Court has already held that Plaintiffs demonstrated standing to pursue their CWA claims, and the trial record only confirmed that conclusion. The CWA requires the State to develop and maintain case plans that are timely, comprehensive, and directed toward permanency, including adoption when reunification is not feasible.[373] Plaintiffs allege, and trial evidence established, systemic failures in OCS's case

---

[369] *M.R. v. Dreyfus*, 697 F.3d 706, 734 (9th Cir. 2012).

[370] ECF No. 336 at 17.

[371] Trial Tr. at 478:4-7 (Groh); Findings of Fact, Section V.A., *supra.*

[372] *Id.* at 1077:15-1078:25 (Farina); *id.* at 1673: 5-12; *id.* at 1683:11-15 (Rubin); Findings of Fact, Section V.A., *supra.*

[373] 42 U.S.C. § 675(1).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 74 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 74 of 112

planning that place children at ongoing risk of prolonged foster care, unstable placements, and denial of permanent living arrangements. As the Court recognized in its Order Granting Class Certification what matters for standing is that these systemic deficiencies inflict concrete harms, traceable to OCS's practices, that are redressable by injunctive relief.[374] The Court expressly found that named plaintiffs Eleanor T., Rachel T., Lana H., and Mary B. demonstrated injury-in-fact, causation, and redressability by a preponderance of the evidence, and therefore had standing to bring their CWA claims.[375] This did not change at trial.

## II. PLAINTIFFS HAVE PROVEN A VIOLATION OF THEIR SUBSTANTIVE DUE PROCESS RIGHTS

Plaintiffs assert claims under § 1983 for violation of their Fourteenth Amendment substantive due process rights. To succeed on this claim, Plaintiffs must demonstrate that Defendants' policies and practices deprived them of a cognizable constitutional right, and that Defendants acted with "deliberate indifference" to the protected right.[376] Based on the foregoing findings of fact and applicable law, the Court concludes Plaintiffs are entitled to relief on this claim.

---

[374] ECF No. 336 at 17.

[375] *Id.*

[376] *M.D. v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018).

## A. Governing Law

### 1. The scope of Plaintiffs' substantive due process rights

It is beyond dispute that "foster children have a 'federal constitutional right to state protection' while they remain in the care of the State."[377] Children, like Plaintiffs, whom the state has removed from their homes and placed in foster care, have a "special relationship" with the state that triggers Fourteenth Amendment due process protections.[378] "Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child."[379]

The Fourteenth Amendment does not guarantee foster children "optimal treatment and services" while in state custody,[380] but it does provide a constitutional baseline. Children in foster care "have a constitutionally protected right to basic needs,

---

[377] *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012) (quoting *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 883, 846–47 (9th Cir. 2010)).

[378] *Id.*; *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

[379] *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992).

[380] *M.D.*, 907 F.3d at 251.

such as food, clothing, shelter, medical care, and reasonable safety."[381] Plaintiffs' due process claim rests on such cognizable constitutional rights.[382]

As foster children, Plaintiffs' right to "reasonable safety and minimally adequate care and treatment" encompasses freedom from the foreseeable risk of maltreatment and protection from unnecessary intrusions into their emotional well-being.[383] As this Court already recognized, such rights "fall on the basic needs end of the spectrum."[384] Foster children have a right to freedom from "physical abuse and violations of bodily integrity" and to protection from "egregious intrusions on a child's emotional well-being," such as "persistent threats of bodily harm or aggressive verbal bullying."[385]

---

[381] *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1092 (D. Alaska 2023); *see also Henry A.*, 678 F.3d at 1000 (recognizing that the state has a duty to provide for the "basic needs" of those in its custody).

[382] *See Jeremiah M.*, 695 F. Supp. 3d at 1092–93.

[383] *Lipscomb*, 962 F.2d at 1379; *see also Gary G. v. Newsom*, No. 5:23-cv-00947, 2024 WL 4354697, at *11 (C.D. Cal. Sept. 30, 2024) ("[T]he Court finds that the risk of maltreatment is properly pleaded as a violation of the right to reasonable safety, which is a cognizable right."); *Jeremiah M.*, 695 F. Supp. 3d at 1092.

[384] *Jeremiah M.*, 695 F. Supp. 3d at 1092.

[385] *M.D.*, 907 F.3d at 255-56 (holding that the state could be held liable "for inflicting further harm that compounds that damage" and citing evidence adduced at trial showing that plaintiffs "saw their level of care increase markedly over the course of their time in [foster care] as a result of abuse and continued lack of permanency."); *accord Henry A.*, 678 F.3d at 1000 (recognizing that due process rights encompass "a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent" (quoting *Tamas*, 630 F.3d at 842); *id.* at 1001 (finding it "clearly established law" that a "foster child's due process rights are violated when a state official exhibits deliberate indifference . . . to suspected physical [or sexual] abuse

Critically, these constitutional guarantees extend to freedom from an unreasonable ***risk*** of foreseeable harm, not just freedom from ***actual*** harm.[386] The risk of maltreatment includes known and obvious risks of physical or severe emotional harm.[387] Thus, Plaintiffs "need not show that every member of the class has actually ***been*** harmed while in State custody; they need only demonstrate they face a ***risk*** of serious harm as a result of the State's policies and that the State was deliberately indifferent to the risk."[388]

---

in a foster home"); *Doe v. S.C. Dep't of Soc. Servs*., 597 F.3d 163, 176 (4th Cir. 2010) ("[T]he state officials responsible for [placement] decisions had a corresponding duty to refrain from placing [a foster child] in a known, dangerous environment in deliberate indifference to her right to personal safety and security."); *Gary G.* 2024 WL 4354697, at *11 (C.D. Cal. Sep. 30, 2024) (citing deprivation of services, lack of caseworker visits, and inadequate case planning as examples of cognizable risks of maltreatment).

[386] *See Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (stating that individuals in state custody "have the right not to be subjected to the unreasonable *threat* of injury or death . . . and need not wait until actual casualties occur in order to obtain relief from such conditions" (emphasis added)).

[387] For statutory reporting purposes, maltreatment is a term-of-art defined as "a child who is the subject of a substantiated, indicated, or 'alternative response' maltreatment report." PX17 at 1. For substantive due process purposes, risk of maltreatment encompasses safety risks that are known to Defendants or so obvious that they should have been known. Although maltreatment rates reported to the federal government may demonstrate that the risks of Defendants' policies and practices have manifested into *actual* harm, the foreseeable *risk* of maltreatment, and the deprivation of Plaintiffs' rights, persists so long as Defendants' policies and practices remain unchanged.

