| | |
|---|---|
| MARY B., *et al.*,<br><br>            Plaintiffs,<br>      v.<br><br>TRACY DOMPELING, Acting Commissioner, Alaska Department of Family and Community Services, in her official capacity, *et al.*,<br><br>            Defendants. | Case No. 3:22-cv-00129-SLG |

## DECISION AND ORDER

This matter came before the Court for a eleven-day bench trial from August 25 to September 11, 2025.[1]  Trial was held on three causes of action: (1) violation of Substantive Due Process pursuant to the Fourteenth Amendment[2]; (2) violation of the Adoption Assistance and Child Welfare Act of 1980 ("CWA"), 42 U.S.C. § 670 *et. seq.*;[3] and (3) violations of the Americans with Disabilities Act ("ADA"), 42

---

[1] Named Plaintiffs in this class action are Mary B., Connor B., Rachel T, Eleanor T., and Lana H. Defendants are Kim Guay, Director, Office of Children's Services, in her official capacity; Alaska Office of Children's Services; Tracy Dompeling, Acting Commissioner, Alaska Department of Health and Social Services, in her official capacity; and the Alaska Department of Health and Social Services.  At the time of trial, Kim Kovol was the Commissioner of the Alaska Department of Family and Community Services; Ms. Kovol testified at trial.  Docket 412 at 70.  Since trial, Ms. Kovol has left her role as Commissioner.  Because Ms. Kovol was sued in her official capacity, Tracy Dompeling, Acting Commissioner, is substituted as Defendant in this action pursuant to Federal Rule of Civil Procedure 25.  The case caption is amended accordingly.

[2] Docket 16 at ¶¶ 264-69.

[3] Docket 16 at ¶¶ 277-80.  The Court previously dismissed Plaintiffs' claim brought pursuant to § 672(a) of the CWA, Docket 55 at 56-60, and granted summary judgment to Defendants on

U.S.C. § 12131 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*[4] The Court heard the testimony of 28 witnesses, and the parties submitted numerous exhibits.[5] Based on the foregoing, and the record as a whole in this case, the Court now enters the following Findings of Fact and Conclusions of Law.[6]

As a preliminary matter, the Court recounts that in the order granting class certification, the Court relied on Plaintiffs' case summaries to find that at least one Named Plaintiff had standing as to each of Plaintiffs' claims and to find that class certification was proper.[7] Regarding standing, the Court found that "the 'manner and degree of evidence required' at the preliminary class certification stage is not the same as 'at the successive stages of the litigation'—*i.e.*, at trial," and plaintiffs are accorded "greater evidentiary freedom at the class certification stage" than at trial.[8] The Court then relied on the facts as recounted in Plaintiffs' case summaries

---

Plaintiffs' CWA claim premised on purported statutory rights to "placement in the least restrictive and most family-like setting, closest to their home community that conforms to nationally recommended professional standards, 42 U.S.C. §§ 671(a)(16), 675(5)(A)," Docket 286 at 5, 16-18, and "access to quality services to protect his or her safety and health, 42 U.S.C. § 671(a)(22)," Docket 286 at 5, 21.

[4] Docket 16 at ¶¶ 298-315. The Court dismissed Plaintiffs' ADA and Rehabilitation Act claims insofar as they alleged violations based on failure to offer reasonable modifications of OCS Safety Plans, healthcare services, and services to foster care providers. Docket 55 at 63-66.

[5] Docket 451; Docket 452; Docket 453.

[6] *See* Federal Rule of Civil Procedure 52(a)(1) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately."). Findings of fact in a civil case are by a preponderance of the evidence unless otherwise specified.

[7] Docket 336 at 16-26, 32-33, 43-44.

[8] Docket 336 at 13 (quoting *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018)).

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 2 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 2 of 60

to determine that Plaintiffs had established by a preponderance of the evidence their standing and the propriety of class certification.[9]

Before trial, the Court ruled that Plaintiffs' case summaries were inadmissible as substantive evidence under Federal Rule of Evidence 1006 and that if the parties sought to rely on evidence from the case summaries at trial, they would need to move into evidence the underlying portions of the case files.[10] But the Court left open the possibility that the case summaries may be admissible under Federal Rule of Evidence 703, which permits the admission of documents that an expert relied upon in formulating her opinion, not as substantive evidence, but to explain the basis of the expert's opinion.[11]

At trial, neither party moved to admit the case summaries. Instead, Plaintiffs moved to admit the Named Plaintiffs' full case files pursuant to Rule 703, which the Court denied on the basis that Plaintiffs' expert "did not rely on all of those materials."[12] Plaintiffs then moved to admit under Rule 703 excerpts of Named

---

[9] *See* Docket 336.

[10] Docket 384.

[11] Docket 384 at 5; *United States v. Sims*, 514 F.2d 147, 149-50 (9th Cir. 1975) (explaining that Rule 703 permits the admission of otherwise inadmissible evidence upon which an expert relies for the purpose of explaining the expert's opinion, but the evidence is not admissible as substantive evidence); *see Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-62 (9th Cir. 1984) ("Rule 703 merely permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion. It does not allow the admission of the reports to establish the truth of what they assert." (internal citations omitted)).

[12] Docket 417 at 24-26.

Plaintiffs' case files that their expert "relied upon."[13] Defendants did not object to the extent the case file excerpts were admitted "to evaluate the accuracy of the expert report and not for any substantive use," and the Court admitted the case file excerpts under Rule 703 "for that limited purpose."[14] As such, while the Court previously found that at least one Named Plaintiff had standing to assert each of Plaintiffs' claims and that class certification was appropriate at the class certification stage based primarily on the case summaries, the Court evaluates anew whether Plaintiffs proved their claims by a preponderance of the substantive evidence and opinion testimony that was admitted at trial. The Court now turns to Named Plaintiffs' standing and the merits of each of Plaintiffs' claims.

## A. STANDING

1. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."[15]

2. "A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"[16] "Therefore, in a case . . . that proceeds to trial, the specific facts set forth by the plaintiff to support standing 'must be supported

---

[13] Docket 420 at 5.

[14] Docket 420 at 5; Docket 452 at 10.

[15] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U. S. 442, 466 (2016) (Roberts, C. J., concurring)).

[16] *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 4 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 4 of 60

adequately by the evidence adduced at trial.'"[17]

3. Standing requires (1) that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) 'actual or imminent, not conjectural or hypothetical'"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"[18]

4. "The party invoking federal jurisdiction bears the burden of establishing these elements."[19]

5. In a case seeking injunctive relief, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."[20]

6. "[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been

---

[17] *Id.* (quoting *Lujan*, 504 U.S. at 561).

[18] *Lujan*, 504 U.S. at 560-61 (first quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984); then quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); and then quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42, 38, 43 (1976)).

[19] *Id.* at 561.

[20] *TransUnion LLC*, 594 U.S. at 435.

suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"[21]

7. "[W]hen [courts] measure a plaintiff's standing, regardless of whether the plaintiff sues individually or as class representative, we look concretely at the facts that pertain to that plaintiff."[22]

8. For the reasons set forth below, the Court finds that Plaintiffs have failed to establish any of their claims by a preponderance of the evidence as to any Named Plaintiff. Accordingly, the Court finds that Plaintiffs have failed to demonstrate an injury sufficient to confer Article III standing as to any of the Named Plaintiffs.

## B. FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAIM

Findings of Fact

The Court finds the following facts by a preponderance of the evidence:

1. Pseudonymously Named Plaintiffs are Mary B., Connor B., Eleanor T., Rachel T., and Lana H.[23]

---

[21] *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see L. Tarango Trucking v. County of Contra Costa*, 181 F. Supp. 2d 1017, 1024, 1026 (N.D. Cal. 2001) (finding that the only named plaintiff who testified "did not establish at trial that he suffered an actual injury, or will suffer imminent injury" and, because "Plaintiffs did not present any evidence about any of the other named plaintiffs at trial," "there [was] no evidence that any of the named plaintiffs were injured, or are likely to be injured, by any of the County's allegedly unconstitutional contracting practices").

[22] *B.K. v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019).