[388] *Id.* (emphasis by court).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 78 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 78 of 112

Plaintiffs also have a cognizable right to treatment and care that is consistent with the purpose and assumptions of government custody.[389] OCS assumes custody of children for the purpose of removing them from an unsafe home environment, supplying a temporary, safe, and supportive environment, and providing services to children and parents to resolve the issues that led to the government's assumption of custody. If, after an appropriate period, it is determined that children cannot be safely reunified with their parents, the purpose of custody shifts to finding the children a permanent family home through adoption or guardianship.

### 2. Deliberate indifference

Plaintiffs must show that Defendants "acted with such deliberate indifference to the plaintiffs' liberty interest that their actions shock the conscience."[390] This standard requires both "an objective risk of harm and a subjective awareness of that harm."[391]

To satisfy the objective component, Plaintiffs must show that they face "a substantial risk of serious harm" arising "from a single source or multiple sources."[392]

---

[389] *Jeremiah M.*, 695 F. Supp. 3d at 1092; *Gary G.*, 2024 WL 4354697, at *11, n 15.

[390] *B.K. v. Snyder*, 922 F.3d 957, 968 (9th Cir. 2019) (internal quotation marks omitted).

[391] *Henry A.*, 678 F.3d at 1000–01.

[392] *Farmer v. Brennan*, 511 U.S. 825, 834, 843 (1994); *see also Henry A.*, 678 F.3d at 1001 (deliberate indifference requires "a showing of an objectively substantial risk of harm").

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 79 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 79 of 112

Plaintiffs need not show that the risk applies equally across the class; only that the risk has general application to the class.[393]

To satisfy the subjective requirement, Plaintiffs must show either (1) that state officials were aware of facts from which an inference of substantial risk of harm could be drawn and that (a) they actually drew that inference or (b) a reasonable official would be compelled to draw that inference; or (2) that the "risk of harm is obvious."[394] Evidence that a risk has been "longstanding, pervasive, well-documented, or expressly noted by [state] officials in the past" is sufficient to establish the risk is obvious.[395]

### B. OCS's Policies and Practices Violate Plaintiffs' Substantive Due Process Rights.

#### 1. OCS's policies and practices deprive Plaintiffs of their Fourteenth Amendment substantive due process rights.

The evidence adduced at trial shows that OCS has long maintained an array of policies and practices that plainly and consistently deprive Plaintiffs of their constitutional rights. As detailed above, these longstanding structural conditions

---

[393] *Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014) ("dissimilarities among class members do not impede the generation of common answers to those questions."); Fed. R. Civ. P. 23(b)(2), 1966 Amendment advisory committee note (explaining that certification is appropriate even if the defendant's action or inaction "has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.").

[394] *Henry A.*, 678 F.3d at 1001 (internal quotation marks omitted).

[395] *Farmer*, 511 U.S. at 842.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 80 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 80 of 112

include: (1) chronically overburdened caseworkers and high staff turnover[396]; (2) failure to support foster families and secure adequate foster-home capacity and other appropriate placements[397]; and (3) consistent failure to provide needed services to foster children.[398] It is long-standing and well-documented that these structural deficiencies, whether considered alone or together,[399] put foster children at substantial, foreseeable risk of maltreatment and expose them to severe emotional harm.[400]

These same structural conditions also interfere with the purpose of state custody: providing a safe, temporary custodial placement for foster children or, when necessary, securing them a permanent home. The constellation of systemic, institutional failures plaguing OCS prevent achievement of these goals, which further

---

[396] *See* Findings of Fact, Section I.C, *supra*.

[397] *See* Findings of Fact, Section I.D, *supra*.

[398] *See* Findings of Fact, Section IV.A-B, *supra*.

[399] *See Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982) ("[E]ach condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the [custodial] environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions.").

[400] Defendants relied on their expert Jonathan Rubin to opine on policies, procedures, training, and the State's response to reports. But Mr. Rubin was never presented with the November 2024 legislative audit (Trial Tr. 1726:12-18 (Rubin)), the DOJ report (*id.* at 1740:13-1741:1), or the Annual Reports to the Legislature (*id.* at 1746:1-6). He instead based his report on a select few documents curated by Defendants and Defendants' counsel and interviews of individuals whose titles he could not remember that were conducted under the supervision of counsel (*id.* 1696:16-1697:6). He also admitted that his job was not to "evaluate the success or the outcomes" of any remedial measures that OCS had implemented (*id.* at 1752:6-9), rendering his testimony incomplete and unreliable.

exacerbates the risk of maltreatment. The longer a child remains in foster care, the greater the risk that the child will suffer emotional and psychological harm.[401]

This is why federal law prescribes the treatment and care necessary to reach permanency quickly and safety: OCS must maintain regular and meaningful contact with children and parents; establish appropriate and realistic permanency goals in a timely manner; make diligent efforts to achieve those goals; make concerted efforts to involve children and parents in the case planning process; assess the needs of children, parents, and foster parents and provide the services necessary to meet those needs; and file petitions to terminate parental rights when children have been in care for 15 of the most recent 22 months. OCS's persistent failure to provide this treatment and care—as documented above—deprives Plaintiffs of their constitutionally-protected right to treatment and care that is consistent with the purpose and assumptions of government custody in the first place.

### a. *Unmanageable caseloads and high staff turnover*

There is ample evidence that OCS has long operated with woefully deficient caseload-management standards that lead to severely overburdened caseworkers and unreasonably high staff turnover and vacancy rates.[402]

---

[401] *Lehman v. Lycoming Cnty. Child.'s Servs. Agency*, 458 U.S. 502, 513-514 (1982)

[402] *See* Findings of Fact, Section I, *supra*.