[23] This Court previously dismissed other Named Plaintiffs from this case because they were no longer in OCS custody. Docket 220 at 20.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 6 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 6 of 60

2. Defendant Tracy Dompeling is the Acting Commissioner of the Alaska Department of Family and Community Services.[24]

3. The Office of Children's Services ("OCS") is a division within the Alaska Department of Family and Community Services.[25]

4. Defendant Kim Guay is the Director of OCS.[26]

5. Plaintiffs allege a violation of their Fourteenth Amendment Substantive Due Process rights on behalf of themselves and a General Class comprised of "all children for whom OCS has or will have legal responsibility and who are or will be in the legal and physical custody of OCS."[27]

6. Plaintiffs' Substantive Due Process claim alleges that Defendants violated their (a) "right to freedom from the foreseeable risk of maltreatment while under the protective supervision of the State"; (b) "right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child"; and (e) "right to treatment and care consistent with the purpose and assumptions of government

---

[24] Docket 412 at 70.

[25] Docket 412 at 70.

[26] Docket 412 at 66-67.

[27] Docket 336 at 57-58.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 7 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 7 of 60

custody."[28]

7.  <u>Evidence as to the Named Plaintiffs.</u>

8.  *Mary B. and Connor B.*  Plaintiffs failed to present any substantive evidence at trial regarding Mary and Connor except through the opinion testimony of Ms. Groh.  As discussed below, the Court finds that Ms. Groh's testimony was neither persuasive nor reliable.[29]

9.  Mary and Connor both entered OCS custody when they were very young.  Mary was initially placed with a foster family and was doing well in the foster home.  Then, upon the request of her grandmother, OCS placed Mary with her grandmother.[30]  Mary's sister, Bailey, was also living with the grandmother, and OCS case files indicate that Bailey, who was then 13 or 14 years old, took on caretaking responsibility for Mary.  Then both Bailey and Mary were removed from their grandmother's care after she had a relapse and were placed in the care of their uncle, who lived in the same residence.[31]  Ms. Groh also testified that she recalled a "multi-month gap" between

---

[28] Docket 16 at ¶ 269.

[29] *See infra* Section B, Findings of Fact, ¶¶ 63-75.

[30] Docket 420 at 35.

[31] Docket 417 at 37-39; Docket 420 at 37.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 8 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 8 of 60

visits by Mary's caseworker.[32]

10. In Ms. Groh's opinion, Mary's care by a teen sibling put "a young child at risk of harm in terms of the question of supervision and whether they have a caregiver that can really meet their needs."[33] But the only example of physical harm that Ms. Groh could recall was that in Mary's case file there was a noted incident where a babysitter gave Mary spoiled milk and "Mary could have gotten sick from that."[34]

11. While the circumstances described by Ms. Groh regarding Mary's care by her teenage sister and the incident with spoiled milk are concerning, the Court finds that Plaintiffs have not established by a preponderance of the evidence that Mary faced a substantial risk of harm while in OCS custody due to OCS's policies or practices.

12. As to Connor, Ms. Groh testified that he was placed with a foster family that he bonded with and, at the end of 2024 when she reviewed the case files, he had been with that family for four years. Ms. Groh also testified that it was an open question as to whether OCS has achieved permanency for Connor.[35]

---

[32] Docket 417 at 40-41.

[33] Docket 417 at 48.

[34] Docket 420 at 93.

[35] Docket 417 at 40.

13. The Court recognizes that permanency is often the primary goal for children in foster care, but a lack of permanency alone does not establish by a preponderance of the evidence that Connor faced a substantial risk of harm due to OCS policies or practices. To the contrary, based on the limited evidence at trial presented regarding Connor, it appears that he was doing well in his foster family placement.

14. *Rachel T. and Eleanor T.*

15. Rachel T. and Eleanor T. entered OCS custody in 2020 and were initially staying with a family friend in Fairbanks.[36] Shortly thereafter, Rachel and Eleanor were placed in the custody of their sister, Danyelle Galles, in Anchorage with whom they have remained for their entire time in OCS custody.[37]

16. Ms. Galles had a pre-existing relationship with Rachel and Eleanor before the children were placed with her in 2020. The children had lived with her previously; she had taken them to doctors' appointments; and she had sought guardianship of the children.[38]

17. Ms. Galles was not provided with the children's medical histories or

---

[36] Docket 427 at 98.

[37] Docket 427 at 66-67, 97.

[38] Docket 427 at 70-71, 98-99.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 10 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 10 of 60

any other medical documentation when the children came into her care, but Ms. Galles knew that Eleanor had been born prematurely and had a heart condition. Ms. Galles also knew that Rachel had ear damage when she was younger.[39]

18. When Ms. Galles took Rachel and Eleanor into her home, the children had lice and Rachel had a staph infection.[40]

19. Rachel has been diagnosed with fetal alcohol syndrome disorder, attention deficit hyperactivity disorder, explosive mood dysregulation, and oppositional defiance disorder.[41]

20. Shortly after entering custody and after the children's other sister, Gayle, left the home, Rachel began exhibiting severe behavioral escalations; she would scream, cry, throw herself on the floor, hurt herself, hurt others in the home, and damage Ms. Galles's home and property.[42] Ms. Galles reported Rachel's behavior to Rachel's caseworker who recommended taking Rachel to the emergency psychiatric department.[43]

---

[39] Docket 427 at 70-71.

[40] Docket 427 at 71.

[41] Docket 427 at 85-86.

[42] Docket 427 at 76-77, 82.

[43] Docket 427 at 76-77.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 11 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 11 of 60

21. In March 2021, while Rachel and Ms. Galles were at the emergency psychiatric department, a nurse provided Ms. Galles with a list of providers; Ms. Galles contacted one and scheduled a neuropsychological evaluation for Rachel, which Rachel then received.[44]

22. Based upon a recommendation from the neuropsychological evaluation, Rachel was scheduled with a therapist.[45] Rachel's therapist, pediatric primary care provider, and neuropsychological evaluation doctor all recommended that Rachel be prescribed medication to stabilize her mood.[46] Ms. Galles sent Rachel's neuropsychological report to OCS.[47]

23. Rachel was referred to Orion Behavioral Health for medication management; after consultation, Orion Behavioral Health also recommended that Rachel be prescribed medication.[48]

24. However, at the time of the recommendation, Ms. Galles was unable to put Rachel on medication because Rachel's biological parents

---

[44] Docket 427 at 77-78.

[45] Docket 427 at 78.

[46] Docket 427 at 78.

[47] Docket 427 at 80.

[48] Docket 427 at 80.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 12 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 12 of 60

refused to consent to her taking the medication.[49]  In August 2021, October 2021, and January 2022, OCS attempted to obtain parental consent for medication for Rachel, but that consent was denied.[50]

25. Six to nine months after being prescribed the medication, parental consent was obtained such that Rachel could begin taking medication; Rachel was still on medication at the time of trial.[51]  The medication has helped with Rachel's behavioral outbursts, and Ms. Galles testified Rachel has not had an escalation "in quite some time."[52]

26. Ms. Galles testified that the six-to-nine-month delay in getting Rachel on medication "impacted [Rachel] pretty heavily."  It would sometimes take hours for Rachel to calm down and afterwards Rachel would be emotionally and physically exhausted.  Further, because Ms. Galles was spending most of her attention on Rachel, Eleanor did not receive the support she needed, including mental health treatment.[53]

27. During the time Rachel was placed with Ms. Galles, she needed an

---

[49] Docket 427 at 80, 102.

[50] Docket 431 at 100-03.

[51] Docket 427 at 81, 102.

[52] Docket 427 at 102.

[53] Docket 427 at 82-83.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 13 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 13 of 60

extraction of her wisdom teeth.[54]  In May 2024, Rachel was scheduled for surgery, but Ms. Galles was subsequently informed that the surgery could not occur because OCS had not provided permission.[55] At that time, OCS had the authority to make surgical and medical decisions for Rachel.[56]

28.  Ms. Galles rescheduled Rachel's surgery for six or seven months later; the day before the surgery, Ms. Galles was again informed that the surgery could not occur because OCS had not provided permission.[57]  Ms. Galles was "offered a reschedule another six months out."[58]  The record is unclear as to whether Rachel received the surgery.  While Rachel was waiting for the surgery, she complained to Ms. Galles on a nearly daily basis about mouth pain, headaches, and general discomfort.[59]

29.  At the time of trial, Rachel was enrolled in Alaska's Individualized Supports Medicaid Waiver ("ISW"), through which she receives care

---

[54] Docket 427 at 83.

[55] Docket 427 at 83-84.

[56] Docket 427 at 84.

[57] Docket 427 at 84-85.

[58] Docket 427 at 85.