These conditions directly increase the risk of physical and psychological harm to foster children. The causal link is "obvious," as the Fifth Circuit observed: "[W]hen workloads exceed caseworker bandwidth, caseworkers are not able to effectively safeguard children's health and well-being."[403] Likewise, here, the evidence shows that having unreasonably high caseloads disrupts caseworkers' ability to adequately monitor foster children and supervise foster families, leading to infrequent and inadequate caseworker visits, failure to assess and address safety risks, and failure to evaluate and meet foster children's medical needs.[404]

The facts here are not materially different than those in *M.D.*, where the Fifth Circuit affirmed a lower court finding that Texas's "policy or practice of maintaining overburdened caseworkers directly causes all [foster] children to be exposed to a serious risk of physical and psychological harm" in violation of their substantive due process rights.[405] The court identified a series of deliberate decisions that contributed to the systemic risk of harm created by unmanageable caseloads and high turnover: The agency did not "impose any limit on caseloads"; did not count caseloads "by the number of individual children," which made it "difficult to assess how many children each caseworker actually has"; had not "conducted a workload study to

---

[403] *M.D.*, 907 F.3d at 265.

[404] *See* Findings of Fact, Section I, IV, *supra*.

[405] *M.D.*, 907 F.3d at 264-65.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 83 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 83 of 112

determine how many cases a caseworker can safely manage," and at the time of trial, "had not performed a comprehensive workload study in over a decade"; reported "artificially low" caseload numbers; did not have "informative workload data or internal agency caseload standards"; made "standard, boilerplate [appropriations] request[s]" to the legislature that understated caseworker deficits and were insufficient to replenish the roughly 25% turnover every year; and utilized secondary caseworkers that were not "an adequate or 'reasonable'" substitute for primary caseworkers."[406]

The series of deliberate decisions identified in *M.D.* are identical to those identified in this case. The only difference is that Alaska is worse. Texas had not conducted a workload study in over a decade; Alaska has not conducted a workload study in over two decades. Texas' turnover rates were roughly 25%; Alaska's turnover rates are consistently above 35%.

### b. *Inadequate placement array*

Unmanageable caseloads and high staff turnover also deprive foster parents of much-needed support, thereby reducing placement capacity by impairing efforts to recruit and retain foster homes. This, in turn, contributes to high placement instability

---

[406] *M.D.*, 907 F.3d at 256–63. Compounding these risks is OCS's continued reliance on an inefficient, out-of-date data management system that hinders caseworkers' ability identify, monitor, and serve the basic needs of children in the state's foster-care system. *See* Findings of Fact, Section III, *supra*.

and the likelihood of placement in institutional or other inappropriate settings that increase the risk of maltreatment and emotion trauma.

OCS itself has recognized that "[d]ecrease in support to foster parents . . . results in foster parents choosing to give up on being foster parents, increasing the shortage of foster parents."[407] Significant numbers of foster parents report that they do not receive monthly visits, they are unable to reach caseworkers, they do not receive enough information to meet the child's needs, and caseworker turnover adversely affect them and their foster children.[408] Just as OCS predicted, these systemic failures in case management, communication, information sharing, and basic logistical support have driven many foster parents to stop fostering.

Just last month, nearly 50% of foster parents reported that they are "Unwilling to continue fostering because of insufficient support from OCS," a 16% increase from 2017. While there are certainly external factors that impact the lack of placements, Defendants know that their practices play a part in the lack of placements.[409]

The lack of foster homes and intermediate placement settings forces OCS to make a series of deliberate and dangerous choices: It can place the child in a foster home that it knows cannot adequately meet the needs of the child; it can place the child

---

[407] PX25-0005.

[408] PX202.

[409] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 85 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 85 of 112

in a hospital emergency room or leave the child in an institution even though it is not medically necessary; or it can house the child in an OCS office or a homeless shelter, or in a hotel under the supervision of private security guards with no training on how to care for children with complex medical and mental health needs. OCS's failure to support foster parents and the resulting lack of placements creates a cascade of harms that threaten the safety and well-being of Alaska's foster children.

Such harms include not only improper placements that increase the risk of physical and emotional harm but also high placement instability, which itself exacerbates these harms. Placement instability is symptomatic of "a system of foster care that is unable to achieve a reasonable balance among safety, competence, and stability"—in other words, one that is unable to achieve the very goals underlying the purpose of state custody.[410] Moreover, even if placement instability is not alone unconstitutional, it has a "mutually enforcing effect" that adds to the "cumulative impact of the conditions of [foster care],"[411] conditions that deprive foster children of their rights to freedom from the foreseeable risk of maltreatment, protection from unnecessary intrusions into the child's emotional wellbeing, and treatment and care consistent with the purpose and assumptions of government custody.

---

[410] *K.H. v. Morgan*, 914 F.2d 846, 853 (7th Cir. 1990).

[411] *Rhodes v. Chapman*, 452 U.S. 337, 364 (1981); see also *id.* at 362-63 (Brennan J., concurring); *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 86 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 86 of 112

## 2. Defendants have acted with deliberate indifference to Plaintiffs' constitutional rights.

The evidence shows that unmitigated harms have compounded over the past twenty years to create dangerous conditions, that OCS's cumulative actions and inactions continue to expose Alaska's foster children to objectively substantial risks of harm, and that these risks have general application to the class.

The evidence also shows that Defendants knew or should have known of these risks, and that Defendants acted or failed to act despite their knowledge of these risks. Deliberate indifference does not mean that Defendants acted or failed to act with malice, or that they "acted or failed to act believing that harm actually would befall" foster children.[412] "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."[413]

It is evident from Defendants' testimony that after 20 years of pervasive systemic failures, persistent, obvious and well-documented risks of harm, and consistently low performance on federal metrics, Defendants have grown numb to the risks that foster children endure and begrudgingly accepted these crisis conditions as the unfortunate and inevitable "ebb and flow" of child welfare practice across the country.[414] To any reasonable observer, however, these conditions of foster care

---

[412] *Farmer*, 511 U.S. at 842.

[413] *Id.*

[414] Trial Tr. at 186:6–8 (Guay) ("child welfare ebbs and flows. And we consistently need to show up and continue to work to make it better."); 186:22–23 (Guay) ("This

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 87 OF 112

confinement are objectively unreasonable, and the State's learned helplessness and reckless indifference to these conditions is conscious shocking.[415]

Defendants protest that they are not deliberately indifferent to the risks of harm because they are purportedly making efforts to solve these problems. But "the mere presence of remedial measures" does not defeat a finding of deliberate indifference, as "such measures must be adequate" in addressing the substantial risk of serious harm.[416]

---

is not a one-and-done-type situation. It ebbs and flows."); 1442:5–9 (Swisher) ("it will always be an ebb and flow because child welfare is difficult and not everybody wants to do it, and not everyone can do it forever. And so, there will be turnover."); 301:16–302:5 ("And again, this is across the country; this is not just Alaska."); 312:3–6 (Guay) ("Q. Looking at this chart, would you agree that Alaksa's foster care system is in crisis? A. I would say that all foster systems in our country are in crisis.").