[59] Docket 427 at 85.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 14 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 14 of 60

coordination, day habilitation, and respite services.[60]  Ms. Galles's husband is employed to provide ISW services to Rachel and is compensated through the waiver to provide the services.[61]  Ms. Galles has been working to get Rachel enrolled in Alaska's Intellectual and Developmental Disabilities ("IDD") Medicaid Waiver.[62]

30.  Ms. Galles testified that before Rachel was on medication, she had hoped that the Discovery Unit at Providence would be able to provide Rachel with support, but Rachel was "too acute."[63]  Since Rachel has been taking medication and has been connected to services, Ms. Galles has not considered placing Rachel in an institution because Rachel has not "displayed any behaviors that we felt were necessary."[64]

31.  Eleanor has been diagnosed with autism, attention deficit hyperactivity disorder, oppositional defiance disorder, depression, and anxiety.[65]  Because of Eleanor's birth circumstances, Ms. Galles

---

[60] Docket 427 at 100-01.

[61] Docket 427 at 101.

[62] Docket 427 at 100-01.

[63] Docket 427 at 103.

[64] Docket 427 at 103.

[65] Docket 427 at 88.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 15 of 60
Case 3:22-cv-00129-SLG     Document 461     Filed 03/31/26     Page 15 of 60

had Eleanor's heart evaluated when Eleanor came into her care.[66] Ms. Galles also ensured that Eleanor received primary care, dental care, and mental health services.[67] Eleanor is no longer receiving counseling services because she "graduated" from her services with her therapist but she can return to therapy at any time if she so chooses.[68]

32. When asked if OCS helped connect Eleanor with services or providers, Ms. Galles generally answered no, recalling only one instance where a secondary caseworker provided her with information for a new neuropsychologist.[69]

33. Eleanor has applied for the IDD waiver but was determined to be ineligible. She was scheduled to be reevaluated for the waiver in October 2025.[70]

34. Ms. Galles has received augmented reimbursement rates for her care of Rachel.[71]

35. In the five years that Rachel has been in Ms. Galles's care, she has

---

[66] Docket 427 at 87.

[67] Docket 427 at 87-88.

[68] Docket 427 at 102.

[69] Docket 427 at 88.

[70] Docket 427 at 101.

[71] Docket 427 at 72.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 16 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 16 of 60

had "too many [caseworkers] for [Ms. Galles] to recall."[72] Ms. Galles testified that there were times when Rachel was assigned a new caseworker, but that Ms. Galles was not informed.[73] Ms. Galles recalled speaking with or meeting six primary caseworkers between both Rachel and Eleanor.[74] Ms. Galles testified that during COVID the children's caseworker would perform visits via Zoom and Ms. Galles recalled that a secondary caseworker came to her home two times. Another secondary caseworker also only met with the children via Zoom.[75] After the children's case was transferred from Fairbanks to Wasilla, Ms. Galles or her husband would more often transport the children to Wasilla for meetings and visitation, and the children's most recent secondary caseworker meets with Ms. Galles's husband and the children in their front yard.[76]

36. The Court finds that Plaintiffs failed to establish by a preponderance of the evidence that Rachel or Eleanor faced a substantial risk of harm while in OCS custody due to OCS policies or practices, although this

---

[72] Docket 427 at 86.

[73] Docket 427 at 86-87.

[74] Docket 427 at 87.

[75] Docket 427 at 95-96.

[76] Docket 427 at 96.

is due in large part to the dedicated and considerable efforts of Ms. Galles herself.

37. Ms. Galles is a strong advocate for her sisters and has been able, though with some difficulty, to connect the children to appropriate medical and mental health services. However, the inability to have Rachel's wisdom teeth extracted due to OCS's apparent lack of consent is concerning. While Ms. Galles testified that she alone connected the children with these services and that OCS failed to provide timely authorization for Rachel's oral surgery, she also testified that she is receiving augmented reimbursement rates for her care of Rachel and that her husband is compensated for the services he provides to Rachel as part of the ISW. Further, while it is unclear how frequent caseworkers visited Ms. Galles's home and the children, Ms. Galles recalled that both primary and secondary caseworkers visited the children via Zoom and that currently a caseworker comes to visit the children and her husband.

38. *Lana H.*

39. When Lana entered OCS custody she had been diagnosed with several mental health conditions, including attention deficit hyperactivity disorder, post-traumatic stress disorder, and oppositional defiant disorder. While in OCS custody, Lana received

additional diagnoses of major depressive disorder with anxious distress, social anxiety disorder, and reactive attachment disorder.[77]

40. Lana was taken into emergency OCS custody on May 3, 2018, "due to substance exposure, neglect, mental injury, and physical abuse."[78] There was a note in Lana's case file that had been entered by an OCS Medical Mental Health Unit staff member on April 17, 2018, which was before Lana was in OCS custody, demonstrating that the Medical Mental Health Unit had been involved in Lana's case before she was taken into OCS custody.[79]

41. On May 10, 2018, Lana was referred to Frontier Community Services for mental health, occupational therapy, physical therapy, and speech assessments and treatment, if needed.[80]

42. Shortly after Lana entered OCS custody, the foster family where she was placed told Lana's caseworker that Lana was having outbursts that were too disruptive to the other children in the home. The caseworker asked the foster parent if Lana's therapy provider had an on-call number or provided respite services. The caseworker

[77] Docket 417 at 44; Docket 436 at 74 (noting that Lana H.'s North Star neuropsychological evaluation "lists a number of mental health diagnoses").

[78] Docket 437 at 19; Docket 433 at 73; Docket 436 at 60.

[79] Docket 437 at 19-20; Docket 437 at 74-75.

[80] Docket 436 at 63.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 19 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 19 of 60

determined that Lana was not acute and did not need to be evaluated. The caseworker asked the foster parent if there was anything OCS could put in place over the weekend to keep Lana in the placement. The foster parent was not sure but agreed to keep Lana in her home for a few more days.[81]

43. On May 15, 2018, the foster parent told Lana's caseworker that Lana was continuing to have behavioral issues and that Lana needed more help than the family could provide.[82] A few days later, the foster parent reported that Lana had said that she was intentionally behaving badly because she thought that it would get her reunited with her mother.[83]

44. On June 1, 2018, the foster parent told Lana's caseworker that she wanted Lana removed from her home because Lana had been throwing things at the foster parent and hitting the foster parent. Lana also yelled at another child in the home.[84]

45. That same day, Lana was accepted for residential treatment at North

---

[81] Docket 436 at 63-65.

[82] Docket 436 at 65-66.

[83] Docket 436 at 67.

[84] Docket 436 at 68.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 20 of 60

Star; she was moved to North Star on June 4, 2018.[85] On June 14, 2018, North Star staff completed a neuropsychological evaluation of Lana.[86] The neuropsychological report noted that Lana had been receiving "psychiatric and outpatient therapy services through the Peninsula Community Health Service Program for approximately three years."[87]

46. Lana was at North Star until August 15, 2018.[88] Lana was then placed in a therapeutic group home.[89] Lana's mother agreed that Lana needed residential treatment in a therapeutic foster home.[90]

47. Lacey Centeno—then a nurse in the Medical Mental Health Unit—was assigned as Lana's nurse in June or July of 2020 and, since that time, Ms. Centeno has been involved in Lana's care while in OCS custody.[91]

48. Ms. Centeno testified that she believed that it was difficult to find appropriate placements for Lana because of Lana's desire to be

---

[85] Docket 436 at 68-69, 75; Docket 437 at 22.

[86] Docket 436 at 70, 74; Docket 437 at 24.

[87] Docket 436 at 71; *see* Docket 437 at 21-22.

[88] Docket 436 at 75.

[89] Docket 436 at 75; Docket 437 at 23.

[90] Docket 437 at 22.

[91] Docket 433 at 73.

reunited with her biological mother and, to that end, Lana's sabotage of her placements, which Ms. Centeno testified is often seen with reactive attachment disorder.[92]

49. From approximately August 2020 to June 2021, Lana was placed at San Marcos, an out-of-state treatment facility in Texas.[93] At the time of her admission, Lana's projected discharge date was June 2021.[94] Beginning as early as October 2020, and throughout April and May 2021, OCS was working to find a placement for Lana for after her discharge.[95] Further, at a secure treatment placement hearing on May 7, 2021, Lana's therapist opined that the parties were "[s]till working on conditions being ameliorated such that . . . she could be in less restrictive placement" and that Lana "[w]ould still benefit from being" at San Marcos.[96]

50. Lana was eventually discharged from San Marcos but the record is unclear as to where she was placed upon her discharge.

51. In February 2022, Lana was a patient at Mat-Su Regional Hospital.[97]

---

[92] Docket 433 at 93-94.