[415] *Slade v. Bd. of Sch. Dirs. of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir. 2012) ("Reckless indifference to a child's safety would doubtless shock the conscience.").

[416] *Webb v. Livingston*, 618 F. App'x 201, 209 n.7 (5th Cir. 2015); *see also Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002) ("the defendants in this case are dedicated public servants who have acted to address problems at Tutwiler. Nonetheless, the court must still find deliberate indifference because the defendants' efforts simply do not go far enough; the measures they have taken have had negligible impact on the massive danger posed to inmates."); *Coleman v. Wilson*, 912 F. Supp. 1282, 1319 (E.D. Cal. 1995) ("patently ineffective gestures purportedly directed towards remedying objectively unconstitutional conditions do not prove a lack of deliberate indifference, they demonstrate it."). What Defendants have *not* done "in the face of the substantial risk of harm is also relevant to" whether they are deliberately indifferent. *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *42 (S.D. Tex. July 19, 2017); *see also M.D.*, 907 F.3d at 256-69 (deliberate indifference proven where Texas knew high caseloads and insufficient monitoring and oversight "pose a significant safety risk for foster children" yet had "not taken reasonable steps to cure" the problem). *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004) (upholding injunction because "conditions have persisted for years despite MDOC's purported efforts."); *Ball v. LeBlanc*, 792 F.3d 584, 595-96 (5th Cir. 2015) (affirming findings of deliberate indifference despite efforts to abate risks posed by high temperatures).

Although she agreed the current conditions in Alaska are exceptional conditions that demand exceptional efforts,[417] Director Guay testified that most of the efforts described in its current statewide work plan are steps that OCS would take under regular conditions.[418]

Consistent with OCS's self-assessment,[419] Defendants were repeatedly unable to demonstrate the effectiveness of its efforts because, in most cases, they did not attempt to measure their effectiveness. This Court should not "ask plaintiffs to rely on defendants' good faith but as yet unsubstantiated promises to improve."[420] Without any data to show that their remedial measures have affected Alaska's performance on any child welfare metric, the Court simply has no basis to conclude that any of those

---

[417] Trial Tr. at 303:3–12 (Guay) ("Q. So the cycle is hard to break. The risks cannot be overstated, and the conditions are maybe even more challenging in Alaska by Alaska's uniquely challenging geography, right? A. We do have challenging geography. Q. And all these exceptional conditions demand exceptional efforts, right? A. Yes. And out-of-the-box thinking on how to do the work because what works in DC does not work here in Alaska and what works in New York does not work here.").

[418] *Id.* at 300:19-24 (Guay) ("A. I would say most of these are all important no matter what our workforce looks like. Q. So these are all things that you'd be doing under regular conditions? A. Yeah, but we haven't because we have not prioritized these things.")

[419] PX4-0035 ("OCS is great at new ideas, and starting new initiatives, but is lacking on the necessary focused follow-through of implementation that allows for changes to new initiatives along the way. If new efforts do not work, they are generally eliminated with little assessment, evaluation or changes that could make the effort successful").

[420] *LaShawn A. v. Dixon*, 762 F. Supp. 959, 982 (D.D.C. 1991).

efforts are an adequate or appropriate response to the substantial risk of serious harm faced by Alaska's foster children.

To be sure, Defendants have provided various explanations for their limited success—including geographic conditions, technological limitations, budgetary restrictions, arduous administrative regulations, and competing agency priorities. But none of these explanations preclude a finding of deliberate indifference.

Geographic conditions are not a defense against deliberate indifference.[421] For example, temperature extremes make it more difficult for certain states to maintain constitutional conditions of confinement, but these geographic conditions are not a defense against deliberate indifference.[422] A state is not judged by its harsh geographic conditions; it is judged by its response to those conditions. Lack of funding and legislative inaction also are not defenses to deliberate indifference either.[423]

---

[421] *See, e.g.*, *Ruiz v. Estelle*, 503 F. Supp. 1265, 1289 (S.D. Tex. 1980) (finding deliberate indifference despite social and geographic barriers to recruitment, including "isolated rural communities . . . often lacking adequate housing, particularly for families."); *James v. Wallace*, 406 F. Supp. 318, 325 (M.D. Ala. 1976) (same).

[422] *Compare Fife v. Crist*, 380 F. Supp. 901, 908 (D. Mont. 1974) (failure to protect prisoners against extreme winter conditions in Montana), *with Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) (failure to protect prisoners against scorching summer months in Arizona); *Gates*, 376 F.3d at 334 ("The ambient temperature in the cells is within reasonable limits except during the summer months.").

[423] *See Cole*, 2017 WL 3049540, at *43 ("[But] [e]ven if the remedies ordered would be 'fiscally catastrophic' for TDCJ, . . . the Fifth Circuit has held that inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." (quotations omitted).). *Wyatt v. Aderholt*, 503 F.2d 1305, 1315 (5th Cir. 1974) (holding that defendants' obligation "to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what

Finally, by asserting a remedial efforts defense, Defendants concede several points. First, it is a concession that Defendants have actual knowledge of substantial risks of harm to foster children.[424] Second, it is a concession that Defendants' actions and inactions play a part in sustaining or exacerbating the risk of harm.[425] Third, it is a concession that there are steps within Defendants' control that a court can order to reduce the risk of harm.[426] Plaintiffs have thus proven their substantive due process claim.

## III. OCS'S SYSTEMIC FAILURES HAVE RESULTED IN VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT.

### A. OCS fails to provide services in the most integrated setting appropriate, creating a serious risk of institutionalization.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits

the Governor may do."); *see Cooper v. Aaron*, 358 U.S. 1, 15-16 (1958) ("[The agency cannot] assert their own good faith as a legal excuse for delay in implementing the constitutional rights of [these] respondents, when vindication of those rights was rendered difficult or impossible by the actions of other state officials."); *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1574 (11th Cir. 1994) ("[t]he Constitution does not put a price on constitutional rights, in terms . . . of time or money.").