[93] Docket 431 at 113-14.

[94] Docket 431 at 113-14.

[95] Docket 431 at 114-20.

[96] Docket 431 at 118.

[97] Docket 433 at 75.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 22 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 22 of 60

Ms. Centeno received a call from a hospital worker who stated that Lana was no longer acute and who felt that Lana needed residential care instead of acute care. After the call, Lana remained at the hospital for a day or two longer.[98]

52. In March 2022, Lana was arrested and criminally charged on an allegation that she had held up a piece of glass and threatened to hit her foster parent. Lana was brought to a youth detention center.[99] A note from a March 11, 2022 detention hearing in Lana's juvenile case indicated that OCS was given two weeks to find a safe release plan and placement for Lana, and at that time the State would release Lana from detention.[100] However, on April 21, 2022, Lana was still at the detention center.[101]

53. Lana was then placed at the Mack House, which is a youth shelter in Anchorage, from May 2022 to July 2022.[102] After Lana began making suicidal statements, she was removed from the Mack House and placed into protective custody under Title 47 of Alaska law.[103]

---

[98] Docket 433 at 75-76.

[99] Docket 433 at 76-77.

[100] Docket 433 at 76-77.

[101] Docket 433 at 77-78.

[102] Docket 433 at 79, 89.

[103] Docket 433 at 81-82.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 23 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 23 of 60

54. In October 2022, Lana was a patient at Fairbanks Memorial Hospital.[104] On October 16, 2022, OCS was notified that there was no reason to keep Lana at the hospital any longer and that a different placement was needed.[105] On October 20, 2022, Lana was released from the hospital and OCS arranged for a security worker to pick up Lana and transport her to a hotel where she stayed overnight with OCS staff and the security worker.[106]

55. Lana was placed in an out-of-state treatment facility in Ohio called Foundations for Living from October or November 2022 to June 2023.[107] While at Foundations for Living, Lana was physically restrained approximately seven times. In addition to being restrained, Lana also stated that she had a black eye from staff hitting her in the face and that she had worn the same clothing for three full days.[108]

56. Lori Wikle, who had been identified as a potential foster placement for Lana after her discharge from Foundations for Living, raised concerns with OCS about the physical restraints, bruises associated with the

---

[104] Docket 433 at 82-83.

[105] Docket 433 at 83-84.

[106] Docket 433 at 84.

[107] Docket 433 at 58-59.

[108] Docket 420 at 96-98.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 24 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 24 of 60

restraints, and Lana's reported exposure to head lice, bed bugs, and ringworm.[109]

57. While OCS lacked jurisdiction over an out-of-state facility, OCS referred Ms. Wikle's concerns to a caseworker in Ohio for follow up.[110] An Ohio caseworker and local police officers visited Lana at the facility to investigate Ms. Wikle's concerns.[111] Shortly thereafter, Ms. Centeno—the Medical Mental Health unit nurse assigned to Lana's case—traveled to Ohio to meet with Lana and discuss the allegations and concerns with the facility.[112] After Ms. Centeno reviewed incident reports and talked to facility staff and Lana—who did indeed have bruises on her arms and legs from the restraints and Lana's struggling—Ms. Centeno concluded that the restraints were warranted based on Lana's physical aggression.[113] Further, when Ms. Centeno visited Lana, there was no indication that she had lice and Lana did not mention bed bugs.[114]

58. During Lana's stay at Foundations for Living, OCS sent Talia

---

[109] Docket 433 at 59.

[110] Docket 420 at 43.

[111] Docket 420 at 45-47.

[112] Docket 433 at 60-61.

[113] Docket 433 at 61-63.

[114] Docket 433 at 63-64.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 25 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 25 of 60

Robinson to visit Lana two or three times and OCS funded at least two visits by Ms. Wikle.[115]

59. At a deposition, Justin Lazenby, Lana's guardian *ad litem* from the beginning of her case until 2023, persuasively testified that all of Lana's placements in residential treatment facilities were in her best interest and that when he felt Lana no longer needed the level of care provided in a residential treatment setting, he advocated for her discharge, which occurred soon after.[116] According to Mr. Lazenby, Lana received behavioral health services while in OCS custody, including wraparound services provided by several therapeutic treatment homes.[117]

60. The Court finds that Plaintiffs failed to establish by a preponderance of the evidence that Lana faced a substantial risk of harm while in OCS custody due to OCS policies or practices.

61. <u>Other children</u>.

62. Two children who had previously been in OCS custody—Matthew Vandenberg and Levi Vandenberg—testified at trial.[118] However,

---

[115] Docket 433 at 67.

[116] Docket 420 at 49; Docket 405; Defs.' Ex. PPPP at 61, 70-71, 125-27.

[117] Defs.' Ex. PPPP at 76-77.

[118] Docket 412 at 13-44.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 26 of 60

these children are no longer Named Plaintiffs in this case.[119] And their testimony was in many respects unreliable because it was contradicted by their case files and by testimony elicited on cross-examination and from other witnesses.[120]

63. <u>Testimony of Alicia Groh</u>.

64. Plaintiffs proffered testimony by Alicia Groh.[121] Plaintiffs sought to qualify Ms. Groh as an expert witness in the field of child welfare. During voir dire, Ms. Groh testified about her background, education, and experience in the field of child welfare.[122]

65. Ms. Groh then testified as to her approach in formulating her opinions in this case. She first reviewed documents and data, including reports from OCS, the Alaska Child and Family Services Plans, Annual Progress and Services Reports, Citizen Review Panel reports, and OCS's Performance Improvement Plan.[123] She also reviewed spreadsheets with data that had been provided to her by Plaintiffs' attorneys that had been generated by OCS and email

---

[119] *See* Docket 220.

[120] *See* Defs.' Ex. CCCCC, Docket 412 at 14-15, 32-36, 48-51; Docket 429 at 30-33, 38-47, 114-17; Docket 424 at 49-51.

[121] *See generally* Docket 431; Docket 417.

[122] Docket 431 at 35-63.

[123] Docket 431 at 64, 67.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 27 of 60

correspondence between OCS leadership and staff.[124]

66. Based on her review of these documents, Ms. Groh identified "themes" that "emerge[d]"; with those themes in mind, Ms. Groh then reviewed "the case files and case summaries of the [N]amed [P]laintiffs."[125]

67. Ms. Groh testified that she was provided with "full electronic versions of the case files for the [N]amed [P]laintiffs" to review. In reviewing the case files, Ms. Groh first did a "high level walk-through" to "orient[] [herself] to the case files." She then did some "spot reading throughout the case files" to ascertain what the "story [was] overall."[126]

68. Ms. Groh testified that she also reviewed the case summaries, which were narratives prepared by Plaintiffs' counsel of selected excerpts from the Named Plaintiffs' case files.[127]

69. On cross-examination, Ms. Groh testified that she had "largely" "cut and pasted" the case file summaries that Plaintiffs' attorneys had prepared into her report and that although her report contained "citations in the full case summaries," she "did not crosscheck in the

---

[124] Docket 431 at 67-68.

[125] Docket 431 at 64-65.

[126] Docket 431 at 65-66.

[127] Docket 431 at 66.

full case files."[128]

70. The Court finds that the case summaries for the Named Plaintiffs are not an accurate portrayal of the experiences in foster care of any of the Named Plaintiffs.

71. For example, during cross-examination Defendants reviewed a sentence in Ms. Groh's amended report that recounted the following for Rachel and Eleanor: "'Between 2016 and 2020, OCS received at least nine Child Protective Services reports regarding the family' . . . 'at least six of which were screened out.'"[129] Ms. Groh admitted that the source cited for that proposition, which was copied from the case summaries, did not have anything to do with protective services reports nor did it pertain to Rachel and Eleanor.[130]

72. In another instance, in Ms. Groh's amended report she copied a portion of the case summaries recounting that an August 2020 note indicated that there was no placement identified for Lana after her discharge from San Marcos.[131] Ms. Groh had concluded that the lack of a discharge placement in August 2020 "meant that Lana's

---

[128] Docket 431 at 88-92.

[129] Docket 431 at 93-94.

[130] Docket 431 at 93-94; Docket 417 at 12-14.