[424] *Harris v. Angelina Cnty.*, 31 F.3d 331, 335 (5th Cir. 1994).

[425] *Kentucky*, 473 U.S. at 166 (citation omitted).

[426] *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2140 (2025) ("When as here a government seeks to justify its regulatory actions by, on the one hand, touting the consequences for fuel usage and emissions while, on the other, maintaining that those same regulations are unreviewable because there are no consequences, courts can appropriately be skeptical.").

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 91 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 91 of 112

of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[427] To comply with the ADA, public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[428] The "most integrated setting appropriate" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."[429] To prove a violation of this integration mandate, "a plaintiff need only show that the challenged state action creates a serious risk of institutionalization."[430]

The failure to provide services in a community-based setting is a form of discrimination on the basis of disability and may create a risk of institutionalization in violation of the ADA.[431] It is sufficient if the lack of community-based services creates a risk that children will be (1) *placed* in an institutional setting without medical justification, or (2) *retained* in an institutional setting after their condition has

---

[427] 42 U.S.C. § 12132.

[428] 28 C.F.R. § 35.130(d).

[429] 28 C.F.A. Pt. 35, App. B.

[430] *M.R*, 697 F.3d at 734; *see also Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1170–71 (N.D. Cal. 2009) ("[T]he *risk* of institutionalization is sufficient to demonstrate a violation of Title II [of the ADA].").

[431] *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999); *Townsend v. Quasim*, 328 F.3d 511, 516–17 (9th Cir. 2003).

Plaintiffs' Supplemental Proposed Findings of Fact & Conclusions of Law
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
Page 92 of 112

Case 3:22-cv-00129-SLG   Document 459   Filed 09/25/25   Page 92 of 112

stabilized and the treatment team has determined that it is no longer medically necessary to remain in the institution.[432]

Here, OCS has systematically failed to provide services to children with behavioral health disabilities in the most integrated setting appropriate to their needs, creating a serious risk of institutionalization in violation of the ADA.

### 1. OCS is responsible for providing services to foster children in the state, including those with behavioral health disabilities.

To start, OCS is responsible for providing services to foster children in the state, including those with behavioral health disabilities. As discussed above, although OCS and DOH work together to ensure "that children in foster care have access to healthcare services," DOH "does not oversee or have jurisdiction over foster children."[433] Rather, the State of Alaska designated OCS as the **single state entity** responsible for administering services to foster children in the state under the CWA.[434] As the Alaska Supreme Court has said: "OCS is entrusted with caring for some of the most vulnerable

---

[432] *See, e.g.*, *M.R.*, 697 F.3d at 706 (placement); *Townsend*, 328 F.3d at 517 (placement); *Olmstead*, 527 U.S. at 593, 597, 600 (retention).

[433] Trial Tr. at 1160:1–5 (Hedberg), 1127:5–8 (Hedberg).

[434] PX5-0004; *see also* Alaska Stat. § 47.10.084 (2018).

people in Alaska: children whose parents are unable to care for them."[435] "It is OCS's duty to get treatment for" those children, and that duty is non-delegable.[436]

OCS must, among many other things, ensure that children's needs are assessed, that children are referred for available and necessary services, that foster parents receive necessary medical information, and that medical information is accessible and communicated to all necessary parties.[437] These services unquestionably fall within the scope of the ADA.[438]

The term "institutionalization" means segregating or isolating individuals with disabilities in settings that require those individuals to "relinquish participation in community life they could enjoy given reasonable accommodations."[439] Institutionalization encompasses more than confinement in a locked facility.[440] Indeed, OCS itself defines an "institution" broadly as "a child care facility operated by a public

---

[435] *Native Vill. of Kwinhagak v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 542 P.3d 1099, 1122 (Alaska 2024).

[436] *Id.*

[437] 42 U.S.C. § 670 et seq.

[438] *See Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (construing the phrase "services, programs, or activities" to bring within the scope of the ADA *anything* a public entity does" (emphasis added) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001))).

[439] *Olmstead*, 527 U.S. at 583.

[440] *Pashby v. Delia*, 709 F.3d 307, 323 (4th Cir. 2013) (holding that Adult Care Homes, even though they were not locked facilities, were "institutions" for purposes of the integration mandate because they "segregate residents from the community and impede residents' interactions with people who do not have disabilities.").

or private agency and providing 24-hour care and/or treatment for children who require separation from their own homes and group living experience."[441] "These facilities may include: child care institutions, residential treatment facilities, maternity homes, nursing homes, hospitals, etc."[442]

### 2. OCS's actions and inactions increase the risk of institutionalization.

Throughout the trial, witnesses and evidence submitted to the court, including the 2022 DOJ Report, discussed the lack of necessary services for children.[443] For example, the DOJ found that "[t]he State has long recognized that its community-based behavioral health service system does not meet the needs of children at serious risk of institutionalization."[444] Additionally, as discussed above and in the DOJ report, OCS lacks a sufficient number of placements necessary to meet the medical and mental health needs of foster children in the state—including therapeutic foster homes, family habilitation homes, and intermediate care facilities. This failure to recruit, retain, and

---

[441]Trial Tr. at 1341:--1342:4 (Centeno); *see also* https://dfcs.alaska.gov/ocs/Documents/statistics/Webdata/static_webdata_definitions.pdf.

[442] *Id.*

[443] *See* Findings of Fact, Section IV, *supra*.

[444] PX52-0014-15; *see also id.* ("More than 10 years later, the State acknowledges that it still has limited capacity to provide timely, appropriate services and supports to prevent institutional placement of children with behavioral health disabilities."

contract with providers and foster homes able to care for children with medical and mental health needs increases the risk of unnecessary institutionalization.

The practice of placing children in hospital settings is also driven by official policy. According to OCS's Statewide Placement Search Flowchart, if a child's "[b]ehavior or mental health is effecting placement options," caseworkers are instructed to "[t]ake [the child] to the nearest psych ED or other facility for level of care recommendation if one is not already provided."[445] OCS thus knows—and expects—that children will be unnecessarily institutionalized due to a lack of sufficient community-based services.

Further, even if Alaska had a complete array of services, that would mean little if caseworkers do not perform their requisite monthly visits—as there is no way to ensure that foster children receive the services they need.[446] As discussed above, OCS routinely fails to make necessary visits to foster children, leading to a failure to assess those children for needed services and to connect children with those services. For example, in its 2025 APSR, OCS reported that caseworker visits with children were of sufficient frequency and quality in only 50% of cases reviewed, and that children's needs were assessed and met in only 40% of cases reviewed.[447] And in is latest report

---

[445] PX68-0002.