[131] Docket 431 at 113-14.

discharge from an institution was delayed, not because the institutional setting continued to be appropriate for her, but because OCS didn't have an appropriate placement option for her."[132]  But as noted above, on cross-examination, Defendants established that Lana's projected discharge date was not anticipated to be until June 2021.[133]  Defendants also showed Ms. Groh portions of Lana's case file, which demonstrated that OCS was working on Lana's discharge placement in October 2020 and in April and May 2021 before Lana's discharge date.[134]  Further, in state court notes from a secure treatment placement hearing on May 7, 2021, Lana's therapist opined that the parties were "still working on conditions being ameliorated such that . . . she could be in less restrictive placement" and that Lana "[w]ould still benefit from being here," meaning at San Marcos.[135]  Ms. Groh ultimately acknowledged that the opinion in her report on Lana's delayed discharge was an error.[136]

73. As another example, Ms. Groh recalled that Matthew Vandenberg

---

[132] Docket 431 at 113-14.

[133] Docket 431 at 113-14.

[134] Docket 431 at 114-17.

[135] Docket 431 at 118.

[136] Docket 431 at 120-21.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 30 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 30 of 60

testified that he was visited by a caseworker who he did not know and that the caseworker was unable to answer his questions about the status of his case.[137] On cross-examination, Defendants showed Ms. Groh portions of Matthew Vandenberg's case file which demonstrated that Matthew in fact had had multiple contacts with his primary caseworker shortly before and after the visit Matthew mentioned in his testimony.[138] Ms. Groh agreed that Matthew and his brother Levi "saw these caseworkers regularly."[139]

74. Further, Ms. Groh testified that "there was some communication in the case file from an OCS worker . . . expressing concern that if OCS couldn't provide better support to [Ms. Galles], that she shouldn't be able to keep that placement."[140]  On cross-examination, Ms. Groh agreed that the case note showed that Rachel had a neurological examination shortly after she entered OCS custody, that both Rachel and Eleanor had access to various resources and supports, and that Ms. Galles expressed that she "by no means wants [Rachel] removed from [her] household, [she] just want[s] to ensure that she's properly

---

[137] Docket 417 at 87-88.

[138] Docket 420 at 54.

[139] Docket 420 at 55.

[140] Docket 417 at 34; *see* Docket 420 at 99-100.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 31 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 31 of 60

support[ed]."[141]

75. In sum, given the inaccuracies and omissions in the case summaries, and Ms. Groh's extensive reliance on those summaries, the Court does not find her opinions on the Named Plaintiffs' experiences while in state custody to be reliable or persuasive.

76. In any event, Ms. Groh's testimony supports finding that the evidence fails to show that any Named Plaintiff faced a substantial risk of harm. In Ms. Groh's opinion, Mary's care by a teen sibling put "a young child at risk of harm in terms of the question of supervision and whether they have a caregiver that can really meet their needs."[142]   But the only example of physical harm that Ms. Groh could recall was that in Mary's case file there was a noted incident where a babysitter gave Mary spoiled milk and "Mary could have gotten sick from that."[143]  Ms. Groh did not recall seeing any evidence that Mary needed services but did not receive them.[144]

77. Ms. Groh answered "No" when asked if she noted, upon her review of Rachel and Eleanor's case files, whether there was treatment or

---

[141] Docket 420 at 31-32.

[142] Docket 417 at 48.

[143] Docket 420 at 93.

[144] Docket 420 at 39.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 32 of 60
Case 3:22-cv-00129-SLG     Document 461     Filed 03/31/26     Page 32 of 60

services that the girls needed but did not receive.[145] She also testified that she could not point to any specific evidence that OCS did anything that harmed Rachel or Eleanor's emotional well-being.[146]

78. As to Lana, Ms. Groh could not identify any particular placement that was inappropriate.[147]

79. For the foregoing reasons, the Court finds that Plaintiffs failed to establish by a preponderance of the evidence that any OCS policy or practice created a substantial risk of harm to any of the Named Plaintiffs.

## Conclusions of Law

1. The Court has jurisdiction over Plaintiffs' Fourteenth Amendment claim pursuant to 28 U.S.C. § 1331.

2. "Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child."[148]

---

[145] Docket 420 at 34.

[146] Docket 420 at 34.

[147] Docket 420 at 50-51.

[148] *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992); *see B.K.*, 922 F.3d at 968 ("Due process requires the state to provide children in its care 'reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child.'" (quoting *Lipscomb*, 962 F.2d at 1379)).

3. "To prevail on a claim for failure to meet this duty, a plaintiff must prove that state officials acted with such deliberate indifference to the plaintiffs' liberty interest that their actions 'shock the conscience.'"[149]

4. "The [Supreme] Court has repeatedly 'spoken of the cognizable level of executive abuse of power as that which shocks the conscience.' '[O]nly the most egregious official conduct can be said to be arbitrary in a constitutional sense.'"[150]

5. "This standard requires proof of two facts: (1) an objectively substantial risk of harm, and (2) the official's subjective awareness of that risk."[151] "The second part may be proven by showing (1) that the official was aware of facts from which an inference of risk may be drawn and that the official made that inference, (2) that the official was aware of facts from which an inference of risk may be drawn and that any reasonable official would have been compelled to draw that inference, or (3) that the risk of harm is obvious."[152]

6. "[I]t is enough that the official acted or failed to act despite his

---

[149] *B.K.*, 922 F.3d at 968 (quoting *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010)).

[150] *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

[151] *B.K.*, 922 F.3d at 968.

[152] *Id.*

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 34 of 60
Case 3:22-cv-00129-SLG     Document 461     Filed 03/31/26     Page 34 of 60

knowledge of a substantial risk of serious harm."[153]

7. Plaintiffs' Substantive Due Process claim is based on "(a) the right to freedom from the foreseeable risk of maltreatment while under the protective supervision of the State; (b) the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child; . . . [and] (e) the right to treatment and care consistent with the purpose and assumptions of government custody."[154]

8. In *M.D. v. Abbott*, the plaintiffs brought a class action against the Texas child welfare system for violations of the plaintiffs' Substantive Due Process rights.[155]  The trial court heard testimony from six next friends and attorneys *ad litem* of the named plaintiffs, reviewed the named plaintiffs' case files, and heard from 12 expert witnesses.[156] The plaintiffs presented considerable evidence that the named plaintiffs were experiencing severe abuse while in state custody.[157]

9. For example, the district court recounted the evidence as to one

---

[153] *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

[154] Docket 16 at ¶ 269.

[155] 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[156] *Id.* at 700, 703-04; *see also M.D. v. Abbott*, 907 F.3d 237, 247 (5th Cir. 2018) (affirming in part, reversing in part, and remanding).

[157] *See M.D.*, 152 F. Supp. 3d at 718–28.

named plaintiff, M.D. While in state custody, M.D. changed placements 19 times, was arrested and taken to juvenile detention four times, was placed in psychiatric hospitals 11 times, had 16 different primary and secondary caseworkers, and attended nine schools over her seven years while in state custody.[158] During M.D.'s time in state custody—from August 2007 to November 2013 when she ran away, with her whereabouts unknown at the time of trial—M.D. spent almost all her time in residential treatment centers.[159] She spent only 14 days in foster family homes.[160]

10. Before M.D. entered foster care, she had been living with her aunt. M.D. exhibited behavioral problems while in her aunt's care and she was admitted to a psychiatric hospital. While there, she claimed that an older cousin, who did not live in the aunt's home, had been sexually abusing her for several years. The hospital reported the allegation to the state, which investigated and determined that there was reason to believe that M.D. had been sexually abused. However, no action was taken as a consequence. After further behavioral issues while in her

---

[158] *Id.* at 718-19.

[159] *Id.* at 725.

[160] *Id.*

aunt's case, M.D.'s aunt relinquished custody of her to the state.[161]

11.  M.D. was then placed in various hospitals and residential treatments centers.  She alleged physical and sexual abuse or harassment at most of the residential treatment centers, though some claims were unsubstantiated.[162]  At one residential treatment center, M.D. accused a staff member of raping her, and M.D.'s caseworker knew that "sexual abuse was not new at the facility."  An investigation into the allegation was hampered by a delayed medical exam and the investigator did not find that the allegation occurred but could not definitively rule out that the abuse occurred.[163]

12.  While at the residential treatment facility, M.D. was also "subjected to inappropriate living conditions," including sharing a trailer with nine other girls with a single shower and toilet.[164]

13.  The district court found that "[o]n multiple occasions M.D. alleged physical, sexual, and verbal abuse.  Many allegations received cursory reviews . . . . Other allegations were not investigated at all. M.D.'s living conditions often violated [state] regulations. Because of

---

[161] *Id.* at 719.

[162] *Id.* at 720-21.

[163] *Id.* at 721.