[446] Trial Tr. 1170 at 14–24 (Hedberg); *see also* Findings of Fact, Section V, *supra*.

[447] PX13-0016, 018.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 96 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 96 of 112

to the Legislature, OCS reported that nearly 40% of children did not receive monthly visits in 2024.[448] Without their needs assessed and without services provided to foster children or provided timely, foster children's symptoms will continue to be exacerbated to the point where institutionalization becomes the only option even if it would have been made unnecessary with the provision of services.[449] Together, these policies and practices "exacerbate[] the risk that [foster children] will be institutionalized."[450]

### B. The provision of community-based services will not fundamentally alter the nature of the services OCS provides.

To accommodate a person with disabilities, the state must implement "reasonable modifications in policies, practices, or procedures" to avoid unnecessary institutionalization or isolation, at least where the modifications would not fundamentally alter the state's service, program, or activity.[451]

A fundamental-alteration defense "allow[s] the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be

---

[448] *See* Findings of Fact, Section I.C, *supra.*; *see also* PX21 at 8.

[449] Trial Tr. at 938:10-939:11 (Farina); 940:21-941:7 (Farina).

[450] *M.R.*, 697 F.3d at 730.

[451] 28 C.F.R. § 35.130(b)(7)(i); *see also Townsend*, 328 F.3d at 516. While Defendants have not yet fully articulated a fundamental alteration defense including in their summary judgment briefing, Plaintiffs discuss the fundamental alteration defense and reasonable modifications in the event that Defendants do so in their supplemental findings of fact and conclusions of law.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 97 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 97 of 112

inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities."[452] It is the State's burden—not Plaintiffs'—to show that relief would be a fundamental alteration of the nature of the services provided.[453] The Court must then determine whether a judicial remedy "is a 'reasonable modification' of those programs or a more major change that 'fundamentally alters' their nature."[454]

"The distinction between a reasonable modification and fundamental alteration is 'fact-specific, requiring case-by-case inquiry.'"[455] Whether a modification is reasonable "depends on how it impacts the goals of an agency's program,"[456] and requires the court to "consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably."[457] "[B]udgetary concerns do not alone sustain a

---

[452] *Olmstead*, 527 U.S. at 604.

[453] *Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 860 (9th Cir. 2022).

[454] *Id.*

[455] *Id.* at 862 (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996)).

[456] *Id.*

[457] *Olmstead*, 527 U.S. at 597.

fundamental alteration defense."[458] The State must show beyond mere speculation that reallocating funds would disadvantage other disabled populations.[459]

OCS has failed to demonstrate that any of the reasonable modifications identified over the course of trial[460] will fundamentally alter the nature of the services, programs, and activities OCS provides. Indeed, these modifications rely on existing programs, and the state is already obligated to provide these services to children with behavioral health disabilities under the Medicaid Act and uses substantial Medicaid funding to do so in institutional settings. These reasonable modifications will not only reduce the risk of institutionalization, but also be more cost-effective than providing treatment in psychiatric hospitals and residential treatment facilities. By reallocating existing funding to support statewide implementation of community-based services, OCS can fulfill its obligations under Title II of the ADA and serve children in the most integrated setting appropriate to their needs.

## IV. DEFENDANTS VIOLATED THE CHILD WELFARE ACT

The CWA provides federal funding to "enabl[e] each State to provide, in appropriate cases, foster care and transitional independent living programs for

---

[458] *M.R.*, 697 F.3d at 736 (collecting cases); *see also Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1183 (10th Cir. 2003) ("If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed.").

[459] *See, e.g.*, *M.R.*, 697 F.3d at 737.

[460] *See* Findings of Fact, Section IV.C., *supra*.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 99 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 99 of 112

children . . . , adoption assistance for children with special needs, kinship guardianship assistance, and prevention services or programs."[461] Section 671 requires that, for a State to be eligible for federal funds, the State must have a plan approved by the Secretary of Health and Human Services that complies with 37 requirements.[462] One such requirement, found in § 671(a)(22), provides that the State plan must "develop and implement standards to ensure that children in foster care placements in public or private agencies are provided quality services that protect the safety and health of the children." Another State plan requirement, § 671(a)(16), provides that a State plan must

> provide[] for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child.

Section 675(1) explains that a "'case plan' means a written document" that includes a "description of the type of home or institution in which a child is to be placed" and a "plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or

---

[461] 42 U.S.C. § 670.

[462] 42 U.S.C. § 671.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 100 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 100 of 112

the permanent placement of the child, and address the needs of the child while in foster care . . . ."[463]

A "case review system," as defined in § 675(5)(A), "means a procedure for assuring that . . . each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child . . . ."

Further, pursuant to a case review system, "the State shall file a petition to terminate the parental rights of the child's parents (or, if such a petition has been filed by another party, seek to be joined as a party to the petition), and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption" if a child "has been in foster care under the responsibility of the State for 15 of the most recent 22 months."[464] There are three exceptions to this timeline to file the petition: (i) the child is being cared for by a relative, (ii) the case plan demonstrates that a parental rights termination petition would not be in the best interests of the child, or (iii) the State has not provided the child's family with services that are necessary for the safe return of the child to the child's home.[465]

---

[463] 42 U.S.C. § 675(1)(A), (B).

[464] 42 U.S.C. § 675(5)(E).

[465] 42 U.S.C. § 675(5)(E)(i)-(iii).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 101 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 101 of 112

This Court already found[466] that certain CWA provisions create statutory rights enforceable by Plaintiffs:

*First*, to a written case plan that includes a plan to provide safe, appropriate and stable placements;[467] ensures the child receives safe and proper care while in foster care and implementation of that plan;[468] and ensures provision of services to parents, children, and foster parents to facilitate reunification, or where that is impossible, the permanent placement of the child and implementation of that plan.[469]

*Second*, to a case review system or procedure in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, close to their home community.[470]

*Third*, is the right to "a procedure for assuring that" "in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, . . . the State shall file a petition to terminate the parental rights of the child's parents" unless certain exceptions apply.[471]

---

[466] ECF 286.

[467] 42 U.S.C. §§ 671(a)(16), 675(1)(A).