[164] *Id.* at 722.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 37 of 60
Case 3:22-cv-00129-SLG     Document 461     Filed 03/31/26     Page 37 of 60

Texas's inadequate placement array, M.D. returned to the Hector Garza [residential treatment center] in 2013. An untimely caseworker turnover coincided with her return to Hector Garza. In addition, [the state] failed to reunite M.D. with her family despite a court order to do so, which contributed to her running away. When M.D. was found, miscommunications between her *ad litem*, her new caseworker, her shelter home, and the Houston Police Department allowed her to run away for good."[165]

14. The district court ultimately found that the named plaintiffs had proven that the state's "policies and practices amount to structural deficiencies that cause an unreasonable risk of harm to all class and subclass members" such that the state violated the plaintiffs' Substantive Due Process rights.[166]

15. On appeal, the Fifth Circuit affirmed the district court's finding that the state's policies with respect to caseload management, monitoring, and oversight violated the plaintiffs' Substantive Due Process rights.[167]

16. The Circuit Court held that "there was a wealth of evidence at trial

---

[165] *Id.* at 727.

[166] *Id.* at 822.

[167] *M.D.*, 907 F.3d at 265, 268, 287-88.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 38 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 38 of 60

establishing that many children experience some degree of concrete harm after entering the State's care.  For example, almost all of the named plaintiffs entered the system at a 'Basic' level of care.  By [the state's] own standards, a 'Basic' child is the least 'damaged' an intake can be.  Most saw their level of care increase markedly over the course of their time in [the state's care] as a result of abuse and continued lack of permanency.  Their experiences map the accounts of the former foster children who were presented as fact witnesses at trial and are consistent with testimony from attorneys ad litem, former [state] caseworkers, and experts."[168]

17. Further, the Circuit noted that "[s]everal named plaintiffs and former foster children testified that they would often go months without seeing their primary caseworker."[169]

18. Further, the Circuit held that "the experiences of the named plaintiffs and testimony from former foster children, caseworkers, attorneys ad litem, and experts indicate that abuse is exceedingly common" such that, without "meaningful, face-to-face access to . . . caseworkers, abuse frequently goes unreported or uninvestigated."[170]

---

[168] *Id.* at 255-56.

[169] *Id.* at 259.

[170] *Id.* at 264.

19. Unlike in *M.D.*, where the named plaintiffs presented considerable evidence that they were experiencing severe abuse while in state custody and that the state was failing to adequately investigate the abuse, the Named Plaintiffs in this case have failed to establish by a preponderance of the evidence that any Named Plaintiff faced a substantial risk of harm while in OCS custody.

20. In contrast to *M.D.*, the evidence presented at trial in this case failed to establish by a preponderance of the evidence that any Named Plaintiff suffered a cognizable injury to their Substantive Due Process rights caused by any act or omission of Defendants.

21. "In a class action, standing is satisfied if at least one named plaintiff meets the requirements."[171]

22. It is the Named Plaintiffs' burden to support each standing element "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation."[172]

23. Because no Named Plaintiff has proven by a preponderance of the evidence that he or she faced a substantial risk of harm while in OCS custody due to OCS's policies or practices, no Named Plaintiff has

---

[171] *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

[172] *Lujan*, 504 U.S. at 561.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 40 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 40 of 60

proven an injury sufficient for standing purposes. Therefore, Defendants are entitled to judgment on Plaintiffs' Fourteenth Amendment Substantive Due Process claim.

## C.  ADOPTION ASSISTANCE AND CHILD WELFARE ACT CLAIMS

### Findings of Fact

The Court finds the following facts by a preponderance of the evidence:

1.  Plaintiffs allege a violation of the Adoption Assistance and Child Welfare Act ("CWA") on behalf of themselves and a General Class comprised of "all children for whom OCS has or will have legal responsibility and who are or will be in the legal and physical custody of OCS."[173]

2.  Plaintiffs allege that Defendants violated their rights pursuant to the CWA to:

    a)  a written case plan that includes a plan to provide safe, appropriate and stable placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

    d)  a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

---

[173] Docket 336 at 57-58.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 41 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 41 of 60

e)     a written case plan that ensures provision of services to parents, children, and foster parents to facilitate reunification, or where that is impossible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

f)     a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, close to their home community, 42 U.S.C. §§ 671(a)(16), 675(5)(A); and

g)     the right to have a petition to terminate parental rights filed if the child has been in foster care for 15 out of the last 22 months, unless doing so goes against the best interest of the child as documented in the case record, or subject to a statutory exemption, 42 U.S.C. § 675(5)(E).[174]

3.    <u>Case Plan and Case Review System</u>.  Federal law and OCS policy requires that initial case plans be completed within 60 days after OCS removes a child from a home.[175]  In 2023, 57.3% of case plans were

---

[174] Docket 16 at ¶¶ 279-80; *see* Docket 286 at 5-6, 21 (granting Defendants summary judgment on Plaintiffs' CWA claim as to two other purported rights).

[175] Docket 432 at 136; Defs.' Ex. A at 83, 90 (citing 45 C.F.R. § 1356.21(g)(2) ("The case plan for each child must: . . . [b]e developed within a reasonable period, to be established by the title IV-E agency, but in no event later than 60 days from the child's removal from the home pursuant to

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 42 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 42 of 60

not completed by OCS within 60 days.[176]   Rates of case plan completion within 60 days vary significantly between OCS regions.[177]

4.  Ms. Groh testified that OCS caseworkers are required to conduct monthly visits with children and that regular visits help caseworkers keep case plans current and identify other needs.[178]   However, Plaintiffs' case plan and case review system CWA claim is based on alleged violations of 42 U.S.C. §§ 671(a)(16), 675(1)(A), 675(1)(B), and 675(5)(A).  None of these statutes contain a monthly caseworker visit requirement and Plaintiffs did not allege a CWA claims based on monthly visits in their Complaint.

5.  <u>Termination of Parental Rights</u>. The CWA requires OCS to file a petition to terminate parental rights if a child has been in foster care for 15 out of the most recent 22 months unless one of three exceptions applies.[179]

6.  <u>Evidence as to Named Plaintiffs.</u>

7.  Plaintiffs presented no evidence at trial as to whether any Named

---

paragraph (k) of this section . . . .")).

[176] Docket 417 at 93; Pls.' Ex. 187.

[177] Docket 420 at 85-86.

[178] Docket 417 at 96-97.

[179] 42 U.S.C. § 675(5)(E); Docket 443 at 20.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 43 of 60

Plaintiff had an untimely or deficient case plan.

8. Ms. Groh did not determine whether OCS failed to create a case plan for Rachel T. or Eleanor T.; nor did she evaluate their case plans.[180]

9. Ms. Groh "[did not] recall seeing" evidence that OCS failed to create a case plan for Mary B. or Connor B.[181]

10. Ms. Groh answered "no" when asked if OCS failed to create a case plan for Lana H.[182]

11. Plaintiffs presented no evidence at trial as to whether a termination of parental rights petition had not been timely filed and without a statutory exception as to any Named Plaintiff.

12. On cross-examination, Defendants noted that Ms. Groh's amended report stated that, for the T. children, "Family case plans from December 29, 2021 and August 24, 2022 do not list any compelling reason why a TPR was not filed, as called for with permanency planning timelines."[183] However, placement with a relative is a statutorily recognized exception to the requirement that a petition be filed, and Ms. Groh agreed that Rachel T. and Eleanor T. were "placed

---

[180] Docket 420 at 34.

[181] Docket 420 at 39.

[182] Docket 420 at 50.

[183] Docket 431 at 94-95.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 44 of 60

with their adult half-sister" "throughout their time in OCS custody."[184]

<u>Conclusions of Law</u>

I. *Adoption Assistance and Child Welfare Act*

1. The Court has jurisdiction over Plaintiffs' Adoption Assistance and Child Welfare Act ("CWA") claims pursuant to 28 U.S.C. § 1331.

2. The CWA provides that states receiving federal funding to finance the cost of caring for eligible foster children must develop a written case plan for each foster child.[185]

3. Specifically, 42 U.S.C. § 671(a)(16) provides that a State plan must

> provide[] for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child.

4. A case plan must include a "description of the type of home or institution in which a child is to be placed" and a "plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the

---

[184] Docket 431 at 96-97.