[468] 42 U.S.C. §§ 671(a)(16), 675(1)(B).

[469] 42 U.S.C. §§ 671(a)(16), 675(1)(B).

[470] 42 U.S.C. §§ 671(a)(16), 675(5)(A).

[471] 42 U.S.C. § 675(5)(E).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 102 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 102 of 112

## A. The CWA Requires Strict Compliance from Alaska.

Alaska chose to accept federal funds, so it must comply with these federal conditions.[472] Plaintiffs are entitled to more than substantial compliance; they are entitled to strict compliance.[473] "Impossibility of perfect compliance . . . may be a defense to contempt, but it does not preclude an injunction requiring compliance with the regulations when a pattern of non-compliance has been shown to have existed."[474] Even if substantial compliance is enough, the Ninth Circuit found the payment of 80%

---

[472] *Cal. All. of Child & Family Servs. v. Allenby*, 589 F.3d 1017, 1022 (9th Cir. 2009) (unpublished) (citation omitted).

[473] *Id.* at 1022 (citation omitted) ("As a general rule, a state that accepts federal funds with conditions attached must strictly comply with those conditions—substantial compliance will not be good enough."); *Withrow v. Concannon*, 942 F.2d 1385, 1387 (9th Cir. 1991) ("We are not convinced, however, that the standard for termination of federal funding, a virtual death sentence for a state's program, is the appropriate one to define the rights of applicants and recipients of program benefits. The funding standard is not intended to be the measure of what the regulations require; it is intended to measure how great a failure to meet those requirements should cause funds to be cut off. The language of the federal regulations is unequivocal, and states that a decision 'shall' or 'must' be made within the specified number of days. The regulations' commands effectuate the purposes of the federal categorical programs, to render reasonably prompt assistance to persons in dire need. From the standpoint of the applicants or recipients who are denied hearings and decisions within the time mandated by federal regulations, it is no comfort to be told that there is no federal remedy because the state is in 'substantial compliance' with the federal requirements."); *Id.* at 1388 ("We hold, however, that the regulations require compliance, not 'substantial compliance.'").

[474] *Withrow*, 942 F.2d at 1388.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 103 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 103 of 112

of what is owed under the act to foster parents "isn't even close" to substantial compliance.[475]

## B. Defendants Failed to Comply with the CWA's Case Plan Requirements.

As described above, OCS's workforce is chronically understaffed and overburdened, making it impossible for caseworkers to complete essential tasks necessary to prepare and update written plans required by CWA. Defendants also failed to establish a case review system or procedure in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, close to their home community.[476]

This includes infrequent and poor quality caseworker visits,[477] untimely and insufficient case planning,[478] and a failure to involve parents and children in the case planning process.[479] In 2023, only 57% of case plans were established within the

---

[475] *Cal. All. of Child & Family Servs.*, 589 F.3d at 1023.

[476] 42 U.S.C. §§ 671(a)(16), 675(5)(A).

[477] *See* Findings of Fact, Section I.C.1, *supra*.

[478] *See* Findings of Fact, Section I.C.2, *supra*; *see also* Trial Tr. at 463:19-25 (Groh) (testifying that OCS fails to adequately case plan, including the" active process of creating case plans and updating case plans and sort of having them be that living document" as well as expressing "concerns around timely completion of the initial case plan when OCS removes a child from home.").

[479] *See* Findings of Fact, Section I.C.2, *supra*.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 104 OF 112

required 60-day window.[480] Initial case plans are also not routinely or consistently updated. As of January 2025, only 66% of parent case plans were current.[481]

OCS also does not visit children and families or include them in the case planning process. In its 2024 Annual Report to the Legislature, OCS reported that only 61% of foster children in out-of-home placement received monthly visits, an 11% decrease since 2019.[482] As of January 2025, OCS made only 17% of monthly visits to fathers and 28% of monthly visits to mothers.[483] And in 2024, only 27% of caseworker visits with parents were sufficient.[484] And as of 2024, OCS was effective at involving parents or children in the case planning process in only 42% of cases reviewed.[485]

Without these essential tasks being performed consistently and with 40% of children not receiving monthly visits, none of the CWA requirements for a written case plan or case review system can be met.

---

[480] PX187.

[481] PX195.

[482] PX21-0008.

[483] PX196; PX197.

[484] PX13-0019.

[485] PX13-0017.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 105 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 105 of 112

**C.**   **Defendants Failed to Monitor and Petition to Terminate Parental Rights for Foster Children.**

Defendants also fail to meet CWA requirements that they have "a procedure for assuring that" "in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, . . . the State shall file a petition to terminate the parental rights of the child's parents" unless certain exceptions apply.[486]

For all of the reasons identified above, there is no procedure in place to adequately assess and track whether and OCS is required to file a TPR petition. OCS failed to put forth any evidence that its system does anything to ensure timely filing of TPR petitions. Instead, for children who have been in foster care for 15 of the most recent 22 months, OCS is currently relying on the ORCA Report Manager System that is incapable of tracking whether a TPR petition has been filed timely or a compelling reason identified.[487] In fact, just to respond to Plaintiffs' document requests regarding the timeliness of OCS's filing of TPRs, the Department of Law needed to perform a manual review of case files for the purposes of this litigation, calling into question the accuracy of Defendants' data regarding compliance with § 675(5)(E).[488] Still, the

---

[486] 42 U.S.C. § 675(5)(E).

[487] *See* Findings of Fact, Section I.C.4, *supra*.

[488] Trial Tr. at 2431:8—2432:2 (Donahue); *see also* DX TTTT.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 106 OF 112

Case 3:22-cv-00129-SLG   Document 459   Filed 09/25/25   Page 106 of 112

Department of Law was unable to establish the reason for the failure to file a petition in a substantial percentage of cases, stating that the cases required "further analysis."[489]

Without accurate tracking, there is no way to assure TPR petitions are timely filed. Instead, the best OCS could offer is that "It is possible, in the future, that an updated CCWIS system could interface with the court system to inform ORCA on the status of a TPR petition."[490] Plaintiffs have thus proven that Defendants are violating the CWA.

## V.  PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF.

To be entitled to a permanent injunction, plaintiffs must, in addition to proving a constitutional violation, demonstrate "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[491] "Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and

---

[489] Findings of Fact, Section I.C, *supra*

[490] *See* Findings of Fact, Section I.C.4, *supra*.