[185] 42 U.S.C. § 675(1)(A), (B).

needs of the child while in foster care . . . ."[186]

5. A case plan must be written within 60 days from the child's removal from the child's home.[187]

6. The CWA also requires states to have a "case review system."[188]  A case review system is "a procedure for assuring that . . . each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child . . . ."[189]

7. The CWA also requires states to "file a petition to terminate the parental rights of the child's parents" if a child "has been in foster care under the responsibility of the State for 15 of the most recent 22 months."[190]

8. There are three exceptions to this termination petition requirement: "the child is being cared for by a relative"; the case plan demonstrates that a parental rights termination petition "would not be in the best

---

[186] 42 U.S.C. § 675(1)(A), (B).

[187] 45 C.F.R. § 1356.21(g)(2).

[188] 42 U.S.C. § 671(a)(16).

[189] 42 U.S.C. § 675(5)(A).

[190] 42 U.S.C. § 675(5)(E).

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 46 of 60
Case 3:22-cv-00129-SLG     Document 461     Filed 03/31/26     Page 46 of 60

interests of the child"; or the State has not provided the child's family with services that are necessary for the safe return of the child to the child's home.[191]

9. This Court previously found that, pursuant to *Henry A. v. Willden*, 678 F.3d 991 (9th Cir. 2012), these provisions of the CWA—§§ 671(a)(16), 675(1), 675(5)(A), and 675(5)(E)—create rights enforceable through 42 U.S.C. § 1983.[192]

10. As found above, Named Plaintiffs failed to present evidence that OCS failed to timely create a case plan for any Named Plaintiff or that the case plan of any Named Plaintiff was inadequate in any way.

11. As found above, Named Plaintiffs failed to present evidence that OCS failed to timely file a petition to terminate parental rights in any of their cases and that any failure to timely file a petition was without a statutory exception.

12. Rachel T. and Eleanor T. were placed with a relative during virtually their entire time in OCS custody.

13. Mary B. had been intermittently placed with relatives and had been in OCS custody for more than 15 months, but Plaintiffs failed to establish by a preponderance of the evidence that OCS failed to file a

---

[191] 42 U.S.C. § 675(5)(E)(i)-(iii).

[192] Docket 286 at 15-20.

termination petition or that a statutory exception did not apply.

14. Connor B. was placed in a non-relative foster family and had been in OCS custody for more than 15 months, but Plaintiffs failed to establish by a preponderance of the evidence that OCS failed to file a termination petition or that a statutory exception did not apply.

15. Lana H. had been in OCS custody for more than 15 months, but Plaintiffs failed to establish by a preponderance of the evidence that OCS failed to file a termination petition or that a statutory exception did not apply.

16. Because no Named Plaintiff has proven by a preponderance of the evidence that he or she lacked a case plan, had a legally inadequate case plan, or OCS did not review the case plan pursuant to OCS's case plan review system, no Named Plaintiff has proven an injury sufficient for standing purposes.

17. Further, because no Named Plaintiff has proven by a preponderance of the evidence that OCS failed to file a termination petition or that a statutory exception did not apply, no Named Plaintiff has proven an injury sufficient for standing purposes.

18. Therefore, Defendants are entitled to judgment on Plaintiffs' CWA claims.

## D. AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT CLAIM

<u>Findings of Fact</u>

The Court finds the following facts by a preponderance of the evidence:

1. Plaintiffs bring claims for alleged violations of the Americans with Disabilities Act and the Rehabilitation Act on behalf of themselves and the ADA Subclass.[193]

2. The ADA Subclass is comprised of "children who are or will be in foster care and experience physical, cognitive, and psychiatric disabilities."[194]

3. Plaintiffs allege that, "[b]y placing foster children with disabilities in institutions instead of foster homes in the community, Defendants have violated the ADA Subclass members' rights under *Olmstead* and the integration mandate of the ADA to placement in the least restrictive setting appropriate to their needs."[195]

4. <u>Rachel T.</u>  Rachel has been diagnosed with fetal alcohol syndrome disorder, attention deficit hyperactivity disorder, explosive mood dysregulation, and oppositional defiance disorder.[196]  While Plaintiffs

---

[193] Docket 16 at ¶¶ 298-315.

[194] Docket 336 at 58.

[195] Dochet 16 at ¶ 305 (citing *Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999)).

[196] Docket 427 at 85-86.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 49 of 60

failed to present evidence that Rachel's diagnoses render her a qualifying individual pursuant to the ADA, the Court finds it more likely than not that Rachel is a qualifying individual pursuant to the ADA.

5. The record shows only one instance where Rachel received treatment at what could be considered an institution. After Rachel began exhibiting severe behavioral escalations, Ms. Galles reported Rachel's behavior to Rachel's caseworker; the caseworker recommended taking Rachel to the emergency psychiatric department.[197] While Rachel and Ms. Galles were at the emergency psychiatric department, a nurse provided Ms. Galles with a list of providers; Ms. Galles contacted one and scheduled a neuropsychological evaluation, which Rachel received.[198] There is no evidence that Rachel was committed to inpatient treatment at the hospital after she visited the emergency psychiatric department. There is no evidence that Rachel was otherwise institutionalized while she was in OCS custody.

80. Ms. Galles also testified that before Rachel was on medication, Ms. Galles had hoped that the Discovery Unit at Providence would be able

---

[197] Docket 427 at 76-77, 82.

[198] Docket 427 at 77-78.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 50 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 50 of 60

to provide Rachel with support, but Rachel was "too acute."[199] There is no evidence as to what kind of services are provided by the Discovery Unit, whether inpatient or out-patient. Ms. Galles's testimony alone does not establish by a preponderance of the evidence that Rachel faced a risk of unnecessary institutionalization while in OCS custody.

81. Further, Ms. Galles testified that since Rachel has been taking medication and has been connected to services, Ms. Galles has not considered placing Rachel in an institution because Rachel has not "displayed any behaviors that we felt were necessary."[200]

6. Lana H. While Lana was in OCS custody, she had numerous mental health diagnoses.[201] While Plaintiffs failed to present evidence that Lana's diagnoses render her a qualifying individual pursuant to the ADA, the Court finds it more likely than not that Lana is a qualifying individual pursuant to the ADA.

7. *Testimony of Alicia Groh.* Ms. Groh opined that she did not see any evidence that Lana's care in an institution was ever unjustified.[202]

---

[199] Docket 427 at 103.

[200] Docket 427 at 103.

[201] *See* supra Section B, Findings of Fact, ¶¶ 38-59.

[202] Docket 420 at 51.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 51 of 60
Case 3:22-cv-00129-SLG    Document 461    Filed 03/31/26    Page 51 of 60

8. *Testimony of Anna Farina.* Plaintiffs proffered testimony by Dr. Anna Farina as an expert witness on the subjects of "foster care youth in OCS care . . . in Alaska, and . . . their experiences with mental health services received and overall . . . risk of institutionalization."[203] Dr. Farina is an experienced social worker with a Doctorate in Social Work.[204] She has decades of experience as a social worker and providing therapy to children who have experienced trauma.[205]

9. At trial, the Court found that Dr. Farina was qualified to offer an expert opinion on "Alaska's child welfare system and whether a failure to provide community-based services to foster children in Alaska is creating a serious risk of institutionalization for those children."[206]

10. To formulate her opinion, Dr. Farina interviewed several children who were presently or formerly in OCS custody to prepare her expert report. She testified to the experiences of two of the V. children, including Levi who testified on the first day of trial, and two other children, M.J. and P.[207] None of these children are Named Plaintiffs

---

[203] Docket 424 at 80.

[204] Docket 424 at 70.

[205] Docket 424 at 70-76.

[206] Docket 424 at 89, 95.

[207] Docket 424 at 105-19.

in this case.

11. Dr. Farina also reviewed the case summaries of Named Plaintiffs' case files that were prepared by Plaintiffs' attorneys and the actual case files of the Named Plaintiffs "kind of together."[208]  Dr. Farina did not separately review the case files.[209]

12. To develop her opinion, Dr. Farina pulled out "codes" from the interviews she conducted and the case summaries.[210]

13. At her deposition, when asked if she fact checked the case summaries against the case files, Dr. Farina testified that she "didn't have any reason to believe it would be different. . . . [The summaries] weren't making any, like, conclusions that I would need to check."[211]  At trial, regarding the accuracy of the case summaries, Dr. Farina testified that "[w]hat I was doing is looking at the summaries and the case files, so I saw the case summaries as -- almost like a coding process where they're labeling the big segments of data.  So I would go back and kind of look and see, especially if something was, you know -- if I had any questions about something, using the case files to check it. I saw

---

[208] Docket 423 at 7.

[209] Docket 423 at 8.