[491] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Edmo v. Corizon, Inc*., 935 F.3d 757, 784 (9th Cir. 2019).

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al*.; Case No. 3:22-cv-00129-SLG
PAGE 107 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 107 of 112

therefore generally constitute irreparable harm."[492] Exacerbation of mental and physical conditions and risk of institutionalization amount to irreparable injury.[493]

Plaintiffs need not show that the state action they seek to enjoin is the "exclusive" or "primary" cause of the injury.[494] Nor must Plaintiffs prove that an injunction would eliminate every factor contributing to the risk of harm or institutionalization. Plaintiffs need only show that "'exacerbation of the current . . . situation and additional suffering [could] be avoided'" through an injunction.[495] Courts cannot permit the perpetuation of unconstitutional conduct simply because the remedy "may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some."[496]

---

[492] *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also, e.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (First Amendment); *Edmo*, 935 F.3d at 798 (Eighth Amendment); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 708 (9th Cir. 1997) (Fourteenth Amendment).

[493] *See M.R.*, 697 F.3d at 733.

[494] *Id.* at 728; *Brown v. Plata*, 563 U.S. 493, 525 (2011) (affirming prisoner reduction injunction even though unconstitutional conditions of confinement were caused by factors in addition to overcrowding, including "chronic and worsening budget shortfalls, a lack of political will in favor of reform, inadequate facilities, and systemic administrative failures").

[495] *M.R.*, 697 F.3d at 728 (quoting *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004)); *Plata*, 563 U.S. at 524 (affirming prisoner reduction injunction even though "reducing crowding in the prisons would not entirely cure the violations").

[496] *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 28 (1971); *Plata*, 563 U.S. at 511 ("Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all 'persons,'" and "may not allow constitutional violations to

The Ninth Circuit has "several times held that the balance of hardships favors beneficiaries of public assistance who may be forced to do without needed medical services over a state concerned with conserving scarce resources."[497] The evidence here demonstrates that class members are exposed to an ongoing systemic risk of serious harm in violation of their constitutional and statutory rights that will continue unabated absent a permanent injunction. "System-wide relief is required if the injury is the result of violations of a statute or the constitution that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs) . . . ."[498] A properly tailored injunction is not "invalid simply because it will have collateral effects."[499] And a remedy that necessarily requires the expenditure of state funds to achieve compliance fits the "prospective-compliance

_____

continue simply because a remedy would involve intrusion into the realm of prison administration.").

[497] *M.R.*, 697 F.3d at 737 (collecting cases); *see also See Wilson*, 501 U.S. at 311 n.2 ("Among the lower courts, 'it is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement.'") (collecting cases); *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (*Milliken II*) ("[F]ederal courts [can] enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury."); *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them.").

[498] *M.R.*, 697 F.3d at 738.

[499] *Plata*, 563 U.S. at 531.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 109 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 109 of 112

exception" to the Eleventh Amendment prohibition against money damages against the state.[500]

As Plaintiffs illustrated in their Opposition to Defendants' Motion for Summary Judgment,[501] numerous states have made improvements to their child welfare systems under both consent decrees and post-trial injunctive relief. For example, following a trial in Texas, in connection with *M.D.*, the state made substantial improvements in their completion of high-priority abuse and neglect investigations within 60 days (improving from 21% compliance in 2019 to 84% compliance in 2023).[502] Following a trial in the District of Columbia, the child welfare agency prepared better case plans, decreased the number of children living in institutions more than 100 miles from the city and children under six living in group homes, hired nearly 100 social workers, and cut caseloads by more than half.[503] The Court finds such relief necessary here.

---

[500] *Milliken*, 433 U.S. at 289; *Cal. All. of Child & Family Servs. v. Wagner*, 425 F. App'x 660, 662 (9th Cir. 2011) (unpublished) (quoting *Natural Resources Def. Council v. Cal. Dept. of Transp.*, 96 F.3d 420, 422 (9th Cir. 1996)) ("A district court may enjoin state officials from future violations of a federal statute, 'even if it might require substantial outlay of funds from the state treasury'").

[501] ECF No. 283 at 54-56.

[502] ECF No. 23 at 55 (citing *M.D.,* 119 F.4th at 385).

[503] *Id.* at 54.

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 110 OF 112

Case 3:22-cv-00129-SLG    Document 459    Filed 09/25/25    Page 110 of 112

Dated: September 25, 2025.       Respectfully submitted,


_s/ Kevin D. Homiak_
Galen D. Bellamy (_pro hac vice_)
bellamy@wtotrial.com
Kevin D. Homiak (_pro hac vice_)
homiak@wtotrial.com
Colleen Koch (_pro hac vice_)
koch@wtotrial.com
**WHEELER TRIGG O'DONNELL LLP**
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: (303) 244-1800


Marcia Robinson Lowry (_pro hac vice_)
mlowry@abetterchildhood.org
Julia K. Tebor (_pro hac vice_)
jtebor@abetterchildhood.org
Anastasia Benedetto (_pro hac vice_)
abenedetto@abetterchildhood.org
David Baloche (_pro hac vice_)
dbaloche@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone:   (646) 795-4456

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
_Mary B., et al., v. Kim Kovol, et al._; Case No. 3:22-cv-00129-SLG
PAGE 111 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 111 of 112

Facsimile:      (212) 692-0415

Elena M. Romerdahl, AK Bar No. 1509072
eromerdahl@perkinscoie.com
**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, AK 99501
Telephone:    (907) 279-8561
Facsimile:     (907) 276-3108

Mark Regan, AK Bar No. 8409081
mregan@dlcak.org
**DISABILITY LAW CENTER OF ALASKA**
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Telephone:    (907) 565-1002
Facsimile:     (907) 565-1000

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on September 25, 2025, I electronically filed the foregoing **Supplemental Proposed Findings of Fact & Conclusions of Law** with the Clerk of Court for the United States District Court – District of Alaska by using the CM/ECF system. Participants in Case No. 3:22-cv-00129-SLG who are registered CM/ECF users will be served by the CM/ECF system.

*s/ Kevin D. Homiak*

PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW
*Mary B., et al., v. Kim Kovol, et al.*; Case No. 3:22-cv-00129-SLG
PAGE 112 OF 112

Case 3:22-cv-00129-SLG     Document 459     Filed 09/25/25     Page 112 of 112