[210] Docket 423 at 19.

[211] Docket 423 at 9.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 53 of 60

it as part of the process."[212]

14. As found above, the case summaries are not an accurate portrayal of the experiences of Named Plaintiffs in OCS custody.[213]

15. On redirect, Dr. Farina was asked about a statement she made at her deposition when she testified about Lana H.'s experience "going back to North Star" a "number of times." Dr. Farina "didn't see record of, again, consistent services in between the hospital and hospitalization." Dr. Farina was asked whether it was her opinion that, if Lana had received the services, she would not have been readmitted to North Star. Dr. Farina responded that she could not "speculate" and "[a]ll [she knew was] that research shows that it puts somebody at greater risk of rehospitalization."[214]

16. The Court finds Dr. Farina's opinions on Lana H.'s risk of institutionalization to be unpersuasive. Dr. Farina relied heavily on the case summaries. Her review of Lana H.'s actual case file was quite limited and not independent from the portions of the case file selected by Plaintiffs' attorneys in the case summaries. The Court therefore gives her opinion little weight.

---

[212] Docket 423 at 8.

[213] *See supra* Section B, Findings of Fact, ¶ 70.

[214] Docket 423 at 99-100.

17. *Testimony of Jonathan Rubin.* Defendants proffered testimony by Jonathan Rubin as an expert in child welfare and child welfare systems.[215] Defendants asked Mr. Rubin to prepare an opinion on the appropriateness of Alaska's child welfare system, including its policies, procedures, and training practices.[216]

18. Mr. Rubin has a Master's in Social Work and worked for a county in Pennsylvania for 15 years, starting as a caseworker and moving up to a managerial role.[217] He also was the county's Director of Housing and Human Services for five years, and was appointed by the Governor of Pennsylvania as the Deputy Secretary for Children, Youth, and Families.[218] As a consultant, Mr. Rubin has worked with Florida to develop the state's Child and Family Services Plan; assisted Oregon in integrating its child welfare and Medicaid systems; and worked with a child welfare nonprofit in New Hampshire.[219]

19. Mr. Rubin reviewed OCS's policy manual and procedures, Alaska's Child and Family Services Plan, foster parent handbooks, and other

---

[215] Docket 436 at 15.

[216] Docket 436 at 11.

[217] Docket 436 at 5-6.

[218] Docket 436 at 6-7.

[219] Docket 436 at 8-9.

written materials.[220]  He also conducted seven or eight telephonic interviews with OCS staff.  He then spent ten days in Alaska meeting with OCS staff and leadership, including supervisors and caseworkers, toured OCS offices, and traveled with a caseworker to the village of Kasigluk for a caseworker visit.[221]  He also met with the Tanana Chiefs Conference and attended the Alaska Leadership Conference.[222]

20. At trial, the Court found that Mr. Rubin was qualified as an expert in child welfare and child welfare systems.[223]

21. On cross-examination, Plaintiffs asked Mr. Rubin about portions of Lana H.'s case file showing that in May 2018 after Lana came into OCS custody, she began displaying some behavioral issues in her foster family and that Lana had stated that she was behaving badly because she believed that her behavior would get her reunited with her mother.[224]  Lana's case files showed that she was in therapy and had been assessed for mental health treatment.

---

[220] Docket 436 at 12.

[221] Docket 436 at 12-13.

[222] Docket 436 at 14.

[223] Docket 436 at 15-16.

[224] Docket 436 at 60-75; *see supra* Section B, Findings of Fact, ¶¶ 38-44.

22. Plaintiffs asked Mr. Rubin if there was any indication that Lana had been referred to a psychologist or a neuropsychologist in May 2018 while her behavior was escalating and before Lana went to North Star.[225] Mr. Rubin responded that if a child indicates that she is exhibiting behaviors "intentionally to try to go back to mom, it may not indicate to you that you need a neurological evaluation," but he did not see "anything inappropriate in terms of the case work practice."[226]

23. Plaintiffs also asked Mr. Rubin if, in his opinion, Lana would have benefitted from psychological or neuropsychological treatment or psychotropic medications in May 2018. Mr. Rubin responded that Lana had been receiving psychiatric and outpatient therapy at the Peninsula Community Health Services Program for three years at that time and so he would defer to the staff at that program who were treating Lana as to whether such treatment or medication was appropriate.[227] He further testified that "OCS [had] responded appropriately."[228]

24. The Court finds that Mr. Rubin's testimony was persuasive that Lana

---

[225] Docket 436 at 69.

[226] Docket 436 at 69-70.

[227] Docket 436 at 71-72.

[228] Docket 436 at 73.

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 57 of 60
Case 3:22-cv-00129-SLG   Document 461   Filed 03/31/26   Page 57 of 60

H. was receiving adequate services in May 2018 and was not at increased risk of institutionalization at that time as a result of OCS policies or practices.

25. As recounted above, Lana was placed at North Star and at least two out-of-state residential treatment facilities. However, the Court finds that Plaintiffs failed to establish by a preponderance of the evidence that Lana's institutionalizations were unnecessary, that the length of any of her institutionalizations were unnecessarily prolonged, or that OCS policies or practices placed Lana at a risk of unnecessary institutionalization.[229]

<u>Conclusions of Law</u>

1. The Court has jurisdiction over Plaintiffs' Americans with Disabilities Act ("ADA") and Rehabilitation Act claim pursuant to 28 U.S.C. § 1331.

2. Plaintiffs' ADA and Rehabilitation Act claims are based on Title II of the ADA.[230]

3. "To prove that a public service or program violates Title II of the ADA, a plaintiff must show '(1) he is a qualified individual with a disability;

---

[229] *See* supra Section B, Findings of Fact, ¶¶ 38-59.

[230] Docket 55 at 66-68. This Court dismissed Plaintiffs' claims insofar as they alleged violations based on failure to offer reasonable modifications of OCS Safety Plans, healthcare services, and services to foster care providers. Docket 55 at 63-66.

(2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against by the public entity; (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.'"[231]

4. Pursuant to 28 C.F.R. § 35.130(d)—called the integration mandate— "the failure to provide . . . services in a community-based setting [is] a form of discrimination on the basis of disability."[232]

5. "'[T]he integration mandate prohibits public entities from pursuing policies that place individuals at risk of unnecessary institutionalization.'"[233]

6. The term "institutionalization" means segregating or isolating individuals with disabilities in settings that require those individuals to "relinquish participation in community life they could enjoy given reasonable accommodations."[234]

7. The Court finds that that Plaintiffs have failed to establish by a preponderance of the evidence that Rachel T. or Lana H. faced a risk of unnecessary institutionalization.

---

[231] *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001)).

[232] *Townsend*, 328 F.3d at 516-17.

[233] *M.R. v. Dreyfus*, 697 F.3d 706, 734 (9th Cir. 2012) (citation omitted).

[234] *Olmstead v. L. C. by Zimring*, 527 U.S. 581, 583 (1999).

8. Because Plaintiffs have failed to show that OCS practices or policies placed any Named Plaintiff at risk of unnecessary institutionalization, Defendants are entitled to judgment on Plaintiffs' ADA and RA claim.

## E.   ORDER

In light of the foregoing Findings of Fact and Conclusions of Law, the Court finds that Named Plaintiffs have failed to establish standing as to any of their claims.  Therefore, Defendants are entitled to judgment on all of Plaintiffs' claims.

Because Plaintiffs have failed to prove their case as to any Named Plaintiff, the Court will stay the entry of final judgment for **seven days** to provide either party with an opportunity to move for decertification of the General Class and ADA Subclass.[235]

IT IS SO ORDERED this 31st day of March 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[235] *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *NEI Contr. & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019) ("[A] class must be decertified when the class representatives are found to lack standing as to their individual claims."); *Officers for Just. v. Civil Serv. Comm'n*, 688 F.2d 615, 633 (9th Cir. 1982) ("[B]efore entry of a final judgment on the merits, a district court's order respecting class status is not final or irrevocable, but rather, it is inherently tentative."); *see also id.* (noting that the Ninth Circuit has "affirmed a district court's decision to decertify a class following the plaintiffs' failure to produce any evidence of classwide discrimination" "'since plaintiffs' failure to produce evidence may have been due to inadequate representation of the class interests rather than to absence of classwide discrimination, decertification avoided any res judicata effect against the class'" (quoting *O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864, 869 (9th Cir. 1982)));

Case No. 3:22-cv-00129-SLG, *Mary B., et al., v. Dompeling, et al.*
Decision and Order
Page 60 of 60